## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>CARLOS GOMEZ and )<br>MARY GILDEA, )<br><br>Defendants. ) | Criminal No. 05-10022 |

## DEFENDANTS' SENTENCING MEMORANDUM

Defendants Carlos Gomez ("Gomez") and Mary Gildea ("Gildea"), husband and wife, (collectively, the "Gomezes" ) submit this Sentencing Memorandum along with a video concerning the Defendants' business and charitable activities, favorable letters from two of the victims, reports from experts regarding the impact of the "loss" to the victims, and 63 letters of support in connection with their sentencing hearing scheduled for September 27, 2005.[1]

---

[1] The following documents are submitted herewith:
· Exhibit A: transcript of a video containing interviews regarding the Gomezes' business and charitable activities (copies of the video, in DVD format, were hand-delivered to the Court, Probation, and Paul G. Levenson, A.U.S.A.), and Lanco Scaffolding, Inc. brochure;
· Exhibit B: 25 letters concerning the Gomezes' charitable contributions to the Andover School of Montessori;
· Exhibit C: personal and character letters;
· Exhibit D: letters concerning Lanco business;
· Exhibit E: letters from clients of Lanco;
· Exhibit F: letter from Daniel P. McGrath, C.P.A. of May 11, 2005;
· Exhibit G: letter from Norman Goodman, principal of Premium Review Associates of July 7, 2005;
· Exhibit H: letter from Paul McNally, Business Manager, Laborers' Union of July 7, 2005;
· Exhibit I: letter from Mr. McGrath of July 7, 2005;
· Exhibit J: letter from Mr. McNally of June 9, 2005;
· Exhibit K: letters from two Lanco employees;
· Exhibit L: letter from Harry R. Dow, Executive Director, Carpenters' Union of July 6, 2005;
· Exhibit M: letters concerning the Gomezes' other charitable contributions;
· Exhibit N: evidence of restitution to Liberty Mutual;
· Exhibit O: letter from Harry R. Dow of April 19, 2005, with Settlement Agreement;
· Exhibit P: letter from Diana Dadoly, Office Manager, Carpenters' Union of June 10, 2005;
· Exhibit Q: evidence of tax payments;
· Exhibit R: Declaration of James M. DiGiulio, Esq. of March 9, 2005, with attachments A-H;
· Exhibit S: letter from James M. DiGiulio, Esq. of May 4, 2005; and
· Exhibit T: letter from Barry P. Wilson, Esq. of May 2, 2005.

The Gomezes also filed a Downward Departure Motion based on the arguments contained herein.

This case is quite unique and extraordinary. The offenses in question were committed while the Gomezes were in the process of building a small business that has become the cornerstone of dozens of lives and that will not survive without their sustained personal attention. The tremendous support the Gomezes have received from their employees, clients, competitors, neighbors, and various charitable institutions, is indicative of their significant past contributions to the community and their value to society going forward. Moreover, there is extensive evidence that the "loss" calculated according to the advisory Sentencing Guidelines substantially overstates the actual impact of the Gomezes' conduct. The Gomezes are genuinely remorseful, committed to repaying all their obligations, continuing their lifelong commitment to charitable works, and providing employment to numerous hardworking individuals. While the Government may mechanically follow the now advisory Guidelines in its recommendation, this Court should consider the full range of sentencing factors set forth in 18 U.S.C. § 3553 and conclude that the proposed sentence is appropriate under either the statute or as a departure from the Guidelines. Under any sentencing system that takes into account the goals of deterrence, punishment, rehabilitation and restitution, in view of the overall good of society, it would be appropriate to sentence this married couple with three school aged children to the strict probation terms described below. More important still, it is the right thing to do.

## INTRODUCTION

Mr. Gomez founded Lanco Scaffolding, Inc. ("Lanco") in 1984, and has spent the last twenty-one years of his life building and managing the business. Today, it is an industry leader and called upon by major contractors like Payton Construction Co. and Shawmut Design and

Construction to perform difficult, challenging, large-scale and specialized scaffolding jobs throughout Massachusetts. Ms. Gildea joined the company in 1992, and helped grow it from only a few employees to twenty-three, in addition to the Gomezes. Despite the scope of the business, it is still a "mom and pop" operation. Together, the Gomezes handle all the managerial and operational job duties (including sales, contracting, training, management, and operations). They are the only ones with the training, knowledge, skill, experience and customer relationships necessary to operate it on a daily basis and they devote considerable amount of their time and effort to this rapidly growing company. Simply put, they are indispensable to Lanco.

The violations essentially stem from the payment of certain workers under-the-table and the resulting improper accounting and payroll practices. The charges involve the underpayment of workers compensation insurance premiums to two companies, underpayments to two union pension funds, and the underpayment of certain federal withholding taxes. This practice began on a very small scale and increased over the years as the company grew. The Gomezes' primary motivation for maintaining payroll off-the-books was to provide employment for Mr. Gomez's fellow immigrants, many of whom, unfortunately, lacked green cards. Over the past twenty years, Lanco has provided a steady source of work for dozens of hardworking immigrants.

Though the Gomezes' conduct resulted in a "loss" to the victims, their respective out-of-pocket losses are far less than the loss as strictly calculated under the Guidelines. The company's safety record is truly extraordinary. Indeed, neither of the two insurance companies to which the Gomezes underpaid premiums suffered *any* out-of-pocket losses from their conduct. To the contrary, both made profits. Similarly, the Unions' out-of-pocket loss is roughly one-fifth the "loss" under the Guidelines. As discussed below, the Guidelines loss calculation substantially overstates the seriousness of the Gomezes' offense.

The Gomezes acknowledge that their conduct was wrongful and they have already taken numerous, substantial steps to rectify their mistakes. To date, they have made over **$2,262,175** in restitution payments and are actively cooperating with the Laborers' Union to conclude a restitution agreement. Though this has certainly strained their operation financially, Lanco has adequate capital, and sufficient contract backlog and assets, to make full restitution, and the Gomezes are committed to doing just that. In addition, all of Lanco's workers are now registered union members, and their wages are reported properly to all appropriate entities.

The Gomezes recognize that they must be punished. However, the success of Lanco is completely dependent upon the Gomezes' day-to-day participation, and any significant period of incarceration will cause the business to close, compromise their ability to satisfy their remaining restitution and tax obligations, wreak economic devastation on the livelihoods of Lanco's 23 long-term employees and their many dependents, and inflict irreparable damage to the lives of the Gomezes' three young children, a 10 year old daughter and 8 year old twins, a boy and a girl.

Whether considered in light of the now-advisory United States Sentencing Guidelines, see United States v. Booker, 543 U.S. ---, 125 S.Ct. 738 (2005), after applying the downward departures to which the Gomezes are entitled or, more appropriately, pursuant to the sentencing factors enumerated under 18 U.S.C. § 3553(a), which requires courts to consider, *inter alia*, the "nature and circumstances of the offense" and the "history and characteristics of the defendant," the Gomezes' respectfully submit that the following sentence is fair and just for each of them: a period of five years' probation, with the following special conditions: a) a period of eight months' home detention; b) full compliance with a restitution schedule with the Laborer's Union as approved by the Court; c) full cooperation with the Internal Revenue Service in calculating any additional taxes owed by Lanco and/or the Gomezes; d) participation in a community service

4

plan involving Habitat for Humanity as approved by the Court; and e) payment of a $10,000 fine each.[2]

Alternatively, to the extent that the Court deems it necessary to impose some period of incarceration, the Gomezes jointly request that Carlos Gomez be directed to serve eight months in a half-way house and that Ms. Gildea be permitted to serve eight months in home detention, and that all of the other sentencing terms discussed above also be imposed. This will achieve the effect of punishing Mr. Gomez, the person who initiated the problem, with a period of incarceration, while allowing Lanco to remain a viable business operation and source of employment for 23 co-workers. It will also avoid traumatizing the Gomezes' three innocent young children with the loss of both parents to lengthy periods of incarceration.

The proposed sentences will still impose significant restrictions on the Gomezes' freedom. The Gomezes submit that society's interests are best served by fashioning a sentence that allows them to insure that Lanco continues as a viable economic enterprise so that they can satisfy their remaining restitution obligations, provide a legitimate source of livelihood for their workers and their many dependents, and provide economic and emotional support to their three children. In addition, given the low likelihood of recidivism, society will be better served if the Gomezes can put their substantial skills and personal qualities to use in community service rather than being warehoused, unproductively, in a penal institution for any lengthy period of time.

---

[2] Habitat for Humanity is a non-profit organization dedicated to constructing homes and shops in low-income neighborhoods. The Gomezes have provided scaffolding installation services and materials for the Habitat Blue Hill Place construction project in 2004. See infra p. 36; Ex. M, Letter from David Lopes to Judge O'Toole of April 12, 2005, and Thomas Grillo, *Blight Flight: Habitat brings housing and commerce to long-vacant lot*, October 18, 2003. Their community service would consist of providing a specified range of scaffolding services and materials to support similar Habitat projects.

## LEGAL BACKGROUND

On March 29, 2005, the Gomezes pled guilty to an Information alleging one (1) count of Conspiracy (18 U.S.C. § 371), eleven (11) counts of Mail Fraud (18 U.S.C. § 1341), and five (5) counts of ERISA False Statement (18 U.S.C. § 1027). Ms. Gildea additionally pled guilty to six (6) counts of Subscribing False Tax Returns (26 U.S.C. § 7206(1)).

The Plea Agreements signed by Mr. Gomez and Ms. Gildea on December 13 and 8, 2004, respectively, before the Supreme Court's decision in Booker, each provide that the Gomezes can argue that the Sentencing Guidelines are unconstitutional. Alternatively, the Plea Agreements permit the Gomezes to argue that the Sentencing Guidelines may serve as a guide to the Court but cannot constitutionally bind the Court's sentencing determination. Accordingly, although the Gomezes and the Government agreed to certain preliminary Sentencing Guideline calculations, they did so with the express caveat that these calculations were agreed to only: "[T]o the extent that sentencing in this case is, or may be, controlled or guided by the United States Sentencing Guidelines...." Plea Agreements ¶ 3(a)-(c).

Subject to this reservation, the Plea Agreements provide that the parties agree that the base offense level for Counts 1(b)-(c) and 2 through 17, is 7 pursuant to U.S.S.G. § 2B1.1(a), and that there is an 18 level increase in the base offense level, pursuant to U.S.S.G. § 2B1.1(b)(1)(J), based on a "loss" range of between $2,500,000 and $7,000,000. The base offense level for Count 1(a) and, as to Ms. Gildea, Counts 18 through 23, is 20, pursuant to U.S.S.G. §§ 2T1.1(a)(1) and 2T4.1, based on a tax loss of more than $400,000 and less than $1,000,000. Pursuant to the grouping rules of U.S.S.G. § 3D1.4, this results in a combined adjusted offense level of 26 and a total offense level of 23, after the agreed-upon 3 offense level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1. This results in a guideline range of

46-57 months imprisonment, assuming a criminal history category of I and prior to applicable

downward departures.[3]  Significantly, the Plea Agreement explicitly permits the Gomezes to

move for downward departures from the Sentencing Guidelines for each of the reasons set forth

herein.  See Plea Agreements ¶ 3(h).

## FACTUAL BACKGROUND

### I.    Defendant Carlos Gomez

Carlos Gomez was born in 1952 in Monterico, Guatemala.  He was one of seven children

and his family subsisted under difficult conditions.  His father, an alcoholic, worked as a taxi

driver and his mother cooked food for tourists in a hut on a local beach.  Mr. Gomez and his

siblings were split up at a young age and sent to live in surrounding villages with family friends

so they could attend school.  Mr. Gomez completed the equivalent of a 5th grade United States

education  at which time he left school to work and help support his family.  Gomez Presentence

Report ("PSR") ¶¶ 101-03.

Mr. Gomez legally entered the United States in 1971 and moved to Chicago, Illinois.  He

worked for a scaffolding company, earning $12 a day.  In 1979, he moved to Massachusetts and

continued to work in the scaffolding industry.  In 1984, Mr. Gomez formed Lanco, located in

Somerville, Massachusetts.  Gomez PSR ¶¶ 104-06, 130.  He has never collected unemployment

benefits, social security income or disability benefits or any form of public assistance.  Id.  From

the start, most of Lanco's workers were fellow immigrants from Guatemala or El Salvador.  Mr.

Gomez was contacted by many such immigrants eager, and often desperate, to support their

families in the United States and back in their native countries and willing to perform hard and

dangerous work.  Many of them did not have green cards.  Mr. Gomez found it difficult to turn

---

[3]  As discussed below, Ms. Gildea objects to Probation's calculation of her criminal history category as II, resulting
in  a Guideline imprisonment range of 51-63 months. Alternatively, Ms. Gildea moves for a downward departure

these people away and often hired them to perform various odd jobs at first and then trained them to perform scaffolding work.

Lanco was originally a non-union company, but as it grew in size and visibility, Mr. Gomez was essentially forced to unionize. He entered into his first Collective Bargaining Agreement ("CBA") with the Laborer's Union in 1986. The CBA contained an "evergreen provision" that resulted in the agreement automatically renewing on a yearly basis. Mr. Gomez, with his limited schooling and ability to read English, did not have legal counsel to advise him in his negotiations with the Laborers' Union or to interpret the far reaching potential civil and criminal implications of the agreement, especially those at issue here. He also effectively had no choice but to enter into this agreement (or be forced out of business) as there was mounting pressure to unionize. Unfortunately, many of Lanco's workers could not actually qualify for union membership because they did not have green cards. It was for this reason that Mr. Gomez began the practice of not reporting wages, or paying taxes, for those workers. Mr. Gomez was faced with a dilemma: either comply with his legal obligations and fire his friends and fellow immigrants, effectively ending their ability to support themselves and their dependents, or pay them off the books so they could continue to support their families. He chose to help his workers and their families.

Lanco specializes in complex, large-scale scaffolding projects. Some recent projects of note include scaffolding for construction at the Moakley Federal Courthouse (the names of several Lanco employees appear on the dedication to the Courthouse in the lobby), Fenway Park, the State House, The Fleet Center, numerous downtown Boston high-rise office buildings and various church steeples, including steeples at Boston College. Gildea PSR ¶ 124. See also Ex. A, Lanco brochure. Lanco currently employs 23 workers full-time, in addition to the

---

from criminal history category II to criminal history category I, pursuant to U.S.S.G. § 4A1.3(b)(1).

Gomezes. Most of these individuals are long-time employees with no job experience other than Lanco. The following is a list of current employees (many of whom are brothers), their length of employment at Lanco and their direct dependents:

|  | Employee | Years at Lanco | Dependents |
|---|---|---|---|
| 1. | Candido Castenada | 7 | wife and two children |
| 2. | Hector Castenada | 11 | n/a |
| 3. | Luis Umansor | 19 | wife and ten children |
| 4. | Kendal Moran | 18 | wife and two children |
| 5. | Roberto Gomez | 20 | wife and five children |
| 6. | Fernando Gomez | 20 | wife and two children |
| 7. | Jose Romero | 17 | wife and two children |
| 8. | Pedro Romero | 13 | wife and two children |
| 9. | Wilfredo Romero | 9 | wife and supports many family members |
| 10. | Nery Ortiz | 15 | wife and four children |
| 11. | Eleazar Ortiz | 16 | wife and two children |
| 12. | Oscar Ortiz | 6 | wife and three children |
| 13. | Cesar Ortiz | 3 | wife and three children |
| 14. | Carlos Perlera | 5 | n/a |
| 15. | Luis Perlera | 11 | wife and three children |
| 16. | Manuel Perlera | 8 | n/a |
| 17. | Ubencindo Perlera | 4 | mother, wife and three children |
| 18. | Jose Perlera | 4 | n/a |
| 19. | Wilson Perlera | 2 | single |
| 20. | Mario Gutierrez | 5 | wife and two children |
| 21. | Jose Pleitez | 3 | brother in El Salvador |
| 22. | Francisco Pleitez | 10 | wife and five children |
| 23. | Marcos Lima | 10 | wife and two children |

As evidenced by their statements contained on the video, see Ex. A, many of these employees also support extended family members back in Guatemala and El Salvador. See infra p. 29-30. Lanco's demise would have a devastating impact on these employees and their extended families. See id..

This is not the case of an individual who underreported obligations for purely selfish, personal financial gain. Rather, through his actions, Mr. Gomez created and grew a company that provides living wages for numerous workers and their families. As amply demonstrated in

the video, Lanco has been a lifeline for many of these men and their families. This is one of those rare cases where the offenses were committed in the service of a greater good, to provide decent wages to men willing to put in hard and dangerous work to support their families. To be clear, Mr. Gomez does not suggest that this excuses his conduct. However, it does place that conduct in its true context. In contrast to most crimes that do nothing but harm society, Mr. Gomez committed these offenses in the course of creating jobs and opportunities for numerous fellow immigrants and their dependents. Unlike most violators, Mr. Gomez was trying to do good and he did so, albeit in the wrong way. He should be judged and sentenced accordingly.

## II.    **Defendant Mary Gildea**

Mary Gildea was born in Wilmington, Delaware in 1957. She was also one of seven children. Ms. Gildea graduated from high school in Delaware in 1975 and took courses in nursing and chemistry at the University of Delaware between 1975 and 1979, when she left without completing her college degree. Aside from a brief period of military service, Ms. Gildea has worked full-time since leaving college. She has never collected unemployment benefits, social security income or disability benefits or any form of public assistance. Gildea PSR ¶¶ 96, 120, 124, 127.

Ms. Gildea moved to Massachusetts in 1986. She was working for LVI Environmental Services, Inc., an asbestos removal company, as the operations/office manager in 1989, when she met Mr. Gomez at a job site. They dated for several years and married in October 1992. Gildea PSR ¶¶ 96, 107. Ms. Gildea began working at Lanco when Mr. Gomez was wrongly incarcerated.    See infra pp. 46-47. The company had fallen into chaos during Mr. Gomez's absence and the workers were immobilized with confusion. Ms. Gildea learned that the books were in disarray and that certain of the workers were being paid "off the books." Ms. Gildea was

10

faced with the same dilemma. She could either advise her husband that he must terminate all
employees without a green card, effectively reducing them and their dependents to poverty, or
she could continue the practice in place, allowing the workers to continue to support themselves
and their families. She too chose to stand by the workers.

This decision weighed heavily on Ms. Gildea over time, as she assumed full-time
responsibility for all of Lanco's record-keeping. This unfortunate situation was not one she
created; rather, she had inherited it as part of her marriage. In essence, by marrying Mr. Gomez
and assuming responsibility for managing his business affairs, Ms. Gildea became married to the
entire Lanco family of workers and their dependents. Although she does not suggest that this
excuses her conduct, in order to keep the workers employed, Ms. Gildea was required to
continue various accounting practices to avoid detection by various auditors.

This situation troubled Ms. Gildea, who understood she was violating the law, but saw it
as the lesser of two evils, not of her making. She felt trapped and could not see a way out for
the Company and its employees. If she suddenly reported all the workers actually on the payroll,
it would expose those employees who were without green cards and who were not eligible for
union membership. It would also subject the company to legal jeopardy. Moreover, if she
merely placed on the official payroll and union rolls all employees who were here legally, those
workers would make less money than before, due to added withholdings for income taxes and
union contributions. This would result in the further anomaly that the most experienced workers
with the greatest seniority, who were more likely to have green cards, would receive lower pay
than the less-experienced, non-green card employees paid off the books.

Although Ms. Gildea agonized over this situation, she could not find a solution. She has
described the instant case as a blessing in disguise, because it lifted a heavy burden from her

11

shoulders. Indeed, when the federal agents arrived to execute the search warrant, Ms. Gildea

actually thanked them for bringing her dilemma to an end.

## III.    The Gomez Family

Ms. Gildea and Mr. Gomez are an extremely close, devoted couple. They have lived and

worked together virtually 24 hours a day for the past 13 years. Ms. Gildea also recognized Mr.

Gomez's alcohol problem early in their relationship and through her support, he has been sober

for the past fourteen years. See Gomez PSR ¶ 123. They have three small children, Greta, who

is ten, and twins, Samuel and Olivia, who are eight. Id. ¶¶ 109-11. As demonstrated by the

video and numerous reference letters submitted on the Gomezes behalf, they are extraordinarily

devoted to their children's education and are heavily involved in the Andover School of

Montessori that their children attend. See Exs. A, B. Both Mr. Gomez and Ms. Gildea have

made substantial contributions, not just of money, but of time and sweat equity, in the

development of the school in numerous ways that benefit not just their children but the school as

a whole. The many heartfelt testimonial letters and the statements of Joan Ellis, Art Teacher at

the Andover School of Montessori, contained on the video, illustrate the unique personal

contributions Mr. Gomez and Ms. Gildea have each made to the success of the school and the

profound impression their devotion has made on the administration and teachers at the school.

Ms. Ellis' statements perhaps best demonstrate this point:

> I'd like to share with you some of the things that Carlos and Mary have provided to
> our school, both material goods as well as inspirational pieces to add to the
> programs....What's important to know is that Carlos comes and works at the school.
> He installs the swing sets, he rakes the bark mulch, he helps put the benches and all of
> the things that are necessary to keep the programs running, outside and inside....*[The
> Gomezes] are the heart and soul of this school* and they continue to advocate for not
> just their own children but all of the children and staff as well....Many people in this
> school community...don't know all the stuff [the Gomezes] have done to contribute.
> They don't want to be highlighted....Their focus is on people and the things in their
> life.

12

<u>Ex.</u> A, Transcript pp. 12-14 (emphasis added). These efforts on behalf of the entire Montessori school family speak volumes about the kind of caring people the Gomezes truly are. <u>See also</u> <u>Exs.</u> B, C; <u>infra</u> pp. 34-37.

**IV.    Lanco Scaffolding, Inc.**

Lanco provides a livelihood for several members of the Gomez's extended family: his brothers Roberto, 50, and Fernando, 46, work at Lanco, as does his sister's husband, Kendal Moran and his nephew Carlos Lima. <u>See</u> Gomez PSR ¶¶ 95, 97. It also enables the Gomezes to financially support Mr. Gomez's mother, for whom they purchased a home in Guatemala, and to help support Roberto Gomez's 14 year old son who was diagnosed with *ataxia telangiectasia*, a lethal genetic disease that attacks children, causing progressive loss of muscle control, cancer, and immune system problems. Gomez PSR ¶¶ 94, 114. Roberto Gomez advised Probation that Mr. Gomez has been very generous to his family, providing the family with a special van and his son with a special bed and wheelchair. Gomez PSR ¶ 114.

The lengthy tenure of many of Lanco's employees, who basically consist of members of six different families, also speaks volumes about the type of company the Gomezes have created, the loyalty they have engendered in their employees and how crucial the continued success of Lanco is to the economic well-being of these employees. Lanco has been unusually loyal to these employees, providing them with work and wages (even if it entails doing odd jobs around the warehouse) throughout the year, contrary to the common industry practice of maintaining only a skeleton crew and calling on the union hall when additional day laborers are needed. Lanco's financial support of their workers during periods of scarce work saves them from reliance upon unemployment or welfare. In the past year, Lanco paid approximately $1.5 million in wages to these workers. As numerous employees have noted in their statements on the

video, the Gomezes have been extraordinarily generous to their employees, whom they treat
more like family members.  See Ex. A.  All of these individuals owe their success in the United
States to Carlos Gomez who, created Lanco out of nothing and Mary Gildea, who has helped
build Lanco to the successful business it is today.

Lanco completes approximately 150 projects each year.  Gildea PSR ¶ 124.  To obtain
these contracts, they must bid on more than 1,000 projects a year.  See id.  Most, if not all, of
those contracts are awarded based on Mr. Gomez's skills in evaluating, designing and pricing a
project and selling it to the customer.  Mr. Gomez has established an outstanding reputation in
the close-knit scaffolding and construction community in Massachusetts, based on his expertise
in designing and erecting scaffolding, his safety record and work ethic and responsiveness to
client's needs twenty-four hours a day.  He is the force and backbone of Lanco, and when
contractors hire Lanco they are, in reality, hiring Mr. Gomez.  The following comments from
Lanco's clients and business partners best reflect these points:

- Over the last 15 years, Carlos has always exhibited a professional work ethic and
  pride in the services he has provided to numerous customers...Mr. Gomez has on
  many occasions gone above and beyond the role as a business owner to help his
  employees whenever possible regarding diverse problems they may face.  Ex. D,
  Letter from Joseph R. Nogueira to Judge O'Toole of April 14, 2005.

- It is evident that the training [the Lanco employees] have received from Carlos
  Gomez is of the highest quality as it relates to their consistent safety, ethics and
  professionalism.  Due to the nature of their work...Lanco is always the first and last
  representation of manpower that our company presents to our business clients.  They
  always represent us in a highly professional manner.  The bottom line is...Lanco
  Scaffolding has always presented to us a group of hard working, exceptionally well
  trained, courteous, and just plain good people.  Ex. E, Letter from William F. Whall
  to Judge O'Toole of April 15, 2005.

- I have known Carlos Gomez and Lanco Scaffolding, Inc. for over 20 years...During
  this long period of time I have been favorably impressed with Carlos and his
  company....I can only conclude that the consistency [of the employees] was directed
  from the top and covered all aspects of his company.  Ex. E, Letter from Evan L.
  Hankin to Judge O'Toole of April 26, 2005.

Mr. Gomez's job duties at Lanco are best summarized as follows:

> He arrives every day at the warehouse at approximately 5:00 am and readies everything for the crews - the daily schedule is set the night before by Ms. Gildea with his input (as explained below). The crew arrives at 6:30 and he reviews the specs for each job with every crew member. The teams are then driven to the various jobs sites by the company. With the exception of the crew leaders…most employees do not drive.
>
> Mr. Gomez is primarily responsible for designing and laying out each job. To do this, he draws from over 30 years of experience in the industry. Among other things, he designs the scaffolding structure and determines equipment usage and "tie off" procedures, which vary from job-to-job. He also is the exclusive trainer for scaffolding erection and safety.
>
> Everyday Mr. Gomez tries to visit each job site to oversee progress and safety. Every evening, he uses information from these visits to assist Ms. Gildea in ascertaining job needs and staffing/scheduling for the next day. Between job site visits, he meets with existing and potential customers to review new projects, make sales pitches, deliver estimates, and address all necessary issues arising in the field. He works closely with Mr. Moran to generate competitive estimates because he is the only individual in the Company capable of assessing job scope, i.e. duration, design, equipment and labor needs, and safety.
>
> Occasionally, jobs must be completed during evening hours or on weekends. In those instances, if feasible, Mr. Gomez stays for the duration of the project(s) and works with the employees.
>
> Mr. Gomez handles "toolbox" safety meetings with his crews on a regular basis. Those meetings are to address any specific conditions on a job site that are unique and to ensure that all safety procedures are being followed on the job for the benefit of Lanco's employees as well as all of the trades working on, or in the vicinity of, the Lanco's scaffolding.

Ex. F, pp. 2-3.

Ms. Gildea's job duties at Lanco are best summarized as follows:

> She is responsible for all of the administration, accounting, billing, and management of the office. She arrives each day at approximately 9:00 am, after dropping her three children off at school. She then meets with Mr. Gomez to review daily scheduling, answers phones, addresses employee issues, summarizes payroll information for the payroll service, prepares progress bills, formalizes new job quotes and does the company's banking. She is the only person capable of performing these job duties and, other than Mr. Gomez and Mr. Moran, is the only other individual at Lanco who

speaks English fluently. At the end of each day (i.e. after 7:00 pm), she prepares the work schedule for the next day with input on job progress from Mr. Gomez. If there are any special assignments, she contacts the employees that night and makes any arrangements necessary for them and/or the particular job.

Id. at 3.

It was Ms. Gildea who convinced Carlos to professionalize Lanco by renting office space in 1991; it was she who convinced him to transfer the office to a warehouse so they could better oversee the employees, and it was Ms. Gildea who stepped in to run Lanco when Mr. Gomez was wrongfully incarcerated in the early 1990s. See infra pp. 46-47. Given the integral role Mr. Gomez and Ms. Gildea play in the successful day-to-day operation of Lanco, incarceration of either of them for any significant period of time will cause the Company to go out of business and will leave its many employees without jobs to support their many dependents.

## ARGUMENT

In Booker, the Supreme Court held the Sentencing Guidelines to be advisory and reiterated the goal of achieving fair, balanced and proportional sentences. 543 U.S. ---, 125 S.Ct. 738 (2005). As a result, the now purely advisory Sentencing Guidelines are only one of numerous sentencing factors that courts must consider pursuant to 18 U.S.C. § 3553(a) in imposing sentence. Other factors of equal if not greater importance include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

16

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

. . .

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. §§ 3553(a)(1)-(3), (7).  In addition, 18 U.S.C. § 3553(a) directs sentencing courts to "impose a sentence sufficient, but not greater than necessary" to comply with the goals enumerated above.  The factors discussed below, whether considered independently, or as well-recognized downward departures under the Sentencing Guidelines, support the sentences the Gomezes request.

## I.   THE PROPOSED SENTENCE IS WARRANTED UNDER 18 U.S.C. § 3553(a) AND THE ADVISORY SENTENCING GUIDELINES BECAUSE THE LOSS CALCULATION SUBSTANTIALLY OVERSTATES THE SERIOUSNESS OF THE OFFENSE AND WOULD RESULT IN A GROSSLY UNJUST PUNISHMENT.

18 U.S.C. § 3553(a) requires sentencing courts to account for "the nature and circumstances of the offense" and "the need for the sentence imposed to reflect the seriousness of the offense" in determining a sufficient, but not greater than necessary, sentence.  18 U.S.C. §§ 3553(a)(1), (a)(2)(A).  The loss calculation in this case is comprised of three components: 1) workers compensation insurance premiums underpaid to the Liberty Mutual Insurance Group ("Liberty") and Eastern Casualty Insurance Company ("Eastern") totaling $1,983,935; 2) underpayments to the Massachusetts Laborers' Benefit Fund ("the Laborers' Union") and the Carpenters' Benefit Fund  ("the Carpenters' Union") (collectively, "Unions") totaling $1,954,679; and 3) federal income tax withholdings totaling $831,485.  The Gomezes do not contest the $831,485 tax loss figure, although they note that they have already made a tax payment of $1,250,000 to satisfy this and any other yet-to-be-determined tax liabilities.

However, the loss calculations attributed to the workers compensation insurers and the Unions do not accurately reflect the severity of harm to those entities.[4] A more accurate gauge of the "seriousness of the offense" is the out-of-pocket loss sustained by those entities. Here, due the Lanco's extraordinary safety history, the Gomezes' actions actually resulted in *no* out-of-pocket loss to the workers compensation insurers, and only minimal potential out-of-pocket loss to the Unions.[5]

Under § 3553(a), the Court should consider this evidence in determining what type and length of sentence would be "sufficient, but not greater than necessary," to satisfy the purposes of sentencing.[6] United States v. Pimental, 367 F.Supp.2d 143 (D. Mass. 2005) (Gertner, J.) is an analogous case. In Pimental, the defendant, owner of a small construction business, was convicted of two counts of mail fraud arising from his underpayment of workers compensation insurance premiums. The Government sought to sentence Mr. Pimental at the upper end of the Guideline range of 27-33 months, based upon a loss calculated by the difference between insurance premiums owed and premiums paid (approximately $500,000). Judge Gertner rejected the Government's loss calculation, noting that there were no claims paid and, therefore, "[n]o *actual loss* resulted from the [defendant's] misrepresentation," and sentenced Mr. Pimental, for this and other reasons, to probation. Id. at 155-157 (emphasis added). As in Pimental, the loss calculation under the advisory Guidelines is not a reasonable and fair basis for imposing a

---

[4] The Gomezes do not challenge the accuracy of the "loss" amounts in the Plea Agreements they signed; rather, they contend that those figures do not properly reflect the impact of their conduct upon the victims in this case. Indeed, each Plea Agreement permits the Gomezes to challenge the guideline calculation, *inter alia*, on the ground that the loss overstates the seriousness of the offense.

[5] At this time, any liability for which the Unions would be responsible to their members is still prospective. See infra pp. 17-24.

[6] Furthermore, to the extent this Court looks to the advisory Guidelines in imposing a sentence, a downward departure is warranted because the calculation of loss substantially overstates the seriousness of the offense and results in a grossly unjust punishment. U.S.S.G. § 2B1.1, n.19(c); see infra pp. 17-24.

sentence in this case. The more equitable barometer for punishment in this case is the victims' out-of-pocket losses.

Similarly, in United States v. Tobin, 28 F. Supp. 2d 674 (D. Mass. 1998) (Young, J.), a pre-Booker case, the court held that "loss" for purposes of restitution in a workers compensation fraud case is determined by "amount of the claims paid...*not* by the amount of the premiums withheld." Id. at 677 (emphasis added). The Tobin court further held that "[E]xpectancy damages [i.e., premiums withheld] are not the equivalent of monetary loss." Id., n.4.

## A. The Workers Compensation Insurance Companies Suffered No Out Of Pocket Losses And Actually Profited From Lanco.

The Gomezes do not dispute that they underpaid approximately $801,059 in workers compensation premiums to Liberty Mutual Insurance Company and $1,182,876 in insurance premiums to Eastern Casualty Insurance Company. However, neither of these insurance companies suffered any out-of-pocket losses as a result of these actions. Indeed, the companies made a combined profit of over $200,000 from Lanco's business, even with the underpaid premiums. In addition, the Gomezes have already made full restitution to Liberty Mutual of $866,992 in premiums. Ex. N. Eastern Casualty is no longer in business.

A detailed analysis of the loss to the workers compensation insurers was completed by industry expert Norman Goodman, founder and principal of Premium Review Associates, a company that specializes in evaluating workers compensations policies, and retained by the Gomezes in this case. See Ex. G. After a thorough review of the relevant insurance policies, payrolls, and other relevant documents, Mr. Goodman concludes that the workers compensation insurers sustained *no* out of pocket *loss* (i.e., premiums paid – [claims paid + administrative expenses]) and, in fact, made an estimated *profit* of **$218,093**. Because of the extraordinary safety record of Lanco, the insurers during the relevant time period have only had to pay two

19

claims totaling $59,266.[7]  While the definition of "loss" in the advisory Guidelines technically

allows for a calculation based on foreseeable or expectancy damages for sentencing purposes, the

Pimental and Tobin methodology, which is reflected in Mr. Goodman's report, is a much more

equitable measurement for punishment in this case.  This argument bears even greater weight

given the dramatic discrepancy between the advisory Sentencing Guidelines workers

compensation loss of $1,983,935, based on unpaid insurance premiums, and the out-of-pocket

loss ($0).  See U.S.S.G. § 2B1.1, cmt. 3.  In essence, the Gomezes should not be forced to endure

a far lengthier jail sentence because insurance companies failed to realize an additional

$1,983,935 in profits off Lanco.

> B.  The Loss Calculation For The Unions Also Substantially Overstates The Seriousness
> Of The Offense Because The Unions Were Not Responsible To Their Members For
> Certain Portions Of The Unpaid Remittances, And They Are Not Liable To Those
> Lanco Employees Who Were Not Union Members.

The $1,660,259 and $294,420 loss calculations under the advisory Sentencing Guidelines

with respect to the Laborers' and Carpenters' Unions, respectively, also substantially overstate

the seriousness of the offense.  Strictly applying the CBAs, the loss was calculated as follows:

(1) union remittances, based on Lanco's Union members' unreported hours; plus (2) remittance

based on all hours worked by all Lanco's non-Union employees.

This calculation substantially overstates the loss with respect to the first category of

employees described above because the Unions are not responsible to their members for certain

portions of the unpaid remittances (e.g., Health and Welfare and Annuity contributions), which

in this case substantially reduces the Unions' exposure.  This has been affirmed by the Laborers

Union, in its victim impact statement submitted to Probation by Thomas Masiello received by

the Probation Office on May 12, 2005, in which Mr. Masiello states:

---

[7] See infra 17-24.

> There are no requirements that participants [i.e., Union members] be credited for
> Health and Welfare Fund coverage if the contributions are not received and…[t]here
> is no definitive rule by the Internal Revenue Service yet as to whether or not laborers
> must be credited for Annuity Fund contributions not received….As a result, laborers
> will lose Annuity Fund contributions which were not made by Lanco Scaffolding,
> Inc.

Gomez PSR ¶ 46. Thus, the actual harm to the Unions, fairly measured by the potential liability

of the Unions to its members, is much lower than the advisory Guidelines figure.[8]

The calculation also substantially overstates the loss with respect to the second category

of employees described above, because the Unions are not liable to those employees who were

*not* Union members. See Ex. H ("Laborers Union is not responsible to Lanco's employees who

were not members of the Union for any unpaid remittances").

Daniel P. McGrath, a Certified Public Accountant retained by the Gomezes for this case,

analyzed the Laborer's potential exposure to its members and concluded it to be **$315,104.04**.

Ex. I. This calculation excludes those amounts for which the Union has no responsibility to its

members (as confirmed by Mr. Masiello, Gomez PSR ¶ 46) and excludes amounts based on non-

Union Lanco employees for whom the Union has no liability (as confirmed by Mr. McNally,

Ex. H). The resulting figure comprises the Union's potential out-of-pocket liability to Lanco

employees who were Union members, and who were paid some, or all, of their wages under the

table. Id. A similar calculation of the Carpenters' potential exposure results in a figure of

**$112,540.90**. Id.

These loss figures are also consistent with the statement of Mr. McNally regarding the

Laborers' loss:

> While I understand how the latter [Guidelines] figure ($1.6 million) was calculated,
> and that technically it may be correct, I respectfully submit that the former number

---

[8] See United States v. Bruckman, 874 F.2d 57, 63 (1st. Cir. 1989) ("the sentencing judge may properly consider
victim impact information concerning financial losses of victims").

($315,104.04) is a far more accurate barometer of the impact of Lanco's actions on the Union. I say this because the $315,104.04 figure accounts for two important facts: first, Laborers' Union is not responsible to Lanco's employees who were not members of the Union for any unpaid remittances; and second, even for those employees who were members of the Union, the Laborers are not responsible to them for a majority percentage of unpaid remittances (as explained in the letter from Thomas Masiello, Administrator of the Massachusetts Laborers' Benefit Funds, which was submitted to the Probation Office on May 12, 2005). Accordingly, I respectfully ask that $315,104.04 be considered the "loss" to the Union for the purposes of determining a sentence in this matter because this calculation appropriately backs-out remittances not due to non-Union members and the share attributable to uncollectible Heath and Welfare and Annuity Funds.

Ex. H. Thus, as the chart below demonstrates, there is a significant disparity between the loss calculated under the advisory Guidelines and the true "impact" on the victims..

| CALCULATION OF LOSS | | |
|---|---|---|
| | **Guidelines Calculation** | **Defendants' Calculation**[9] |
| Liberty Mutual Insurance Group | $801,059.00 | $0 |
| Eastern Casualty Insurance Company | $1,182,876.00 | $0 |
| **Total Loss to Workers Compensation Insurers** | **$1,983,935.00** | **$0** |
| | | |
| Massachusetts Laborers' Benefit Fund | $1,660,259.00 | $315,104.04 |
| Carpenters' Benefit Fund | $294,420.00 | $112,540.90 |
| **Total Loss to Unions** | **$1,954,679.00** | **$427,644.94** |
| **Total Fraud Loss**[10] | **$3,938,614.00** | **$427,644.94**[11] |

C. The Gomezes' Proposed Sentence Is Warranted Because The Loss Calculation Does Not Accurately Reflect The "Nature And Circumstances" Of The Offense Under 18 U.S.C. § 3553(a).

The nature and circumstances of this case weigh heavily in favor of imposing a sentence far below the Guideline ranges referenced in the Plea Agreements. When considered in light of 18 U.S.C. § 3553(a)(1), the offenses to which the Gomezes pled guilty do not warrant such a

---

[9] The Gomezes submit this loss should apply for any departure purposes as well.

[10] In addition, the Plea Agreements provide for a total *tax* loss of $831,485, for a total combined loss of $4,770,099

severe sentence. The insurance companies suffered no out-of-pocket losses and the Unions suffered far lower potential, if any, losses. The Gomezes should not be treated for sentencing purposes in the same manner as someone who, for example, stole, embezzled or received a fraudulent claim payment of $4 million dollars from insurance companies or unions. The financial impact on these entities is dramatically less severe than the Guideline "loss" figure would suggest and the Gomezes' sentence should be reflect the far less serious nature and impact of their offense conduct. Simply put, the Gomezes should not be punished more because the insurance companies and unions did not profit *more* from their dealings with Lanco; rather, they should only be punished for the out-of-pocket losses they in fact caused.

### D. The Advisory Sentencing Guidelines Also Permit A Downward Departure Where The Loss Substantially Overstates The Seriousness Of The Offense.

To the extent that this Court considers the advisory Guidelines in imposing a sentence, a downward departure is warranted based upon the evidence described above. The Guidelines explicitly permit a downward departure where the calculation of loss substantially overstates the seriousness of the offense and would result in a grossly unjust punishment. U.S.S.G. § 2B1.1, n.18(c). The Guidelines reasonably anticipated that some fraudulent misrepresentations are inherently more egregious than others. See Pimental at 156 ("[s]ignificantly, even the Guidelines recognize that there are times that amount of loss overstates a defendant's culpability"). The First Circuit has stated that:

> Precisely because the guidelines use amount of loss as a proxy for culpability in fraud cases, a supportable finding that the loss exaggerates the reality of events *often* is tantamount to a finding that the conventional sentencing range exaggerates a defendant's blameworthiness, and, thus, tends to invite a corresponding downward departure.

---

[11] This figure is reduced further if the $218,093 profit by the workers compensation insurers is subtracted, resulting in a total of $209,551.94.

<u>United States v. Rostoff</u>, 53 F.3d 398, 408-09 (1st Cir. 1995) (emphasis added) (affirming the sentencing court's determination in a bank fraud case that the "loss grossly overstate[d] the seriousness of the criminal activity").

As stated above, the loss calculation under the advisory Guidelines is not a reasonable and fair basis for imposing a sentence in this case, because it does not accurately reflect the seriousness of the offense. The calculation of loss is designed to be a "measure of the seriousness of the offense and the defendant's relative culpability[.]" U.S.S.G. § 2B1.1, cmt. background. Here, given Lanco's outstanding safety record, there is no evidence that the Gomezes expected claims paid out would exceed premiums paid in. The unique circumstances of their case take it outside of the heartland of cases contemplated by the advisory Guidelines, creating a compelling rationale for a downward departure. Under either the now-advisory Guidelines or in light of the § 3553(a) factors, it is unfair to sentence the Gomezes to the same punishment that someone who was truly culpable of a $3,938,614 out-of-pocket fraud loss would receive. The true impact of the Gomezes' actions on the insurance companies and unions is far closer to $427,644.94 than $3,938,614.00. Substituting the lower loss figure reduces the specific offense characteristic two levels, from level 18 (losses more than $2,250,000 but less than $7,000,000) to level 14 (losses more than $400,000 but less than $1,000,000). This translates into a total offense level, after application of the grouping rules, of 20, rather than 23, with a corresponding guideline range of 33-41 months imprisonment before the additional departures discussed below.

II.    **THE PROPOSED SENTENCE IS WARRANTED UNDER 18 U.S.C. § 3553(a) AND THE ADVISORY SENTENCING GUIDELINES BECAUSE OF THE CATASTROPHIC ECONOMIC IMPACT THAT A SENTENCE WITHIN THE APPLICABLE GUIDELINE RANGE WOULD HAVE ON THE GOMEZES' TWENTY-THREE (23) EMPLOYEES.**

The nature and circumstances of this case weigh heavily in favor of granting the proposed sentence because of the economic hardship that would surely befall Lanco's employees if the Gomezes are incarcerated. The Gomezes perform *all* of the management and operational duties for Lanco and are the only ones with the training, knowledge, skill, experience and customer relationships necessary to operate the company on a daily basis. If they are incarcerated, the company will not be able to survive without them and will surely fail. Moreover, the devastating impact of the loss of jobs on the employees is surely beyond the scope of "just punishment" for the Gomezes' offenses.

In addition, a downward departure is warranted if the Court imposes a sentence pursuant to the now-advisory Guidelines. The First Circuit has explicitly recognized that a reduced sentence may be warranted when a defendant's incarceration would result in economic hardship to innocent employees. See United States v. Olbres, 99 F.3d 28, 36 (1st Cir. 1996).

In Olbres, the husband and wife defendants employed twelve people in their small New Hampshire business. Id. at 29. The District Court found that, if the defendants were incarcerated, their company would fail and its 12 employees would lose their jobs. Although Judge Steven J. McAuliffe stated before sentencing that he would have departed "in a manner sufficient to keep the business from failing and putting those people out of work," he declined to depart on these grounds because he mistakenly believed that the Sentencing Guidelines, as a matter of law, prohibited downward departures to prevent the closing of an ongoing business and

25

the consequent loss of employment to its workers. Id. at 33. The First Circuit reversed, holding

that these consequences may indeed constitute grounds for downward departure. Id. at 34-36.

The First Circuit analyzed the case according to the Supreme Court's decision in Koon v.

United States, 518 U.S. 81 (1996), which held that a sentencing court must ask four questions in

considering a departure from the guideline range: (1) What features of this case, potentially, take

it outside the Guidelines' "heartland" and make it a special, or unusual case?; (2) Has the

Commission forbidden departures based on these features?; (3) If not, has the Commission

encouraged departures based on these features?; (4) If not, has the Commission discouraged

departures based on these features? Id. at 95 (quoting United States v. Rivera, 994 F.2d 942, 949

(1st Cir. 1993)). The First Circuit found that, with respect to the risk of job loss to Mr. Olbres'

employees, the Sentencing Commission neither forbade, encouraged, nor discouraged departure

based upon this feature. Olbres at 35 ("It is clear that the Guidelines do not explicitly list the

factor at issue here among the forbidden or the discouraged factors."). Acknowledging that

"[t]he mere fact that innocent others will…be disadvantaged by the defendants' imprisonment is

not alone enough to take a case out of the heartland," the First Circuit stated that "these issues

are matters of degree, involving qualitative and quantitative judgments." Id. at 36. The First

Circuit remanded the case to the district court for consideration of such issues of "degree,"

whereupon the district court granted Mr. Olbres a downward departure and sentenced him to two

months in jail and eleven months community confinement, with restrictions designed to permit

him to conduct his business and preserve the jobs of his employees.[12] See also United States v.

Derbes, 369 F.3d 579, 583 (1st Cir. 2004) (ruling that where defendant is essential to a small

business and where employees might suffer if the company goes out of business, departure is a

possibility); United States v. Dethlefs, 123 F.3d 39, 46 (1st Cir. 1997) (holding that courts are

not foreclosed from the possibility of a downward departure where a defendant's incarceration would result in business failure and cause employees to lose their jobs); United States v. Milikowsky, 65 F.3d 4 (2d Cir. 1995) (affirming grant of one-level downward departure to antitrust violator because imprisoning the defendant business owner would cause extraordinary hardship to his employees); United States v. Morgan, No. 96 Cr. 200, 1996 WL 633993 (N.D. Ill. Oct. 29, 1996) (granting downward departure because it was unlikely that two of the companies associated with the defendant would remain in business if he were to be incarcerated); United States v. Crawford, No. 02 Cr. 894, 2003 WL 21518564, *3 (N.D. Ill. July 2, 2003) (departing down three levels because the defendants were "impossible to replace and critical to the continued operations" of the business and the "employment of its personnel").

The job loss and economic hardship that would result from sentencing the Gomezes to significant terms of incarceration is substantially similar to the economic hardship and job loss that the district court ultimately found sufficient in Olbres to justify a downward departure and a two-month imprisonment. Furthermore, where the downward departure granted in Olbres protected twelve employees, a downward departure here will protect at least twenty-three employees.[13] In addition, this case presents an additional factor not found in Olbres: most, if not all, of the Lanco employees are predominantly Spanish-speaking, with limited English-language skills, and if the company were to close they would have an exceptionally difficult time finding new employment.

---

[12] The district court had originally sentenced Mr. Olbres to 18 months incarceration. Olbres at 30.
[13] Mr. McGrath states that based upon his evaluation of Lanco, "[t]he Company anticipates a very busy summer and adding a number of new projects that were delayed because of the severe weather conditions this past winter. Mr. Gomez and Ms. Gildea report that they are looking to hire and train additional employees to handle Lanco's backlogged worked." Ex. F.

A. The Gomezes Are Indispensable To The Economic Survival Of Lanco.

As stated above, Mr. Gomez started Lanco in 1984 and has spent the last twenty-one

years of his life building and supervising the business. As a principal of Lanco and representing

the "public face" of the company, Mr. Gomez is an irreplaceable part of the company's

continued viability. See Ex. F. Ms. Gildea joined Lanco in 1992 and helped substantially grow

the company from only a few employees to twenty-three employees. She is responsible for all

the administration, accounting, billing, and management of the office. Ms. Gildea's daily

presence at Lanco's office is also critical to the company's operations, as she is the only person

at the company capable of performing all the duties relating to the business within the office.

See id. Under the Gomezes' guidance, Lanco has grown from a small scaffolding company to

one of the most well-respected companies in the region. They have achieved this success

through their unique hands-on involvement in the day-to-day operation of the company. That

Mr. Gomez and Ms. Gildea are essential to the continued success of Lanco is reflected in the

evidence from third parties with knowledge of Lanco's operations as follows:

- Paul McNally, Business Manager for the Laborers, states: "[B]ased on my 30 years of experience in the industry...Carlos and Mary are indispensable to Lanco: Carlos is the public face of the business and does all of the employee training; and Mary performs all operations and administration. *In my opinion, their incarceration would cause Lanco to close immediately.*" Ex. J. (emphasis added)

- Kendal Moran, Lanco employee, states: "Carlos and Mary are invaluable to Lanco Scaffolding. They are Lanco Scaffolding. They have taught us an art form and we are proud to know them and continue to rely on them each and every day....We are all very grateful for our jobs as our families are." Ex. K, Letter from Mr. Moran to Christopher Cunio of April 10, 2005.

- José Pleitez, Lanco employee, states: "[w]ithout this company we are nothing...because [this is how] we support ourselves...pay rent...and continue learning more each day." Ex. A, Transcript p. 9.

28

- Daniel J. McGrath, C.P.A., states: "Mr. Gomez and Ms. Gildea are indispensable to Lanco and their incarceration would result in the immediate closing of the Company and the layoff of all of its employees." <u>Ex.</u> F.

B. <u>The Failure Of Lanco Would Have A Disastrous Impact On The Company's Employees And Their Families.</u>

The Gomezes' employees rely on them and Lanco for their stable, well-paying jobs and highly-specialized training. Most of Lanco's employees have worked for the company for years and are highly dependent on Lanco. Should the company become defunct, these individuals will immediately lose those jobs and, given their limited English-language skills and the risk of discrimination, they will face severe difficulty in securing equally safe and well-paying employment. The loss of their jobs as a result of the Gomezes' prolonged incarceration would have a devastating impact, both financially and emotionally, upon these employees.

Lanco's employees are truly concerned about the potential loss of their jobs and about their well-being should the Gomezes be incarcerated for an extended period of time, as reflected in their video testimonials.

- Employee Wilfredo Romero: "I am very grateful to [Mr. Gomez] and I know he is the right hand of this company. Without him, well, we don't have the means to go on since from these wages I earn I support my mother, pay my car, pay my rent and I support a lot of people...This has been the [only] job I've ever had since I came from my country...I don't know any other work[.]" <u>Ex.</u> A, Transcript p. 5.

- Employee Pedro Romero: "[The Gomezes] have helped me with the child support situation....I have three children. They depend on me, on my work, on the work Mr. Carlos gives me....[W]e depend on him, on the work that he does. My whole family depends on the work he does." <u>Id.</u>, pp. 4-5.

- Employee José Arístides Romero: "It was the first job I got and I have worked all this time at Lanco. [T]hanks to God and Carlos who has given me work, my family has been able to go on. I have a wife and two kids. My kids were born here. I also have my house, my car, what I live off of, of which everything depends on the job, the payments and everything I do depends on it." <u>Id.</u>, p. 4.

- Employee Luis Mario Perlera: "I have two small children and without Mr. Carlos we can't live because without work one can not support oneself and he is a good

29

person....All our life he has had us working and without him the company would close and for our family if we don't have work how are [we] going to support our children?" Id., p. 8.

- Employee José Daniel Perlera: "[Mr. Gomez] helps us a lot, well, he gives us a hand and without him here we are nothing, well, because without him the company is nothing. And, well, thanks to this job we are doing well. We have the things we need[.]" Id., p. 9.

- Employee José Domingo Pleitez: "I support myself and my brothers that are in El Salvador. I help my family that's here and the one who are there and, mainly, without this company we have nothing either because from here is that we support ourselves and from here we pay the rent, each one of us[.]" Id., p. 10.

The catastrophic impact that Lanco's closing would have upon its employees is further reflected in the evidence from third parties with knowledge of Lanco's operations as follows:

- Mr. McNally states: "Carlos and Mary currently provide approximately 24 predominantly Spanish-speaking individuals with safe, well-paying jobs....Their employees, in turn, are able to support their family members and are proud, productive members of society. Lanco's closing would impose extraordinary hardship on these innocent employees and their families because they would immediately lose their jobs." Ex. J.

- Harry R. Dow, Executive Director of the Carpenters Benefit Funds, states: "Lanco is a stable employer that provides union workers, many of whom are minorities, with steady well-compensated employment....[I]f Lanco were to close, the result would be a significant loss to both union employees and workers." Ex. L.

It should also be noted that the continued operation of Lanco provides social and economic benefits to the community beyond simply job security, since many customers and members of the community are dependent on Lanco for the company's safe and reliable services in such a highly-specialized field. Mr. McNally emphasizes the Gomezes' long-standing commitment to employee training, stating that "over the past 20 years, Lanco has trained dozens of employees in the highly specialized field of scaffolding. There are precious few employers today which, like Lanco, invest the time, effort and expense to train their employees. Lanco's closing would eliminate an important source of worker training." Ex. J. Moreover, "Lanco's

closing would create a void in the industry and leave many contractors without a proven, reliable service provider." Id. The sentence proposed by the Gomezes achieves the purposes of punishment and rehabilitation while avoiding any further burdens on society should Lanco fail and its current twenty-three employees become jobless.[14]

## III. THE PROPOSED SENTENCE IS WARRANTED UNDER 18 U.S.C. § 3553(a) AND THE ADVISORY SENTENCING GUIDELINES IN LIGHT OF THE DETRIMENTAL IMPACT THAT INCARCERATION OF THE GOMEZES WOULD HAVE ON THEIR YOUNG CHILDREN.

Section 3553(a)(1) directs sentencing courts to consider "the history and characteristics of the defendant" in determining a sufficient, but not greater than necessary, sentence. This requires the Court to take into account the Gomezes' unique family circumstances, which warrant a reduction in sentence. As detailed below, incarceration of the Gomezes would tear apart their close-knit loving household and have damaging repercussions throughout their immediate and extended family.

Further, even if the Court chooses to impose a sentence under the advisory Guidelines, a downward departure is still warranted on these grounds. Even before Booker, sentencing courts often granted downward departures when a defendant's family circumstances were unusual or "other-than-ordinary." See U.S.S.G. § 5H1.6; United States v. Sclamo, 997 F.2d 970, 973 (1st Cir. 1993) (ruling that extraordinary family circumstances may form a valid basis for downward departure from offense level of 17 to three years probation with six months home confinement); Rivera, 994 F.2d at 949 (1st Cir. 1993) ("[W]hen unforeseen circumstances arise, the district court will decide whether to depart...and, if so, how much...[u]ltimately, however, the Guidelines cannot dictate how courts should sentence in such special, unusual or other-than-ordinary

---

[14] The proposed sentence of 8 months home detention anticipates that the Gomezes will be permitted to continue to work at Lanco. However, given the inevitable limits such a sentence will impose on their freedom of movement and

31

circumstances."); <u>United States v. Johnson</u>, 964 F.2d 124, 125 (2d Cir. 1992) ("the United States Sentencing Guidelines do not require [judges] to leave compassion and common sense at the door to the courtroom"; granting 10-level reduction from offense level 23 based upon family circumstances of defendant and 3-level reduction for other factors for ultimate sentence of six months home detention).

The detrimental impact on the Gomezes' innocent children and other family members if the Gomezes are incarcerated is a mitigating factor which weighs heavily in favor of a reduced sentence in this case. <u>See</u> <u>United States v. Lewis</u>, 375 F. Supp. 2d 1, 3 (D. Mass. 2005) (Harrington, J.) (in imposing an out-of-Guidelines sentence, the Court stated "[s]ince all sentences relate to an individual human person, and not to a norm, a sentence must be shaped to the individual defendant involved...the Court in imposing an appropriate sentence shall...full[y] examin[e]...the individual defendant's *personal characteristics, family responsibilities,* medical and mental condition, criminal record and the particular circumstances surrounding the crime") (emphasis added). <u>See also</u> <u>United States v. Jaber</u>, 362 F. Supp. 2d 365, 376, n.21 (D. Mass. 2005) (Gertner, J.) ("<u>Booker</u> plainly allows courts to look carefully at those factors and to determine to what degree they are relevant to individual cases"). <u>See also</u> 18 U.S.C. § 3661 ("no limitation shall be placed on the information concerning the *background, character, and conduct of [the defendant]* which the court may receive and consider for the purposes of imposing a sentence.") (emphasis added).

As described above, not only would the Gomezes' incarceration cause a substantial and direct loss of critical caretaking and financial support to their three young children, it would result in irreparable damage and suffering to their entire extended family. <u>See</u> <u>supra</u> pp. 31-32.

---

their ability to be responsive to their clients' needs, any lengthier sentence will increase the danger that Lanco will fail.

Moreover, the fact that Mr. Gomez and Ms. Gildea are co-defendants in this case raises the possibility that *both* parents will be incarcerated, leaving their three young children without either parent to care or provide for them. See United States v. Aguirre, 214 F.3d 1122, 1127 (9th Cir. 2000) (affirming downward departure of four levels for extraordinary family circumstances where an 8 year old boy whose father was deceased "would be losing a mother for a substantial period of time."). A downward departure is necessary to minimize the already devastating impact imprisonment of both parents, even if staggered, would inflict on these children. The Gomezes' continued presence is necessary for more than mere family stability; it is critical to the preservation of the entire family unit and the future well-being of the family's youngest members. The positive impact of both parents on their children is reflected in letters from third parties who have witnessed the interaction between the Gomez family members:

- The Gomez family are a very close knit, devoted family. In my view, it would not be in their best interest for the children to be separated from their parents. Ex. B, Letter from Margaret Albanese to Judge O'Toole of April 13, 2005.

- Mary and Carlos are consistently involved with the raising of their children. When other families at our school designate the care of their children to a nanny or other care provider, Mary and/or Carlos are transporting and spending the time with their children during these formative years...Their children are the most important part of their lives and I ask that you take this into consideration. Id., Letter from Linda Edmands to Judge O'Toole of April 13, 2005.

- It is not often that an educator comes across a set of parents that lives and breathes for their children the way that in which Mary and Carlos do. But I soon learned that this caring and devotion extended beyond their own children and included not only members of their own family, but for all of the children who were enrolled in our school. Such a devotion can only be characterized as exceptional and extraordinary. Id., Letter from Richmond S. Abbe to Judge O'Toole of April 14, 2005.

- We have watched, first-hand, the Gomez children grow into wonderful, kind and compassionate young people, which is due solely to their parents' guidance and love. Carlos and Mary are good people who are raising a wonderful family, which is no small feat in today's society. To take them away from their family would be tragic and do irreparable harm to the children. We would like to that that a solution could

be reached that would not include punishing the Gomez children as well. Id., Letter from Dr. Alan and Rose Skolnick to Judge O'Toole of April 14, 2005.

In light of the Gomezes' extraordinary family obligations, the proposed sentence is merited whether considered in light of the statutory purposes of § 3553(a) or under the advisory Guidelines framework, and is necessary to prevent severe harm to the Gomezes' entire family, who have come to rely on them for so much.

## IV. THE PROPOSED SENTENCE IS WARRANTED UNDER 18 U.S.C. § 3553(a) AND THE ADVISORY SENTENCING GUIDELINES BECAUSE OF THE SIGNIFICANT CONTRIBUTIONS THE GOMEZES HAVE MADE TO THEIR COMMUNITY.

The Gomezes additionally request the proposed sentence on the grounds of their substantial charitable and community activities. These activities are a relevant element of "the history and characteristics of the defendant[s]," which must be considered under 18 U.S.C. § 3553(a)(1). They are also a mitigating factor under the now-advisory Guidelines, warranting a downward departure.

Even when the Guidelines were mandatory, a defendant's charitable and community activities were permissible grounds for adjustment where the activities were exceptional and rendered the case different from the ordinary case. See U.S.S.G. § 5H1.11. See also Koon, 518 U.S. at 96. Particular attention has been paid to those activities that involve significant contributions of the defendant's time and personal skill, rather than those that merely consist of financial contributions. See United States v. Mehta, 307 F. Supp. 2d 270, 277 (D. Mass. 2004) (Gertner, J.) (granting five-level departure). See also United States v. Serafini, 233 F.3d 758, 776 (3d Cir. 2000) (granting three-level departure, noting that "while many of [defendant's] acts involved the giving of money, the monetary aid was only one aspect of otherwise charitable conduct on his part, distinguishing his acts from the impersonal writing of checks that is the

34

norm for many wealthy individuals"); United States v. Cooper, 394 F.3d 172, 177 (3d Cir. 2005)

(granting four level departure and sentence of probation in securities fraud and tax evasion case

for good works where defendant did not simply donate money to charity, but also engaged in

activities which demonstrated a "hands on personal sacrifice[] which have had a dramatic and

positive impact on the lives of others.").

The Gomezes' contributions to their community are quintessential examples of the kind

of good works that courts look to as grounds for departing downward. The Gomezes have

provided invaluable hands-on service to their community, their children's school (the Andover

School of Montessori), and other charities. See generally Exs. B, M. The Gomezes are much

more than mere financial benefactors to their community.[15] Indeed, they generously devote their

spare time and energies, often anonymously, to various charitable and educational endeavors.

To that end, Mr. Gomez has taken the initiative on several projects at their children's

school, including grooming school grounds, building shelves in the school library, collecting

trash at school events, and leveling and maintaining the children's playground to ensure its

safety. See generally Ex. B. Ms. Gildea has displayed similar generosity, with her unparalleled

dedication to improving her children's school environment for students and teachers alike and

has actively served on numerous school committees for several years and worked as a tireless

advocate for better health care and other benefits for the school's teachers. See id. Whether

organizing fundraising initiatives, staff appreciation events, shoveling snow, even simply picking

up trash after school picnics, the Gomezes have consistently displayed exceptional leadership

---

[15] It is worth noting, though, that their financial generosity has benefited the school's teachers and community at large, including the Gomezes' assistance in covering the necessary medical expenses of a teacher's husband whose battle with multiple sclerosis left him confined to a wheelchair, unable to work, and without sufficient health care coverage. See Ex. B, Letter from Joan Ellis to Judge O'Toole of April 10, 2005. See also Serafini, 233 F.3d at 776 (where community service and charitable works acknowledged by court in granting departure included providing a $300,000 guarantee for medical treatment of a terminally ill patient).

35

and generosity towards those around them. See id. As Claire Bradley, a Children's House teacher, states in her letter of support, "[n]o parents have ever had such an impact on our school community during my twenty three years as a teacher here....[A]n interest in helping our students and staff [is] their only concern." Id., Letter from Ms. Bradley to Judge O'Toole of April 15, 2005. Similarly, Richmond Abbe, prior headmaster of the school, states, "Carlos and Mary always gave willingly, not only of their resources, but more importantly of their time, talents, and seemingly endless supply [of] enthusiasm and energy. It was performed out of a true belief and conviction that the work we undertook at school made a significant impact on the lives of children." Id., Letter from Mr. Abbe to Judge O'Toole of April 14, 2005.

The Gomezes' consideration also extends to the community at large, where the Gomezes have supported the work of muralist Be Sargent, who has created several large-scale murals in the Boston area, by providing scaffolding support for her projects at no cost. Ms. Sargent states in her letter of support, "I never was able to raise more than $15,000 for my labor on any of these murals but I could live on that. Nevertheless, I often tried to get a sense of what I was getting for free. Mary or Carlos would say 'never mind, just go on painting.'" Ex. M, Letter from Ms. Sargent to Judge O'Toole of April 12, 2005. In addition, Mr. Gomez has demonstrated his commitment to helping build homes for Rebuilding Together Boston and Habitat for Humanity by providing in-kind donations of scaffolding installation and rental services as evidenced by the letters of support from Martine L. Taylor, Executive Director of Rebuilding Together Boston, and David Lopes, Chief Operating Officer of Habitat for Humanity Greater Boston. Id., Letter from Ms. Taylor to Judge O'Toole of April 18, 2005; Letter from Mr. Lopes to Judge O'Toole of April 12, 2005.

Based upon the foregoing, the proposed sentence, whether in light of the statutory goals of 18 U.S.C. § 3553(a) or under the now-advisory Guidelines framework, will enable the Gomezes, who have been consistently recognized for their positive impact on the community, to continue their longstanding and valuable commitment to community service.

## V.    THE PROPOSED SENTENCE IS WARRANTED UNDER 18 U.S.C. § 3553(a) AND THE ADVISORY SENTENCING GUIDELINES BECAUSE OF THE EXTRAORDINARY RESTITUTION ALREADY MADE BY THE GOMEZES.

The Court's consideration of "the history and characteristics of the defendant" under 18 U.S.C. § 3553(a)(1) must also include the Gomezes' exceptional endeavors to remedy the harm they have caused, as detailed below.  Extraordinary restitution is also a recognized ground for downward departure under the advisory Guidelines.  See U.S.S.G. § 5K2.0(d)(5); United States v. Kim, 364 F.3d 1235 (11th Cir. 2004) (holding that payment of $280,000 restitution by defendants, a husband and wife, after they pled guilty to conspiracy to defraud the United States and fraudulently obtaining government assistance, respectively, was extraordinary enough to remove case from "heartland" and justify downward departure from 24 months to probation and home detention where defendants' conduct demonstrated their sincere remorse and acceptance of responsibility); United States v. Oligmueller, 198 F.3d 669, 672 (8th Cir. 1999) (affirming district court's one level downward departure on the basis of extraordinary restitution because "[w]e have previously held that cases [are sufficiently atypical] when there are extraordinary efforts at restitution"); United States v. Hairston, 96 F.3d 102, 107-08 (4th Cir. 1997) (paying restitution can, in exceptional circumstances, be basis for departure from Guidelines); United States v. Lieberman, 971 F.2d 989, 996 (3d. Cir. 1992) (affirming departure where defendant agreed to pay "$34,000 more than he thought he owed and to which he pled guilty"); United States v. Garlich, 951 F.2d 161 (8th Cir. 1991) (holding that district court should consider

whether the defendant's extraordinary restitution efforts merited departure or reasonable sentence out of the Guidelines range);

In this case, the Gomezes have taken extraordinary steps to pay restitution for their mistakes. As of May 2005, the Gomezes have made total restitution of **$2,262,175.** See Ex. F. The Gomezes have proactively and voluntarily paid $866,992 to Liberty Mutual Insurance Group, $145,143 to the Carpenters' Union, and $1,250,000 toward outstanding tax liabilities. Exs. F, N, O, P, Q. In addition, the Gomezes are committed to ensuring that any amounts owed, beyond the substantial restitution which has already been made, will be paid in full at the earliest possible date.[16]

The Gomezes' restitution efforts have been acknowledged by the victims in this case. Mr. McNally notes that the situation is "currently being remedied" and states,

> Carlos and Mary are committed to making amends with the Laborers. Lanco has offered to repay all unpaid union benefits for their employees who were Laborers for a period of years to be determined and cooperate in an audit. Based on the information that I now have, this is a reasonable manner in which to hold Lanco responsible to the Laborers and will result in substantial restitution (over $400,000) to the Union. The Laborers are amenable to Lanco paying this amount out over time to facilitate repayment and to avoid further straining the business.

Ex. J, p. 2.

## VI. MS. GILDEA'S CRIMINAL HISTORY CATEGORY SHOULD BE I.

A. Ms. Gildea Objects To The Assessment Of One Criminal History Point Based On A Charge To Which She Never Pled Guilty Or Admitted Sufficient Facts And For Which She Was Subsequently Judicially Determined To Be Innocent.

---

[16] Lanco is profitable and can make reasonable restitution payments going forward. Ex. F. However, the Gomezes' ongoing restitution efforts are contingent upon Lanco's continuing viability, making a downward departure in this case even more critical. See United States v. Pearson, 282 F.Supp.2d 941, 944 (E.D. Wis. 2003) (holding that a two-level downward departure from Level 12 to 10 was appropriate based partly on the fact that sentence would allow defendant to continue working, better enabling her to pay the substantial restitution she owed to the victim in the case). Furthermore, "the need to provide restitution to any victims of the offense" is a factor outlined in § 3553(a) that must be considered by sentencing courts in imposing a just sentence. 18 U.S.C. § 3553(a)(7).

Ms. Gildea objects to Probation's assessment of one criminal history point based upon the diversionary disposition imposed in Woburn District Court on March 22, 2000 in connection with one count of indecent assault and battery and a related count of assault and battery. Gildea PSR ¶ 85. Ms. Gildea has never admitted her guilt or admitted to any facts supporting a finding of guilt. Moreover, at a subsequent civil trial brought by the complainant, Ms. Gildea's actual innocence was resoundingly affirmed by the civil trial judge, Judge Timothy H. Gailey, who found that "[t]here was no assault and battery by the Defendant at any time alleged by the Plaintiff." Judge Gailey found the plaintiff to be "utterly and unequivocally incredible as a witness" and her account of the events to be "totally fabricated and bear no relation whatsoever to the truth." Ex. R, attachment H. Thus, Ms. Gildea was judicially determined, under a lesser standard of proof than beyond a reasonable doubt, to be actually innocent of the charges against her.

### 1. Procedural History.

Ms. Gildea was charged with two counts of assault and battery, based on the now totally discredited allegations of her former housekeeper, Rosalia De Guzman (the "Complainant"), that Ms. Gildea grabbed her shirt, pushed her up against a wall and grabbed her cheeks and chest during a dispute over housekeeping in May 1999. Ex. R, ¶ 5. She adamantly maintained her innocence from the start. Id.

Ms. Gildea appeared in court on March 22, 2000 ready to proceed to trial and defend her innocence against these unwarranted charges. However, at the eleventh-hour, the Commonwealth announced it intended to call her 3 year old daughter Olivia to testify. Id. ¶ 13-14. First, on the day of trial, the Commonwealth filed a Motion in Limine to Admit Olivia Gomez's Out-of-Court Statements Into Evidence As "Spontaneous Utterances." Id. ¶ 14. Olivia

was only 2 years old at the time of the alleged incident, and was only 3 years old on March 22, 2000. Id. The court denied the motion to allow the Complainant to testify about statements allegedly made by Olivia. Id. The Commonwealth then indicated that it intended to call the child herself to testify. Id. This came as a complete surprise to Ms. Gildea and her counsel, as Olivia's name was not on the witness list, she had not been subpoenaed, and Ms. Gildea had received no notice that the Commonwealth intended to call her. Id.

Ms. Gildea's counsel objected to the Commonwealth calling the child to testify on the grounds that Olivia was not old enough to be a competent witness. However, the court indicated it would reserve any ruling on the issue until such time as the Commonwealth called the child during the trial. Id. Ms. Gildea had not foreseen that defending her innocence would subject her child to the trauma of testifying, and she was anguished and visibly upset over the prospect of her child being forced to testify. Id. ¶ 15. She also was given very little time to consult with her attorney about this development, or to fully assess the proposed waiver of rights and plea disposition - with which she was wholly unfamiliar.[17] Id. ¶¶ 16-17.

Ms. Gildea was confronted with a wrenching dilemma; either proceed to trial and defend her innocence or accept a deal for a continuance without a finding ("CWOF") and spare her daughter the trauma of testifying in a criminal trial involving a dispute between her mother and her caretaker. With less than thirty minutes to decide before a jury was empanelled, Ms. Gildea placed her daughter's welfare first and waived her right to a trial. Id. ¶¶ 15-17. While still vigorously maintaining her innocence, and with evident reluctance, Ms. Gildea admitted that the

---

[17] Indeed, when Ms. Gildea evidenced her reluctance to go forward, she was reminded that a jury could be empanelled within one-half hour. Ex. R ¶¶ 15, 24. At another point, the Court, out of frustration with Ms. Gildea's reluctance to admit sufficient facts, announced that the trial would commence. Ms. Gildea obviously felt unduly pressured by these time constraints into making an unexpected and unwelcome decision to accept the diversionary disposition to protect her daughter.

government had in its possession facts sufficient to establish guilt. Id. ¶ 18. She did not

however, admit the alleged facts themselves, or any culpability. See id., attachment G; Ex. S.

As evidenced by the plea, Ms. Gildea did not admit guilt or admit to facts sufficient to

support guilt. See Ex. R, attachment G, pp. 13-17. She merely conceded that the governments

evidence, which she did not admit to, was sufficient to establish guilt. Given that this was the

classic "he said-she said" case, with the government's case hinging on the credibility of the

complainant, Ms. Gildea was, in essence, conceding, and only reluctantly, nothing more than that

if the jury believed the complainant, there would be sufficient evidence to establish guilt.[18] See,

e.g., Santos v. Director of the Division of Employment Security, 398 Mass. 471, 473 (1986)

(admission to sufficient facts did not constitute an admission to any personal criminal

involvement). The case was continued without a finding, Ms. Gildea completed an 18-month

period of unsupervised probation and the case was ultimately dismissed. Ex. R ¶ 21.[19]

### 2.  Subsequent Judicial Determination Of Complete Innocence.

Within days after the criminal proceeding was resolved, Ms. Gildea's accuser filed a civil

suit in Chelsea District Court. De Guzman v. Gildea Gomez, Civ. No. 0014CV0031. See

id. ¶ 22. The subsequent civil trial and the civil court's findings conclusively show that the

---

[18] As Ms. Gildea's attorney, Mr. DiGiulio, stated: "Ms. Gomez was not required to admit to any of the alleged facts supporting the charges. Instead, she merely acknowledged that the facts alleged, if believed by a jury, would be sufficient to support a guilty verdict. Ms. Gomez steadfastly maintained her actual innocence throughout the plea colloquy.... Ms. Gomez checked neither "Plea of Guilty" nor "Admission of Facts Sufficient for a Finding of Guilty" on [the Tender of Plea or Admission and Waiver of Rights] form." Ex. S. Thus, Ms. Gildea did not admit to sufficient facts or indeed to any facts. She merely acknowledged that if the alleged facts were believed by a jury they would be sufficient to support a guilty verdict.

[19] The colloquy was also defective in that the court failed to inform Ms. Gildea that a jury could not construe her failure to testify at trial against her. Although the court explained that Ms. Gildea could not be forced to testify at trial, it failed to further explain that a jury would not be allowed to draw any adverse inferences from her failure to testify. The colloquy violated Ms. Gildea's constitutional rights. An intelligent plea requires that the defendant know of the procedural protections she is relinquishing by tendering a plea. Commonwealth v. Correa, 43 Mass. App. Ct. 714, 717, 686 N.E.2d 213, 216 (1997). The judge must ensure that the defendant is informed, on the record and in open court, of the three constitutional rights that are waived when tendering a plea: "the right to trial, the

original criminal complaint – and the plea disposition – were based upon false allegations. Indeed, Judge Gailey found a "myriad of inconsistencies in [Complainant's] accounts of the alleged incidents, [her] record of physical and psychological treatment before and after the alleged incidents, and [her] false and inconsistent testimony as to her medical conditions and treatments." Id. ¶ 26. These were the very same allegations upon which the criminal charges were founded. Based in part on newly discovered evidence, after a bench trial, Judge Gailey concluded that the Complainant was "*utterly and unequivocally incredible as a witness*" and that it was more likely than not that her allegations were "*totally fabricated and bear no relation whatsoever to the truth.*" Id. ¶ 26 (emphasis added). The court entered judgment for Ms. Gildea, concluding that "*[t]here was no assault and battery by [Ms. Gildea] at any time alleged by the [Complainant].*" Id. (emphasis added). See also Ex. R, attachment H.

Due process and justice mandate that this diversionary disposition should not be included in calculating Ms. Gildea's criminal history category. The Commonwealth's case was based upon the word of an unstable woman clearly motivated by economic gain, whose testimony was resoundingly rejected as false by Judge Gailey, applying the lesser, civil preponderance of the evidence, standard of proof, rather than the beyond a reasonable doubt standard.

A fair reading of the plea colloquy reveals that Ms. Gildea struggled -- for understandable reasons – with even admitting that the government had sufficient facts. See id.; Ex. R at 13-17. Even her limited colloquy was tendered under duress. In addition, while the court apprised Ms. Gildea that she had a right not to testify at trial, it did not advise her, as required, that neither a judge nor a jury could hold her silence against her in deciding the case. Given the context of this case, this omission by the court constituted a violation of Ms. Gildea's due process rights.

---

right to confront one's accusers, and the privilege against self-incrimination." Id. (quoting Commonwealth v. Duquette, 386 Mass. 834, 841 (1982)).

Coupled with the obvious duress under which the plea was tendered and the subsequent judicial

finding of actual innocence by Judge Gailey, this diversionary disposition should not be counted

in calculating Ms. Gildea's criminal history.

### 3. A Diversionary Disposition Without A Finding Of Guilt Should Not Be Counted.

U.S.S.G. § 4A1.2 provides, in relevant part, that: "Diversion from the judicial process

without a finding of guilt (e.g., deferred prosecution) is not counted. A diversionary disposition

resulting from a finding or admission of guilt, or a plea of nolo contendere, in a judicial

proceeding is counted as a sentence under §4A1.1(c) even if a conviction is not formally

entered...." Application Note 9, Diversionary Dispositions, provides, in relevant part, that:

"Section 4A1.2(f) requires counting prior adult diversionary dispositions if they involved a

judicial determination of guilt or an admission of guilt in open court." U.S.S.G. § 4A1.2, cmt.

n.9.

This case presents the unique instance where not only was there no admission of guilt,

but where the defendant was actually judicially determined to be completely innocent of the

charges under a lesser standard of proof than would have been required at a criminal trial. This

dramatically distinguishes this case from the line of First Circuit cases upholding the assessment

of criminal history points based on continuances without a finding. See, e.g., United States v.

Morillo, 178 F.3d 18, 21 (1st Cir. 1999) (in contrast to Gildea, defendant acknowledged on the

Tender of Plea or Admission Waiver of Rights form that he was tendering an "admission to facts

sufficient for a finding of guilt;" no claim defendant actually innocent of charges); United States

v. Dubovsky, 279 F.3d 5, 9 (1st Cir. 2002) (no claim that defendant was actually innocent of

charge); United States v. Fraser, 388 F.3d 371(1st Cir. 2004) (defendant admitted guilt in open

court). While district courts typically may not question the validity of the underlying CWOF,

see, e.g., United States v. Reyes, 386 F.3d 332 (1st Cir. 2004), that should not apply where, as

here, there is not just an actual claim of innocence but a judicial finding of innocence. Finally, it

is well-settled that where the underlying state court sentence is determined not to count, the two-

level enhancement for committing the federal offense while on probation for the state sentence

also must be erased. See Mateo v. United States, 398 F.3d 126, 133 (1st Cir. 2005) (citing

U.S.S.G. §§ 4A1.2(j), 4A1.2, cmt. n.6).

    B.  The Court Should Grant A Downward Departure From Criminal History Category II
       To Criminal History Category I On The Grounds That Category II Substantially
       Over-Represents The Seriousness Of The Offense And The Likelihood Of
       Recidivism.

       Alternatively, Ms. Gildea moves for a downward departure from criminal history

category II to criminal history category I, pursuant to U.S.S.G. § 4A1.3(b)(1), on the grounds

that her criminal history category: a) substantially over-represents the seriousness of her criminal

history; and b) the likelihood that she will commit other crimes, given her age, her love of and

concern for her children and other family members, her genuine remorse and her outstanding

efforts at restitution and rehabilitation discussed below and in more detail in the letters of support

submitted by a wide range of acquaintances.

       1.  Criminal History II Substantially Over-Represents The Seriousness Of Ms.
           Gildea's Criminal History As It Is Based On A Disposition For Which She
           Was Clearly Innocent.

       As discussed above, Ms. Gildea was judicially determined to be innocent, under a lesser

standard of proof than beyond a reasonable doubt, of the two charges that formed the basis for

the diversionary disposition referenced in paragraph 85 of her PSR, and for which Probation

assesses one criminal history point. Probation assessed an additional two points, pursuant to

U.S.S.G. § 4A1.1(d), because the instant offense occurred during the time that Ms. Gildea was

under a criminal justice diversionary sentence for those charges. Given that Ms. Gildea was

actually innocent of those charges, the resulting three criminal history points substantially over-represent the seriousness of her criminal history. Accordingly, pursuant to U.S.S.G. § 4A1.3(b)(1), Ms. Gildea moves for a downward departure from criminal history II to criminal history I , on the grounds that category II unfairly punishes Ms. Gildea for a crime she did not commit, and that category I more accurately reflects her criminal history.

### 2. Criminal History Category II Substantially Over-Represents The Likelihood That Ms. Gildea Will Commit Other Crimes.

Ms. Gildea is a 48 year old mother of three young children; she is a partner in a very stable marriage. She has no alcohol or drug addiction problems, is financially secure, and has no history of violence, aside from the totally discredited charges of her mentally unstable former housekeeper.[20] She has fully accepted responsibility for her crimes and has taken, and continues to take, all reasonable measures to make restitution to each of the victims.

In addition, as amply demonstrated by the many testimonials from the children's Montessori school, Ms. Gildea and her husband are deeply and unusually devoted to their children's upbringing and welfare. For the past several years, Ms. Gildea has had to live every day with the fear that her three children will lose both parents to potentially lengthy periods of incarceration. It is inconceivable that a woman of Ms. Gildea's maturity and proven responsibility to her children would do anything to place herself and her family in similar legal jeopardy again. Thus, aside from the fact that she was actually innocent of the charges that result in a criminal history category II calculation, given Ms. Gildea's age and maturity, her remorse, her demonstrable efforts to make amends, and her family responsibilities, there is

[20] Although Ms. Gildea's PSR references several extremely minor petty offenses involving, for example, bounced checks of $15.70 and $17.99 (Gildea PSR ¶ 81), a dispute over a $5 scarf (Gildea PSR ¶ 82), and one other matter involving less than $300 (Gildea PSR ¶ 83-84), these offenses occurred many years ago, and they are not includable, for good reason, in calculating her criminal history category. Thus, the court should not consider them in

absolutely no "likelihood of recidivism" in her case. Accordingly, Ms. Gildea moves for a

downward departure to criminal history category I on the grounds that criminal history category

II over-represents the likelihood that she will commit other crimes.

## VII.  THE PROPOSED SENTENCE IS WARRANTED UNDER 18 U.S.C. § 3553(a) AND THE ADVISORY SENTENCING GUIDELINES FOR MR. GOMEZ BECAUSE OF HIS PRIOR WRONGFUL CONVICTION AND TIME ERRONEOUSLY SERVED.

Mr. Gomez's prior wrongful conviction and incarceration merits consideration by the

Court as part of "the history and characteristics of the defendant" under 18 U.S.C. § 3553(a)(1).

In 1991, Mr. Gomez was convicted in a jury trial and incarcerated for more than one year for a

crime he did not commit.  See Gomez PSR ¶ 91. The charges against him were based upon

entirely fabricated evidence and testimony.  See Ex. T. Mr. Gomez was convicted by the jury

based upon the testimony of the prosecution's key witness.  See id. Mr. Gomez was finally

vindicated of this conviction by prevailing on a Motion for New Trial before the trial court,

which was granted because of the discovery of new evidence which led Superior Court Judge

Robert H. Bohn, Jr. to conclude that the testimony of the prosecution's key witness against him

was "false and misleading in a material respect."  See id. Mr. Gomez had strenuously

maintained his innocence throughout the trial, and the newly discovered evidence was consistent

with his version of the relevant events and entirely inconsistent with that of the prosecution's

witness.  See id. The Middlesex County District Attorney's office then chose not to pursue a re-

trial of the matter, and the case was ultimately Nolle Prosequi on November 4, 1997. However,

as a result of the false testimony against him, Mr. Gomez was wrongfully imprisoned for more

than one year before he was finally exonerated.  See id. As stated by Barry P. Wilson, Esq., who

represented Mr. Gomez following his conviction, "[T]hough justice was ultimately served, [Mr.

---

determining the likelihood of recidivism. Even if the court does consider them, their age and petty nature make them entirely irrelevant to the issue of Ms. Gildea's likelihood for recidivism in 2005 given her current stage of life.

Gomez] must have endured untold anguish during those 13 months." Id. The pain that Mr.
Gomez had to endure in being falsely charged, and then convicted and sentenced to jail, must be
considered by the Court in determining a sufficient, but not greater than necessary, sentence in
this case.

Furthermore, a downward departure based upon Mr. Gomez's prior wrongful conviction
and incarceration is warranted under the advisory Guidelines. As acknowledged by the
Sentencing Commission when the first set of Guidelines was promulgated, "it is difficult to
prescribe a single set of guidelines that encompasses the vast range of human conduct potentially
relevant to a sentencing decision." See U.S.S.G. § 5K2.0, cmt. background. Sentencing courts
therefore have discretion to depart from the applicable Guideline range on those grounds when
"mechanical application of the guidelines would fail to achieve the statutory purposes and goals
of sentencing." See id. See also United States v. Miller, 991 F.2d 552, 554 (9th Cir. 1993)
(holding that where defendant had erroneously served 6 months of home detention, district court
was free to depart "because the Commission seems not to have considered the issue of
compensating for time erroneously served"). The atypical circumstances of Mr. Gomez's prior
wrongful conviction clearly render this case one outside the "heartland" of cases the Guidelines
were designed to address, and warrant "compensation" for time erroneously served. See Koon,
518 U.S. at 94 (noting that the Guidelines allow district courts to depart in cases that feature
aggravating or mitigating circumstances of a kind or degree not adequately taken into
consideration by the Sentencing Commission); Miller, 991 F.2d at 554.

## VIII. THE PROPOSED SENTENCE IS WARRANTED UNDER 18 U.S.C. § 3553(a) AND THE ADVISORY SENTENCING GUIDELINES IN LIGHT OF THE TOTALITY OF THE CIRCUMSTANCES PRESENT IN THIS CASE.

Under the requirement of 18 U.S.C. § 3553(a)(1) that sentencing courts consider "the nature and circumstances of the offense and the history and characteristics of the defendant," all the facts detailed above should be considered as a whole in determining a sufficient, but not greater than necessary, sentence for the Gomezes. Taken as a whole, these facts support the Gomezes' requests for the proposed sentence under the post-Booker statutory scheme.

Similarly, the Sentencing Commission specifically authorized downward departures based on a combination of such factors, which when taken *collectively* differ significantly from the heartland of cases covered by the Guidelines, even though none of the characteristics or circumstances *individually* warrant departure. See U.S.S.G. §§ 5K2.0(a)(2)(A), (c) (emphasis added). The First Circuit has embraced such a departure analysis in holding that the convergence of factors in a case may, in combination, suffice to remove it from heartland of the Guidelines. See United States v. Sklar, 920 F.2d 107, 117 (1st Cir. 1990).

Therefore, while the numerous grounds listed above are individually adequate to warrant the proposed sentence, particularly in light of the statutory purposes set forth under § 3553(a)(1), should the Court find that no single factor is sufficient on its own to justify a departure under the now-advisory Guidelines, the Gomezes urge that a downward departure is warranted based on the totality of the circumstances in the instant case which, taken together, are present in a substantial degree to remove it from the heartland of the Guidelines.

## CONCLUSION

In consideration of all of the factors described under 18 U.S.C. § 3553(a), as well as the now-advisory Sentencing Guidelines, the Gomezes request that this Court impose a sentence of:

five years' probation, with the following special conditions: a) a period of eight months home detention; b) full compliance with a restitution schedule with the Laborer's Union as approved by the Court; c) full cooperation with the Internal Revenue Service in calculating any additional taxes owed by Lanco and/or the Gomezes; d) participation in a community service plan involving Habitat for Humanity as approved by the Court; and e) payment of a $10,000 fine each.

Respectfully submitted,


/s/ Harry L. Manion III
Harry L. Manion III, BBO # 317440
Christopher J. Cunio, BBO # 634518
Cooley Manion Jones LLP
21 Custom House Street
Boston, MA 02110
617-737-3100
*Counsel for Defendant Carlos Gomez*


/s/ Joseph F. Savage, Jr.
Joseph F. Savage, Jr., Esq., BBO 443030
Kevin P. McGrath, Esq., BBO #550123
Goodwin Procter LLP
Exchange Place
Boston, MA 02109
617-570-1000
*Counsel for Defendant Mary Gildea*


Dated: August 15, 2005

146189.1

50

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of August, 2005, a copy of the following documents were served via first-class mail upon U.S. Probation Officer Stephanie K. Henshaw and Assistant U.S. Attorney Paul G. Levenson:

- Defendants' Joint Motion for Downward Departure;
- Defendants' Sentencing Memorandum (with exhibits); and
- Defendants' Assented-To Motion for Leave to File a Memorandum in Excess of Twenty (20) Pages; and

/s/ Harry L. Manion III_____

# EXHIBIT  A

**Andover School and Lanco Scaffolding Video Transcript**

1   **Chapter 1**

2   My name is Hector Castaneda.

3   My name is Cándido Castaneda.

4   My name is Francisco Pleitez.

5   My name is José Domingo Pleitez.

6   My name is Luis Antonio Umansor.

7   My name is Arístides Romero.

8   My name is Mario Alberto Gutierrez.

9   My name is Pedro Arturo Romero.

10  My name is Wilfredo Romero.

11  My name is Hubencindo Perlera.

12  My name is José Perlera.

13  My name is Mario Perlera.

14  My name is Carlos Manuel Perlera.

15  My name is Patrocinio Ortiz.

16  My name is Cesar Ortiz.

17  My name is Oscar Ortiz.

18  My name is Eleazar Ortiz.

19

20  **Chapter 2**

21  C. Castaneda: My name is Cándido Castaneda. I'm 29 years old. I've been working here at Lanco

22  for 7 years. I have a son with my wife. I also have my family in my country. They all depend on

23  me. I own a house with my brother. All that depends on my work. I also have my car and all this

24  depends on my work.

25  Interpreter: Your training?

26  C. Castaneda: My boss, Mr. Carlos, has taught me my training. I have nothing against him. I

27  appreciate everything he has taught me. He has helped me a lot. And Mary also.

28  Interpreter: What types of things has your job helped you with?

29  C. Castaneda: Well, it has helped me and my family a lot.

30  Interpreter: Thank you.

31

32  **Chapter 3**

33  H. Castaneda: My name is Hector Castaneda. I'm 34 years old. I've been working for Lanco for

1    11 years.

2    <u>Interpreter</u>: How many years was it, thirty?

3    <u>H. Castaneda</u>: 34. I live at 58 Dorchester Street in Lawrence. My brother and I own that property.

4    It's something we have been able to achieve with effort and the work we have had with Lanco.

5    We are grateful for Mr. Carlos's trust. We can only be grateful because he has been a great

6    person. He has treated us very well. He has given us trust because he's our, we are all Hispanics. I

7    also have ... I do not have children here. I only have my parents. They are elderly. They come to

8    visit me with a visa. That's it. They depend on me. Thank you.

9    <u>L. Umansor</u>: My name is Luis Umansor. Well, I came from El Salvador in '85 and I started

10   working here with Carlos Gomez in '86. It's been my only job. I have learned, I started in the

11   yard, working, cleaning and doing what one, there isn't any of this work in our country and since

12   '86 until now I have been working here. I have not stopped working. Thanks to God they have

13   treated me very well and I was raised in a family of ten children that I had in my country. From

14   here came the part I earned to send them money. I have a daughter who is a doctor in medicine. I

15   thank God because of that and we are here, well, waiting since this man has treated us so well. He

16   has given us work. We have never needed welfare. We have never needed to collect. We have

17   never needed anything else, just the job. And after, I got my residence here with them. I learned

18   to drive and I straightened out my papers. I became an American citizen. Uh, and now I lead a

19   group in the field I work at, thanks to the teaching they have given us because we have not had

20   any other schooling other than Carlos Gomez that he has taught us. Yeah. Ok.

21

22   **Chapter 4**

23   <u>K. Moran</u>: Okay. My name is Kendal Moran. I am a married guy with two children. I live in

24   Andover, Massachusetts for over two years. I be working with Lanco Scaffolding since 1987....I

25   started working for Carlos as a driver and the workhouse man. I met him here but I know his

26   family from Guatemala which I am.... I am originally from Guatemala. I became also a United

27   States citizen. When I started working with him he taught me everything I know up to today. Like

28   I said before I started working as a driver, and as a workhouse man and then as a laborer also

29   installing and dismounting the scaffold. And I became in the last ten years the estimator of the

30   company. All that process, along the line, Carlos teach me every area up to today. We continues

31   working hand by hand. Normally we go to see the client. And he is the guy who talks with the

32   client, and I'm just assisting with taking the measurements and then we come into the office and

33   do the calculations for the job.

1   Also I am very fortunate to work for Carlos for this many years. I have a really good pay. I can

2   afford my house in Andover, for which I pay a mortgage payment every month. In the same time

3   I am very fortunate to work also with Mary Gildea... she is in charge of all the administration for

4   the company. She receives all the phone calls for the clients, she calls Carlos so we can go and

5   visit the client. That's how the process is started with the jobs. When we come back from the job

6   site we do the calculation. She makes the proposal to the client, um, also when the job is

7   becoming a real job for the company, she makes all the folders, all the paperwork for that

8   particular job. Se sends all the invoices to the client. She calls them about collecting the money.

9   Uh.

10  Interpreter: How has it affected your life, working for them?

11  K. Moran: Oh really. I am very fortunate. I feel very proud to work with Carlos for that many

12  years and also be part of working with Mary Gildea. My day, regular, can start at about 4:30-5

13  o'clock in the morning. When I come to the shop normally I call Mary and she has prepared all

14  the schedule for that particular day, which crew going to each particular job, which truck taking

15  the crew leader to the truck. She's taking complete care of all the scheduling for the different

16  jobs. Again, I am more than proud working for Carlos. He is a good man. Also I am very proud

17  working for Mary, she helps me a lot too. Even became a part of my friends. I can call her too.

18  She help me a lot with my personal life....[helped] when I wished to live in Andover

19  Before Andover, I live in Wilmington and before Wilmington I live here in Somerville. Thank

20  you very much and any information they need or something they can contact me here in the office

21  in my telephone number.

22

23  **Chapter 5**

24  R. Gomez: My name is Roberto

25  Gomez. I am Carlos Gomez's brother. As a brother, as family, Carlos is a great person. Eh, as

26  workers, or, me, as one of his workers, I am, he has been a wonderful person. Yes. To Carlos, we

27  grew up since we were small. Uh, he has been like a father to us. He has helped us when I was in

28  school in Guatemala, we come from there. He gave us a big hand economically. And then we

29  decided to come to the United States, a wonderful, big country.

30  When we started he was already made, so to speak. Uh, it helped us out to be here together as

31  family and uh, as workers. During the last few years, as a person, he has been wonderful because

32  I have a son that has a disease, an illness. He has given me a big hand economically and morally,

33  both he and his wife have been wonderful. As workers he has always taught us each job that we

34  do daily. He is always with us. Uh, he visits us, eh, and also he is the one in charge of visiting our

1  clients and speaking to the companies that we work for. And really, well, he is our leader, the

2  leader of each one of us and we have a group of workers that come from very far away to survive,

3  to survive in this country that is so big. And sometimes we make mistakes but we are human and

4  I think we fix them with the talent that Carlos has taught us. Because he, ok.

5

6  F. Gomez: Hi. My name is Fernando Gomez. I have been working here for twenty years. Carlos

7  Gomez is my brother. And as a brother he has been good and as a boss too. The proof, the proof

8  is I've been working with him for twenty years and I've never had problems. And I've always

9  been fine working with him. And also I've been raise my family with his help through the work

10 he provides me. Now I have a 21 year old daughter who is going to graduate soon, well, next

11 month and I have done this because of my job's help and obviously it's because of the work that

12 my brother Carlos Gomez awards me. Who is going to graduate next month, yeah, because I have

13 been able to support my family because of my work. And everything I have now and I have

14 learned it's because I have watched my brother throughout this time. That's all I can say about

15 him.

16

17 **Chapter 6**

18 J. Romero: My name is José Arístides Romero. I have been working at this company for

19 seventeen years. Eh, I am the oldest of three brothers that work for Lanco. Um, when I came to

20 this country, it was to this state. It was the first job I got and I have worked all this time at Lanco.

21 Eh, thanks to God and Carlos who has given me work, my family has been able to go on. Um, I

22 have a wife and two kids. My kids were born here. I also have my house, my car, what I live off

23 of, of which everything depends on the job, the payments and everything I do depends on it. To

24 me, Carlos has been someone who has taught me a lot. He has taught me the job and respect. I

25 respect him a lot and I have a lot of appreciation for him. He has always been there during the

26 times we have needed him. He has always been with us. He has helped us out a lot. Eh, also,

27 Carlos has always been at the jobs when we need him. He is the one who guides us and he is the

28 one who always directs when, when something is going wrong or if there is any correction to be

29 made on the work he is the one who takes care of it. Ok

30

31 P. Romero: My name is Pedro Romero. I have been working for Mr. Carlos and Mary for 13

32 years. They have helped me a lot giving me work. I started with them when I was very young. I

33 got married. Now I'm divorced. They have helped me with the child support situation. They ... I

34 have three children. They depend on me, on my work, on the work Mr. Carlos gives me. And,

146184                                                                          4

1    well, I have had some accidents that have not happened here and well, thanks to Mr. Carlos, well,

2    I have always received my check and they have always helped me out that way and well, we

3    started from the bottom so to speak, and, well, now the company has grown a lot and, well, we do

4    need him with us. That's why, well, we depend on him, on the work that he does. My whole

5    family depends on the work he does. That's it.

6

7    **Chapter 7**

8    <u>W. Romero</u>: My name is Wilfredo Romero. I have been at this company for nine years and, well,

9    Mr. Carlos has been a... Mr. Carlos has been a person who has always given me a hand in all the

10   time that I have needed most he gave me a job. At the moment I needed it the most and he has

11   come and motivated me to keep going and he has given me encouragement in each decision I'm

12   going to make and he's a very understanding person and, uh, well, I have been doing this for a

13   long time. He has helped me to get ahead. He has always told me what I have to do on the

14   scaffold. He never rushes me or anything. He has always been an understanding man and, well, I

15   am very grateful to him and I know he is the right hand of this company. Without him, well, we

16   don't have the means to go on since from these wages I earn I support my mother, pay my car,

17   pay my rent and I support a lot of people. And well, this has been the job I have always had since

18   I came from my country. And I don't, don't know any other work only the scaffold and that's my

19   profession and I would like to keep doing it. Always forward. Ok.

20   <u>Interpreter</u>: Thank you.

21   <u>W. Romero</u>: Ok.

22

23   <u>N. Ortiz</u>: Ready? Well, my name is Nery Ortiz. I immigrated to this country in 1988. I was here

24   for two years. In 1990 I found out about this company, Lanco Scaffolding. From '88 to '90 I had

25   like four or five jobs where there where days I worked and days I did not work. In 1990 that I

26   found out about this company I have work everyday. I come, well, I have a place to come to

27   everyday. And, what can I tell you? Since then it has helped me out a lot. From the first day of

28   work I started at the company I said to myself this is the job I can do. Then about the job, well,

29   first I bought a car and after I have my house. Understand? I have four children and if then, if,

30   well I think if Mr. Carlos Gomez, if his freedom was taken away it would harm me too much.

31   Because they might come to the decision of closing the company then what would happen if this

32   finished and I had to go to a temporary agency, where, where everyday there are lots of people

33   waiting to see if they will get work each day, where maybe there will be days when I will work

34   and days I will not while here thanks to God that Mr. Carlos Gomez, well, with him in this

1    company that is, I could say no one can replace him. Yes. Umm, well, what can I say? I would
2    really feel like I'm starting over again. Thank you.
3
4    **Chapter 8**
5    E. Ortiz: My name is Eleazar Ortiz. I have been working at this company for 16 years. And I feel
6    very proud to work at this company because working at this company I have been able to care for
7    my family well. I am married. I have two children. One of them goes to school and the other one
8    works. One is 14 years old and the other one is 21 years old. And during the time I have been
9    working at this company, neither I or any of my children has needed help from the government,
10   free care, no kind of free help from the government. All my life I have supported them with my
11   job and the insurance I have had here. And at least because of the help Mr. Carlos, the lady, his
12   wife, another good person, that no, well, maybe not to everyone, with everyone is this way but
13   with us has been an excellent person, all of us who work at this company. He has been very good
14   to everyone here, she has been perfectly fine with all the workers and we have never even had a
15   scolding from her. Well, we also know what we have to do. Because of my job and because of
16   them I have bought my house. I live in Jamaica Plain; I live at 4 Ash Street. I pay; I have two cars
17   because of my work here in the company. And I also help the Jamaica Plain police. I help the
18   firefighters that ask me for help too. I help them also. It's because of all the help I have had at this
19   company. Since I came I have worked here and I have felt very proud of my work that I know
20   how to do here. Everything because of the help Mr. Carlos, the lady and that's why we don't want
21   Mr. Carlos not to be here because he is the brain of this company and the lady also. They are
22   needed in this company. And if it happened, as they say, that he can go to jail, we don't want to
23   go to that extreme because we are all going to be affected with our families also. Yeah.
24
25   **Chapter 9**
26   O. Ortiz: Yes, my name is Oscar Ortiz. I'm 35 years old. I've been working for this company for
27   six years. And I'm thinking, in other words, I am very saddened by the situation my bosses have
28   been in. They have been very good to me since I work for him and I have depended six years that
29   I've been working in this company. I depend on it for the work I have done and my family that is
30   at my country depends on me. Therefore, it would affect me a lot if this company were to close.
31   Carlos Gomez, who is my boss and well Mrs. Mary. I don't know in what other situation I would
32   find myself in if they closed this company. Therefore, I think if there was another option of them
33   being able to fix their situation it would be better for me because at other jobs I would have to
34   start over and it would be more difficult for me, more problematic to support my family. Uh, it's

1   that I have three children who are in school and I, well, carry out my work and I am very attentive

2   to my work and, to me, they have been good employers. I have nothing to say against them only

3   that they are very good to me. And that I wish this did not happen so I won't be harmed, since, at

4   the unions, at the union that I belong to it would be more difficult for me to find work if this

5   company was closed.

6

7   **Chapter 10**

8   C. Ortiz: My name is Cesar Ortiz and I work here with Mr. Carlos Gomez. I have been working

9   for 7 years. And I think that to me they are great people. Because of both of them, Carlos Gomez

10  and Mary Gildea, my family and I have been able to go on. Uh, like I already said, thanks to them

11  I was able to bring my family that lived in Central America. Now we live here and, well, then, to

12  me, they are very good people and that's what I think about them, very good. And, well, to me,

13  this, he, since I have worked here I have not had problems with them even once. Uh, they have

14  treated me the best possible. Eh, that's what I think about them, that they are very good people

15  and that's it.

16  I have been working at this company for 3 years. When, when I started, when I came and I asked

17  him for work, the gentleman opened the doors of his company to me. And he has been very good

18  because he has kept me at this job the whole time and through this job I support my family, yes.

19  Patrocinio Ortiz. And the gentleman, what would happen if his company were closed? I don't

20  think I would make what I make here somewhere else. And when we are at a job and the truck

21  does not get there, the gentleman is very good and he goes and buys us food and everything.

22  Interpreter: Do you have children?

23  C. Ortiz: Yes I do, but they are in Guatemala. And every month I send them money over there.

24  Like I already said, if they were to close this company who knows what would happen. Good

25  people, that's all I can say. Thank you very much.

26

27  **Chapter 11**

28  Interpreter: We're going to start with your name. My name is...

29  C. Perlera: My name is Carlos Manuel Perlera. I am working here at Carlos Gomez's company

30  because of my brother. I was employed here because of my brother. Well, I have overcome

31  working here. I have learned many things. Oh, well, working here, I have helped my family in El

32  Salvador sending them money and, oh, well, yes, I have overcome many things working here.

33  Also at work you learn, you learn to work, also to listen to your bosses. Well, we wouldn't want

34  to happen what is to, what wants to happen because if I don't, I don't know what would happen

146184                                                                                          7

1    because here one does not live for free. One has to pay bills, rent, everything, etc. Well, if I, these

2    are my only words and I hope everything turns out fine, that we are able to move forward and see

3    what happens with us here at Carlos Gomez's company. I have been working five years, well, I

4    wouldn't want something to happen that would affect us, the workers, because it would be a

5    ...Oh, and I hope that these problems that are going on resolve themselves so everything can keep

6    going and the same group keeps working here, well, because we need him present here because if

7    not, if not we will not continue fighting for our lives and...

8

9    **Chapter 12**

10   L. Perlera: My name is Luis Mario Perlera and I've been working at this company for 11 years.

11   And I am a laborer and I have two small children and without Mr. Carlos we can't live because

12   without work one can not support oneself and he is a good person that has never sent us to collect.

13   All our life he has had us working and without him the company would close and for our family

14   if we don't have work how are going to support our children?

15   Interpreter: Were you able to buy a home?

16   L. Perlera: Hmm?

17   Interpreter: Do you have a car and a home?

18   L. Perlera: Yeah, I have a car. And always from what one earns here you have to send to ones'

19   family to ones' country. Also, if not how is the family going to support itself? And I can say that I

20   have, well, my brother and the cousins have to come after and I love Carlos.

21   Interpreter: Yes.

22   L. Perlera: Are we done?

23   Interpreter: Yes.

24

25   M. Perlera: My name is Manuel Reyes Perlera. I live in Somerville, 73 Perkins. They have treated

26   us the best, mostly Mr. Carlos, Mary. We live from this to support our family. Is that all?

27   Interpreter: Do you have children?

28   M. Perlera: No, I'm single, I don't have children. That's all.

29   Interpreter: Thank you.

30

31   W. Perlera: My name is Wencindo Perlera. I've been working at this company for four years.

32   Yeah. Here we always work every day. With frames, boards, we work heavily, hard everyday.

33   Hmm. Always here, from this job we earn to be able to live, to support ourselves, food, rent, well,

34   everything, to buy everything. Hmm. I have one son here. My wife, I'm married, yeah. Well,

146184                                                                                                    8

1  here, we always work. All the guys come here to be able to always go on, to have something to
2  eat another day, to pay everything. All of us always need the work. Everyone...
3  Interpreter: Are your wife and son here?
4  W. Perlera: Yes, they are here. Well, here...
5  Interpreter: What have you been able to, what type of work do you do?
6  W. Perlera: Here we always work with this material that is here, the equipment, the components.
7  Hmm. Yeah.
8  Interpreter: Have you been able to buy a home?
9  W. Perlera: Yes, well, I, thanks to this job I have bought a car, we pay insurance and everything.
10  Yeah. We always have family in El Salvador that we have to help; we have to send a lot of
11  money there. Hmm. Yeah. Only. Thank you.
12
13  **Chapter 13**
14  J. Perlera: My name is José Daniel Perlera. I live at 10 Walden Street, Revere, apt 2. Different,
15  because of this job I help my family. I help myself. Because I can have this job I have my things.
16  I have learned to do this work and we really like how he has treated us. With us, everything is
17  fine. And he helps us a lot, well, he gives us a hand and without him here we are nothing, well,
18  because without him the company is nothing. And, well, thanks to this job we are doing well. We
19  have the things we need, well, and to help...
20  Interpreter: Do you provide money to your family?
21  J. Perlera: Oh, yes, I help my family in El Salvador. Um-hmm. Yeah. I have been working here
22  for four years and I have been able to go on with his help, Mr. Carlos's help. He has supported
23  me here. When I needed work, he helped me here with the work and all that. Ok. That's it. Ok.
24  Thank you.
25
26  Hubencindo Perlera: I'm 24. Uh, I've been working for Lanco for a year. Uh, to me, Mr. Carlos is
27  a very good person Uh, he, if it wasn't for him; thanks to him I have helped my family. Uh,
28  only...
29  Interpreter: Do you have family?
30  H. Perlera: Yes, my brothers are here. And my wife.
31  Interpreter: Do you send, do you support the family?
32  H. Perlera: Yes, I send my mother money thanks to the job I have. I help my mother and my
33  brothers. That's it.
34

1
2 <u>M. Gutierrez</u>: My name is Mario Alberto Gutierrez. Yeah, I work for Mr. Carlos Gomez. My job
3 is to work on the scaffold. They have been very good people with me.
4 <u>Interpreter</u>: How many years have you been working?
5 <u>M. Gutierrez</u>: Five years. Yeah, I depend on this company. Eh, eh, everything I have done. I have
6 been happy working here. I am grateful to them because they have been good people with me.
7 <u>Interpreter</u>: Do you have family here?
8 <u>M. Gutierrez</u>: Yes, I have two children. Eh, my wife. Only.
9 <u>Interpreter</u>: And have you been able to **(could not hear)** ... buy a house?
10 <u>M. Gutierrez</u>: No, uh, what I have done is bring my family from my country, my wife and my
11 children. Yeah.
12
13 <u>J. Pleitez</u>: My name is José Domingo Pleitez. I am from El Salvador. Uh, I have been working
14 here for 3 years. And, uh, from here is that I support myself and my brothers that are in El
15 Salvador. I help my family that's here and the ones who are there and, mainly, without this
16 company we are nothing either because from here is that we support ourselves and from here we
17 pay the rent, each one of us and, well, I, it's from here that I pay rent, from the work Mr. Carlos
18 gives us and the support he gives to each one of us and, well, have learned the work little by little
19 and we continue learning more each day. Uh, well, I thank Mr. Carlos for giving us this work and
20 that we keep going and I wish him to be working with us. Ok. That's it, nothing else.
21 <u>Interpreter</u>: Thank you.
22
23 **Chapter 14**
24 <u>F. Pleitez</u>: My name is Francisco Pleitez. And, well, I feel happy here because Mr. Carlos gave
25 me this job and it's been 10 years that I work here. And with this job I have done my things in El
26 Salvador, my country. I support five children over there. I provide them a pretty house. And here,
27 well, I have, I brought two of my children here and they are working here and I have my car. I
28 also have my license here. And I am grateful for all of that to Mr. Carlos Gomez that, in addition,
29 he taught me the job in the beginning. I have the hope of working here until I die. I feel happy
30 here, yes.
31
32 **Chapter 15**
33 <u>M. Lima</u>: How're you doing? My name is Marcos Lima. I've been working for Lanco for, uh, ten
34 years. Uh. They help me out by being able to...letting me start driving. I got my license. I've been

146184                                      

1   driving their trucks, their pickup trucks. What else can I say about them? They taught me how to

2   be a good responsible guy, not only at work but also at the house. You know I have two kids,

3   one's five years the other is a year and a half. My wife is working. What else? They're good

4   people. They've been training me to do...to be successful in life, not only as a boss, as a foreman

5   and also as a worker. Thank you.

6

7   **Chapter 18**

8   <u>Joan Ellis</u>: My name is Joan Ellis. I am the art teacher at the Andover School of Montessori. I'd

9   like to share with you some of the things that Carlos and Mary have provided to our school, both

10  material goods as well as inspirational pieces to add to the programs. So, we could start with the

11  mailbox, which used to be a broken down wooden post with a... sort of a residential-style

12  mailbox, and Mary and Carlos both felt that it would represent the school a little better to have

13  something a little more permanent.

14  This is the playground that is used by lower-elementary, upper-elementary right through 'til

15  middle-school. The field and this play structure were, um, installed by Carlos and Mary through

16  their generous donation. Carlos came the day that the pieces were delivered and made sure that

17  everything was fitted in properly, installed properly. Bark mulch was raked, and just... he just

18  wanted to make sure that everything was suitable for the age levels. The bleachers were installed.

19  They were used for picnics, um, all-school meetings where we could be outside watching the

20  children play. So, the equipment was brought in, installed, and then Carlos realized that the staff

21  and the observers, who were out here at playground duty, needed a place to sit so any of the

22  benches that you see around were brought in so that, um, the adults would have a place to sit.

23  There are also child-size picnic tables that Carlos had built by someone he knew who was capable

24  of doing that so there are several places around the school where you'll see miniature picnic

25  tables and benches.

26  This brick patio within the confines of the entry-way of the school was a fundraiser for us and

27  parents were asked to buy a brick that was engraved with their child's name. And when the

28  project was just about finished, Carlos offered to purchase a brick in the name of every staff

29  member and, um, administrative person who was here at the school at the time. So, it was a very

30  moving gesture and it has meant a lot to us over the years.

31  The photo of Maria Montessori, the woman who....whose teaching methods were the basis for the

32  Montessori schools, um... Carlos realized that there was no photo of Maria around anywhere in

33  the school so he and Mary researched and found a photo and, uh, did the framing and brought it

34  in and hung it so we would always have Maria looking over our shoulders.

146184

1    The founders of this particular school, the Padini family and the Peck family, were asked to

2    attend a photo shoot and Carlos and Mary had, um, that photo framed so that we have that as a

3    reminder of the wonderful generosity of other people as well.

4    This room is our all-purpose room. It's called the American room and it was funded by Carlos

5    and it is used for our physical education program on days when the children can't go outside. It's

6    used for our music program. It's also used for all of our major events -- grand-friends day, staff

7    appreciation day, all kinds of events where we have the whole student body and parents as well.

8    Tables, all the chairs and all of the musical instruments in this room were donated by Carlos and

9    Mary.

10   This mobile was donated by Mary and Carlos, and Carlos wanted to be sure that the children saw

11   workmen, uh,  installing it so he brought his crew and all the scaffolding necessary to get the job

12   done and set it all up and the students were called out, a classroom at a time, so they could watch

13   the process taking place. It has been a beautiful addition to our school and has inspired many art

14   projects. Um. Students have made mobiles in this same style, and its a beautiful piece, even on a

15   rainy day.

16   The fine art reproductions that are throughout the school are a wonderful source of inspiration for

17   not only the children but for the adults as well. The art has inspired the children in their art classes

18   as well as outside of their art classes by doing their artwork at home in the style of the artists

19   represented.

20   This area we call the butterfly garden, adjacent to the nursery school area's playground. This

21   arbor Carlos built so the teachers would have a nice place to sit, watch the flowers grow, watch

22   the butterflies come and go and during the spring and early summer it really is a very special

23   place to be.

24   This, uh, play structure, Carlos installed, and it's for children aged three, four and five so its a

25   smaller scale than the structure in the other playground but it's also one that is very well used by

26   the children.

27   The concrete step outside the classroom door was specially built by Carlos. There's a matching

28   set on the other side of the building and its for one teacher in particular who had difficulty with

29   the high step coming down off uh...off the classroom level. So he built that, extended it out so he

30   wouldn't be effected by the snow and ice that gathers along the roof edges.

31   So that's a representative sample of some of the things that Carlos and Mary have donated to the

32   school. What's important to know is that Carlos comes and works at the school. He installs the

33   swing sets, he rakes the bark mulch, he helps put in the benches and all of the things that are

34   necessary to keep the programs running, outside and inside. Their artwork in the hallways adds

1    excitement, just to the overall look of the school. They've enhanced the science program, the

2    music program, the art program...academics in each one of the grade levels and they are a true

3    part of this school. They are the heart and soul of this school and they continue to advocate for

4    not just their own children but all of the children and the staff as well and they're well-loved

5    members of our community. Thank you.

6

7    **Chapter 19**

8    <u>Joan Ellis</u>: Many people in this school community don't know all that stuff, they don't know all

9    the stuff they have done to contribute. They don't want to be highlighted. When that American

10   room was built and we had our first big event in there, the director at the time wanted to bring

11   them up and, you know, make sure everybody gave a big... they didn't want it. They didn't want

12   that. They just wanted to sit there and just enjoy watching people enjoy that room. It's...it's

13   amazing. They don't... they don't want any special anything....something. There's a difference, a

14   big difference between that and somebody who's throwing money around. You know, and I told

15   Mary I was really nervous about doing this and she said "oh you know you're going to be great,

16   you're such a natural, you're just great," and I said I think I freeze up in front of the camera and

17   she said 'oh you'll be great". So the other night I made a list of stuff that I could talk about and

18   she said "no no, you don't want all that, just a few things, you know, cut that down. Cut that

19   down." I mean there's stuff in my art room... these drying racks, the skeletons and the globes. I

20   mean these beautiful globes. Just beautiful things that they do to enhance the programs and they

21   just don't want anything. They don't want people knowing. Most people don't know... So, and

22   there are details.... that I don't even know........I've gotten to be friends with them and I just really

23   admire them. They don't have a summer house. They don't have any of that extra stuff. Their

24   focus is on people and the things in their life.... Mary said, "how can you take care of more than

25   one house? I've got all I can do to take care of one." You know she does her own house stuff...

26   just doesn't want all of that flashy stuff. She wants to make a difference right here. So now, you

27   know, granted they have made some big mistakes in their judgment but in their hearts and their

28   minds they really thought that was the right thing to do for those people involved, for those

29   people that they hired. They really thought they were helping those people but the downside is

30   they were doing themselves in by doing that. And, if you asked any teacher, any staff member,

31   any employee of the school, what they thought of the Gomez family you're just liable to get

32   somebody bubbling over with emotion, even the people who sweep the floors. It's amazing. They

33   just... they're very inspiring and when they ask you how you are, they really want to know how

34   you are. And I have to be careful what I tell her. You know I had a daughter who was going

146184                                                                                              13

1    through a Master's program and she was, you know, living from pittance paycheck to pittance

2    paycheck and Mary said "oh yeah well we'll get her a microwave oven for her apartment." No,

3    Mary. That's fine. Don't. You know? And I thought I better stop carping about how bad my

4    daughter has it because she'll move in with a truck, filled up with all kinds of stuff but its not in a

5    flashy way, you know, its in a...just a real genuine giving generous day. They do a huge amount

6    here for the school.

7



# LANCO
# SCAFFOLDING

36 Windsor Rd. Somerville, MA 02144 (617) 623-0060

Revised 7-22-91



St. Mary's Church — Lawrence

## About Lanco Scaffolding

Lanco Scaffolding has been specializing in the design, installation and dismantling of scaffolding since 1984. Our top three personnel represent 42 years of combined experience with all types of scaffolding needs.

We have erected scaffolding for a wide range of projects, from new building construction to rehabilitation, from office skyscrapers to residential chimneys, from water towers to church steeples. We can meet all your access needs. We use only scaffolding products which we know meet our strict safety standards.

At Lanco, we offer complete scaffolding services — from design, installation and dismantling to sales and rentals — for simple to complex projects. We also specialize in Historical Restorations. Lanco Scaffolding — quality products, dependable service, reasonable rates. Serving most New England states.



Central Administration Building — Worcester



Massachusetts College of Art — Boston





State House

125 High Street

## Canopies

Lanco specializes in canopies for all your job needs — heavy duty (300 lbs./sq. ft.), medium duty (150 lbs./sq. ft.) and light-duty (25 lbs./sq. ft.).

And Lanco canopies offer...

**Safety** — Lanco's commitment to safety is visible with the Lanco Canopy. Made of steel tubing and I-beams overhead, you can be assured of surfaces being protected.

**Aesthetics** — For those jobs where appearance is important, Lanco Scaffolding will design a canopy system to blend in with the exterior of your building.



Keystone Building — Boston

## Shoring

With Lanco Scaffolding, your shoring costs are minimized. Our flexible units can do your job faster and more economically because they are simple to design. These 24K frame units can be adjusted



to the exact height you need, and easy to handle on the job. Lanco Shoring products can fit all your job needs, regardless of height, size or type of load.



## Rolling Towers

Lanco Rolling Towers offer the best in safety and convenience. Built on rubber casters, Lanco Rolling Towers can easily be rolled to the job or out of the way. These towers can be used many ways, such as to span open areas with two towers, to work a curved wall or ceiling, or with a stepped-up working platform. Their versatility make them ideal for installation and maintenance work in a variety of industries. Whatever your needs, Lanco has the rolling tower.

# Boilers

Lanco Scaffolding is available for boiler repairs. Our system reduces the number of days needed to complete the job because it is easy to assemble and dismantle.

scaffolding system and to allow access to all areas — firebox walls, pendants, ceilings, superheat and ash hoppers.



Lanco Boiler Scaffolding is strong, and stable. It is designed to distribute weight evenly throughout the

## Power Platforms

Lanco Power Platforms offer optimal flexibility and can be used for various job types. The twin-mast system allows installation on uneven ground conditions and can handle high payloads. Built-in features, such as automatic level control devices and manual brake release levers, assure ease of use when operating the platforms.





# Unit Parts

## SECTIONAL STEEL SCAFFOLD FRAMES

**LF 3**
HEIGHT 3′
WIDTH 5′

The **LF 3** is the shortest of the Ladder Frame Group, with plank levels of 18″ or 36″. Generally used in conjunction with other frames for intermediate planking heights.
Has 2′ stud centers for braces.

**LF 5**
HEIGHT 5′
WIDTH 5′

The Basic Lanco Frame. Used by mason contractors and in Rolling Towers. Can be used in conjunction with all other Lanco Frames.
Has 4′ stud centers for cross braces.

**LF 6**
HEIGHT 6′4″
WIDTH 5′

The **LF 6** is used in conjunction with the **LF 5, LF 4** & **LF 3** to obtain the proper height for Rolling Towers. Through the use of any or all of the **LF** frames in a tower a built-in ladder is provided to the top deck. Has 4′ stud centers for cross braces.

**OE 10**
HEIGHT 10′1″
WIDTH 5′

The **OE 10** is used mainly when the scaffold must be kept clear for pedestrian passageways. Has 2 sets of studs on 4 centers for 2 sets of cross braces.

**LF 4**
HEIGHT 4′
WIDTH 5′

The 4′ Ladder Frame can be used as an alternate to the 5′ Ladder Frame. It is also very popular with Mason Contractors and in Towers.
Has 3′ stud centers for braces.

**OE 6**
HEIGHT 6′4″
WIDTH 5′

Stud Center: 4′0″, Weight: 49½ lbs. Width measured on tubing centers.

**(Not Shown)** Canopy Frame for sidewalk protection. 6′0″ wide × 7′6″ high. Stud centers 4′0″ & 2′0″ Weight 65 lbs. Width measured on tubing centers.

**LS 3**
**LS 5**
**LS 6**
**LS 10**

These Lanco Frames are 2′ wide, and are ideal for working in narrow areas. Can also be used to fit around obstructions.

**BRACE LOCK**

**DL**
Drop Lock. Complete assembly is factory installed. Designed as assembly point for braces. Wt. 1 lb.

VANGUARD

**TP**
Toggle Pin. Solid Steel pin with swivel bar. In open position to insert; in closed position, as illustrated to lock. Wt. 11 lbs. per 100 units.

**CP**

**Coupling Pins** are used to stack frames on top of each other.

**RUBBER CASTER 8″** **RC 8**

This heavy duty, double locking caster makes moving a rolling tower fast and easy.

## HORIZONTAL BRACES

**HZB**

**HZB S**

**Horizontal Braces** are used to increase rigidity in rolling and stationary towers, and to substitute for cross braces when open areas in a scaffold are desired.

**Horizontal Braces** come in the following sizes: 5′, 7′ and 10′ long.

The **S** in HZB S indicates a spring clip in each end.

## BASE PLATES

BP
SBP
CBP
DBP

**Base Plates** are used to provide a stable surface to build scaffolding from. BP are used for level ground; SBP for sloping ground, CBP for building off of Putlogs and DBP for building two scaffolds side by side.

## CROSS BRACES

**Cross Braces** are used to join two Lanco frames of the same size. The following is a table of the commonly used brace sizes and the frames that they are used with.

| Frame Height | Brace Number | Distance Spanned | Stud Centers |
|---|---|---|---|
| LF or LS 3<br>3′ high | B 52 | 5′ | 2′ |
| | B 62 | 6′ | 2′ |
| | B 72 | 7′ | 2′ |
| | B 82 | 8′ | 2′ |
| | B 102 | 10′ | 2′ |
| LF 4 | B 53 | 5′ | 3′ |
| | B 63 | 6′ | 3′ |
| | B 73 | 7′ | 3′ |
| | B 83 | 8′ | 3′ |
| | B 103 | 10′ | 3′ |
| LF or LS 5<br>LF or LS 6<br>OE or F6<br>OE or LS 10 | B 54 | 5′ | 4′ |
| | B 64 | 6′ | 4′ |
| | B 74 | 7′ | 4′ |
| | B 84 | 8′ | 4′ |
| | B 104 | 10′ | 4′ |

## POWERED SWING STAGE



110 volt or air powered

**Power Swing Stage Units** are available singular or in pairs to adapt to both Work Cages, Bosun Chairs and Aluminum Platforms. Unlimited in Height they climb, they can be run on either 110 or 220.



FULL SIZE CAGE

## STEEL STAIR UNITS



**SSU 6**

**Steel Stair Units** with hand rails are designed to provide ease of access to all levels of a scaffold. These stair units are used in the interior of the scaffold and come in sizes for 6'4" frames.

## PUTLOGS



**P8**     **P12**



**P16**     **P22**

**Putlogs** Are used to span between scaffold towers. This eliminates much of the built up scaffold that would otherwise be needed. Each putlog requires two hangers to attach it to the scaffold. There are 4 sizes of putlogs: 8', 12', 16' and 22'.

## PUTLOG HANGERS




**PH12**     **PH22**

**PH12** Used to mount putlogs parallel to the frame.

**PH22** Can be used to mount putlogs parallel or at right angles to the frame.

## PULLEY ARMS



**PA**

**Light Duty Pulley Arms** are of the same size tubing as the frame leg. They are slipped over a Guard Rail Post and a Well Wheel is attached. This enables material to be hoisted to the scaffolding platform.



**SA-21**
21½" Side Arm/Bracket, to extend work area outward 21½". Wt. 10 lbs.

**SA-24**
24" Side Arm to extend work area outwards up to 24". Wt. 12 lbs.

**SA-30**
30" Side Arm to extend work area outwards up to 30". Wt. 14 lbs.



**EA-21**
21½" End Arm to extend work area outwards at frame ends to 21½". Wt. 12 lbs.

**EA-30**
30" End Arm to extend work areas at frame ends up to 30". Wt. 16 lbs.



18"



Leveling Jack with Base Plate attached. To level scaffolding on uneven surfaces. Wt. 13½ lbs.



15"

Leveling Jack for use with base plates, casters, or shoring head. Wt. 13½ lbs.

## STAGES AND ALUMA-PLANK



**AP**

**AS**

**Aluma-Plank**
The modern method of decking a scaffold is the Aluma-Plank. Aluma-Plank come 7' - 8' or 10' lengths with plywood or aluminum decking.

**Aluminum Stages**
Aluminum Stages provide the working platform for the Power Climber hoist and give added versatility to other types of scaffolding. All widths with lengths from 8' to 39' are available for sale or rental.

## GUARD RAIL
## GUARD RAIL POSTS



**GRP**

**GR 5 - 7 - 10**

**Guard Rail** of the proper size attach at two positions on the guard rail post, 22" & 42". For spans over 10', guard rail chain is available. Be sure to check state and local laws when ordering scaffolding, as many areas require guard rail.

**Guard Rail Posts** are manufactured of tubing the same diameter as the coupling pin. They are inserted in the top frame to provide support for the Horizontal Guard Rail.

## TUBE & CLAMP





**SC**     **RAC**

In addition to complete scaffolds, tube and clamp components may be used in conjunction with frame components to provide additional platform levels, to tie frame towers together or to provide hand rails at intermediate levels. **RAC Right Angle Clamps** and **SC Swivel Clamps** combine with tubes in 6', 8', 10' and 13' lengths.

## SAFETY RULES AND REGULATIONS

**The Lanco Scaffolding Company** provides each customer with a copy of Scaffold Safety Rules with each order. Be sure that these rules are followed in every instance

## Safety

Lanco Scaffolding is safety conscious — committed to providing only the highest quality scaffolding products and services to our customers. Our scaffolding is manufactured from high-tensile steel tubing. These units are interchangeable and can be combined to fill any scaffolding need.

Lanco Scaffolding understands your concern for safety and is committed to providing you with the safest scaffolding system possible. We follow all safety rules as recommended by the Scaffolding, Shoring and Forming Institute, Inc. No matter what your scaffolding needs, you can be assured of quality scaffolding with Lanco.





Fenway Park



Boston College



Sacred Heart — Weymouth



Fenway Park

# EXHIBIT  B



**ANDOVER SCHOOL** of MONTESSORI

400 South Main Street ▪ Andover MA 01810 ▪ Tel: 978.475.2299 ▪ Fax: 978.475.1290
e-mail: amurenia@andomon.org ▪ website: www.andomon.org

*Head of School:  Alex R. Murenia*

April 12, 2005

The Honorable George A. O'Toole, Jr.
United States District Court for the District of Mass.
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

Dear Judge O'Toole,

I am writing on behalf of Carlos Gomez.  I have been Head of School at Andover School
of Montessori since July 1, 2003.  I have known Carlos since that time to the present.  As
principal of a small school of 206 students and 161 families I have the privilege of getting
to know all of my students and most of the parents in this school community.

I have found Carlos Gomez to be a wonderful person and supportive parent at Andover
School of Montessori.  He offered to help with snow removal this winter.  He has always
asked if he can assist me as Head of School regarding parent projects.  He is a kind,
generous, spiritual man.

Carols loves his children.  I have worked in schools for almost thirty years.  I have had
the opportunity to view hundreds of Dads interact with their children.  Carlos has a
beautiful, loving relationship with each of his children.  With all due respect, Judge, I
would never give you advice on how to process people in Carlos' situation.  I am not
even sure about the details of his situation.  I would ask, however, that you consider
Carlos' 3 children who truly need the love and respect of this great man as you determine
what is appropriate for Carlos as you proceed forward in his legal matters.

Please do not hesitate to contact me with any questions you may have at 978-475-2299,
Extension 12.

Sincerely,

*Alex Murenia*

Alex R. Murenia
Head of School

36 Emily St.
Haverhill, MA. 01832
April 13, 2005

Dear Judge George A. O'Toole,

I write in support of Mary and Carlos Gomez.

I have known Mary and Carlos since they started their three children at our school, the Andover School of Montessori, six years ago. They came to my attention first when I was attending a school picnic and saw a new family bringing in chairs and tables and lots of food for everyone to enjoy. The fact that one family would supply furniture and food for everyone was a first for the school. Throughout the years they have been extremely generous and kind to, not only the teachers of their children, but to all the staff and the school at large. Their generosity was not limited to financial aide but included giving their time and energy to helping the teachers and working in various capacities for the overall good of the school.

Each year Carlos, Mary and their three children have joined other parents in coming to the school to clean up the playground areas in preparation for the beginning of school. They also readily help to chaperone the children on field trips. Mary always gives of her time to attend meetings in the planning of fundraisers, staff appreciation lunches, open houses and other events at the school.

As I have gotten to know them better over the years I see a mom and dad who show their love for their children by not spoiling them, but by modeling kindness and respectfulness to their fellow man and teaching them to be responsible citizens in society. The three children, without exception, are caring, helpful, organized, very capable and very happy little people who have lots of common sense and are not afraid to dirty their hands when helping others.

When I think of Carlos and Mary, one tremendously kind gesture comes to mind. In their third year at the school Carlos wrote a letter to the Board of Directors congratulating them on the fine school they run and commending the staff for their genuine dedication and love for the children and their attention to security and safety at the school. He went on to say how comfortable he felt each day as he dropped his children off at the school knowing that they would be in a safe, secure environment where they would be well cared for by all. Knowing that their children were in safe hands was the most important thing to Mary and Carlos. In all my years at the school that was the only time a parent took the time to write such an appreciative letter. The letter was very sincere and clearly written from the heart.

The Gomez family are a very close knit, devoted family. In my view, it would not be in their best interest for the children to be separated from their parents. I take the liberty to urge you to be as lenient as possible in passing judgment.

I thank you for giving me this opportunity to write in support of this truly exceptional family.

Sincerely,

*Margaret Albanese*

Margaret Albanese
(Former Director of children's House at Andover School of Montessori)

April 15, 2005

Dear Judge O'Toole,

Mary and Carlos Gomez are extremely thoughtful and generous people who are always aware of the needs of others. From the time when they first arrived at our school, they began to supply our classrooms with equipment and materials which greatly enriched the daily lives of the children as well as raising the morale of the staff. No parents have ever had such an impact on our school community during my twenty three years as a teacher here. Their work is often done anonymously, with an interest in helping our students and staff their only concern.

Mary and Carlos are very special people who truly care for others and who work to improve the lives of those around them.

Please consider their history of loving and giving.

Thank you,
Claire Bradley
Andover School of Montessori
Andover, Mass.

April 13, 2005
The Honorable George A. O'Toole, Jr.
United States District Court For
The District of Mass.
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210


Dear Sir,

  I am writing on behalf of Carlos and Mary Gomez. My story with the Gomez family
started six years ago when I accepted a teaching position at the Montessori School in
Andover. We were experiencing our inaugural year at this school together. I was a
seasoned teacher quite used to pinching my own pennies to add supplies to my
classroom. When Carlos and Mary got wind of the fact that teachers were spending their
own money to buy materials and supplies they stepped in. They asked the teachers to
provide a wish list of materials or supplies needed for the classroom and said she would
take care of it. They relieved the teachers of financial burden and enriched the
classrooms. And yet, it is really more accurate to say that the entire school was enriched
by the Gomez family. Both Mary and Carlos were committed to making the teachers feel
valued and enhancing the educational experience of the children. The opportunities that
Carlos and Mary created for the children's lives to be enriched at our school are endless.
The children were exposed to beautiful art work and play structures were added to the
playgrounds.

As I look back at my first year and reflect on my thoughts in the beginning of that year, I
recall that I was not planning to return the following year. I did not feel valued nor did
my colleagues for that matter. There was an underlying message and that message was
that we were all replaceable. Carlos and Mary stepped in once again. They started at the
top, with the Executive Director at the time. Again, they sought and found opportunities
whereby they could make the staff feel valued. Thanks to the Carlos and Mary we had a
real Christmas party that year; it was the beginning of a tradition at the school. The party
was held at a lovely restaurant it was going out to eat with your family.

That same year the staff was attending a national conference in New York City. It was
decided that the least expensive way to travel was by bus. Carlos and Mary talked to our
Director and said they would cover the attendance fees for any staff members that wanted
to go. Many of us had already depleted our professional development monies. In addition,
they upgraded our bus! I still have such fond memories of that trip; you see something
had happened during that weekend, the staff had bonded. We began to act, feel, and
function like a family. It was during that weekend that I decided to return to the school
the following year, six years later I am still here. Another tradition was started by Carlos
and Mary that year. Simply put, feeding the staff members when there was an evening
event. Many of our staff travel a distance and stay through when there is an evening
school event, Carlos and Mary always provided a meal for the staff. As I write I think of
many more examples that I could include, but quite frankly there would be no end to this
letter.

In my first year at the school, I went from feeling unappreciated to a valued member of a community. I was inspired as a teacher to believe that the profession as a whole is an honorable one, also worthy of value. These two people touched not only my life but also, the lives of many within the community in a very positive way. They did not achieve this only through monetary means. Mary Gomez is talented writer who would write the most beautiful letters. As a staff member I received a number of her letters that reflected her deep appreciation of the work we do. Mary's writing skills include humor as well. She always seemed to know when we needed a good laugh. I will always be grateful to both of them for all that they have done for so many,


Sincerely,
Susan Burns

April 13, 2005

Dear Honorable George A. O'Toole,

I have known Carlos and Mary Gomez since the year 2000, my first year teaching at the Andover School of Montessori. (I have been a Montessori teacher for over twenty years.) I first met their son as one of my students; he was four years old at the time. This gave me the chance to become acquainted with the Gomez family. I was impressed with their obvious loving and caring values exhibited thru their parenting. Impressed too, with the value the Gomez's have placed on a good education, and their active participation in instilling a respect in their children towards the teacher and other students.

As the year progressed I became acquainted the Gomez's other two children who were also as kind, polite and studious. The children have always appeared very close and display a strong connection to each other. Their parents have given a foundation of love and appreciation for simple pleasures of life to them. Cooking dinner together, reading a family story by candlelight, and of course doing their homework, are stories shared in the classroom by the Gomez children.

I regard Mr. and Mrs. Gomez as hard working yet extremely dedicated to their children. This is difficult to balance in today's society. They have been an integral part of our school community for many years, participating in many school functions. Always volunteering their services for school picnics, field trips, and wherever they can help.

I am fortunate to know the Gomez' family. I am sure you will see these same qualities also.

Sincerely,

Catherine Constantine

Catherine Constantine

April 13, 2005

The Honorable George A. O'Toole, Jr.
United States District Court For
The District of Mass.
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

Dear Sir,

I am writing on behalf of Mary and Carlos Gomez. They are great people who always work behind the scenes, without recognition. Not only do they give support to the teachers and the school, but they think about what the needs are and take action. If there is a night that the teachers need to stay late to meet with parents, food will be delivered from them to the school for a supper break for the staff. Many teachers don't realize who the food is from.

Their thoughts are with the people they deal with. Thoughtfulness and concern are the hallmark of their care for others. They have given their children the same values. One day I was asked to take a group of students on their winter walk with the physical education teacher. It was very difficult walking and I was a little nervous about trudging up and down in the woods. Olivia Gomez figured out what was going on and came right over to me and held my hand and actually helped me through the rest of the walk. That's what they are like - ready to lend a hand whenever and wherever they see a need.

Mary was instrumental in my obtaining a coupon toward our Christmas Eve dinner. When I saw her a month or two later, she remembered and asked if we had enjoyed the dinner.

Thoughtful and considerate and involved - that's the Gomez family.

Thank you,

Sandra Curtin

Sandra Curtin
Teacher
Andover School of Montessori
400 South Main St.
Andover, MA 01810

Susan M. Devine, Library Media Specialist
Andover School of Montessori
400 South Main St.
Andover, MA 01810

Thursday, April 14, 2005

The Honorable George A. O'Toole, Jr.
United States District Court for
The District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

Dear Judge O'Toole,

Mary and Carlos Gomez are a positive influence in our school and I am writing on their behalf as someone who has frequently observed their good will and community-spiritedness.

I have been the Library Media Specialist at Andover School of Montessori since 2001 when our new library was completed. During the past four years I have been in a position to observe the constant quiet generosity of Carlos and Mary Gomez. They were instrumental in getting our school library started and have continued to support it for the benefit of students, staff and families. They do a great deal for our small school anonymously. Their three small children are frequent library users. The warmth and participation of the Gomez family contributes to community life ant our school and I hope you will be able to consider this in your evaluation.

Sincerely,

*Susan M. Devine*

Susan M. Devine

The Honorable George A. O'Toole, Jr.
United States District Court For The District of Mass.
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston MA 02210

April 13, 2005

Dear Sir,

I am writing on behalf of Carlos and Mary Gomez. I served as the kindergarten teacher
for their children at the Andover School of Montessori in Andover, Massachusetts during
the school years of 2000-2003.

Carlos and Mary demonstrated their support of their children's teachers from the very
beginning. Gifts at the holidays, a fully sponsored trip to the National Montessori
Conference in New York City for the entire staff and gifts for the classrooms including
microwaves, refrigerators and life-sized skeletons were demonstrations of their support
through these years.

During the second phase of construction of our school, the Gomez family donated to the
building fund which enabled us to add on a Common Room, called the American Room,
where the entire school community could gather together.

Carlos and Mary reimbursed four teachers, including myself, for the money we spent to
take the Montessori certification course. This was a generous gift to me, personally.

Mary and Carlos are consistently involved with the raising of their children. When other
families at our school designate the care of their children to a nanny or other care
provider, Mary and/or Carlos are transporting and spending the time with their children
during these formative years.

In conclusion, Mary and Carlos Gomez are kind, loving and respected members of our
community. Their children are the most important part of their lives and I ask that you
take this into consideration.

Respectfully submitted by,

*Linda Edmands*

Linda Edmands
218 Holt Rd
Andover, Ma 01810

10 Willard Circle
Andover MA 01810
April 10. 2005

The Honorable George A. O'Toole, Jr.

I'm writing this letter on behalf of Mary Gildea and Carlos Gomez, with the hope that it will shed some light on the kind of people they are. Despite their serious legal situation, they are wonderful, kind and generous people who have enriched the lives of everyone around them.

I first met Mary and Carlos at an all-school picnic at the Andover School of Montessori in 1999. Their blanket was spread out on the ground and was abuzz with activity. Their three beautiful children danced to the music on Mary's CD player, and a cluster of laughing parents and teachers sang along to an old favorite by Frank Sinatra. Clearly, this was the place to be!

I had just begun teaching Art at A.S.M., a mid-life career change necessitated by several family misfortunes. My husband had recently been diagnosed with Multiple Sclerosis and was suffering from symptoms such as numbness in his feet and legs,

blurred vision, extreme fatigue and near constant pain. Though now confined to a wheelchair, he managed to go to work every day, but his job required long hours, frequent travel and a level of concentration that was becoming increasingly difficult to maintain. Life was stressful, and finances were tight with two children in college.

I found my teaching job to be a challenge, but an exhilarating one. My fellow staff members were an incredibly talented and dedicated group, and completely devoted to the children in their care. I was getting to know the parents, and became especially fond of Mary and Carlos. They were down-to-earth, thoughtful, humble and always on the lookout for ways to help someone. They always made sure the teachers and students had what they needed for a successful school day. When the playground equipment needed to be refurbished, Carlos showed up with a truckload of new swingsets and jungle-gyms. When children complained that the ground was too wet to play ball, Carlos arrived with a load of

fresh barkmulch and a crew of men to spread it. The playground grew, the fields were groomed, and the children were happy. Together, they have provided microwave ovens for the classrooms, life-size skeletons for the science program, musical instruments, library books, specialty art materials and countless other items to enhance the school programs. Mary always took the time to get to know every staff member and not only valued them as individuals but appreciated the sacrifices they made as part of the teaching profession.

My husband's health continued to deteriorate and he could no longer work. Although we lost his income, the company agreed to continue providing health care. Within a few months however, the company filed for bankruptcy and our health coverage was suddenly terminated. My part-time income was hardly sufficient to cover the extra costs and we were beginning to flounder financially. Mary saw how difficult my life was and how I was affected by the hardships at home. In an overwhelming

gesture of generosity and kindness, she offered to cover some of the insurance costs for the upcoming year. I don't know how my husband and I would have made it through those dark days without their help. My husband and I will be eternally grateful.

Things are better now, and I've taken another job to make ends meet. Mary continues to advocate for complete health coverage for all teachers at A.S.M., and one day I believe she will make it happen. She's a dynamic, creative and well-loved member of our school community. Both she and Carlos have become like family to many of the faculty, and as many as there are of us, each person has their own unique story to tell. I hope you get a chance to hear them. And maybe in some small way we can give something back to two of the most inspiring people we've ever met. I'd like that.

Sincerely,

Joan Ellis

The Honorable George A. O'Toole, Jr.
United States District Court For The District Of Mass.
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

April 12, 2005

Dear Sir,

I am employed at the Andover School of Montessori as Director of Admission and
I have known the Gomez family for six years. I met Carlos and Mary Gomez
when they were looking for a suitable preschool for their children, Samuel, Olivia
and Greta. My first impression of Carlos and Mary was that they were loving
parents whose priorities were the education and safety of their children. Over the
years they have remained committed to their children's education and have
become very involved in our school.

They have made generous donations to the school including playground
equipment, auction items and materials for the classrooms to enhance the
programs, but they have also supported the teachers in so many ways.
Parent/teacher conference days, which occur twice a year, are long days for the
teachers, ending at 8:00pm. On each of these occasions for the last six years,
Mary and Carlos have set up tables, provided food and served dinner to the entire
staff showing their appreciation and support and thus raising the spirits of the
teachers. The Gomezes accompany the children on their field trips, visit their
classrooms and actively serve on school committees, advocating better and more
equitable benefits for the teachers.

Carlos and Mary are kind, thoughtful and loving parents who are inspiring similar
qualities in their children. My husband had open heart surgery last year and Sam,
Olivia and Greta would come to my office daily and ask me how he was feeling
and to tell me that he was in their prayers.

I do not know all the details of the charges that have been brought against them
but I know that whatever they did was out of giving not greed – giving others a
chance to improve their lives and support their families. Mary and Carlos Gomez
are good people and have a wonderful family. It would be devastating for them to
be separated. I ask if you would please consider a form of punishment that would
not tear apart this very special family.

Yours sincerely,

Yvonne Howard

Gloria Parsons
4 Salem Street
N. Reading, Ma  01864

April 2005

The Honorable George A. O'Toole, Jr.
United States District Court For
The District Of Mass
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA  02210

I met Mary and Carlos when Olivia, their daughter, entered my Montessori
classroom as a three-year old.

Mary and Carlos have always been supportive of their children's teachers,
and the whole staff at Andover School of Montessori.  They continually
spoke up at board meetings in support of the teachers.  Mary and Carlos
often expressed that our job was very important and undervalued.  They
would often arrive with poems and written thank yous for our efforts.  They
hold teachers in the highest regard.  They considered us more than suppliers
of their children's education.  They wanted us to help shape their children's
future and the future of the rest of the children in our care.  They were most
keen to know that their children were kind and respectful to others.

I have known Mary and Carlos to be kind, generous and caring and they
back up their feelings.

Sincerely,

*Gloria Parsons*

Gloria Parsons

The Honorable George A. O'Toole, Jr.
United States District Court for
The District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

Honorable George A. O'Toole, Jr.,

It is my pleasure to be asked to write a letter on behalf of the Mr. and Mrs.
Gomez. I have taught at the Andover School of Montessori (ASM) for 6 years
and have witnessed their generosity first hand. Having been a public school
teacher for four years previously, I was amazed by the donations made by the
school community at ASM. What has always struck me about the Gomezes is
that their contributions to our school are not only monetary, but also included
personal time, thoughtful gifts, and sentiments from the heart.

Through my tenure at ASM I have seen the school grow in size and get to
marvel at how far the school has come as I travel the corridors. At almost every
intersection the school's beauty and charm has been touched in some way by the
Gomezes generosity. In typical Gomez style there are no plaques or name plates
stating the donors and few people realize all the work they have done towards
the building's appearance.

Thoughtful gifts are a nice perk to otherwise tough days at work. When
the teachers are asked to extend their working day to include night work, such as
parent conferences or other obligations, the Gomezes have provided staff meals.
These meals are nice hot meals for a tired staff after a long day of working with
students. More importantly it is a nice opportunity to sit and relax with fellow
staff members. Mary also provides storage dishes so that we can take home
leftovers.

Occasionally a little token of appreciation is left for every staff member. This usually comes in the form of a box of chocolates, flowers, or some other little gift. While these gifts may seem small, they mean a lot. One year a poem for teachers was included with the gift. I mentioned my experience in the classroom, but I also am from a family of teachers (mother, father, brother, grandmother, aunts, etc.). This poem was shown to my mother as a way for me to explain to her how nice the Gomezes are. My mother shared the poem with many an ex-teacher and was met with the same response of how wonderfully thoughtful it was.

It is hard to put into words the true meaning of how much the Gomez family (parents and children) have done for our school's community. What is felt is that after toiling along, day in day out, someone out there appreciates your hard work.

Sincerely,

David Penley

# Can I Be A Teacher For Halloween?

"Mommmmm!" was her scream
 as she flew through the door,
 "Can I Be A Teacher
 For Halloween?"
Alright...slow down...I guess so, "Sure!"
Now I thought to myself,
 what could my child mean?

"I want to dress like a teacher,"
 catching her breath she replied
"I feel like a teacher...
deep down inside."

"Okey Dokey," I heard myself say
Now, what to do,
to make it this way.
A pumpkin, a tiger would be easy you see
But a Teacher, I worried,
was too hard for me.

I fumbled and muttered and stammered and pondered
A Teacher costume?... I wondered and wondered .

To the attic we raced
 as my stomach felt sick
Could I find a costume
 that would do the trick?

"Here's a long skirt," I said,
 "How about this?"
"No, no" she dismissed,
 as we looked through & through
"It's not a skirt that I'm thinking will do."

"Here's a plaid jumper - does this seem to fit?"
"No, no" she replied, "no, no that's not it."

We dug and we searched
 through old clothes and a book
But each choice produced
the same puzzled look.

I sat back and asked,
"What did you have in mind?
How would you be a teacher?
What's your design?

A  teacher's so sweet, Mom, she hugs tears away
A teacher is warm, like the sunshine in May
She plants flowers inside me that grow everyday
She holds onto my hand and lets me lead the way.
A teacher is kind, she said with a grin
They have sort of a light, Mom, that shines from within.

I looked at my child and tried not to cry
I looked at my child and I wondered why...

Why I couldn't think of what a teacher costume might be
Why a little sweet child must explain it to me.

Before I could offer another suggestion
She raced off to the kitchen...in that direction.

By the time I caught up
She had proudly produced
Her Halloween costume
A teachers tribute.

She held up some glow sticks
 that shine in the dark
"These will work," she exclaimed,
  "they'll work perfectly!"
I'll use my glow sticks and
I'll shine like ET!!

I'll wear a dark suit so
 the only thing there will be
Is the bright light inside
like the movie, you see?

I know I was smiling
as she saw my confusion.
She knew I had not
understood her solution.

I needed more detail
that she provided to me -

A teacher glows from inside Mom,
 so secretly...
It's a glow,
a bright glow,
     ...only children can see!

April 18, 2005

Honorable George A. O'Toole, Jr.
United States District Court for the District of Massachusetts
Suite 4710
1 Courthouse Way
Boston, MA  02210

Dear Sir,

I am writing this letter on behalf of Mary and Carlos Gomez.  I am a thirty plus year classroom and administrative professional and wish to attest to my high regard, appreciation and admiration for the Gomez's and their family.

I have had the pleasure of being a teacher to the children as well as advisor and counselor to the parents for the past six years.

The Gomez family has consistently demonstrated a deep concern for the well-being and education of their children, a strong commitment to their school (The Andover School of Montessori), and a continued fulfillment of the obligations necessary to best foster a successful family and social environment.  I only wish there were more such dedicated and concerned parents in today's entitled society.

All my observations and experiences with the family confirm and secure my attitude that they have always demonstrated the consideration, commitment, concern and appreciation to be a successful and valuable asset and welcomed members of our community.

I've attached some correspondence from several years ago that best illustrates their respect and appreciation for members of the teaching profession.

Regards,

Patricia R. Slater
Teacher, Lower Elementary
Andover School of Montessori
978-475-2299

December 2001

*It is not the critic who counts. Not the man who
points out how the strong man stumbles or
where the doer of deeds could have done better.
The credit belongs to the man who is actually in
the arena, whose face is marred by dust and
sweat and blood who strives valiantly, who errs
and comes up short again and again, because
there is no effort without error or
shortcoming…but who knows the great
enthusiasms, the great devotions, who spends
himself for a worthy cause, who, at best, knows,
in the end, the triumph of high achievement, and
who, at the worst, if he fails, at least he fails
while daring greatly, so that his place shall never
be with those cold and timid souls who knew
neither victory nor defeat.*

*…Franklin Roosevelt*

*The credit belongs to you who are actually in the
arena. We are truly grateful.*

Marie Whitton
331 Amesbury Line Rd.
Haverhill, MA 01830

April 14, 2005

The Honorable George A. O'Toole, Jr.
United States District Court For
The District of Mass.
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

The Honorable George A. O'Toole, Jr.:

I had the pleasure of meeting Mary and Carlos Gomez when their three children,
Greta, Olivia, and Sam began attending the Andover School of Montessori. As Business
Manager at the school, I am well aware of the financial support Mary and Carlos have
given to the school. More meaningful to me personally, however, has been the caring
and compassion they have shown towards the staff.

Mary writes poems to the staff on a regular basis, always full of humor and wit. These
poems are always the talk of the day, making us laugh and wonder in awe how she does
it. When some of the light bulbs in the lanterns in the parking lot burnt out, Carlos was
concerned for the safety of the staff members who leave after dark. He showed up with a
truck, ladder, and work crew to replace the bulbs. When Mary and Carlos see a need,
they don't hesitate to do whatever they can to fulfill that need and make our school a
happier and safer place. They understand that a staff that feels supported and appreciated
makes for a healthy classroom environment for their children and their classmates.

Mary and Carlos' main concern has always been for the well being of their three
children and it is very apparent when I see the love in Greta, Olivia, and Sam's faces.
They adore their parents and love to tell family stories of the cookies they baked with
their mom, the baseball games with their dad, the visits to their grandmother's house.
They are always polite and respectful and a pleasure to see every school day.

We need more caring people in this world like the Gomezes. What a wonderful world
it would be.

Very truly yours,

Marie Whitton

**Edward N. Krapels**
**43 Candlestick Road**
**North Andover, MA 01845**

April 13, 2005

The Honorable George A. O'Toole, Jr.
United States District Court for
the District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

Dear Judge O'Toole,

For the past six years, it has been my pleasure – and my family's – to work with Carlos and Mary Gomez on behalf of a very special institution: the Andover School of Montessori (ASM). Montessori schools fill a very special need in the educational community: they promote the principle that a child fulfills his or her potential in a way and at a pace that is unique, and the schools provide a safe and nurturing environment in which the kids can achieve that potential.

ASM has grown during this period from a couple of pre-kindergarten classes in the basement of a church to a thriving, pre-K to eight grade school educating more than 200 children. This success has been due to hundreds of charitable families – because not a penny of public funds has been used – but no family has been more generous than that of Carlos and Mary Gomez.

I have been a member of the Board of Trustees of ASM for the past four years, and have been in charge of development in the past two years. Carlos and Mary have been during this period the most generous family to the school. Without them, the school would not have met its financial covenants. Without them, the faculty of the school would not have had its most passionate and generous supporters.

Most recently, Carlos and Mary have indicated an interest in leading the effort in the school's next capital campaign, aimed at increasing the size of the library, establishing a lunch room and a gym, and allowing for the expansion of the school to 250 children.

I, and our community as a whole, sincerely appreciate their generosity and leadership. We wish their wonderful children the very best in pursuing their education, and Carlos and Mary the very best in pursuing their future interest.

I would be happy to discuss these issues further, and may be reached at 089-290-0864, or ekrapels@esai.com.

Sincerely,

Edward N. Krapels, PhD.

Home phone 978-686-5095; cell phone 978-290-0864; work phone 781-245-2036
Email: ekrapels@esai.com



**ANDOVER SCHOOL** of MONTESSORI

400 South Main Street ▪ Andover MA 01810 ▪ Tel: 978.475.2299 ▪ Fax: 978.475.1290
e-mail: amurenia@andomon.org ▪ website: www.andomon.org

*The Board of Directors*

April 14, 2005

The Honorable George A. O'Toole, Jr.
United States District Court For The District Of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA  02210

Dear Honorable Judge O'Toole,

I am writing on behalf of Mary and Carlos Gomez, two fine and loving parents and
contributing members of our Andover School of Montessori Community.

As the Chair of the Board of Directors for the past five years, I have come to have know
Carlos and Mary Gomez as individuals and of their involvement at the school. They have
been kind, supportive, thoughtful and generous with both their time, energy, commitment
and resources to further the purpose of our fine school to create lifelong learners and
citizens of the world community.

On many occasions they have taken the extra time and effort to identify ways and provide
the means to recognize the faculty in their fine efforts. During school conferences when
faculty are available to meet individually with parents, Carlos would make sure that food
was specially prepared just for the faculty and Mary was there donning her apron to serve
the faculty warm food as they continue their efforts to work with ASM families into the
evening. When the school population started to expand and include older children, Carlos
and Mary so the need for a more appropriate playground and provided both the resources
and their own energy to ensure a most attractive inviting playground was constructed to
be available to the students of our school.

Carlos and Mary have consistently provided the means to encourage faculty
development. In past years, they had provide not only the financial resources for the
faculty to attend a national Montessori convention, but then Carlos even drove the van
himself to the conference. During social and fund raising events, Carlos and Mary Gomez
have constructively provided opportunities for the faculty to participate in the fun and
festivities. They have diligently worked to include the faculty in all of our community
events so they are equal participating partners in our inclusive community.

Three years ago last June; the Andover School of Montessori had the wonderful opportunity to celebrate the graduation of its first eight-grade class. It was primarily a result of the efforts of Carlos and Mary that the public celebration was able to take place: everything from risers for the speakers, to our first plaque honoring the efforts of our graduates, to providing the reception food. All the while this graduation celebration was provided in our American Room, the construction of which would not have been possible without the generous contribution of the Gomez family.

The American Room has become the central place for our Montessori Community, holding United Nations Day Celebrations, Founders Day recognition, Brownie troop meetings and even physical education classes. What is important to note here is the humbleness of this kind family. On the day we dedicated the facility, we asked if they would like to name the room. Their thoughtful response at that time was, if it must have a name, then please name it the American room.

In summary, Carlos and Mary Gomez have been much more than benefactors to our Montessori community. They are a loving, kind family who are deeply respected by all, They have given generously of their personal time, energy, good cheer and kind deeds to make it a better community for all: children, faculty and parents. I respectfully request your honor to give your heartfelt positive consideration to Carlos and Mary Gomez and to the impact of this consideration on the entire fine family; and to remember the thoughts of Maria Montessori on the subject of mistakes: that "knowledge [is] gained from its own mistakes".

Respectfully yours,

Diane Bauer
President

**_Tanya Gould & Jeremy Finkle_**
**_29 Blue Ridge Road_**
**_North Andover, MA 01845_**
**_978-975-0657_**

15 April 2005

The Honorable George A. O'Toole, Jr.
United States District Court for
The District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

Dear Judge O'Toole,

We are writing this letter in support of Mr. Carlos Gomez. We have known Carlos, his wife Mary, and their three children for the past six years—primarily through the Andover School of Montessori, which the Gomez children attend and our daughter formerly attended. One of us (Tanya) is actively involved in the school—frequently substituting at the school and currently serving on the Board of Directors—and has frequent contact with the Gomez family.

The Gomez family has been a generous benefactor to the Andover School of Montessori, but they have played a far more important role in the life of our school. They have given generously of themselves to the school. If they see something that needs to be done, they do it. It's not an uncommon occurrence to see Carlos wielding a broom or Mary shoveling snow—with their children in tow helping out. They are the kind of people who run out to get food after finding out that no dinner is being provided for teachers during conferences. They notice that something is unsafe on the school playground and come back and fix it before the next day.

Montessori schools strive to inculcate values of grace, courtesy, and respect. Carlos Gomez personifies these values. He is unfailingly gracious with everyone, as courteous to the janitor as he is to the head of school. The respect with which he treats teachers is particularly noteworthy; wealthy parents are not always considerate in their dealings with teachers. Carlos is almost reverential in his dealings with the people to whom he has entrusted the education of his children. I know that Carlos and Mary are beloved among the teachers—not because of their gifts to the school but for their many kindnesses and basic decency.

Carlos Gomez is precisely the kind of person that has made America the wonderful country that it is. He came here with nothing, worked hard, and by dint of this hard work became a success. He loves this country and lives a life that exemplifies the values on which America was founded. We have the highest regard for him and are unreserved in our recommendation of him as a person deserving of all due leniency allowed under sentencing guidelines.

Thank you for your consideration in this matter.

Respectfully,

Tanya Gould, Ph.D.                    Jeremy Finkle, M.D.

Stephen A. Conant
34 Barasford Avenue
Lowell, Massachusetts 01852

The Honorable George A. O'Toole, Jr.
United States District Court For
The District Of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

Your Honor,

It has been my good fortune to have been associated with Carlos Gomez, while his children and my daughter were students together at the Andover School of Montessori in Andover, Massachusetts. During that period I served on the board of directors of the school and Carlos's generosity in supporting the school was well known to all board members. Carlos provided a substantial donation to the school that enabled us during a time of school expansion to add a meeting hall, which Carlos asked that we call the "American Room". He also contributed playground equipment and was very supportive of our faculty. Above all Carlos's first concern was for the children who attended the school and that they receive the best possible education. He related this concern to me every time we spoke.

What most impressed me about Carlos, however, was his quiet spoken manner and modesty regarding his donations to the school. Carlos never provided the donations to advance his own standing in the school, but to simply benefit the students. He sought nothing in return and was simply pleased that he was able to help make the school a better environment for learning. Many others expected a lot more for a lot less.

While I am not familiar with the reason for Carlos's appearance before your court, I can say without hesitation that Carlos always impressed me as a forthright and honest individual who only finds the good in people around him and seeks to help people in anyway that he can.

Sincerely,

Stephen A. Conant.

April 14, 2005

The Honorable George A. O'Toole, Jr.
United States District Court for
The District of Massachusetts
John Joseph Moakley U.S. Courthouse
One Courthouse Way
Boston, Massachusetts 02210

Dear Sir:

I am writing on behalf of Carlos Gomez who I know from Andover School of
Montessori. ASM is a K-8 school in Andover, Massachusetts that has about 200 students.
I have been on the Board of Directors of the school since 2000.

Carlos and his wife Mary have been valuable assets to the school since the beginning of
my tenure. While their financial contributions have been second to none, they also are
generally active participants in all school events. Their children also are a delightful
addition to the school and are considered leaders in the Montessori classrooms.

Whether promoting our charity auctions, golf tournaments or other school functions,
Carlos and Mary could always be seen working the events: setting up tables, managing
concessions, organizing children, or helping to clean up.

I work on a number of local non-profit projects with many volunteers but rarely see
people of the caliber of Carlos and Mary. They don't look for notoriety or special status
in exchange for their generous financial contributions and dedicated service; they just
quietly have become a very critical asset of the school. There are many plaques at ASM
bearing the names of generous people. However, even though they have clearly been
among the school's largest donors and hardest workers in the 25 year+ history of the
school, they have preferred to keep their generosity behind the scenes.

Thank you for considering all of the facts.

Regards,

Willard D. Perkins
14 Rennie Drive
Andover, MA 01810
978 475-5400

**Richmond S. Abbe**
**8894 McNair Drive**
**Alexandria, VA  22309**
**703-799-8215          rsabbe@aol.com**

April 14, 2005

Honorable George A. O'Toole, Jr., Suite 4710
United States District Court for the District of Massachusetts
1 Courthouse Way
Boston, MA  02210

Your Honor:

My name is Richmond Abbe and I currently reside in Alexandria, VA.  Prior to moving
to this area, I was the Head of School at Andover School of Montessori (1998-2003)
where I came to know Carlos and Mary (Gildea) Gomez.  In most cases, a headmaster
will come to know his families as clients or customers, but in this case I am also their
friend.  It is with both of these relationships in mind that I wish to offer this letter of
support.

I first came to know Mary when she applied their three children for admission to my
school in 1999-2000.  I was immediately struck by the obvious love and commitment that
she had for her children and by her goals for their education and their social/emotional
development.  Carlos was away on business at this time and I did not meet him until
many weeks later.  However, Mary conveyed to me that his desires for the children were
as equally strong as her own.  When I had the opportunity to meet Carlos, his total
dedication to his family was readily apparent and quite moving.  It is not often that an
educator comes across a set of parents that lives and breathes for their children the way in
which Mary and Carlos do.  But I soon learned that this caring and devotion extended
beyond their own children and included not only members of their own family, but for all
of the children (and by extension their teachers) who were enrolled in our school.  Such
devotion can only be characterized as exceptional and extraordinary.

Soon into their tenure at the school, Mary came to me asking what we needed in the way
of help and/or assistance.  No request was too small or mundane, too personal or too
quirky.  I asked for help staining a new storage shed that had been built and the next thing
you know, their nephew Danny and a few other guys were on site, brushes in hand and
making short work of the request.  Not long after, Carlos happened upon school one
weekend when I was attempting to change, from a cherry-picker, an industrial-sized
lightbulb in the school parking lot.  Carlos climbed aboard and right by my side assisted
me in this difficult and dirty endeavor.  This is memorable to me because it was not only
a measure of this man, but also an indication of his work ethic.  Being a New Englander,
I have always prided myself on my Yankee thrift and ingenuity, as well my belief that
you don't "pay for something you can do yourself"—no matter your financial

circumstances. I found my match in Carlos Gomez because this man puts his muscle (as well as his money) "where his mouth is". This event began for me a friendship with Carlos and Mary.

Throughout the next 3 ½ years, we worked together to improve the conditions at the school, not only aesthetically but emotionally and spiritually as well. Carlos and Mary always gave willingly, not only of their resources, but more importantly of their time, talents and seemingly endless supply enthusiasm and energy. It was performed out of a :t true belief and conviction that the work we undertook at school made a significant impa on the lives of children. I found their generosity to be acts of selfless charity to the      :ly or at least without attribution (this is the way they wanted it). I often acknowledged their stewardship, but always in quiet and direct ways only known to them.

I could create a litany of examples in which Carlos and Mary made significant and measurable improvements in the life of Andover School of Montessori, but I will leave that for other supporters. For it is in the intangible (and possibly invisible) contributions that they made that to me made the biggest, most memorable and enduring impact and legacy. Their ability to assess needs, to physically (and at times financially) make improvements is well known in the community. But what might be lesser known (or not even recognized by some) is what I consider to be the most important of all--the manner in which they demonstrated a strong work ethic, became role-models through action rather than recognition, their unshakeable belief and consummate dedication in assisting us to offer the best education possible. For they knew as I did that the true way to change and to improve the world is through the children of today—our hope for the future and our leaders of tomorrow.

I am not privy to the causes that led to such a judgment against Carlos and Mary and I do not care to speculate or rationalize. Instead I simply want to offer additional information that I feel should be known to you when rendering your decision on the fate of these two people. Whatever actions caused them to come before you, it is my sincerest hope and desire that you will be able to also take under consideration that which I have conveyed herein.

Should you find it helpful to contact me for greater details or further information, feel free to contact me. Thank you for taking the time to thoughtfully consider my statement of support.

Sincerely,

Richmond S. Abbe

April 14, 2005

To the Honorable Judge George A. O'Toole Jr.,

I am unsure about the issues that are now before you concerning Mary and Carlos Gomez. I am writing to inform you of my knowledge and dealings with these two individuals.

I have known Mary and Carlos Gomez approximately 6 years. This relationship began when they enrolled their three children at the Andover School of Montessori where I was a kindergarten teacher. I taught two of their children in their kindergarten year. I can tell you that they are loving, caring parents who see to their children's needs with patience and tenderness. There is no pretense or exaggeration in their everyday life with their children. They exemplify core values of respect, trust and the need to care for one another. They also model the necessity of giving back to the community of which they are a part.

I vividly recall the day when Carlos spoke to a few teachers about his feelings for the staff and the Andover School of Montessori. He thanked us for being there for his children. He told us he knew that his children were receiving not only a fantastic education but that he was bringing his family to a safe place where they loved to be. I'd heard those words several times before but *never* with such heartfelt emotion and sincerity. It is a conversation I will not soon forget.

I also recall the day when I found Mary in the staff kitchen, on her knees, washing the inside of the refrigerator- a spill of some kind that no one had discovered until later in the day. Mary just went into the staff room, rolled up her sleeves and went to work. We were short-handed that day and she told me that the teachers had enough to do without having to worry about cleaning a spill in the frig. Mary did things like that. She is always ready to lend a helping hand. No fuss/no muss- just do it.

There was an epidemic of broken electronic equipment in the classrooms. Every classroom had one thing or another wrong with the CD/tape players. Mary, while speaking with one of her children's teachers heard of this problem. The next day, along with her children, she dropped off a new CD/tape player for every classroom in the

building. This was a typical Mary Gomez gesture. She is big-hearted and generous. She seeks no rewards for her thoughtfulness. She just smiles and says "I'm happy to do it."

These are just a couple of examples of the generous hearts these two people possess. There are so many others: benches for the playground so the teachers can sit at recess; picnic tables for the children so they can enjoy eating outside; lovely welcome mats for the outside doors and garden stones to grace our flower gardens; several deliveries of sand for the sand boxes; yards of mulch for the playgrounds; entire gym sets for the three playgrounds; larger swing sets for the older children; books and shelving for the library; gift certificates to educational stores so we can enrich our classrooms; flowers, for no special reason other than to say "Thank you" for your hard work in teaching and caring for our children; "surprise" gift bags during the year to show their appreciation to the staff; holiday celebration dinners for the entire staff; luncheons/dinners provided for the staff on parent-conference days-all this and more. In both time and money, they have contributed generously to the development, improvement and upkeep of the school.

In the years I have known Carlos and Mary Gomez, they have never sought recognition for their many magnanimous contributions to the staff and to the school. Indeed, they are embarrassed by any effort on our part to thank them for their support and kindness. This is the Mary and Carlos Gomez that I know and care about.


Respectfully,

*Louisette J. Morin*

Louisette J. Morin, a Montessori teacher
22 Winston Drive
Lawrence, MA 01843

*Deborah Buckley Hope*

*370 Great Pond Road*

*North Andover, Massachusetts 01845*

April 14, 2005

The Honorable George A. O'Toole, Jr.
Moakley Courthouse
1 Courthouse Way
Boston, MA  02210

Dear Judge O'Toole:

In one's lifetime we meet many people – some are more special and have more of an affect than others. You can see the impact that they create in the world. Carlos and Mary Gomez are very very special people with big hearts, concern for everyone and a desire to make a positive impact on the world – not only for their children but because they want to change the world in a positive way.

We have had the pleasure of knowing Carlos and Mary for over 6 years. Our children attend the Andover School of Montessori together. We first met them in 1999 when our daughters were in pre-school together. We became friends quickly. Mary and Carlos are very dedicated to their children and family and we often had long conversations about parenting and family. We have spent many occasions together with our children, as they have become great friends.

We have come to know them through many social activities at school – they are extremely generous with their time, their hearts and their money. We added a very large addition to the Montessori school and the Gomez family was an integral part of the planning and funding. In addition they have contributed benches, playground equipment, seating for the soccer field and countless other anonymous contributions when a classroom, the library or the computer lab needed something. We serve on school development committees and again they are very generous with donations for fundraising efforts, finding very special and unique items that they know would raise money for the school.

We truly believe Mary and Carlos are wonderful and special people. One can see them reflected in the wonderful, respectful children they have raised. They do everything together as a family – their children are their top priority.

We welcome the opportunity to speak with you if we can provide any further insight about this wonderful couple and their family.

Sincerely,

Deborah Buckley Hope

Alan C. Hope

April 14, 2005

The Honorable George A. O'Toole,Jr.
United States District Court for
The District of Massachusetts
John Joseph Moakley U.S. Courthouse
One Courthouse Way
Boston, Massachusetts 02210

Dear Sir:

It is my privilege to provide you some insight into the lives of Carlos and Mary Gomez. I have been associated with them both for over three years. My son James is currently in class with their son Sam Gomez at Andover School of Montessori. I have been responsible for coordinating the school's major fundraiser for each of the past three years. The events would not have been the success they were without the support of the Gomez family. As I am sure you will read from other ardent supporters, the Gomez family is generous.

When the family realized a playground was needed they put a plan into action and saw that it was built. When a major expansion was required they were a key part in that effort. When any need is put out, they willingly (and humbly) answer the call. I remember a story when I first joined the school about a family who contributed to build the major gathering room in the school. Many of the rooms in the school had been dedicated to sponsors. When it came time to name this new room there was no "Gomez Family Room" plaque placed at the entrance to the door. Instead the room was called the American room.

While it may seem easy to write a check, they are also as willing to dedicate their personal human resources. Mary herself provides all of the dinners for staff gatherings. When the school picnic occurs Mary and Carlos dawn their aprons to dish out ice cream, flip burgers and collect the trash. They are both such an excellent example to our school community of how to give back. They understand that to whom much is given much is expected and they step up to the plate time and time again.

I have also benefited from Mary's unbreakable spirit with regard to her commitment to raising hardworking, thankful and smart children. She continually evaluates what is best for her children. If extra help is needed she makes sure they receive it. Although her children are being raised in a family of adequate resources, they are not being spoiled. Mary and Carlos make sure that their children work hard, study hard and remain thankful for all of the blessings they have been given.

Although they have been going through an extremely difficult time over the last year, their dedication and commitment has not wavered. They have given their situation the perspective it deserves and are relying on prayers and the help of their friends to see them through this time.

I would welcome the opportunity to share with you further insights and feedback as you deem appropriate. Please do not hesitate to contact me at 978 886 4318 if you would like to speak with me directly.

Thank you for considering all of the facts.

Regards,

Annie Perkins
14 Rennie Drive
Andover, MA 01810

277 Lowell Street
Andover, Massachusetts 01810

April 14, 2005

The Honorable George A. O'Toole, Jr.
United States District Court For
The District Of Massachusetts
John Joseph Moakley United States Courthouse
1 Courthouse Way
Boston, Massachusetts 02210

Dear Judge O'Toole:

My family has been friends with Mary and Carlos Gomez for more than six years now. Carlos and my children's Father, Stergios Papadopulos (owner of Captain Pizza located in North Reading, Massachusetts) became acquainted when Carlos would go to the pizza shop. I met the Gomez family at our children's school. Currently my son Demos and their older daughter Greta are in the same classroom.

Mary and Carlos are lovely, kind and caring souls. Whether trying to beautify our children's surroundings in and out of the school, or donning an apron to serve the teacher's dinner – their desire to make people feel cherished and happy is evident. I always know that if I were ever to need Mary's help, she would be at my side in an instant.

Sincerely yours,

Ann M. Papadopulu

Dr. Alan and Rose Skolnick
62 Poor Street
Andover, MA 01810
(978)-749-0643

The Honorable George A. O'Toole, Jr.                    April 14, 2005
United States District Court For
The District of Mass.
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

Dear Sir,

We are writing this letter in support of Carlos and Mary Gomez. We have known the
Gomez's for the past five years. Our children have been together in a small independent
school for this period of time. We have watched, first-hand, the Gomez children grow
into wonderful, kind and compassionate young people, which is due solely to their
parents' guidance and love. Carlos and Mary are good people who are raising a
wonderful family, which is no small feat in today's society. To take them away from their
family would be tragic and do irreparable harm to the children. We would like to think
that a solution could be reached that would not include punishing the Gomez children as
well. We implore you, Sir, to look at this case with humanity and compassion and think
of these children when you make your decision.

Sincerely,

Dr. Alan and Rose Skolnick

# EXHIBIT  C

LAW OFFICES OF
## JOHN J. BONISTALLI
ONE FINANCIAL CENTER
BOSTON, MASSACHUSETTS 02111

JOHN J. BONISTALLI
THOMAS V. DiGANGI

617 695-3755
FAX: 617 695-0053

NANTUCKET OFFICE:
37 CENTRE STREET
NANTUCKET. MA 02554
(508) 228-0771
FAX: (508) 228-6205

April 15, 2005

The Honorable George A. O'Toole, Jr.
United States District Court For
The District Of Mass.
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA  02210

          Re:    Carlos Gomez

Dear Judge O'Toole:

          I was introduced to Carlos Gomez and his wife, Mary, last year.  I had a chance to get to know both of them and to understand the nature of the charges against them. Carlos came to the United States over 20 years ago and first settled in the Chicago area. He learned his trade there and ultimately relocated to the Boston area.  Unfortunately for Carlos, he learned some improper ways to run his business even though he believed he was helping many immigrants and their families.  As the business expanded, the efforts to operate under the old culture were too overwhelming and Mary and Carlos acknowledged their wrongdoing.

          Both Carlos and Mary seem to be very hardworking people and are devoted to their children.  I respectfully ask the Court to show whatever leniency it can to both Carlos and Mary for the benefit of their children.

                              Very truly yours,

                              John J. Bonistalli

JJB/pas

Thomas Connelly
38 Ray Road
Hillsboro, NH 03244
(603)-464-3848

The Honorable George A. O'Toole, Jr.
United States District Court For
The District of Mass.
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

Dear Sir,

My name is Tom Connelly, and I write to call your attention to the Gomez case, which is before you and to offer my personal assessments of Carlos and Mary.

First, let me establish my bonafides. I am a father of six (newspaper editor, librarian, teachers, nurse practitioner, published author) with fourteen grandchildren, who will be married fifty years in August. I am also a Korean War Vet, a retired teacher, coach, and Boston Marathoner. This background I provide so that you'll know I have had my share of life experiences, and that, if nothing else, I should be a pretty good judge of people.

Carlos and Mary are good people. Yes I know a law has been broken, and yes, I know punishment must be levied, but, despite this aberration, the Gomez's have a strong value system and are a strong family. Spend time with them, and you'll find too, that the love and respect that flows over and between husband and wife and parents and children is almost palpable.

To me it's a Spanish thing. I've felt the same thing over the years with my Spanish wife and her family.

Obviously, I would hope you'd show as much leniency as possible, but I understand what needs to be and Carlos and Mary do too. But, and I'm adamant about this, if you don't do everything in your power to see that the parents are always there for the children, then you are punishing the innocent along with the guilty. I think you have several arrows in your quiver, please, please don't choose the one that locks up these fundamentally sound people who have learned a painful lesson.

My cynicism seems to have grown exponentially these last few years so when I say that thinking of the Gomez's and their plight makes me think of Kenneth Lay, too. "The Lays", I'm told, get standing "Os" when they enter their country club dining room down in Huston. Think of that. All those victims of the Enron Shenanigans, and they still love the impresario of it all. No standing "Os" for the Guatemalan/American Carlos and Mary, no friends in high places.

What was it, Judge, that Shakespeare said about "the quality of mercy"?

Sincerely,

Thom Connelly

April 12,2005

The Honorable George A. O'Toole, Jr.
United States District Court
The District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA. 02210

Dear Judge O'Toole:

I would like to share some information that I believe will help the court better understand the character of Carlos Gomez and Mary Gildea Gomez.

As a Mortgage Loan Officer I have had a professional relationship with Carlos, Mary and their family for over 10 years. During that time I have always found them to be honest and forthcoming throughout the mortgage financing process. I have done many mortgages for Carlos' family members and I have witnessed his financial and emotional generosity to his siblings and other relatives.   Carlos has always stressed the importance of home ownership to his family and has contributed his own money and time to make this a reality for them. He has given many of his family members gift funds as down payments on their first homes. He and Mary have also helped some family members with the mortgage process when English was not their first language.

Carlos and Mary are extremely hard working, family oriented people who are very enthusiastic about their business. I have seen their business grow and become more successful over the years and with that success, they have reached out to their family and community with a helping hand. They have been a pleasure to have as clients.

Thank you for your consideration.

Sincerely yours,

Joanne O'Keefe

April 25, 2005


The Honorable George A. O'Toole, Jr.
United States District Court For the District Of Massachusetts
Moakley Court House
1 Courthouse Way
Boston, Ma 02210



Dear Sir,

My Name is Joseph Giacalone; I reside at 16 Darrell Dr. North Reading, MA. I am writing to you today on behalf of Carlos Gomez and his family who have been my neighbors for the past three years.

Mr. Gomez and his family live at 14 Darrell Dr. - our houses are situated side by side. I can confirm that Carlos is one of the best neighbors a person could have. Carlos is without a doubt the friendliest and most trusting man in the neighborhood. Carlos and his wife Mary welcomed my family the first day we moved into the neighborhood and have been there for us ever since.

Over the years, my children have become friends with the Gomez family and their three children, and are often playing together on our back yard swing set. Carlos and Mary are extremely dedicated to their family - Mary can be seen driving the children to school each day as Carlos leaves for work. In the evenings and on weekends, Carlos is often outside playing ball with his kids in their well maintained yard.

By all accounts the Gomez family are hard working, caring, and friendly people and I have never witnessed any evidence to the contrary. It is my sincere hope you will take my letter into consideration before making any judgments.


Very truly yours,

Joseph Giacalone

The Honorable George A. O'Toole Jr.
United States District Court for
The District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston MA 02210

April 17, 2005

Dear Sir,

My name is Harold Sullivan Jr. I live in North Reading and am a neighbor of the Gomez family. Upon hearing of the situation Carlos and Mary are in, I found myself compelled to write to you on their behalf.

I have known them for over ten years. During that time, we have not socialized much, partly because my children are ten years older then theirs, however, I do know them well enough to say that they are kind, sincere, and generous members of our community. Last summer our nephew, Chad Felix, needed medical procedures that were not covered under insurance and the treatments were to be done at the Mayo Clinic in Minnesota. My wife and I hosted a clambake in our yard to raise money, and as usual, Carlos Gomez and his family were there to help and support the cause in a most generous way. Carlos's generosity made a big difference that day as well as many times before at block parties, school events, area fundraisers, and other charitable endeavors. Carlos knows first hand what it means to be in need and always extends himself personally and financially to help others. I believe he has worked extremely hard for many years to get where he is today.

From my house I often see Carlos playing with his children in the front yard of their home. He is an extremely devoted father to his children. He radiates a warm gentle feeling whenever I have seen him at social gatherings which everyone enjoys. On occasion I find myself able to stop and catch up on the news of his family and tell him of mine. I enjoy the conversations we have had over the years and look forward to time we spend together. We have shared a lot in common with our families always coming first. My daughter now attends Boston College and my son is a student at St. John's Prep high school. They both have great memories of baby sitting the Gomez children. I sincerely hope that Carlos and his family gets through this crisis and can move on with their lives.

Very truly yours,

Harold Sullivan Jr.

200 Park Street, Suite 2



Phillips

North Reading, MA 01864

April 15, 2005

Honorable George A. O'Toole, Jr.
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

Dear Your Honor:

I am writing to you on behalf of Carols and Mary Gomez. I have had the pleasure of knowing the Gomez family for twelve years personally and professionally. They continue to be actively involved in all aspects of their children's lives. My daughter Kylie attended The Montessori School with their son Sam and two daughters Greta and Olivia. I have seen first hand how nurturing Carlos and Mary are with their family.

As a former detective, prosecutor, and juvenile officer, I can understand the severity of this difficult situation. However, this is a case where leniency will benefit this family and our society. Carlos and Mary will continue to be positive role models in their children's lives and active members of our community. I appreciate your time and consideration on this case.

Respectfully Yours,

Michael P. Phillips
978-664-3674

*LEM File: \Mike\your honor*

April 14, 2005

The Honorable George A. O'Toole, Jr.
United States District Court For
The District of Massachusetts
John Joseph Moakley Courthouse
1 Courthouse Way
Boston, MA  02210

Dear Sir:

Carlos and Mary Gomez have been my next door neighbors for the last ten years so my
wife and I know them well. I am superficially aware of their current legal issues and
wanted to address you on what I consider several positive characteristics of the Gomez
family.

First of all, they are very generous in nature. A good example is my kids going door to
door for school or charity fund raisers and always knowing that the Gomez's donation
will be amongst the most generous. Though Carlos does not talk about it, I know for a
fact that he takes good care of both his parents and several other relatives, assuring that
they are well provided for. They are very approachable and are the type of people that
would do anything for family, neighbors and the community.

Secondly, they are very down to earth and friendly. On several occasions they have
opened their house and yard up to all of the neighborhood children to help celebrate one
of their kids birthdays. They also actively participate in neighborhood get togethers. They
live in a very nice, well kept house but are also very unpretentious

Finally, and perhaps most importantly, I sometimes experience Carlos and Mary through
their three children. I am a firm believer that children mimic much of the same behavior
or characteristics as their parents. This ranges in everything from friendliness to
politeness or to how they deal with adults. I can tell your that their three children are
absolute models of good kids. They are friendly, they are polite, they ask, they don't tell,
they say please, they say thank-you and they get along very well with other playmates in
the neighborhood.

In conclusion, the Gomez's are very good people who fit in nicely with the quiet yet open
neighborhood that we share with them. We wish them well as they work through their
current situation and are hopeful for as positive an outcome as can be expected. Should
you have any questions, please contact me at the address below.

Very Truly Yours,

Thomas D. Nunn
12 Darrell Drive
North Reading, MA 01864



# North Reading Skating Association

P.O. Box 121 · North Reading, Massachusetts 01864

The Honorable George A. O`Toole Jr.
United States District Court for
The District of Massachusetts
John Joseph Moakley US Courthouse
1 Courthouse Way
Boston, MA. 02210

April 13th, 2005

Dear Judge O`Toole,

My name is Michael Carey, I am writing on behalf of my dear friend Carlos Gomez. My wife (Elizabeth) and I have known and associated with the Gomez family for nearly ten years. My family has lived in North Reading for nineteen years.

Mary and Carlos are very family orientated. They have three beautiful and polite children. There house is immaculate and the grounds that surround are impeccable. Carlos is one of the most hardest working people that I know. He is caring, giving. A wonderful father to his children.

All the years I have known Carlos he has always waved and smiled as he goes by our house. I know, he leaves very early for work as do I in the mornings and he does stop and asks how my family members are doing.

Mr. Gomez would give the shirt off his back if you ask for it. We need more caring friends like Carlos. I am proud to be his neighbor and friend.

Very Yours Truly,

J. Michael Carey

8 Darrell Drive
North Reading, MA. 01864

April 14, 2005

Honorable George A. O'Toole, Jr.
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

RE: Personal Recommendation

Dear Honorable Judge,

    In regards to my knowledge of Mr. Carlos Gomez and Mrs. Mary Gomez, I have known this couple for about ten years, when they moved to North Reading.

    I'm writing this letter of personal recommendation for Mr. & Mrs. Gomez, because I believe them to be honorable, proud citizens of our town. They are actively involved in supporting our town's municipal departments, school systems, youth sports, etc. They participate with their children in many town activities, such as our annual Fireworks display, and volunteer their time and attention in many other ways.

    I'm very proud to know them and hope you will consider leniency when reviewing their case, as they are a great asset to our community.

    For further comments, you may contact me directly at (978) 664-2141.

Sincerely,

Chief Henry Purnell
Chief of Police
North Reading, MA

HP/lem

CONFIDENTIAL: File:\gomez, purnell

The Honorable George A. O'Toole, Jr.
United States District Court for the District
Of Mass.
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA  02210


Dear Sir,

      Our names are Louis and Laura Pintsopoulos. We reside at 15 Darrell Drive,
North Reading, MA. We are neighbors of Carlos and Mary Gomez.
      We have known Carlos and Mary for about 10 years. Our children, Gina and
Louie are frequent guests in their home. They go over to visit Sam, Olivia and Gretta, the
Gomez children. When they visit the Gomez residence they are treated like royalty. I
cannot even recount how many times Carlos and Mary have gone above and beyond for
my children. They treat them as if they were their own children. They are wonderful
people, very kind and extremely thoughtful. I am very particular about where my children
go. I feel when they go to the Gomez residence they are at their second home.
      Their children are the most polite and respectful children (with great senses of
humor I might add) that I know. That says a lot for their parenting skills. Children such as
the Gomez children are few and far between these days. I think this is due in part to the
time Mary and Carlos spend with them. They always do things as a family. They are
always doing something with their children. They are very family oriented people.
      Carlos and Mary are very hard working people who are respectful and friendly to
all. They in turn are very well liked and respected in the neighborhood and community.
They go out of their way to lend a hand. If I had a crisis or an emergency they would be
the first people I would ask to help because I know that they would do it out of the
goodness of their heart. I also know I would not even have to ask because they would be
right there lending their support.  I know I am not their only neighbor who feels this way.
They are a very well liked family.

Very Truly Yours,

Louis Pintsopoulos
Laura Pintsopoulos

# EXHIBIT  D

The Honorable George A. O'Toole Jr., Suite 4710
United States District Court for the District of Massachusetts
One Courthouse Way, Boston, MA 02210

April 11, 2005

Your Honor:

I have had the pleasure of working with Lanco Scaffolding for the past two years on several different construction projects. What I saw over this period of time was an owner who never hesitated to provide his crew with the best "fall protection" safety equipment available. Their safety and well being were always at the forefront of Mr. Gomez's motivation in the selection, delivery and education in the proper use of any equipment. It is rare for me to do business with a company that makes time for on the job training in the proper use and or installation of the equipment. I can remember several cold January mornings going over the proper use of the equipment with the Lanco supervisor and crew. I was always struck by how friendly and attentive the Lanco crew were, generally speaking there are not a lot of happy faces on a cold morning on a job site, clearly the Lanco crew were the exception. There was an esprit de coeur with this crew not generally found in this business.

The Lanco crew approached their work in a professional, efficient manner. They put in the time at the General Contractor meetings to plan and discuss not only the scope of the job but also how the safety equipment would be implemented on the site to assure efficient safe practices. I was part of these sessions and speak with first hand knowledge.

I would frequently have occasion to talk to the General Contractor in charge of the job and would find that Lanco Scaffolding was always referred to in complimentary terms, a conversation that is rare indeed in this rough and tough business.

In particular I remember driving on the Mass Pike Past Fenway Park and seeing the BU site that Lanco had enclosed and thinking how the excellent craftsmanship reminded me of the scaffolding on the Washington Monument in DC. The workmanship is excellent. Just like the park Services authorities, Carlos Gomez and his crew not only get the job done safely but also produce quality work.

Sincerely,

Richard Gilbert
President
Ultimate Safety & Security

# LINWOOD DEVELOPMENT LLC

561 WINDSOR STREET
SUITE A404
SOMERVILLE, MA 02143
TELEPHONE 617-623-1114
FAX 617-623-1115

April 14, 2005

Honorable George A. O'Toole, Jr.
Suite 4710
United States District Court for the District of Massachusetts
1 Courthouse Way
Boston, MA. 02210

Dear Sir,

I am writing this letter on behalf of Mr. & Mr. Carlos Gomez regarding their character and work ethic as principals of Lanco Scaffolding. I have known Mr. Gomez for 15 years both in a business and personal capacity. Over the last 15 years, Carlos has always exhibited a professional work ethic and pride in the services he has provided to numerous customers in and around the Boston metropolitan area.

His workers have adopted the same sense of responsibility and pride as Mr. Gomez in providing services to customers and execute their responsibilities with a sense of artistry. Mr. Gomez has on many occasions gone above and beyond the role as a business owner to help his employees whenever possible regarding diverse problems they may face regardless of whether they are work related or of a personal nature. Mr. Gomez and his employees have on many occasions donated at no cost the services of Lanco with regard to a number of beautification objectives undertaken by cities and towns in the Boston area.

Furthermore, Mr. Gomez had made a number of endowments to schools in hopes of assisting these educational establishments in providing a higher degree of educational services to children. Mr. Gomez is a firm believer that the "children of today are the leaders of tomorrow" and they should receive the educational opportunities that he did not as a child.

Respectfully Submitted,

Joseph R. Nogueira
Principal
Linwood Development, LLC

# Boynton Yards Associates I, LLC

*38 Union Square, Somerville, MA 02143*

April 19, 2005

The Honorable George A. O'Toole, Jr.
United States District Court for
The District Of Mass.
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston MA  02210

Carlos Gomez is our neighbor in the Boynton Yards area in Somerville.  He was among the first to enter this Brownfield area and accepted responsibility for hiring and maintaining employments of low income workers.  Over the years his business has grown but he still maintains a strong positive community attitude.

Carlos, through his efforts and his support of the community has lived up to his responsibility in the revitalization of the Boynton Yards area and he and his business, with its minority employment, have been a valuable asset to the City.

We hope that these factors will be considered as part of your judgment.

Sincerely,

Joseph Vaccaro

*Phone (617) 666-9080*                                                    *Fax (617) 623-5302*

April 18, 2002.

The Honorable George A. O'Toole, Jr.
United States District Court For
The District Of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

Dear Sir;

My name is Gary Pressler. I'm employed as vice president of Boston Ladder and Scaffolding Co. , a division of Lynn Ladder and Scaffolding Co. I have been employed by Boston Ladder and Scaffolding Co. twenty six years this coming May.

I am writing to you on behalf of Carlos Gomez, of Lanco Scaffolding, Inc. I first met Carlos around, 1985. He was working for Coast Ladder Co. of Beverly, MA. as a scaffold erector. It was during this period we developed a business relationship. Boston Ladder sold and rented equipment to Lanco Scaffold. Over the years our business relationship has not always been smooth, but knowing who I was dealing with, we have continued as a competitor and vendor to Lanco Scaffold.

With reference to Carlos's present situation, I know only what I have read in the newspapers and what little information Carlos and I have spoken about on the phone. I do not believe financial gain was Carlos's motive. Knowing Carlos and his background as I do, I feel it was his compassion of his fellow man that created his problem. Carlos was one who always spoke very highly of each of his employees. As if they were all part of a team and his equal. I know of his history in Guatemala, the work in Chicago, and I have watched his growth in Boston.  I can tell you that Carlos and his wife, Mary are good people.

Sincerely,

# EXHIBIT  E

 **CONSTRUCTIONS COLLABORATIVE, INC.**

CONTRACTORS & WEATHERPROOFERS

P.O. BOX 541015 (99 HAMMOND STREET)
WALTHAM, MASSACHUSETTS 02454-1015
(781) 891-6757  FAX (781) 891-4527
www.constructionscollab.com

April 10, 2005

Honorable George A. O'Toole, Jr.
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

Dear Sir;

We have hired Lanco Scaffolding on a number of projects over the last decade. Lanco has recently erected staging for us in on projects in Wellesley and Nantucket. We are currently using, or have recently had Lanco remove, or scale back, their staging at the end, or later stages of the project, for our jobs in West Newton and Norwood.

We have become familiar with Lanco's people. Lanco's staff is skilled, communicative, motivated and highly trained. We are in our 35th year of specialty contracting and many of our projects (if not most) require safe, intuitive, OSHA approved staging. In our 35 years, we have hired a number of different staging contractors, who have run the gamut of good to totally incompetent. As we have 6 employees who are OSHA certified as competent in staging, we know the difference. Lanco's people demonstrate excellent workmanship, an understanding of the needs of their and our safety and have excellent communication skills and work ethic. As a merit shop contractor, nearly all of our projects are private; but, we consistently hire Lanco because they most closely meet our needs, not because they meet union status or a set aside goal.

It is our intention to continue our relationship with Lanco on future projects. We recommend Lanco on multiple employer sites, and they are currently active with some of the GC's we work with.

To put our unqualified recommendation of Lanco in perspective, we are long term members of the National Roofing Contractors Association (NRCA) and North East Roofing Contractors Association (NERCA). I have been a director at NERCA for 17 of the past 20 years. I am currently the Chairman of NERCA's Residential Roofing Committee, past chairman of the Safety Committee, Education Committee and Asbestos Committee. I am a director of The National Slate Association, a past member of ASTM D-08 Committee and on the faculty of The Roofing Industry Educational Institute. I have on three occasions demurred a recommendation for director status at NRCA, due to time constraints.

Yours truly;

Clark Chase IV
Pres./Tres.

**Phoenix Bay State**
**Construction Company, Inc.**

SPECIALIZING IN MASONRY CONSTRUCTION, RESTORATION & RENOVATIONS

April 15, 2005

Honorable George A. O'Toole, Jr.
Suite 4710
United States District Court for the District of Massachusetts
1 Courthouse Way
Boston, MA 02210

Dear Honorable Judge O'Toole:

We have been requested to express to you our experience dealing with Carlos Gomez's Lanco Scaffolding Company. We have spent the last 35 years in the construction business and it is a pleasure to be able to say good things about a person/company without any sense of qualification or reservation.

We have been dealing with Lanco Scaffolding for the last 16 to 20 years. From our very first dealings right through to the present moment the consistent exceptional professional performance of this company remains a bright spot in our business dealings.

When we bring this company on board at the start of any project (especially appreciated when that project is something like a building at Harvard Yard) we can rely on the presence of a highly professional, efficient, and so importantly courteous crew of men doing their work. It is evident that the training these men have received from Carlos Gomez is of the highest quality as it relates to their consistent safety, ethics and professionalism.

Due to the nature of their work, (i.e. erecting scaffolding and the subsequent dismantling of the same), Lanco is always the first and last representation of manpower that our company presents to our business clients. They always represent us in a highly professional manner.

The bottom line is that - from top to bottom - Lanco Scaffolding has always presented to us a group of hard working, exceptionally well trained, courteous and just plain good people.

If further confirmation of these facts are needed please feel free to contact me.

Yours truly,

William F. Whall
Principal

lancoref

79 Shirley Street • Boston, MA 02119 • Tel: 617-442-4408 • Fax: 617-442-9094
Email: pbs@pbsboston.com • www.pbsboston.com

# E. A. COLANGELI CONSTRUCTION CO. INC.
## GENERAL CONTRACTOR
### 15 REARDON ROAD
### MEDFORD, MA 02155

TELEPHONE (781) 396-9093                          FAX (781) 395-6952

April 15, 2005

Honorable George A. O'Toole, Jr.
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

To whom it may concern:

E.A. Colangeli Const. Co. Inc. has been doing business with Lanco Scaffolding for over 10 years. During that time Lanco has erected scaffolding for us on several projects both in the private sector and on public work projects.

E.A. Colangeli has always found Lanco to be prompt and their work to comply with all project requirements including state, federal and OSHA requirements. Lanco's payroll records, work force and insurance certificates were received on time and in compliance on all projects.

E.A. Colangeli will continue to contract our scaffolding requireme    ith Lanco and I highly recommend them for other projects.

Sincerely yours,

Rico Colangeli, Sr.

President

 MUCKLE & ASSOCIATES, INC.

April 14, 2005

To Whom It May Concern:

Our company performs exterior restoration of landmark historical buildings in the greater Boston area and across Massachusetts. Lanco is our first choice for scaffolding, particularly in the most challenging situations: urban high-traffic locations, church towers made from stone, wooden steeples and cupolas, and church interiors. They are capable of taking on small projects such as specialty scaffolding for a monumental stained glass window or a cupola, as well as large projects like the scaffolding of Cambridge City Hall.

We have engaged Lanco Scaffolding on many projects over the past ten years, and have always been confident that they will meet construction schedule, fulfill all the OSHA scaffold requirements, and do a thoroughly professional job.

Muckle & Associates, Inc. recommends Lanco Scaffolding for all high-end construction projects, both new and restoration.

Very truly yours,

Susan G. Muckle
President
Muckle & Associates, Inc.



# murphy
## specialty inc.

www.murphyspecialty.com

Honorable George A. O'Toole, Jr.
John Joseph Moakley U.S. Courthouse
One Courthouse Way
Boston, MA. 02210

Dear Mr. O'Toole,

Murphy Specialty, Inc. highly recommends using Lanco Scaffolding, Inc.( Lanco). Lanco has worked erecting scaffolding for us on several projects over many years. Lanco is currently erecting scaffolding for us @ the James Hennigan School in Jamaica Plain, MA.( Boston Public Schools ). Lanco's employees have been very consistent and performed excellently when it comes to coordination, scheduling, laying out the job.

One thing I personally like is their special attention to safety issues, good housekeeping, and explaining what can and cannot be done on the built scaffolding.

Recent jobs that Lanco erected for us are:

Ted Williams Tunnel-Pump Station # 5
U/Mass-Boston-Power Plant Hatch

We are very pleased with Lanco, and will continue to use them on our future projects.

If you have any questions, please call me directly @ 617-719-0400.


Sincerely,

Paul G. Hardiman, Jr.
Project Manager-Murphy Specialty, Inc.


P.O. Box 292 • Readville, MA 02137
Tel. (617) 361-3242 • Fax (617) 364-3830

*"An Equal Opportunity Employer"*

208

# NORTHERN CONTRACTING CORP.

April 22, 2005

The Honorable George A. O'Toole, Jr.
John J. Moakley U.S. Courthouse
One Courthouse Way
Boston MA 02210

**Re: Lanco Scaffolding**

Dear Judge O'Toole:

Northern Contracting has done business with Lanco Scaffolding for a number of years, most recently at our 157-159 Newbury Street building renovation which is now underway.

We have always found Lanco's employees to be competent and hard-working and have found Lanco's services to be satisfactory in every respect.

Northern Contracting has benefited greatly from its association with Lanco and we look forward to working with them in the future.

Regards,

Paul F. Sciaba
President

P.O. Box 96  •  776R Washington Street  •  Canton, MA 02021  •  (781) 821-4200  •  Fax (781) 821-4201

**RPM**

Restoration Preservation Masonry, Inc.
www.RPMnewengland.com

## Restoration Preservation Masonry, Inc.

79 Lyman Street                                                    telephone: (508) 393-8033
Northborough, MA 01532                                                fax: (508) 393-9871

April 19, 2005

Honorable George A. O'Toole, Jr.
John Joseph Moakley US Courthouse
1 Courthouse Way
Boston, MA 02210

Re: Lanco Scaffolding

Dear Sir,

For the past 10 years we have maintained an excellent business relationship with Lanco Scaffolding using their services on many of our projects.

They continually provide quality workmanship in a safe and timely manner, while pay close attention to the needs of their customers.

We have solicited pricing on current projects and will continue to contract with them in the future.

Please contact the undersigned for any additional information required.

Very truly yours,

Paul Haven
President

# D. J. CONSTRUCTION COMPANY, INC.

## MASONRY CONTRACTORS AND BUILDERS

63 Sears Road    Milton, Massachusetts 02186

(617) 696-8724    Fax 696-0128

April 19, 2005

Honorable George A. O'Toole, Jr.
John Joseph Moakley U. S. Courthouse
1 Courthouse Way
Boston, MA  02210

Dear Sir:

Our Company has hired Lanco Scaffolding to erect our scaffolding on many jobs over the past many years.  Lanco's workmen are highly trained and skilled.  We are very familiar with their excellent workmanship, their safety record, and their strong work ethic.

We will continue to work with Lanco Scaffolding in the future and look forward to maintaining our excellent work relationship with them.

Thank you for your consideration in this very important matter.

Sincerely,

D.J. CONSTRUCTION CO., INC.

BY:
R.J. Tenaglia

plt



April 15, 2005

To Whom It May Concern:

     Component Assembly Systems, Inc. has contracted the supply and erection of staging to Lanco Scaffolding Inc. for over 10 years on several of our projects. A couple of the notable projects that they worked with us on were the US Federal Courthouse on Fan Pier in Boston and more recently at the MIT Ray and Maria Stata Center in Cambridge.

     We have always had a positive experience with Carlos Gomez and Lanco Scaffolding and we plan to continue using them on our future projects.

Very truly yours,

Paul Pawlowski
Sr. Vice President

**Component Assembly Systems, Inc.**

# TITAN ROOFING, INC.
### 70 Orange St., Chicopee, MA 01013-3849

**Main office phone (413) 536-1624**
*Main office fax (413) 533-2560*
*Estimating fax (413) 533-1186*

**MINORITY BUSINESS ENTERPRISE**
**Commonwealth of Massachusetts**
**City of Boston**
**State of New York**

April 15, 2005

Honorable George A. O'Toole, Jr.
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

Gentlemen,

Titan Roofing, Inc. has been doing business with Lanco Scaffolding for more than 20 years. The performance and workmanship of Lanco's scaffolding projects is excellent. Titan Roofing is extremely satisfied with the business relationship that we have with Lanco.

Please feel free to call the undersigned if you would like a list of projects that Lanco has performed for Titan.

Very truly yours,

Fred Pazmino
President



**STATEWIDE RM, INC.**
RESTORATION & MASONRY

April 21, 2005

To whom it may concern,

Lanco Scaffolding Inc. has been erecting scaffolding for our masonry projects since 1996. No matter the size of the project we would always use Lanco Scaffolding. We find them always available; work is performed in a timely and efficient manner, with the utmost attention given to safety standards

Yours sincerely,

Kieran Fitzgibbon



# W. T. Rich Company, Inc.

⌐ FAXED ⌐

April 26, 2005

To Whom It May Concern:

W. T. Rich Company has employed Lanco Scaffolding, Inc. on our projects for well over 15 years. We have never experienced any problems with the scaffolding you have erected and we have always been totally satisfied with both the performance of your work and the quality of same.

It has been a pleasure doing business with your company and we look forward to working with you on many projects in the future.

Very truly yours,

W. T. Rich Company

Walter T. Rich
President

WTR/je
cc: RWR
0426lanco

214 Lincoln Street, Suite 320 • Allston, MA 02134
Tel: 617-787-5400 • Fax: 617-787-5959 • Website: www.wtrich.com



## RESTORATION CO., INC.

557 Main Street, Medford, MA 02155

Phone (781) 396-6150                                                          Fax (781) 396-0042

April 27,2005

To whom it may concern;

We have been doing business with LANCO SCAFFOLDING INC. 33 Earle st.
Somerville,Mass. For four years.

We are very pleased with the quality work that they have performed on our job sites also
they are safety conscious and very polite to everyone involved in our projects.

I myself have dealt with lanco in the past for 20 years and will only use this company to
perform the scaffolding work.

Please feel free to call on me regarding this company .

Sincerely

Frank Di Censo  President

**hankin**

Evan L. Hankin

**CONSTRUCTION COMPANY, INC.**

21A Olympia Avenue
Woburn, MA 01801
Tel 781.932.0655
Fax 781.932.8742

April 26, 2005

The Honorable George A. O'Toole, Jr.       RE:    CARLOS GOMEZ
UNITED STATES DISTRICT COURT                      LANCO SCAFFOLDING, INC.
 FOR THE DISTRICT OF MASSACHUSETTS               Somerville, MA
JOHN JOSEPH MOAKLEY U.S. COURTHOUSE              FILE:  CORR-GOMEZ
1 Courthouse Way
Boston, MA  02210

Dear Sir:

      I have known Carlos Gomez and LANCO SCAFFOLDING, INC for over 20 years
both as a structural engineering consultant to him and his company and as a
construction contractor who uses his services as a pipe scaffolding erector.  During this
long period of time I have been very favorably impressed with Carlos and his company.
The personnel who worked at the jobsites were professional, courteous, well-trained
and knowledgeable in their craft and cognizant of the OSHA and current safety
regulations.  When professional consulting services were requested of me the office
personnel also exhibited the same courteous and knowledgeable demeanor as the
tradesmen.  I can only conclude that the consistency was directed from the top and
covered all aspects of his company.
      Over the years Carlos has paid my invoices fully and promptly.  His invoices to
me were not always paid promptly and I greatly appreciated his patience.
      A few months ago I became aware of the general nature of Carlos's present
difficulties.  I was, quite frankly, very surprised as this was inconsistent with his
reputation and character as I had known him over many years.  I humbly ask that the
court consider his present situation as an aberration which appears to be
unrepresentative of a long history of hard work and integrity.

                                          Very truly yours,

                                          Evan L. Hankin
                                          President

# M. F. REYNOLDS, INC.

**BUILDERS SINCE 1890**

125 East Albion Street
Medford MA 02155-6601

Telephone: (781) 393-4800
Fax: (781) 393-5889

April 27, 2005

Honorable George A. O'Toole, Jr.
John Joseph Moakley U. S. Courthouse
1 Courthouse Way
Boston MA 02210

Re: Lanco Scaffolding, 33 Earle Street, Somerville. MA

Dear Sir:

M. F. Reynolds, Inc. has hired Lanco Scaffolding to erect our scaffolding jobs during many of the past years. Lanco is presently erecting scaffolding at one of our projects at 208 Beacon Street, Boston, MA.

Lanco's workmen are highly trained and skilled. We are very familiar with their excellent workmanship and safety record, and their strong work ethic.

M. F. Reynolds, Inc. will continue to do work with Lanco Scaffolding in the future and look forward to maintaining our excellent work relationship with them.

Thank you for your consideration in this very important matter.

Sincerely,

M. F. REYNOLDS, INC.

David G. Dankens
President

# EXHIBIT  F

# DANIEL P. McGRATH
*Certified Public Accountant*

May 11, 2005

**Via Hand Delivery**

Stephanie K. Henshaw
Martha C. Victoria
U.S. Probation Officers
Probation and Parole Department
United States Courthouse, Suite 1200
1 Courthouse Way
Boston, MA 02210-3027

<div style="text-align:center">

**RE: Carlos Gomez and Mary Gildea
Criminal No. 05-cr-10022-GAO**

</div>

Dear Ms. Henshaw and Ms. Victoria:

I am a Certified Public Accountant with an office located at 409 Pond Street, Suite 4, Braintree, MA 02184. My curriculum vitae is attached hereto as <u>Exhibit 1</u>. I have been engaged by Carlos Gomez ("Mr. Gomez") and Mary Gildea Gomez ("Ms. Gildea") (collectively the "Gomezes") to evaluate two issues:

· *first*, their roles in the management and operation of Lanco Scaffolding Inc. ("Lanco"); and

· *second*, the short and long term viability of the Company using corrected operating procedures - i.e. all employees are now on the books and revised estimating procedures are being used.

In order to evaluate these issues, I conducted a site visit during which I reviewed certain books and records of the Company that contained information regarding the cash receipts, cash disbursements, general ledger trial balance, and payroll. I also interviewed Mr. Gomez, Ms. Gildea, and Kendal Moran, Lanco's estimator, and have had numerous follow-up communications with them concerning various financial and operational issues.

Based on the foregoing and my experience in the industry, my conclusions are:

1) Mr. Gomez and Ms. Gildea are indispensable to Lanco and their incarceration would result in the immediate closing of the Company and the layoff of all of its employees (currently 24). They perform all of the management and operational duties for the company and they are the only ones with the training, knowledge, skill, experience and customer relationships necessary to operate it on a daily basis; and

2) The Company is in a rather precarious financial situation due to the significant financial strain caused by the Gomezes' aggressive restitution to the victims (**$2,262,175** to Liberty Mutual, the Carpenter's Union, IRS and Massachusetts DOR); however, as long as Mr. Gomez and Ms. Gildea are involved in operating it, Lanco will remain a viable company that employs between 20-30 individuals.

I.    **Overview of Lanco**: Lanco is operated out of a 10,000 sq. ft. warehouse that is situated on a roughly 1.25 acre industrial-zoned lot in Somerville, which Mr. Gomez owns. The Company owns outright over 20,000 pieces of scaffolding and 9 heavy trucks. In 2004, its sales were $4,582,000 and its gross payroll, with all employees on the books, was $1,248,000.

II.   **Significant Roles of Carlos Gomez and Mary Gildea**

Lanco is run, like many other privately owned businesses, by its owners (the Gomezes) who perform all critical management and operational job duties (including sales, contracting, training, management, and operations) themselves. More specifically:

· Mr. Gomez maintains *all* client relations and performs *all* key training and scaffolding installation supervision. With assistance from an outside engineer, he also assists in *all* scaffolding design.

· Ms. Gildea performs *all* operations and administration, except for estimating, which is done by Kendal Moran ("Moran") with the Gomezes' assistance.

· The other employees make up basically 6 crews, which erect the scaffolding. Attached hereto as Exhibit 2 is Lanco's organizational chart.

A.    Carlos Gomez: He arrives every day at the warehouse at approximately 5:00 am and readies everything for the crews - the daily schedule is set the night before by Ms. Gildea with his input (as explained below). The crew arrives at 6:30 and he reviews the specs for each job with every crew member. The teams are then driven to the various

Probation and Parole Department
May 11, 2005
Page 3

jobs sites by the company.  With the exception of the crew leaders (see Org. Chart), most employees do not drive.

Mr. Gomez is primarily responsible for designing and laying out each job.  To do this, he draws from over 30 years of experience in the industry.  Among other things, he designs the scaffolding structure and determines equipment usage and "tie off" procedures, which vary from job-to-job.  He also is the exclusive trainer for scaffolding erection and safety.

Everyday Mr. Gomez tries to visit each job site to oversee progress and safety.  Every evening, he uses information from these visits to assist Ms. Gildea in ascertaining job needs and staffing/scheduling for the next day.  Between job site visits, he meets with existing and potential customers to review new projects, make sales pitches, deliver estimates, and address all necessary issues arising in the field.  He works closely with Mr. Moran to generate competitive estimates because he is the only individual in the Company capable of assessing job scope, i.e. duration, design, equipment and labor needs, and safety.

Occasionally, jobs must be completed during evening hours or on weekends.  In those instances, if feasible, Mr. Gomez stays for the duration of the project(s) and works with the employees.

Mr. Gomez handles "toolbox" safety meetings with his crews on a regular basis.  Those meetings are to address any specific conditions on a job site that are unique and to ensure that all safety procedures are being followed on the job for the benefit of Lanco's employees as well as all of the trades working on, or in the vicinity of, the Lanco's scaffolding.

B.    Mary Gildea:  She is responsible for all of the administration, accounting, billing, and management of the office.  She arrives each day at approximately 9:00 am, after dropping her three children off at school.  She then meets with Mr. Gomez to review daily scheduling, answers phones, addresses employee issues, summarizes payroll information for the payroll service, prepares progress bills, formalizes new job quotes and does the company's banking.  She is the only person capable of performing these job duties and, other than Mr. Gomez and Mr. Moran, is the only other individual at Lanco who speaks English fluently.  At the end of each day (i.e. after 7:00 pm), she prepares the work schedule for the next day with input on job progress from Mr. Gomez.  If there are any special assignments, she contacts the employees that night and makes any arrangements necessary for them and/or the particular job.

In sum, Mr. Gomez performs every task necessary for the business in the field (except for scaffolding erection) and Ms.Gildea performs every task necessary for the business within the office.

Probation and Parole Department
May 11, 2005
Page 4

Mr. Gomez's and Ms. Gildea's involvement in Lanco is absolutely integral to the continued operation and viability of the Company. They are typical entrepreneurs in the sense that they are available, and often times work, seven days a week for as many hours as the job(s) require. Because they are integral, irreplaceable, and indispensable, it is my opinion that Lanco would close immediately without their daily involvement in the Company.

III.    **Lanco's Viability with Mr. Gomez and Ms. Gildea**

There are generally five factors to consider in determining the current financial position of a company in Lanco's situation: 1) extent of working capital; 2) extent of overall debt; 3) scope of current work "on hand"; 4) extent of company resources available to perform the work; and 5) company's ability to pay restitution and fines.

My analysis of Lanco based on these factors is that it is, and will continue to be, a viable, productive business run by Mr. Gomez and Ms. Gildea. In short, it has the necessary working capital, cued projects, trained labor pool, equipment and assets to continue running in a profitable manner and employing 20-30 individuals with significant growth potential. The following is the relevant key financial information as of 3/31/05.

A.    Adequate working Capital: The Company has approximately $749,000 in liquid assets and only $253,000 in outstanding debt (not including any restitution ordered in this case). That equates to a 3:1 ratio, i.e. the company has $3 of liquid assets available for every $1 of current debt. A ratio of 2 or higher is considered strong. For a number of reasons, the Company's overall debt is very low. It pays bills on a weekly basis and, therefore, does not have a high balance for accounts payable. According to the disbursements journal, monthly overhead costs are low because of the conservative manner in which the business is operated by Mr. Gomez and Ms. Gildea. The Company's offices are located in the scaffolding warehouse and they are equipped and furnished in a very basic manner. Since Mr. Gomez owns the property, the Company is not charged rent. And, Ms. Gildea performs all of the office duties, so there is no full time receptionist and bookkeeper.

B.    Sufficient Contract Backlog: The current level of cued work for the Company is $949,000, which represents about three months of work. This amount is acceptable. The Company anticipates a very busy summer and adding a number of new projects that were delayed because of the severe weather conditions this past winter. Mr. Gomez and Ms. Gildea report that they are looking to hire and train additional employees to handle Lanco's backlogged worked. In addition, because they have been involved in this lawsuit, the Gomezes have had difficulty concentrating on the day-to-day affairs of the Company.

C.    Sufficient Assets Available to Perform the Work: The key items Lanco needs to conduct business are scaffolding apparatus, heavy trucks, and trained employees. As I indicated in Section I above, Lanco has adequate equipment and vehicles at its disposal.

DANIEL P. McGRATH
*Certified Public Accountant*

Probation and Parole Department
May 11, 2005
Page 5

In addition, due to training done by Mr. Gomez, the company has a key group of "field employees" (everyone except Mr. Gomez, Ms. Gildea and Mr. Moran) who are available to erect the scaffolding once everything else has been handled by Mr. Gomez and Ms. Gildea, i.e., project designing, biding, contracting, scheduling, and employee transportation.

The Company has a remarkable safety record, especially given its field, and an exceptional employee retention history, both of which are unquestionably the best that I have encountered. Its employees have been with the Company for periods ranging from a minimum of 4 years, to 7-10 years (most employees), to in excess of 15 years. Employee turnover and on the job injury is virtually non-existent. Based on letters that I have reviewed written by Lanco's customers to this Court, the Company's safety record (for its own employees, as well as all of the other trades that work on, and in the vicinity of, Lanco's scaffolding) is a primary reason for using Lanco.

D.    Ability to Make Full Restitution: Based on the documents that I have reviewed, the Gomezes/Lanco have already made restitution to Liberty Mutual and the Carpenter's Union in the amount of **$1,012,175** ($866,992 to Liberty; and $145,183.02 to the Carpenter's). In addition, there is an estimated payroll tax deficiency of $831,485.07 and there will be late payment penalties and interest assessments associated with it. The Gomezes have already made restitution totaling **$1,250,000** to the IRS and Mass. DOR, which should satisfy the deficiency and leave a balance for penalties and interest. The Gomezes plan to deal with the remaining victims and make restitution to them under payment plan(s) as well.

The Company is profitable and can make reasonable restitution payments going forward. Importantly, Mr. Gomez and Ms. Gildea are completely dedicated to doing this as soon as feasible. The Gomezes have survived the negative publicity from this lawsuit because of customer loyalty and Lanco's exceptional level of job performance and safety.

The Company has corrected key errors in its operations since the issues that are the subject of the criminal prosecution came out in Fall 2003. Now, everyone is on the books and all proper liabilities (worker's compensations, Union and tax) are apparently being met. The Company has revised estimating procedures to allow for the additional, proper costs resulting from the corrections, but is still winning bids at a healthy rate.

DANIEL P. MCGRATH
*Certified Public Accountant*

Probation and Parole Department
May 11, 2005
Page 6


In sum, Mr. Gomez and Ms. Gildea are irreplaceable and indispensable to Lanco. Mr. Gomez is the public face of the corporation and, as explained above, he and Ms. Gildea perform all significant Company matters in the field and in the office. The employees, few of whom speak English well, though exceptionally well trained and dedicated, are not capable of replacing either of the Gomezes (much less both of them) in the short or long term.

If you have any questions, comments or concerns about any of the foregoing, please do not hesitate to contact me.

Sincerely,

Daniel McGrath

cc: Paul G. Levenson, Esq.

*141537*

cc: Harry L. Manion  (w/out enclosures)
    Kevin McGrath (w/ enclosures)
    Lanco Scaffolding, Inc. (w/out enclosures)

DANIEL P. MCGRATH
*Certified Public Accountant*

# EXHIBIT  1

409 Pond Street, Suite 4
Braintree, MA 02184

781-356-5165 Office
781-356-4460 Fax
Danmasscpa@aol.com

# Daniel P McGrath CPA CMA

## Professional Background

In Practice as a Certified Public Accountant, operating as a sole proprietor, concentrating in the areas of construction and real estate. Primarily a corporate client base of real estate developers, general contractors and subcontractors.

Audit Manager with Kennedy and Lehan CPAs, working at various audit and tax levels from 1984 through 1991, preparing corporate financial statements and tax returns, with a concentration in the construction and real estate fields.

Member of the American Institute of Certified Public Accountants, Massachusetts Society of Certified Public Accountants and Institute of Certified Management Accountants.

Member of the Board of Directors of Braintree Co-operative Bank.
Member of the Plymouth and South Shore Association of Realtors

## Development and Construction

Licensed Massachusetts Real Estate Broker, operating as a sole proprietor, purchasing, developing and Investing in various real estate projects; including commercial office units, residential mixed use properties, residential apartments and homes. Development of residential subdivisions from the permitting/raw land stage through completed home sale. Management of construction costs and responsible for all financial aspects of cost control, accounting, budgeting and job cost tracking.

## Expert Experience

Working with various Attorneys & Law firms, over the past fifteen years, as an accounting expert. Primarily in the areas of proper accounting classification and treatment of various corporate income and expenses and shareholder and partner transactions. Provided expert testimony, settlement opinion and options for various levels of disputes, accounting irregularities and lawsuits, both under deposition and/or at trial.

Professional Expert References: James P. Knox, Esquire, Braintree, MA

James F. Rocheleau, Esquire, Quincy, MA

# EXHIBIT  2

# FINCO SCAFFOLDING, INC.



# EXHIBIT  G



PREMIUM REVIEW ASSOCIATES

Premium Recovery Specialists

P.O. Box 7142
Nashua, NH 03060
(603) 888-9361
Fax (603) 891-0646

July 7, 2005

The Honorable George A. O'Toole, Jr.
United States District Court
John Joseph Moakely U.S. Courthouse
1 Courthouse Way
Boston, Ma 02210

RE: <u>United States v. Carlos Gomez and Mary Gildea</u>
    Criminal No. 05-cr-10022-GAO

Dear Judge O'Toole:

I am the founder and principal of Premium Review Associates ("PRA"). PRA specializes in evaluating workers compensation policies to detect premium overcharges from incorrect payrolls, experience modifications, and other variables. Since 1979, PRA has provided its services to over 1000 companies. PRA has also developed software and print manuals relating to workers compensation premium determination and related issues. My curriculum vitae is attached hereto as <u>Exhibit 1</u>.

I have been engaged by counsel for Carlos Gomez ("Mr. Gomez") and his wife Mary Gildea ("Ms. Gildea") (collectively the "Gomezes") to evaluate the *actual loss* to Eastern Casualty Insurance Company ("Eastern") and Liberty Mutual Insurance Group ("Liberty") (collectively the "Insurers") caused by Lanco Scaffolding, Inc.'s premium underpayment on its workers compensation insurance policies during the period March 29, 1996 through March 29, 2003.

In order to evaluate any actual loss to Eastern and/or Liberty Mutual caused by Lanco, I reviewed the materials listed on Exhibit 2, which were either provided by the Gomezes' counsel or obtained by me through various industry sources.

Based on my experience and the extensive materials that I have reviewed on point, it is my conclusion that Lanco's Insurers did not sustain any actual underwriting loss during the relevant policy periods. Instead, as set forth below and reflected in the spreadsheet attached hereto as Exhibit 3, the insurers made a profit of $218,093 on the subject Lanco policies.

**Analysis**

The actual loss to the Insurers in this case, consistent with United States v. Tobin, 28 F. Supp.2d 674 (D.Mass. 1998), would be their out of pocket loss, if any and not the amount of Lanco's premium underpayment. They would have experienced an out of pocket loss if the premiums actually paid by Lanco were exceeded by the amount of claims they paid for injuries to Lanco's employees plus administrative expenses incurred in issuing and servicing the policies. The industry rule of thumb is that administrative expenses are 30% of a policy's premium.

a. Claims paid by Insurers: During the time period March 29,1996 through March 29, 2003, the Insurers paid two claims on Lanco's behalf.  Eastern paid one for $40,578 (policy: 3/98-3/99) and Liberty paid one for $18,688 (policy: 3/02-3/03), which totals **$59,266** (see Exhibit 3).

b. Premiums paid by Lanco: During the same time period, Lanco paid a total of **$396,227** in premiums to both Eastern and Liberty (see id.).

c. Administrative Expenses @ 30% of policy premium **$118,868** (see id.).

d. Insurers' Profit: **$218,093** (see id.).

e. Profit Ratio: 55%.

## Conclusion

I certainly acknowledge that the payment of higher premiums based on a larger (and apparently accurate) payroll would have yielded even greater underwriting profit to the insurance carriers here.  Nonetheless, even as things stand, the Insurers netted a not insubstantial profit of $218,093 on the Lanco policies.

Moreover, the data (specifically, claims paid) suggests that Lanco is an extraordinarily safe place to work.  In Massachusetts, workers compensation insurers typically pay out between 70-88% of policy premiums in claims (published data from 1997-2002).  In Lanco's case, the "loss ratio" was just 15% (see id.).

Respectfully Submitted By,

Norman Goodman

Exhibit 1

# Norman Goodman

35 Green Heron Lane • Nashua, New Hampshire 03062 • (603)888.9361 •
ngoodman@zapcomp.com

## Employment

**Premium Review Associates**                                                      **1979 – Present**
Established in 1979, PRA has saved millions of dollars in workers compensation premium
for more than 1000 employers. We analyze and dissect all the elements that comprise
workers compensation premium, identify mistakes and overcharges, and present our
findings to the insurer for correction.

- Extensive experience with conventional, composite-rated, retrospective, large
  deductible, and other loss sensitive rating plans.
- Developed and marketed EMS II – The first software package to calculate the
  workers compensation experience modification. Sold over 1250 copies
  nationwide to employers, insurance agents and brokers, consultants, and
  insurance carriers nationwide.
- Served as an expert and consulting witness assisting defense counsel with the
  technical aspects of workers compensation to bring about a favorable disposition
  or settlement.
- Authored several manuals on workers compensation premium determination,
  insurance company practices, experience rating, and premium auditing.

## Additional Employment History

**Peerless Insurance Company**                                                     **1976 – 1979**
National Audit Manager – responsible for the administration and workflow of entire
department. Assigned monthly work volumes to auditors, assessed results, conducted
personnel reviews. Established departmental quality control procedures. Worked in
cooperation with Underwriting, Accounting and Marketing Departments to coordinate
the auditing function with company-wide goals.

**Maryland Casualty Company**                                                      **1971 – 1976**
Premium auditor. Responsible for the auditing of policyholders workers compensation,
general liability, and automobile policies. Traveled to policyholders to conduct payroll
and general liability audits and review adequacy of policy exposures. Assisted in various
office administrative tasks.

## Education

Bachelor of Science in Business Administration                                     1970
Monmouth University,
West Long Branch, New Jersey

# Document List

Eastern Casualty Insurance Company

    1996 - 1997
- Prepared Schedule Actual Payroll vs. Reported to Insurers
- Workers Compensation Audit Endorsement (dated 5/21/97)
- Lanco Payroll Journal 3/29/96 to 12/31/96
- Lanco Payroll Journal 1/1/97 to 3/29/97
- Equifax: Workers Compensation Audit - worksheets (dated 3/26/97)

    1997 - 1998
- Prepared Schedule Actual Payroll vs. Reported to Insurers
- Workers Compensation Audit Endorsement (undated)
- New England Insurance Services: Workers Compensation Audit - worksheets (dated 8/6/98)
- Eastern Casualty: Underwriting Alert Form
- Eastern Casualty: Audit Request

    1998 - 1999
- Prepared Schedule Actual Payroll vs. Reported to Insurers
- Workers Compensation Audit Endorsement (dated 6/18/99)
- Eastern Casualty: Underwriting Alert Form
- Nielson Inc: Workers Compensation Audit - worksheets (dated 5/19/99)
- Eastern Casualty: Audit Referral Form (dated 6/17??)

    1999 - 2000
- Prepared Schedule Actual Payroll vs. Reported to Insurers
- Workers Compensation Audit Endorsement (dated 9/29/00)
- Workers Compensation Audit - worksheets (dated 6/14/00)

Liberty Mutual Insurance Group

    2000 - 2001
- Prepared Schedule Actual Payroll vs. Reported to Insurers
- Workers Comp Policy (incomplete)
- Workers Compensation Audit - worksheets (dated 5/11/01)
- Workers Compensation Revised Audit - worksheets (dated 10/3/03)

    2001 - 2002
- Prepared Schedule Actual Payroll vs. Reported to Insurers
- Workers Comp Policy (incomplete)
- US Form # 941: 4 quarters
- Workers Compensation Audit - worksheets (dated 5/28/02)
- Workers Compensation Revised Audit - worksheets (dated 10/3/03)

    2002 - 2003
- Prepared Schedule Actual Payroll vs. Reported to Insurers
- Workers Comp Policy (incomplete)
- Workers Compensation Audit - worksheets (dated 6/17/03)
- Workers Compensation Revised Audit - worksheets (dated 10/3/03)

    2003 - 2004
- Workers Compensation Audit - worksheets (dated 6/17/04)

- STRIDE Report (Loss Run) (Effective Years: 2000 thru 2005)
- Itemized Statement of Loss

Exhibit 2

<u>Other</u>

Workers Compensation Rating & Inspection Bureau "Experience Rating History"
Workers Compensation Rating & Inspection Bureau "Depopulation Report"
Workers Compensation Rating & Inspection Bureau Experience Ratings (2001 - 2004)
Workers Compensation Rating & Inspection Bureau Circular Letter #s: 1753, 1795, 1831, 1877
Workers Compensation Rating & Inspection Bureau Special Bulletins: 6-02, 7-01, 7-99, 8-98, 13-97,
Unit Statistical Reports - for policies of 1996, 1997, 1998, 2002
various emails: Attorney Work Product
Lanco Scaffolding Inc: Cash Disbursement Journal Jan 1, 1996 to May 31, 1996
Lanco General Ledger 1998
Lanco General Ledger 1999
Prepared Schedule "Insurance Premium Fraud Loss" (dated 8/6/04)
United States of America v Carlos Gomez and Mary Gildea - Indictment
Westlaw Citation:  United States of America v. Kevin G. Tobin
Massachusetts Insurance Fraud Bureau: "Focus Fraud" Newsletter

Exhibit 3

Lanco Scaffolding Inc.

# Workers Compensation Policy Premiums, Administrative Expenses, & Insurer Cost-of-Claims

| Insurer | Year of Coverage | Policy # | Actual Incurred Losses[1] | source of Losses | Policy Earned Premium[1][2] | Administrative Expenses[5] | Insurer Profit/(Loss) |
|---|---|---|---|---|---|---|---|
| Eastern Casualty | Mar 29, 1996 - 1997 | WCP0013411 | zero | Unit Report | $ 42,787 | $ 12,836 | $ 29,951 |
| Eastern Casualty | Mar 29, 1997 - 1998 | WCP0013411 | zero | ERW[3] eff 3/29/01 | $ 70,257 | $ 21,077 | $ 49,180 |
| Eastern Casualty | Mar 29, 1998 - 1999 | WCP0013411 | $ 40,578 | ERW[3] eff 3/29/02 | $ 36,004 | $ 10,801 | $ (15,375) |
| Eastern Casualty | Mar 29, 1999 - 2000 | WCP0013411 | zero | ERW[3] eff 3/29/03 | $ 35,239 | $ 10,572 | $ 24,667 |
| Liberty Mutual | Mar 29, 2000 - 2001 | WC131S320965010 | zero | ERW[3] eff 3/29/04 | $ 31,880 [4] | $ 9,564 | $ 22,316 |
| Liberty Mutual | Mar 29, 2001 - 2002 | WC131S320965011 | zero | ERW[3] eff 3/29/04 | $ 34,848 [4] | $ 10,454 | $ 24,394 |
| Liberty Mutual | Mar 29, 2002 - 2003 | WC131S320965012 | $ 18,688 | ERW[3] eff 3/29/04 | $ 145,212 [4] | $ 43,564 | $ 82,960 |
| | | | $ 59,266 | | $ 396,227 | $ 118,868 | $ 218,093 |

Profit Ratio =   55.0%

[1] Omits OCIP data

[2] Excludes Mass DIA Assessment

[3] ERW = The Workers Compensation Rating and Inspection Bureau Experience Rating Worksheet

[4] Calculated premiums. Data from Liberty Mutual policies and audit worksheets

[5] Based on an industry rule of thumb of 30% of Policy Earned Premium

7/7/2005

# EXHIBIT  H

July 7, 2005

The Honorable George A. O'Toole, Jr.
United States District Court
John Joseph Moakely U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

Dear Judge O'Toole:

I write this letter (my second) in support of Carlos Gomez and his wife, Mary Gildea, who are the principals of Lanco Scaffolding, Inc. I previously submitted a letter dated June 9, 2005 addressed to your Honor setting forth certain very unique facts pertaining to Lanco and the Gomezes, which I respectfully asked this Court to consider in determining the appropriate sentence in this case.

As indicated in my previous letter to this Honorable Court, I am the Business Manager for the Massachusetts Laborers District Counsel of the Laborers' International Union of North America (hereinafter the "Laborers"). I have reviewed the letter of Daniel J. McGrath, CPA, dated July 7, 2005, wherein he states "the unpaid contributions for *Laborers' Union* members using the *adjusted rate* is **$315,104.04**", as well as the exhibits to that letter. I have also reviewed various spreadsheets that purportedly quantify the "loss" to the Laborers' Union as a result of Lanco's under-the-table payroll from 1998 through 2003 as $1,660,258.

While I understand how the latter figure ($1.6 million) was calculated, and that technically it may be correct, I respectfully suggest that the former number ($315,104.04) is a far more accurate barometer of the impact of Lanco's actions on the Union. I say this because the $315,104.04 figure accounts for two important facts: first, Laborers' Union is not responsible for Lanco's employees who were not members of the Union for any unpaid remittances; and second, even for those employees who were members of the Union, the Laborers are not responsible to them for a majority percentage of unpaid remittances (as explained in the letter of Thomas Masiello, Administrator of the Massachusetts Laborers' Benefit Funds, which was submitted to the Probation Office on May 12, 2005). Accordingly, I respectfully ask that $315,104.04 be considered the "loss" to the Union for the purpose of determining a sentence in this matter because this calculation appropriately backs-out remittances not due to non-Union members and the share attributable to uncollectible Health and Welfare and Annuity Funds.

In conclusion, it is my lay opinion that $315,104.04 is the far more appropriate measure of the seriousness of the offense in this case and is a much more just figure upon which to determine a sentence.

Thank you for your consideration and attention to this matter.

Sincerely,

Paul J. McNally
Business Manager

# EXHIBIT  I

DANIEL P. McGRATH
*Certified Public Accountant*

July 7, 2005

The Honorable George A. O'Toole, Jr.
United States District Court
John Joseph Moakely U.S. Courthouse
1 Courthouse Way
Boston, Ma. 02210

**RE: Carlos Gomez and Mary Gildea
Criminal No. 05-cr-10022-GAO**

Dear Judge O'Toole:

I am a Certified Public Accountant with an office located at 409 Pond Street, Suite 4, Braintree, MA 02184 and have been engaged by counsel for the Gomezes in the above-referenced matter. I previously submitted a letter (dated May 11, 2005) to Probation on their behalf, which addresses their respective roles in the management and operation of Lanco and the viability of the Company using corrected operating procedures.

I have since been asked to quantify union contributions/remittances owed for Lanco employees who were actually members of the Laborers' Union during the relevant time period (1998-2003) using an adjusted rate (the rate used by the Government *minus* the Annuity Fund and Health and Welfare Fund shares of that rate). In sum, the unpaid contributions for *Laborers' Union* members using the *adjusted rate* is **$315,104.04.** I have attached Exhibits 1-8, which bear this out. A brief explanation of these exhibits is as follows:

· Exhibit 1 is a spreadsheet which summarizes my calculations concerning the Unions. Specifically, it indicates the total hours worked by all Lanco employees (Union and non-Union; excluding Carpenters) on a yearly basis according to figures developed by the FBI (first column from the left). It also indicates the total hours worked by Laborers' Union members that were not reported to the Union – and for which, Union contributions were not paid (fourth column from the right); the Adjusted contribution rate (third column from the right – see further explanation under Exhibit 8 below); the total Adjusted Figure/Laborers - i.e., the total unpaid contributions for Laborers' Union members based on the adjusted rate (second column from the right); and the total Adjusted Figure/Total Hours Per FBI – i.e., the total unpaid contributions treating all Lanco employees,

excluding Carpenters, as Laborers based on the adjusted rate (first column from
the right).

· Exhibits 2-7 are spreadsheets for each of the years 1998-2003 indicating the
total unreported hours for Lanco employees, excluding Carpenters.

· Exhibit 8 is a spreadsheet indicating the contribution/remittance rates used by
the Government and as adjusted. The adjusted rate is the Government's rate
minus the two funds (Annuity Fund and Health and Welfare Fund) for which the
Laborers' Union, according to Thomas Masiello, Administrator of the
Massachusetts Laborers Benefit Funds, is not liable to its members (see Gomez
PSRs, pars. 46). This spreadsheet also indicates the share of the remittance rate
per year that is attributable to the Health and Welfare Fund and Annuity Fund:
between 52% and 68%.

I have also been asked to quantify union contributions/remittances owed for
Lanco employees who were members of the Carpenter's Union during the relevant time
period (1998-2003) using the adjusted rate. In sum, the unpaid contributions for
*Carpenters' Union* members using the *adjusted rate* is **$112,540.90**. I have attached
Exhibits 9, which bears this out. A brief explanation of this Exhibit is as follows:

· Exhibit 9, the equivalent of Exhibits 1 and 8 but related to the Carpenters,
summarizes my calculations concerning the Carpenters' Union indicating the total
hours worked by all Lanco employees, except those treated as Laborers, on a
yearly basis according to figures developed by the FBI; the Adjusted contribution
rate (see explanation of Exhibit 8 above); the total Adjusted Figure/Carpenters -
i.e., the total unpaid contributions for Carpenters' Union members based on the
adjusted rate; and the total Adjusted Figure/Total Hours Per FBI – i.e., the total
unpaid contributions treating all Lanco employees, except those treated as
Laborers, as Carpenters based on the adjusted rate (first column from the right).

Thank you for your consideration of the foregoing.

Sincerely,

Daniel McGrath



**Lanco Scaffolding Inc.**
**Analysis of Labor Union "Loss"**
**For the Years 1998 through 2003**

EXHIBIT 1

| Year | Total Hours Laborers per FBI (See Annual Pages) | Hours Worked Non-Laborers Per Lanco | Hours Worked Laborers Per Lanco | Union Members Hours Previously Reported Per Remittance Reports | Laborers Hours not Reported | Adjusted Rate (See Rate Page) | Adjusted Figure (Laborers) | Adjusted Figure (Total Hours) |
|---|---|---|---|---|---|---|---|---|
| 1998 | 20994.00 | 8448.50 | 12545.50 | 2945.50 | 9600.00 | $ 4.20 | $ 40,320.00 | $ 75,803.70 |
| 1999 | 25561.99 | 10881.50 | 14680.49 | 3756.50 | 10923.99 | $ 3.45 | $ 37,687.77 | $ 75,228.94 |
| 2000 | 19858.00 | 4201.00 | 15657.00 | 5220.00 | 10437.00 | $ 3.80 | $ 39,660.60 | $ 55,624.40 |
| 2001 | 25525.75 | 4455.50 | 21070.25 | 6860.00 | 14210.25 | $ 4.00 | $ 56,841.00 | $ 74,663.00 |
| 2002 | 65077.00 | 30016.00 | 35061.00 | 11672.00 | 23389.00 | $ 3.95 | $ 92,386.55 | $ 210,949.75 |
| 2003 | 46281.50 | 21106.00 | 25175.50 | 12320.00 | 12855.50 | $ 3.75 | $ 48,208.13 | $ 127,355.63 |
| Total Adjusted Figure Laborers Union | | | | | | | $ 315,104.04 | $ 619,625.42 |
| Total Adjusted Figure Carpenters Union (Exhibit 9) | | | | | | | $ 112,540.90 | $ 128,804.26 |
| Total Adjusted Union (Laborers and Carpenters) Figure | | | | | | | $ 427,644.94 | $ 748,429.67 |

DANIEL P. McGRATH
*Certified Public Accountant*

| LANCO LABORERS PAYROLL 1998 (FBI) | | | | | | EXHIBIT 2 | |
|---|---|---|---|---|---|---|---|
| Name | Hours Worked | Hours Reported | Difference | Rate | Total | | Total* |
| Jose Aristedes Romero | 1748.5 | 865.5 | 883 | $ 8.70 | $ 7,682.10 | $ | 7,682.10 |
| Pedro Romero | 2150.5 | 1040 | 1110.5 | $ 8.70 | $ 9,661.35 | $ | 9,661.35 |
| Nery Ortiz | 2255 | 1040 | 1215 | $ 8.70 | $ 10,570.50 | $ | 10,570.50 |
| Marcos Lima | 1097 | | 1097 | $ 8.70 | $ 9,543.90 | $ | 9,543.90 |
| Mario Perlera | 2545.5 | | 2545.5 | $ 8.70 | $ 22,145.85 | $ | 22,145.85 |
| Hector Castaneda | 2749 | | 2749 | $ 8.70 | $ 23,916.30 | $ | 23,916.30 |
| Total Union Hours | 12545.5 | | | | | | |
| Wilfredo Romero | 2249.5 | | 2249.5 | $ 8.70 | $ 19,570.65 | Not in Union at this time* | |
| Roberto Castaneda | 947.5 | | 947.5 | $ 8.70 | $ 8,243.25 | Not in Union at this time | |
| Francisco Plietez | 2946 | | 2946 | $ 8.70 | $ 25,630.20 | Not in Union at this time | |
| Jose Aguilar (Guevara) | 283 | | 283 | $ 8.70 | $ 2,462.10 | Not in Union at this time | |
| Amilcar Rivera | 611 | | 611 | $ 8.70 | $ 5,315.70 | Not in Union at this time | |
| Hector Palma | 556 | | 556 | $ 8.70 | $ 4,837.20 | Not in Union at this time | |
| Andres Zepeda | 855.5 | | 855.5 | $ 8.70 | $ 7,442.85 | Not in Union at this time | |
| Total Non Union Hours | 8448.5 | | | | | | |
| TOTAL | 20,994.00 | 2,945.50 | 18,048.50 | | $ 157,021.95 | $ | 83,520.00 |

*According to Lanco

DANIEL P. MCGRATH
*Certified Public Accountant*

| LANCO LABORERS PAYROLL 1999 (FBI) | | | | | | | EXHIBIT 3 |
| Name | Hours Worked | Hours Reported | Difference | Rate | | Total | Total* |
|---|---|---|---|---|---|---|---|
| Jose Aristides Romero | 2108.5 | 1036.5 | 1072 | $ | 8.70 | $ 9,326.40 | $ 9,326.40 |
| Pedro Romero | 2139.5 | 1020 | 1119.5 | $ | 8.70 | $ 9,739.65 | $ 9,739.65 |
| Nery Ortiz | 2151.5 | 1020 | 1131.5 | $ | 8.70 | $ 9,844.05 | $ 9,844.05 |
| Marcos Lima | 1835 | 680 | 1155 | $ | 8.70 | $ 10,048.50 | $ 10,048.50 |
| Mario Perlera | 2153.5 | | 2153.5 | $ | 8.70 | $ 18,735.45 | $ 18,735.45 |
| Hector Castaneda | 2389 | | 2389 | $ | 8.70 | $ 20,784.30 | $ 20,784.30 |
| Wilfredo Romero | 1902.5 | | 1902.5 | $ | 8.70 | $ 16,551.75 | $ 16,551.75 |
| **Total Union Hours** | **14679.5** | | | | | | |
| | | | | | | | |
| Roberto Castaneda | 2456 | | 2456 | $ | 8.70 | $ 21,367.20 | Not in Union at this time* |
| Francisco Plietez | 1868.5 | | 1868.5 | $ | 8.70 | $ 16,255.95 | Not in Union at this time |
| Armando Ortiz | 2001.5 | | 2001.5 | $ | 8.70 | $ 17,413.05 | Not in Union at this time |
| Oscar Ortiz | 1839 | | 1839 | $ | 8.70 | $ 15,999.30 | Not in Union at this time |
| Mario II Gutierrez | 939.5 | | 939.5 | $ | 8.70 | $ 8,173.65 | Not in Union at this time |
| Jose Nunez | 300.5 | | 300.5 | $ | 8.70 | $ 2,614.35 | Not in Union at this time |
| Manuel Perlera | 211 | | 211 | $ | 8.70 | $ 1,835.70 | Not in Union at this time |
| Nery Ortiz Jr. | 283 | | 283 | $ | 8.70 | $ 2,462.10 | Not in Union at this time |
| Ismael Ortiz | 351.5 | | 351.5 | $ | 8.70 | $ 3,058.05 | Not in Union at this time |
| Manuel Martinez | 265 | | 265 | $ | 8.70 | $ 2,305.50 | Not in Union at this time |
| Samuel Umanzo | 45 | | 45 | $ | 8.70 | $ 391.50 | Not in Union at this time |
| Jose Monterosso | 321 | | 321 | $ | 8.70 | $ 2,792.70 | Not in Union at this time |
| **Total Non Union Hours** | **10881.5** | | | | | | |
| **TOTAL** | **25,561.99** | **3,756.50** | **21,804.50** | | | **$ 189,699.15** | **$ 95,030.10** |

** (below Total column)

*According to Lanco

** Should be 25,561.00

DANIEL P. McGRATH
*Certified Public Accountant*

| LANCO LABORERS PAYROLL 2000 (FBI) | | | | | | EXHIBIT 4 |
|---|---|---|---|---|---|---|
| Name | Hours Worked | Hours Reported | Difference | Rate | Total | Total* |
| Jose Aristides Romero | 2074 | 1020 | 1054 | $ 9.45 | $ 9,960.30 | $ 9,960.30 |
| Pedro Romero | 2160.5 | 1040 | 1120.5 | $ 9.45 | $ 10,588.73 | $ 10,588.73 |
| Nery Ortiz | 2228.5 | 1040 | 1188.5 | $ 9.45 | $ 11,231.33 | $ 11,231.33 |
| Marcos Lima | 2716.5 | 1080 | 1636.5 | $ 9.45 | $ 15,464.93 | $ 15,464.93 |
| Mario Perlera | 2222 | | 2222 | $ 9.45 | $ 20,997.90 | $ 20,997.90 |
| Hector Castaneda | 2261 | 520 | 1741 | $ 9.45 | $ 16,452.45 | $ 16,452.45 |
| Wilfredo Romero | 1994.5 | 520 | 1474.5 | $ 9.45 | $ 13,934.03 | $ 13,934.03 |
| **Total Union Hours** | **15657** | | | | | |
| Roberto Castaneda | 832.5 | | 832.5 | $ 9.45 | $ 7,867.13 | Not in Union at this time* |
| C. Armando Ortiz | 501 | | 501 | $ 9.45 | $ 4,734.45 | Not in Union at this time |
| Oscar Ortiz | 508.5 | | 508.5 | $ 9.45 | $ 4,805.33 | Not in Union at this time |
| Mario II Gutierrez | 573.5 | | 573.5 | $ 9.45 | $ 5,419.58 | Not in Union at this time |
| Manuel Perlera | 569.5 | | 569.5 | $ 9.45 | $ 5,381.78 | Not in Union at this time |
| Oscar Armando Nunez | 291.5 | | 291.5 | $ 9.45 | $ 2,754.68 | Not in Union at this time |
| Karol Monsalve | 520 | | 520 | $ 9.45 | $ 4,914.00 | Not in Union at this time |
| Antonio Tejada | 137 | | 137 | $ 9.45 | $ 1,294.65 | Not in Union at this time |
| Jose Nunez | 267.5 | | 267.5 | $ 9.45 | $ 2,527.88 | Not in Union at this time |
| **Total Non Union Hours** | **4201** | | | | | |
| TOTAL | 19,858.00 | 5,220.00 | 14,638.00 | | $ 138,329.10 | $ 98,629.67 |

*According to Lanco

DANIEL P. McGRATH
*Certified Public Accountant*

| LANCO LABORERS PAYROLL 2001 (FBI) | | | | | | EXHIBIT 5 | |
|---|---|---|---|---|---|---|---|
| Name | Hours Worked | Hours Reported | Difference | Rate | Total | | Total* |
| Jose Aristides Romero | 2138.75 | 1580 | 558.75 | $ 10.50 | $ 5,866.88 | $ | 5,866.88 |
| Pedro Romero | 2234 | 1040 | 1194 | $ 10.50 | $ 12,537.00 | $ | 12,537.00 |
| Nery Ortiz | 2226.5 | 1040 | 1186.5 | $ 10.50 | $ 12,458.25 | $ | 12,458.25 |
| Marcos Lima | 2961.5 | 1040 | 1921.5 | $ 10.50 | $ 20,175.75 | $ | 20,175.75 |
| Mario Perlera | 2277.5 | 1040 | 1237.5 | $ 10.50 | $ 12,993.75 | $ | 12,993.75 |
| Hector Castaneda | 1811.5 | 80 | 1731.5 | $ 10.50 | $ 18,180.75 | $ | 18,180.75 |
| Wilfredo Romero | 2118.5 | 1040 | 1078.5 | $ 10.50 | $ 11,324.25 | $ | 11,324.25 |
| C. Armando Ortiz | 667.5 | | 667.5 | $ 10.50 | $ 7,008.75 | $ | 7,008.75 |
| Oscar Ortiz | 681 | | 681 | $ 10.50 | $ 7,150.50 | $ | 7,150.50 |
| Mario Gutierrez | 841 | | 841 | $ 10.50 | $ 8,830.50 | $ | 8,830.50 |
| Manuel Perlera | 843.5 | | 843.5 | $ 10.50 | $ 8,856.75 | $ | 8,856.75 |
| Jose Perlera | 812 | | 812 | $ 10.50 | $ 8,526.00 | $ | 8,526.00 |
| Ubesindo Perlera | 826.5 | | 826.5 | $ 10.50 | $ 8,678.25 | $ | 8,678.25 |
| Carlos Manuel Perlera | 630.5 | | 630.5 | $ 10.50 | $ 6,620.25 | $ | 6,620.25 |
| **Total Union Hours** | 21070.25 | | | | | | |
| Francisco Plietez | 739 | | 739 | $ 10.50 | $ 7,759.50 | Not in Union at this time* | |
| Jose Monterrosu | 739 | | 739 | $ 10.50 | $ 7,759.50 | Not in Union at this time | |
| Jose Leonel Aguilar (Guevara) | 868.5 | | 868.5 | $ 10.50 | $ 9,119.25 | Not in Union at this time | |
| Moises Parees | 367 | | 367 | $ 10.50 | $ 3,853.50 | Not in Union at this time | |
| William Saldana | 195 | | 195 | $ 10.50 | $ 2,047.50 | Not in Union at this time | |
| Jose Plietez | 549 | | 549 | $ 10.50 | $ 5,764.50 | Not in Union at this time | |
| Gustavo Orellana | 545.5 | | 545.5 | $ 10.50 | $ 5,727.75 | Not in Union at this time | |
| Miguel Rodriguez | 194.5 | | 194.5 | $ 10.50 | $ 2,042.25 | Not in Union at this time | |
| Weneslao Ramirez | 140 | | 140 | $ 10.50 | $ 1,470.00 | Not in Union at this time | |
| Tulio Reyes | 118 | | 118 | $ 10.50 | $ 1,239.00 | Not in Union at this time | |
| **Total Non Union Hours** | 4455.5 | | | | | | |
| **TOTAL** | 25,525.75 | 6,860 | 18,665.75 | | $ 195,990.38 | $ | 149,207.63 |

*According to Lanco

DANIEL P. MCGRATH
*Certified Public Accountant*

| LANCO LABOERS PAYROLL 2002 (FBI) | | | | | | EXHIBIT 6 | |
| Name | Hours Worked | Hours Reported | Difference | Rate | Total | Total* | |
|---|---|---|---|---|---|---|---|
| Jose Aristides Romero | 2321.5 | 2168 | 153.5 | $ 10.80 | $ 1,657.80 | $ 1,657.80 | |
| Pedro Romero | 2348.5 | 1576 | 772.5 | $ 10.80 | $ 8,343.00 | $ 8,343.00 | |
| Nery Ortiz | 2485 | 1600 | 885 | $ 10.80 | $ 9,558.00 | $ 9,558.00 | |
| Marcos Lima | 3292 | 1576 | 1716 | $ 10.80 | $ 18,532.80 | $ 18,532.80 | |
| Mario Perlera | 2268 | 1576 | 692 | $ 10.80 | $ 7,473.60 | $ 7,473.60 | |
| Hector Castaneda | 2585.5 | 1576 | 1009.5 | $ 10.80 | $ 10,902.60 | $ 10,902.60 | |
| Wilfredo Romero | 2238.5 | 1600 | 638.5 | $ 10.80 | $ 6,895.80 | $ 6,895.80 | |
| C. Armando Ortiz | 2287 | | 2287 | $ 10.80 | $ 24,699.60 | $ 24,699.60 | |
| Oscar Ortiz | 2328.5 | | 2328.5 | $ 10.80 | $ 25,147.80 | $ 25,147.80 | |
| Mario Gutierrez | 2704.5 | | 2704.5 | $ 10.80 | $ 29,208.60 | $ 29,208.60 | |
| Jose Perlera | 2717 | | 2717 | $ 10.80 | $ 29,343.60 | $ 29,343.60 | |
| Ubesindo Perlera | 2653.5 | | 2653.5 | $ 10.80 | $ 28,657.80 | $ 28,657.80 | |
| Carlos Manuel Perlera | 2546.5 | | 2546.5 | $ 10.80 | $ 27,502.20 | $ 27,502.20 | |
| Manuel Perlera | 2285 | | 2285 | $ 10.80 | $ 24,678.00 | $ 24,678.00 | |
| **Total Union Hours** | 35061 | | | | | | |
| | | | | | | | |
| Francisco Plietez | 2292.5 | | 2292.5 | $ 10.80 | $ 24,759.00 | Not in Union at this time* | |
| Jose Monterrosu | 271 | | 271 | $ 10.80 | $ 2,926.80 | Not in Union at this time | |
| Jose Leonel Aguilar (Guevara) | 2731.5 | | 2731.5 | $ 10.80 | $ 29,500.20 | Not in Union at this time | |
| Gustavo Orellana | 700 | | 700 | $ 10.80 | $ 7,560.00 | Not in Union at this time | |
| Jose Plietez | 2782 | | 2782 | $ 10.80 | $ 30,045.60 | Not in Union at this time | |
| Miguel Rodriguez | 2459 | | 2459 | $ 10.80 | $ 26,557.20 | Not in Union at this time | |
| Weneslao Ramirez | 810.5 | | 810.5 | $ 10.80 | $ 8,753.40 | Not in Union at this time | |
| Tulio Reyes | 2776 | | 2776 | $ 10.80 | $ 29,980.80 | Not in Union at this time | |
| Bryon De Leon | 2414 | | 2414 | $ 10.80 | $ 26,071.20 | Not in Union at this time | |
| Oscar Martinez | 2389.5 | | 2389.5 | $ 10.80 | $ 25,806.60 | Not in Union at this time | |
| Regino Perlera | 154 | | 154 | $ 10.80 | $ 1,663.20 | Not in Union at this time | |
| Milton Granados | 1798.5 | | 1798.5 | $ 10.80 | $ 19,423.80 | Not in Union at this time | |
| Jose Amilcar Yones | 41 | | 41 | $ 10.80 | $ 442.80 | Not in Union at this time | |
| Crus Loras Guillen | 45.5 | | 45.5 | $ 10.80 | $ 491.40 | Not in Union at this time | |
| Osmin Guillen | 1791.5 | | 1791.5 | $ 10.80 | $ 19,348.20 | Not in Union at this time | |
| Daniel Pleitez | 1380.5 | | 1380.5 | $ 10.80 | $ 14,909.40 | Not in Union at this time | |
| Patrocinio Ortiz | 1347.5 | | 1347.5 | $ 10.80 | $ 14,553.00 | Not in Union at this time | |
| Jose Santos | 1123 | | 1123 | $ 10.80 | $ 12,128.40 | Not in Union at this time | |
| Fernando Brenes | 38.5 | | 38.5 | $ 10.80 | $ 415.80 | Not in Union at this time | |
| Johnny Ortiz | 619 | | 619 | $ 10.80 | $ 6,685.20 | Not in Union at this time | |
| Jose Lemus | 1768 | | 1768 | $ 10.80 | $ 19,094.40 | Not in Union at this time | |
| Antonio Rodriguez | 178 | | 178 | $ 10.80 | $ 1,922.40 | Not in Union at this time | |
| Carlos Arturo Gutierez | 105 | | 105 | $ 10.80 | $ 1,134.00 | Not in Union at this time | |
| **Total Non Union Hours** | 30016 | | | | | | |
| **TOTAL** | 65,077.00 | 11,672.00 | 53,405.00 | | $ 576,774.00 | $ 252,601.20 | |

*According to Lanco

DANIEL P. McGRATH
*Certified Public Accountant*

| LANCO LABORERS PAYROLL 2003 (FBI) | | | | | | EXHIBIT 7 |
|---|---|---|---|---|---|---|
| Name | Hours Worked | Hours Reported | Difference | Rate | Total | Total* |
| Jose Aristides Romero | 1701 | 1760 | -59 | $ 11.85 | -$699.15 | -$699.15 |
| Pedro Romero | 1597.5 | 1760 | -162.5 | $ 11.85 | -$1,925.63 | -$1,925.63 |
| Nery Ortiz | 1842.5 | 1760 | 82.5 | $ 11.85 | $ 977.63 | $ 977.63 |
| Marcos Lima | 3126.5 | 1760 | 1366.5 | $ 11.85 | $ 16,193.03 | $ 16,193.03 |
| Mario Perlera | 1746.5 | 1760 | -13.5 | $ 11.85 | -$159.98 | -$159.98 |
| Hector Castaneda | 1829.5 | 1760 | 69.5 | $ 11.85 | $ 823.58 | $ 823.58 |
| Wilfredo Romero | 1689.5 | 1760 | -70.5 | $ 11.85 | -$835.43 | -$835.43 |
| C. Armando Ortiz | 1601 | | 1601 | $ 11.85 | $ 18,971.85 | $ 18,971.85 |
| Oscar Ortiz | 1625.5 | | 1625.5 | $ 11.85 | $ 19,262.18 | $ 19,262.18 |
| Mario Gutierrez | 1860.5 | | 1860.5 | $ 11.85 | $ 22,046.93 | $ 22,046.93 |
| Jose Perlera | 1442 | | 1442 | $ 11.85 | $ 17,087.70 | $ 17,087.70 |
| Ubesindo Perlera | 1602.5 | | 1602.5 | $ 11.85 | $ 18,989.63 | $ 18,989.63 |
| Carlos Manuel Perlera | 1786 | | 1786 | $ 11.85 | $ 21,164.10 | $ 21,164.10 |
| Manuel Perlera | 1725 | | 1725 | $ 11.85 | $ 20,441.25 | $ 20,441.25 |
| **Total Union Hours** | **25175.5** | | | | | |
| Francisco Plietez | 1310.5 | | 1310.5 | $ 11.85 | $ 15,529.43 | Not in Union at this time* |
| Jose Monterrosu | 318.5 | | 318.5 | $ 11.85 | $ 3,774.23 | Not in Union at this time |
| Jose Leonel Aguilar (Guevara) | 1649.5 | | 1649.5 | $ 11.85 | $ 19,546.58 | Not in Union at this time |
| Jose Plietez | 1909 | | 1909 | $ 11.85 | $ 22,621.65 | Not in Union at this time |
| Miguel Rodriguez | 307 | | 307 | $ 11.85 | $ 3,637.95 | Not in Union at this time |
| Tulio Reyes | 954 | | 954 | $ 11.85 | $ 11,304.90 | Not in Union at this time |
| Bryon De Leon | 1625 | | 1625 | $ 11.85 | $ 19,256.25 | Not in Union at this time |
| Oscar Martinez | 1734 | | 1734 | $ 11.85 | $ 20,547.90 | Not in Union at this time |
| Milton Granado | 2054.5 | | 2054.5 | $ 11.85 | $ 24,345.83 | Not in Union at this time |
| Daniel Pleitez | 1805 | | 1805 | $ 11.85 | $ 21,389.25 | Not in Union at this time |
| Patrocinio Ortiz | 1835 | | 1835 | $ 11.85 | $ 21,744.75 | Not in Union at this time |
| Jose Santos | 1245.5 | | 1245.5 | $ 11.85 | $ 14,759.18 | Not in Union at this time |
| Fernando Brenes | 1919.5 | | 1919.5 | $ 11.85 | $ 22,746.08 | Not in Union at this time |
| Johnny Ortiz | 40 | | 40 | $ 11.85 | $ 474.00 | Not in Union at this time |
| Carlos Arturo Gutierrez | 2132.5 | | 2132.5 | $ 11.85 | $ 25,270.13 | Not in Union at this time |
| Alberto Monterruso | 266.5 | | 266.5 | $ 11.85 | $ 3,158.03 | Not in Union at this time |
| **Total Non Union Hours** | **21106** | | | | | |
| **TOTAL** | **$ 46,281.50** | 12,320.00 | 33,961.50 | | **$ 402,443.78** | **$ 152,337.69** |

*According to Lanco

DANIEL P. McGRATH
*Certified Public Accountant*

EXHIBIT 8

**Lanco Scaffolding Inc**
**Contribution/Remittance Rates**

| Hourly Rates - Adjusted | | | | | | |
|---|---|---|---|---|---|---|
| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
| Rate applied by Government | $ 8.70 | $ 8.70 | $ 9.45 | $ 10.50 | $ 10.80 | $ 11.85 |
| Less: | | | | | | |
| Annuity Fund Portion | $ 2.00 | $ 2.75 | $ 3.15 | $ 3.70 | $ 3.70 | $ 3.35 |
| Health & Welfare Fund Portion | $ 2.50 | $ 2.50 | $ 2.50 | $ 2.80 | $ 3.15 | $ 4.75 |
| Adjusted Rate | $ 4.20 | $ 3.45 | $ 3.80 | $ 4.00 | $ 3.95 | $ 3.75 |
| Annuity & H&W Percentage of Rate - | 52% | 60% | 60% | 62% | 63% | 68% |

Exhibit 9

| Years | Total Hours Carpenters Per FBI | Hours Worked Non-Carpenters Per Lanco | Hours Worked Carpenters Per Lanco | Union Members Hours Previously Reported Remittance Reports | Total Hours Per FBI Analysis | Adjusted Rate (see below) | Adjusted Figure (Carpenters) | Adjusted Figure (Total Hours) |
|---|---|---|---|---|---|---|---|---|
| 1998 | 3192.00 | 247.50 | 2944.50 | 720.00 | 2224.50 | $ 5.24 | $ 11,656.38 | $ 12,953.28 |
| 1999 | 5548.00 | 2482.00 | 3066.00 | 1040.00 | 2026.00 | $ 6.03 | $ 12,216.78 | $ 27,183.24 |
| 2000 | 4451.50 | | 4451.50 | 960.00 | 3491.50 | $ 6.43 | $ 22,450.35 | $ 22,450.35 |
| 2001 | 4420.00 | | 4420.00 | 1000.00 | 3420.00 | $ 6.35 | $ 21,717.00 | $ 21,717.00 |
| 2002 | 5571.00 | | 5571.00 | 1480.00 | 4091.00 | $ 6.29 | $ 25,732.39 | $ 25,732.39 |
| 2003 | 4412.50 | | 4412.50 | 1480.00 | 2932.50 | $ 6.40 | $ 18,768.00 | $ 18,768.00 |
| Total | | | | | | | $ 112,540.90 | $ 128,804.26 |

Calculation of Adjusted Rates

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|
| Rates Applied by Government | $ 11.86 | $ 12.80 | $ 13.69 | $ 14.75 | $ 15.54 | $ 17.12 |
| Less: | | | | | | |
| Annuity Fund Portion | $ 3.15 | $ 4.05 | $ 4.54 | $ 5.68 | $ 6.03 | $ 5.75 |
| Health & Welfare Fund Portion | $ 3.47 | $ 2.72 | $ 2.72 | $ 2.72 | $ 3.22 | $ 4.97 |
| Adjusted Rate | $ 5.24 | $ 6.03 | $ 6.43 | $ 6.35 | $ 6.29 | $ 6.40 |
| Annuity & H&W Percentage of Rate - | 56% | 53% | 53% | 57% | 60% | 63% |

# EXHIBIT  J

M A S S A C H U S E T T S   L A B O R E R S'   D I S T R I C T   C O U N C I L
of the Laborers' International Union of North America, AFL-CIO

7 Laborers' Way
Hopkinton, Massachusetts 01748
Fax (508) 435-7982

Hopkinton Telephones:
(508) 435-4164
(508) 435-4253



Boston Telephones:
(617) 969-4018
(617) 969-4019

June 9, 2005

The Honorable George A. O'Toole, Jr.
United States District Court for the District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

Dear Judge O'Toole:

I write this letter in support of Carlos Gomez and his wife, Mary Gildea, who are the principals of Lanco Scaffolding, Inc.

I am the Business Manager for the Massachusetts Laborers District Counsel of the Laborers' International Union of North America (hereinafter referred to as the "Laborers"), which is the largest Union in the Commonwealth with approximately 21,000 active members. I am also the Chairman of the Delinquency Committee for the Laborers in this district. I am aware that Lanco, a union shop, maintained an under-the-table payroll for a period of years that resulted in the underpayment of benefits to the Laborers' Union. While I do not in any way condone Lanco's actions, I respectfully ask that Carlos and Mary be afforded the utmost leniency in determining their sentence because of the following facts.

First, based on my 30 years of experience in the industry and my understanding of the operations of Lanco from various sources, Carlos and Mary are indispensable to Lanco: Carlos is the public face of the business and does all of the employee training; and Mary performs all operations and administration. In my opinion, their incarceration would cause Lanco to close immediately.

Second, Carlos and Mary currently provide approximately 24 predominantly Spanish-speaking individuals with safe, well-paying jobs (seventeen of these employees are members of the Laborers Union; and 5 are members of the Carpenter's Union). Their employees, in turn, are able to support their families and are proud, productive members

*The Honorable George A. O'Toole, Jr.*
*June 9, 2005*
*Page 2*

of society. Lanco's closing would impose extraordinary hardship on these innocent employees and their families because they would immediately lose their jobs.

Third, by all accounts, Carlos has exceptional experience, knowledge and skill in the field. Many reputable, leading contractors throughout Massachusetts (e.g., Payton Construction Co., Shawmut Design and Construction and William A. Berry & Sons, Inc.) consider Lanco indispensable for difficult, challenging, large scale and/or specialized jobs. Lanco's closing would create a void in the industry and leave many contractors without a proven, reliable service provider.

Fourth, over the past 20 years, Lanco has trained dozens of employees in the highly specialized field of scaffolding. There are precious few employers today which, like Lanco, invest the time, effort and expense to train their employees. Lanco's closing would eliminate an important source of worker training.

Fifth, because of this training, Lanco has a truly exceptional safety record. The safe erection of scaffolding is important not only to Lanco's employees but also to all of the other trades (e.g. masons, iron workers, welders, electricians, plumbers, HVAC, and painters) that work in, on and around the scaffolding during a project. Lanco's closing could result in less-safe jobsites throughout the Commonwealth.

Sixth, Carlos and Mary are committed to making amends with the Laborers. Lanco has offered to repay all unpaid union benefits for their employees who were Laborers for a period of years to be determined and cooperate in an audit. Based on the information that I now have, this is a reasonable manner in which to hold Lanco responsible to the Laborers and will result in substantial restitution (over $400,000) to the Union. The Laborers are amenable to Lanco paying this amount out over time to facilitate repayment and to avoid further straining the business.

Seventh, but for this legal problem, Lanco is a stable company and is poised for substantial growth (and new hires) in the near future because of its backlog of work and the sustained demand for its services. The continued operation of Lanco benefits its employees, its customers, the community, and the Commonwealth in so many ways.

In sum, I believe that Carlos and Mary are good people who were caught up in a regrettable situation that is currently being remedied and that ought not bring down Lanco (a company that they worked tirelessly to build), separate them from their three children, and define them for the rest of their lives.

*The Honorable George A. O'Toole, Jr.*
*June 9, 2005*
*Page 2*


If  I can be of any further assistance, please do not hesitate to contact me at (508) 435-4164.  Also, I would be available to testify on their behalf regarding the above issues, and/or any others to which I am familiar and that may be of assistance to the Court in this case.

Thank you for your time and consideration.



Sincerely,

Paul J. McNally
Business Manager



PJM/jmc




Janet M Conlon signed on this day June 9, 2005 in Middlesex County.

JANET M. CONLON
Notary Public
Commonwealth of Massachusetts
My Commission Expires
February 5, 2010

# EXHIBIT  K

10 APRIL, 2005

The Honorable George A. O'Toole, Jr.
United States District Court For
The District Of Mass.
John Joseph Moakley U.S. Courthouse,
1 Courthouse Way
Boston, MA 02210

Dear Sir,

     I am Luis Umanzor. I am sixty years old and I have been a worker for Carlos Gomez for twenty years. I have ten children. My wife lives in El Salvador in a home I was able to buy because of the kindness of Carlos. A long, long time ago when I came to work for Carlos I had nothing. Carlos gave me a chance. We talk about the old days a lot now that we are faced with these problems. Carlos taught me how to build the scaffolding. One frame at a time he s how me how. He used to wear a beeper then. There were no cell phones, only beepers. He still carries the same beeper, for good luck I guess. He would be up on top of the scaffold and his beeper would ring. He would come down from the scaffold and go t o the pay telephone because it was a customer calling him. That's how we got just in the beginning. He would leave me to put up the scaffold and he would run off to see the next client. We got some more workers. A group of brothers I knew who were look ing for work. They were from El Salvador too and I knew them to be good people. At that time it was easier to work because all you had to do was apply to Social Security and you could get a social security number to work. We did everything Carlos told u s to do and we were able to become citizens each one of us. Carlos was able to get us into the union. The unions would never h ave even looked at us if it wasn't for Carlos. I am a scaffold man now. I can go to any building without Carlos and build a be autiful scaffold that is safe for anyone to work on. I have never had an accident on the scaffold but I did have a brain hemmor age last year. I was at home when it happened and it was very scary for me. I was out of work for a long time. I became very depressed because I am a man that has always worked for my living. One day Carlos called me when I was off during this sad time . He asked me to come to his office and see him and his wife Mary. I came to his office and sat and talked with them. I was very nervous because I was so depressed and I didn't know what was going to become of me. Mary and Carlos talked to me like they always did and they told me something I will never forget. They told me to come to work. That a man needs his work to feel good about himself. Sitting at home was killing me. I wasn't sure what I would be able to do at work but Mary said to me that af ter all my years of working if I couldn't do the same job then could I teach the others to do it. They told me that I would still be paid my full pay and benfits and Carlos said that I would always be part of Lanco.

     I have been back to work since that d ay. I am proud to be a working man and I am grateful for Carlos and Mary and their kindness to me.

     Thank you Sir.

Luis Umanzor

04/11/05

Mr. Chris Cunio
Cooley Manion & Jones
Boston, MA

Dear Mr. Cunio:

I thought I might be able to help explain the City of Somerville Agreements that were entered into by Carlos. I was the one who was reading all this material for Carlos back then and I am very familiar with what transacted. Please read my detail of these years and let me know how I can help.

When Carlos first purchased his warehouse at 33 Earle Street the area was virtually a pit. There was hazardous waste underground, we had to have an environmental impact study conducted and we were adjacent to the old Research Foods compound which was abandoned and also full of hazardous waste. The place literally stunk. There wasn't even a road that we could access to get into the warehouse. We had to unlock a City of Somerville barrier gate each morning when we came in and every time we let a truck out we had to open this huge barrier gate and then shut and lock it behind us. It was the only access to the warehouse Carlos bought. It was a pain in the neck to operate but we were only too happy to have a warehouse at all because prior to that Carlos was just renting an open parking lot in Everett where we would park the trucks each night.

We moved all our equipment to the warehouse in Somerville and we were so busy trying to keep up with the work the warehouse had scaffold everywhere and it too was a mess. We couldn't even open the garage doors properly because they were broken and we had to chain them closed at night because the area was so crime ridden that the kids would break in to try and steal almost anything. Once they pushed in the little window air conditioner and after that we had to board up any windows or openings to prevent them from getting in. People used to come in at night and steal the aluminum planking because they would sell them as scrap and get a few bucks for them. The neighbors in the area told us about this and we ended up having to put the aluminum planks on the roof. Believe it or not, the theives started climbing up onto the roof to get at the aluminum planks. The area was a slum. There was trash all over, mattresses, old computers, everything. People used the area as a dump site. We were always picking up something that was preventing us from even accessing our property. But, it was all Lanco could afford back then and we made due.

About three or four years after we were there the City was negotiating with the U.S. Department of Commerce for funding for a revitalization program here. They came to see Lanco and talked to Carlos about their plans. There would be new roads and new high tech development and all this stuff. They wanted Carlos to agree that he would remain in the area

and employ low income workers. At this time we had 8 guys working steady. Guys would always come to the warehouse asking for work because as I said the area was very depressed. These kinds of people certainly were not going to benefit from the Dot Com boom.

Carlos tried several of them out and most of them wouldn't even bother showing up for work even though they were offered work. A lot of them just wanted a hand out. Some of them however, are still with us today. One in particular I'll talk about later because we ended up employing basically his whole family.

Carlos was interviewed by many organizations at that time because of this redevelopment frenzy. They were mostly Federal Government people and City of Somerville Office of Housing and Community Development people. We got to know the City people pretty well. As Lanco grew we needed more space for the equipment. Mary was with us at that time and when she first came and realized the conditions we were working in she rolled up her sleeves, so to speak, and she went through the place like a whirlwind. She hired the Vietnam Veterans from the Homeless Shelter in Boston and she used to have one of our guys go and pick them up in the morning. The only way they worked was for cash and she fed them as well. She worked at clearing out all the debris around the area and getting the warehouse functional and orderly. We ended up renting an open dirt area from the City of Somerville and that's where we started to store our accumulating equipment.

The guys would hang around the warehouse after work and have beer, that lasted one day after Mary was here. No beer, no hanging around. Everybody looked at things differently after she came but that's another story for another day. We rented the dirt area from the City for a couple of years and then entered into another agreement with the City to purchase the adjacent parcels which were useless to the City but would give Lanco a little more space. I don't know why they never offered for Carlos to buy the large dirt parcel but they didn't. So Carlos bought the two small parcels and the Revitalization Project dragged out for years. Finally a road was put in and the place looks half decent now. The head of all the development was a man named Joseph Vaccaro. He is happy to write on behalf of Carlos. He has watched Carlos for years and knows him well. Knows what he's all about.

Carlos signed, as I recall, annual updates to the Low Income Retention Agreements. Unfortunately, all our records are not here anymore and we've had a difficult time putting our hands on all of the documents. The Attorney for the City of Somerville is on vacation but due back shortly and we will talk to her when she returns to get her to maybe summarize the past thirteen years as well.

I mentioned a few of the people who used to show up at Lanco looking for work. One guy, named Mario Perlera, is of particular interest because he came at a time when Mary was here by herself. Carlos was incarcerated. It was a horrible time to say the least. I myself was in a state of worry and panic and anxiety that I would never want to experience again. Mary and I were coming to the warehouse at 5:00 in the morning, it would still be dark out. Many times Mary would open up the warehouse alone. Mario was hired at that time and he would work with Mary. I don't know how they did it because Mary didn't speak Spanish and Mario

didn't speak English. Somehow Mary was able to communicate with Mario. She used to pull these big huge trucks out and get them into a position where Mario could load them. She showed him how load the trucks in the most efficient manner. Mario could not drive at all so he was useless in that regard. Then Mario brought a guy named Hector Castaneda. And the three of them would work at the warehouse. Mario Perlera and Hector Castaneda developed into two of the finest scaffold builders we have. They also brought their brothers and brothers-in-laws and cousins to Lanco. Now we have many Perlera's and many Castaneda's. Hector has even bought a three family house and he rents two of the units to his family.

I know the story sounds corny but it's the only story we have. As I look back on it sometimes I can't believe we actually made it all these years, but we have. The business thrives because of the simplicity of it. Everyday we come to work. Everyday we hit it hard. And everyday we go home to our families and rest. There's nothing else to say.

Sincerely,

Kendal I. Moran

OMB No. 0610-0003; Approval Expires November 30, 1994

☐ EXHIBIT IV-E-6 (Applicant)  OR  ☐ EXHIBIT IV-E-8 (Other Party)

**FORM ED-612 (REV. 1/92)**
U.S. DEPARTMENT OF COMMERCE
ECONOMIC DEVELOPMENT ADMINISTRATION

**CURRENT AND PROJECTED EMPLOYEE DATA**

1. Name and address of organization

Organization: Lanco Scaffolding, Inc.
No. & Street: 22 McGrath Hwy Suite #5
City: Somerville
State: Ma.
Zip Code: 02143

2. This report is
☒ Final No Annual Follow up
☐ Initial Annual Follow up is required Complete all items
☐ Annual Follow up Complete only items 1-9

Project No:
"Other Party" suffix: OP-
3. ☒ EDA Applicant or recipient
☐ EDA "Other Party", if "Other Party", enter name of EDA Applicant or Recipient:
Organization: Lanco Scaffolding

4. First Impact Date
5. Fully Operational Date

**EDA USE ONLY**

| Job Categories | SEX | 6. Current Permanent Employees — A Total Employees | B Black (not of Hispanic Origin) | C Hispanic | D Asian or Pacific Islander | E American Indian or Alaskan Native | 7. New Permanent Jobs — F Total Employees | G Black (not of Hispanic Origin) | H Hispanic | Asian or Pacific Islander | American Indian or Alaskan Native | Targeted by Employment Plan | 8. Permanent Jobs To be Saved — Total Employees | Total Minorities | 9. Permanent Employees one Year after First Impact — Total Employees | Total Minorities | 10. Permanent Employees when Fully Operational — Total Employees | Total Minorities |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Officials and Managers | F | 2 | | 1 | | 1 | | | | | | | 2 | 2 | 2 | 2 | 2 | 2 |
| | M | 2 | | 2 | | | | | | | | | 2 | 2 | 2 | 2 | 2 | 2 |
| Professionals | F | | | | | | | | | | | | | | | | | |
| | M | | | | | | | | | | | | | | | | | |
| Technicians | F | | | | | | | | | | | | | | | | | |
| | M | | | | | | | | | | | | | | | | | |
| Sales Workers | F | 1 | | | | 1 | | | | | | | | | 0 | 0 | 0 | 0 |
| | M | 1 | | | | 1 | | | | | | | | | 0 | 0 | 0 | 0 |
| Office and Clerical | F | | | | | | 1 | | 1 | | | | | | | | | |
| | M | | | | | | | | | | | | | | | | | |
| Craftsperson (skilled) | F | | | | | | | | | | | | | | | | | |
| | M | 4 | | 4 | | | | | | | | | 4 | 4 | 5 | 5 | 5 | 5 |
| Operatives (semi-skilled) | F | | | | | | | | | | | | | | | | | |
| | M | 2 | | 2 | | | 2 | | 2 | | | | 2 | 2 | 2 | 2 | 2 | 2 |
| Laborers (unskilled) | F | | | | | | | | | | | | | | | | | |
| | M | 8 | | 8 | | | | | | | | | 8 | 8 | 10 | 10 | 10 | 10 |
| Service Work and others | F | | | | | | | | | | | | | | | | | |
| | M | | | | | | | | | | | | | | | | | |
| TOTAL | F | | | | | | | | | | | | | | | | | |
| | M | 17 | 0 | 17 | 0 | 3 | 3 | 0 | 3 | 0 | | | 17 | 17 | 20 | 20 | 20 | 20 |
| GRAND TOTAL | | 20 | | | | | 3 | | | | | | 20 | 17 | 23 | 23 | 23 | 20 |

11. Current temporary and part-time employees
Total 2  Minorities 3  Females 3

12. Projected temporary and part-time employees when fully operational
Total 12  Minorities 6  Females 1

13. This form prepared by: Mary C. Menezes
(Type Name and Position)
Date: 7/13/92
Telephone: 617-623-0060

14. Name of Labor Market Area: Boston, PMSA
Labor Force of Area Total: 1,528,034
Unemployment of Area Overall Rate: 7.5
Date and sources of labor market data: Mass. Dept. of Emp. & Training April 1992

15. Authorized organization official: Carlos Gomez-Pres.
(Type Name and Title)
(Signature)

Note: We may require these benefits that are provided under the program shown here by persons in companies and listed as required by existing law and regulations (42 U.S.C. 2000c-1, 42 U.S.C. 3123, 42 U.S.C. 6795; E.O. 11246, 15 C.F.R. part 8.

Form ED-101A (Rev. 12/91)

Exhibit IV-E-9

U. S. DEPARTMENT OF COMMERCE
ECONOMIC DEVELOPMENT ADMINISTRATION

Locator No.

ASSURANCES OF COMPLIANCE
with Civil Rights and Other Legal Requirements
(To Be Executed Only By Other Parties)

Applicant Name:
City, State, Zip:

The City of Somerville, OHCD, Somerville, Massachusetts 02143

Brief Project Description: The public works improvements component of Phase I of the Boynton Yards Revitalization project

The obligations incurred under this form apply only to the facility or property receiving EDA assistance. This form applies to Other Parties, who are inclusive of any governmental, public or private agency, institution, organization or other entity, or any individual with a direct or substantial participation in the program or project receiving Federal financial assistance from the Economic Development Administration (EDA), such as contractors, subcontractors, providers of employment, or users of the facility or its services. This form is being executed by an "Other Party" who satisfies one or both of the following conditions (check at least one):

$\boxed{\phantom{/}}$ 1. The Other Party will be creating or saving 15 or more jobs (estimated number: _____ ) as a result of EDA assistance, and (check a or b)

$\underline{\text{X}}$ (a) is specifically cited in the application for funds as a project beneficiary.

___ (b) will locate or is located in an assisted industrial park before EDA has made its final disbursement for the park. (Source: 13 CFR 311.3)

$\boxed{\phantom{/}}$ 2. The project serves an industrial park site which is neither owned nor operated by the applicant or recipient of Federal financial assistance. The non-applicant owner(s) and operator(s) are considered "Other Parties". (Source: 13 CFR 305.43)

ASSURANCES OF COMPLIANCE WITH THE DEPARTMENT OF COMMERCE AND THE
ECONOMIC DEVELOPMENT ADMINISTRATION (EDA) REGULATIONS UNDER
TITLE VI OF THE CIVIL RIGHTS ACT OF 1964,
PUBLIC LAW 92-65 (as amended), SECTION 504 OF THE REHABILITATION ACT OF 1973,
AND THE AGE DISCRIMINATION ACT OF 1975

Lanco Scaffolding, Inc.

(Name of Other Party)

(hereinafter called the "Other Party") assures that, as an Other Party, it will comply with Title VI of the Civil Rights Act of 1964, as amended (42 U.S.C. 2000d-2000d 4), the requirements imposed by or pursuant to regulations issued for the Department of Commerce and designated as 15 CFR Subtitle A Part 8, and any amendments thereto.

The Other Party agrees to comply with the provisions of Section 112 of Public Law 92-65 (42 U.S.C. 3123), the requirements imposed by or pursuant to the regulations of the Economic Development Administration promulgated in 13 CFR Part 311 (as explained in the April 1979 EDA Civil Rights Guidelines), and any amendments thereto.

The Other Party agrees to comply with Section 504 of the Rehabilitation Act of 1973 (26 U.S.C. 794) and 15 CFR Part 8b, subsections a, b, c, and e (Regulations of the Department of Commerce implementing Section 504 of the Rehabilitation Act), and the Age Discrimination Act of 1975 (42 U.S.C. 6101), 15 CFR Part 20. Such requirements hold that no person in the United States shall on the ground of race, color, national origin, sex, handicap, or age be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under, any program or activity for which Federal financial assistance has been extended.

Form ED-101A (Rev. 12/91)                    -27-

Assurances of Compliance
With Civil Rights and
Other Legal Requirements

Exhibit IV-E-9

In accordance with these assurances and without limiting the above, the Other Party agrees that these assurances shall be binding upon it, its grantees, assignees, transferees, lessees, and successors in interest. These assurances shall also be binding through every modification or amendment to this project.

The Other Party acknowledges that it has received and read the Department of Commerce and EDA regulations, and that it is aware that if there appears to be a failure or threatened failure to comply with this part, and if the noncompliance or threatened noncompliance cannot be corrected by informal means, compliance with this part may be effected by the suspension or termination of, or refusal to grant or to continue, Federal financial assistance, or by any other means authorized by law.

## NOTICE

This form must be executed by an official authorized to make the aforementioned assurances contained herein, with full authority to bind the recipient or other party identified herein. If the recipient or other party is a corporation, this form must be executed by a corporate officer authorized to make such assurances, and the title block must clearly indicate such authority. Assurance forms executed by employees other than corporate officers will not be accepted unless they are accompanied by a separate certification signed by a corporate officer stating the assurer has full authority to bind the recipient or other party identified below. In the case of an individual executing this assurance form as sole owner, sole owner must be indicated in the title block. For situations other than those discussed herein, contact the EDA regional office for appropriate acceptance instructions.

## ACCEPTANCE OF ASSURANCES OF COMPLIANCE

These assurances are made and accepted for:

Name of Other Party: Lanco Scaffolding, Inc.

Address    22 McGrath Hwy., Suite 5

Somerville, MA 02143

Phone No.: (617) 623-0060

By Carlos Gomez
_____(Type or Print Name)_____

President
_____(Title of Accepting Official)_____

_____(Signature of Accepting Official)_____

_____(Date)_____

## WARNING

False statements or representations made in connection with this "ASSURANCE OF COMPLIANCE" is a violation of Federal law punishable by a fine of not more than $10,000 or by imprisonment for not more than five years, or both (see 42 U.S.C. 3220; 18 U.S.C. 1001).

Form ED-101A (Rev. 12/91)

-28-

Exhibit IV-C-3

U. S. DEPARTMENT OF COMMERCE
Economic Development Administration

EMPLOYER'S CERTIFICATE OF NONRELOCATION

To be executed by employers within project boundaries of projects for construction grant assistance under Titles I, IV, IX and section 301 (f) of Title III of the Public Works and Economic Development Act of 1965, as amended (PWEDA).

NOTE - EDA's regulations at 13 CFR 309.3 prohibit EDA from making construction grants under Titles I, IV, IX and section 301(f) of Title III which will have the effect of assisting an employer in moving jobs from one commuting area to another commuting area. An expansion of an existing business to a new location may be assisted if such an expansion will not cause unemployment in other areas where the business conducts operations.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Items 1-2 are to be completed by Grant Applicants before this form is executed by employers.

1.  Grant Applicant Name:  The City of Somerville

    City, State: Somerville, MA

2.  Short Project Description:  Public works improvements component of Phase I of the
    Boynton Yards Revitalization project.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Employers are to complete items 3-4 and read and understand item 5.

3.  This form is being executed by an employer who satisfies one or more of the following conditions:
    (Check at least one)

    [X]  a.  It is an employer located or locating, or a nonapplicant owner or operator of an
             industrial park or site within the Project Boundaries.
    [ ]  b.  In the case of construction grants to fund area-wide utility systems it is an employer
             which uses or is projected to use greater than ten percent (10%) of the total capacity
             of the utility system as improved by the EDA grant.
    [ ]  c.  It is an affiliate, subsidiary, or other entity under direct, indirect, or common control
             of the foregoing entities.
    [ ]  d.  It is an assignee, transferee, lessee, or successor in interest of the foregoing entities.

4.  EMPLOYER CERTIFICATION AND ASSURANCE OF COMPLIANCE WITH EDA'S NONRELOCATION REGULATIONS

    Lanco Scaffolding, Inc.
    (Name of Employer)

    22 McGrath Hwy. Suite 5                    (617 ) 623-0060
    (Street Address)                              Phone Number

    Somerville, MA 02143
    (City, State, Zip)

(hereinafter called the "Employer") certifies and assures that, as an Employer on a project involving EDA financial assistance, it will comply with EDA's nonrelocation regulations at 13 CFR 309.3.

Form ED-101A (Rev. 12/91)                    -31-

Exhibit IV-G-3

EMPLOYER'S CERTIFICATE OF NONRELOCATION
Page 2

These regulations provide that EDA financial assistance will not be used directly or indirectly to assist Employers who transfer one or more jobs from one commuting area to another. A commuting area is that area defined by the distance people normally travel to work in the locality of the project receiving EDA financial assistance. This restriction applies to the transfer of jobs, not of personnel.

The Employer certifies and assures that it is not its intention to transfer one or more jobs from one commuting area to another by either (1) closing an operation in one commuting area and opening a new operation in the Project Area, which is in a new commuting area, or (2) curtailing its operations in another location and increasing the number of jobs of the existing operations located in the Project Area, for a period forty-eight (48) months from the date of approval by EDA of financial grant assistance.

The Employer certifies and assures that it has not located and that it will not locate in the Project Area prior to the date of EDA's approval of the proposed financial assistance, for the purpose of avoiding the restrictions of this nonrelocation rule.

The Employer understands that EDA financial assistance is not prohibited for the expansion of an Employer through the creation of a new branch, affiliate, or subsidiary which will not result in a decrease in jobs in any area where the Employer conducts business operations, and that retail stores which open new outlets in EDA funded facilities are exempt from this requirement provided: (1) the retail store is not a direct recipient of EDA financial assistance; (2) the retail store is not engaged in a pattern of operations which would result in relocating a substantial portion of its operations from one multi-state region to another; and, (3) the new outlet opening will not result in a significant reduction of employment in the retail store's entire operation.

The undersigned is authorized to make the foregoing certification and assurances and to execute this Certificate on behalf of the Employer.

Executed this 13 day of July , 19 92

by Carlos Gomez
(Type or Print Name)

President
(Title of Executing Official)

(Signature of Executing Official)

5.  WARNING

Note - Section 710(a) of the Public Works and Economic Development Act of 1965, as amended, provides that: "Whoever makes any statement knowing it to be false, or whoever willfully overvalues any security, for the purpose of obtaining for himself or for any applicant any financial assistance under section 101, 201, 202, or 403 or any extension thereof by renewal, deferment or action, or otherwise, or the acceptance, release, or substitution of security therefor, or for the purpose of influencing in any way the action of the Secretary, or for the purpose of obtaining money, property, or anything of value, under this Act, shall be punished by a fine of not more than $10,000 or by imprisonment for not more than five years, or both." EDA'S NONRELOCATION REQUIREMENTS AT 13 CFR 309.3(m) PROVIDE THAT: "WHEN EDA DETERMINES THAT THESE REQUIREMENTS HAVE BEEN VIOLATED, EDA WILL TERMINATE FOR CAUSE THE FINANCIAL ASSISTANCE MADE AVAILABLE BY EDA. THE RECIPIENT WILL BE OBLIGATED TO REPAY TO EDA THE FULL AMOUNT OF THAT FINANCIAL ASSISTANCE, PLUS INTEREST, FROM THE DATE DETERMINED BY EDA UPON WHICH THE VIOLATION OCCURRED, AT THE NEW YORK BANK PRIME RATE AS REPORTED IN THE WALL STREET JOURNAL ON THE DATE OF TERMINATION."

Form ED-101A (Rev. 12/91)                    - 52 -

April 10, 2005


The Honorable George A. O'Toole, Jr.
United States District Court For
The District Of Mass.
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA  02210


Dear Sir,

      My name is Kendal Moran and I respectfully submit my history with
Carlos and Mary Gomez.  I came to this country to pursue  any job
opportunities I could find.  My background was in agriculture and I was
lucky enough to be one of the people in Guatemala who was able to go to
school.  I first came to work for Lanco Scaffolding, Inc. in 1983.  At that
time Carlos was just starting his company and he had only a few men that he
was teaching to erect the scaffolding.  I started out as one of them.  I have a
very good work ethic and I was one who came to work on time and did
everything I could to learn everything I could because I was appreciative.  I
learned how to erect the scaffolding and I learned about estimating a
scaffolding job also.  It came time when Carlos needed someone to ride
along with him and talk to new customers and to write down all the
information and take all the notes and dimensions of the jobs.  Carlos asked
me if I would like to try this and I agreed.  Right from the start it seemed to
work out very well.  I am very good at writing and keeping things organized
and Carlos was good at talking to the customers about the specifics of each
job.  Years went by and the company grew little by little.  Customers we had
done jobs for in the past always had us do their other jobs for them because
our guys were trained so well and we were very reliable and respectful.  We
had a tiny office in Somerville, it was actually an apartment.  Carlos lived
there as well.  As time went by we did work for an asbestos removal
company.  Mary was working for that company and we did the scaffolding
for them at the Jordan March outlet in Quincy.  Carlos and I would be at the
jobsite day and night and Mary would be at the jobsite as well.  That's
where they met.  The rest as they say is history and Carlos and Mary were
married.  Carlos had asked Mary for sometime to come and to work with

him at Lanco and help us to modernize and learn about computers and handle our workload. In February of 1993 Mary came to Lanco. I was very nervous at this time because I didn't know how things would change and how Carlos's wife would change the routine that I was so used to.

Things did change, everything changed. My life changed. My wife's life changed. My two sons lives changed. Mary and I developed a relationship that I regard as one of the most important in my life. She treated me with respect and consideration and tried to make my job easier by showing me more efficient ways to do things and better ways to manage my time and my efforts. She was so giving in her time and efforts on my behalf. I was under enormous stress and anxiety. I was at a breaking point in my life. I was living under the same roof with my mother-in-law and it had become almost unbearable. I opened up and began to talk with Mary one day and I feel that God had put her in our life. She was able to guide me and give me the courage that I needed to make the changes in my life to actually move out of the home with my mother-in-law and to live with my wife and two sons on our own. I have established an extraordinary life for my wife and sons and I am very proud of who my sons have become. I don't feel that any of this would have been possible without Mary's influence on my life. She & Carlos talk endlessly to us about life and reaching out to others and what's really important. I have learned a trade where I have become an expert in this field. I look forward to going to work everyday and I am grateful everyday for knowing Mary & Carlos.

The company is run by Carlos is the field and Mary handles all operations. From the first phone call from a customer to setting the appointment to see the job, to scheduling the crews to erect the scaffold and then invoicing the client and then to taking the scaffolding down. The makeup of Lanco Scaffolding is basically five different families. The Gomez brothers, the Romero brothers, the Ortiz brothers, the Perlera brothers and the Castenadas. We have built up our crews over the years by each of the guys letting us know that their brother is looking for work and he's a hard worker and would we like to try him out. That is how we have ended up with so many brothers. Mary and I start at 4:30 AM each morning. Mary decides which guys are going to which job and this involves a great deal. You see, Mary is like the Mom. She has insisted from day one that we conduct ourselves as the most descent, respectable people on the construction sites. Carlos is very polite and he has always set that example

for us. Mary has to take into consideration who is driving which truck and who will team with who to do each job. She considers personalities, for example, Eleazar can't work with anybody but Roberto because, well, just because, Eleazar is funny that way and Mary knows everybody's little funny quirks and she thinks of everything. She knows how many kids each guy has, where they go to school and how they're doing in school. She knows how to respect each one of us and she works magic when we're so busy we can't imagine how we'll get the work done, somehow she works it all out and guess what, the work gets done. She makes us feel very proud of ourselves, she treats us with respect and kindness and she feels everything is owed to us because she thinks of us as Artists.

Mary takes every phone call. She has taught us that the customer's first contact with us is through the telephone. She has taught us how vital that first call is and how respectful to be to a client from the very first call. Through the course of the day I am out until approximately 1:00 PM. At that time all of the proposals are completed for each new job. Mary also does this. The filing, the organizing, the paperwork, on, and on, it's endless. But it gets done. She works very hard and we have developed a very efficient system that enables us to do this volume of work.

During these very stressful times it has been difficult, I'm sure, for Carlos and Mary to concentrate on their work when I know their biggest concern is their children. But through it all, we have managed, not only to take care of our families but to operate a healthy company with repeat client business and maintain our relationships with the Massachusetts Unions. We did hire Paychex, a professional payroll service and we also hired professional accountants so that absolutely everything will be done correctly and under someone's professional guidance. We have many ongoing projects and have a backlog of very good projects and we look forward to going forward and functioning better and doing our best every day. We have received an outpouring of support from our clients and almost every caller comments on the extraordinary work ethic of our men. It was also brought to our attention, by our men, that their names are etched in the stonework of the lobby of the Moakley Courthouse building as we erected the scaffolding to build the courthouse. We have done the scaffolding for just about every court house, hospital, college, and church in the Boston area. It is with great sadness that we viewed our names in your court house under these circumstances.

Carlos and Mary Gomez are invaluable to Lanco Scaffolding. They are Lanco Scaffolding. They have taught us an art form and we are proud to know them and continue to rely on them each and every day. I myself will always be eternally grateful for the opportunities and guidance they have added to my personal life. Over the past year and a half we have been able to renew our workers compensation insurance company through the Liberty Mutual Company. We have any outstanding safety record with Liberty Mutual and we are very highly rated. We worked out a payment agreement with the Massachusetts Carpenters Union and have fulfilled that payment agreement over the past year and it is now completed. We are working hard to put ourselves on the right track and comply with all rules and regulations. We have learned a great deal. We employ twenty five full time workers. They are all union members and are highly paid and receive an excellent benefit package. We are all very grateful for our jobs as our families are.

Thank you for taking this time to read my thoughts.

Very truly yours,

Kendal I. Moran

On this ___20___ day of ___June___, 20_05_ before me, the undersigned notary public, personally appeared _Kendal I. Moran_ proved to me through satisfactory evidence of identification, which were ___M.D.L.___, to be the person whose name is signed on the preceding or attached document in my presence.



MARIA E. PACHECO
NOTARY PUBLIC
Commonwealth of Massachusetts
My Commission Expires Aug. 23, 2007

# EXHIBIT  L



Carpenters Benefit Funds

350 Fordham Road
Wilmington, MA 01887
www.carpentersfund.org
Phone 978-694-1000
Fax 978-657-9973

Thomas J. Harrington
*Chairman*

Harry R. Dow
*Executive Director*

July 6, 2005

The Honorable George A. O'Toole, Jr.
United States District Court for the District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

Dear Judge O'Toole:

This letter is in support of Carlos Gomez, and his wife, Mary Gildea, who are the principals of Lanco Scaffolding, Inc.

I am acquainted with Carlos and Mary in my present position as the Executive Director of the Carpenters Benefit Funds, which administers the Pension, the Guaranteed Annuity, and the Health Benefits funds for approximately 25,000 union carpenters in the New England area. I also oversee the Massachusetts Carpenters Central Collection Agency (MCCA), which collects benefits payments from union employers. Consequently, I realize that Lanco, a union shop, also maintained an under-the-table payroll for some years, a situation that resulted in an underpayment of benefits to the Carpenters Benefit Funds. However, on behalf of Carlos and Mary, I would like to offer some positive facts that I hope you will take into consideration.

First, I would like to cite Lanco's excellent reputation in the field. Many of the leading contractors—for example, Payton Construction, Shawmut—use Lanco's expertise.

Second, Lanco is a stable employer that provides union workers, many of whom are minorities, with steady well-compensated employment. Obviously if Lanco were to close, the result would be a significant loss to both union employers and workers.

Lanco Scaffolding
Page 2
July 6, 2005

Most significantly, however, in May 2004, Carlos and Mary voluntarily acknowledged their benefit liability to the MCCCA. They then entered into a settlement agreement to repay this liability with interest. This liability has now been satisfied, and Lanco is also current with all benefits payments.

I hope that you will take this information into consideration in this case. If you have any further questions, please call me at 978-752-1132.

Sincerely,

Harry R. Dow
Executive Director

HD:MD

On this sixth day of July, 2005, before me the undersigned notary public, personally appeared Harry R. Dow, and proved to me through satisfactory evidence of identification, which was personal knowledge, to be the person whose name is signed on the preceding document in my presence.

Margaret A. Duprez

My commission expires October 13, 2011.

# EXHIBIT  M

*Be Sargent, Muralist   113 East Logan Avenue   Gallup, New Mexico 87301   505-726-2497*

*The Honorable George A. O'Toole, Jr.*
*United States District Court for the District of Mass.*
*John Joseph Moakley U.S. Courthouse*
*1 Courthouse Way, Boston, MA  02210*

*Tuesday, April 12, 2005,*

*Dear Honorable George A. O'Toole, Jr.,*

*I first met Lanco Scaffolding in 1993 when I was painting <u>A Wall of Respect for Women</u> in Davis Square. I made a plea to Mary Gomez for 4 jacks and she graciously granted them to me. She liked the mural and probably said something like "if you ever need anything come to us."*

*Little did we know that the next year I would be given permission to paint on the side of the Barrister's Hall in Union Square, Somerville, a four story building owned by Frank Privitera.*

*I did go back to Lanco and was overjoyed when they agreed to scaffold the building for the <u>Somerville Gateway Mural</u>, showing George Washington and the raising of the 1st American Flag on Prospect Hill.*

*In 1997, Ames Envelope gave me their wall on Park Street, Somerville for the <u>Immigrants' Mural</u>. That also was a huge wall, my painting started about 20 feet off the ground and went up another 20 feet and was 80 feet long. Lanco provided scaffolding with stairs. Everyone in the mural was an immigrant who had either lived or worked in the neighborhood. Many of them attended the dedication.*

*Carlos qualified as a worker in the neighborhood and the twins as his descendants. And it was such fun to include them.*

*In 1998, I painted the <u>Women's Community Cancer Project Mural</u> on Church Street in Harvard Square. This scaffolding had to span the walkway and be lit up at night. Again Lanco obliged.*

*In 1999, I painted <u>A Wall or Respect for Animals</u> on the Cambridge Antique Market on McGrath Highway. This was the last mural we did together and was the biggest of all.*

*I never was able to raise more than $15,000 for my labor on any of these murals but I could live on that. Nevertheless, I often tried to get a sense of what I was getting for free. Mary or Carlos would say "never mind, just go on painting."*

*Now in New Mexico I am coordinating a project of eight murals and eight muralists for the City of Gallup and we will be spending about $25,000 on scaffolding. Now I would give anything just to have one of the Lanco experts to show us the best way to do things.*

*If my letter can help Carlos and Mary I will feel I have finally been able to repay them in a small way. Please understand that they are unusually generous people with a strong sense of social responsibility.*

*Feel free to contact me at 505-726-2497 or go to my website where you can see more of the murals <u>www.besargent.com</u>*

*Sincerely,*

*Be Sargent*



























**Habitat for Humanity**
GREATER BOSTON

April 12, 2005

The Honorable George A. O'Toole, Jr.
United States District Court For
The District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

Dear Judge O'Toole:

I am writing to acknowledge Carlos Gomez's significant and exceptional support of Habitat for Humanity Greater Boston and its homebuilding mission. As the owner of Lanco Scaffolding, Mr. Gomez generously provided scaffold installation and rental services for our Blue Hill Place construction project in the fall of 2004. His in-kind donations allowed us to substantially lower construction costs and build the "safe, decent and affordable homes" that are vital to our ministry. Habitat works because of the support of individuals like Carlos Gomez and we are truly grateful for his generosity.

Sincerely,

David Lopes
Chief Operating Officer

**Habitat for Humanity**
GREATER BOSTON

October 13, 2004

Carlos Gomez
Lanco Scaffolding, Inc.
33 Earle Street
Somerville, MA  02143

Dear Mr. Gomez,

Thank you very much for your in-kind donation of scaffolding services to Habitat for Humanity Greater Boston. We are truly grateful for the scaffold installation and rental services you provided worth $12,900.  Your gift is appreciated as it contributes toward the building of affordable housing in the Greater Boston area.

As we celebrate over 16 years of home building in Boston, Habitat for Humanity Greater Boston and the families we serve continue to be blessed by the love and support we receive from people like you. Thank you for your continued support.

Sincerely,

David Lopes
Chief Operating Officer

DL/jek

No goods or services were provided in consideration of this gift.

Habitat for Humanity is a charitable, tax exempt organization under section 501 (c)(3) of the Internal Revenue Code. Contributions are tax deductible and this letter can serve as your receipt.


A rendering of the site at Blue Hill Place

The Blue Hill Place prject is the largest project to date for Habitat for Humanity Boston. The project site is on Blue Hill Avenue, Dorchester. The planning for the project is well underway. The homes site on Blue Hill Avenue between Intervale and Creston Streets in Dorchester will have twenty-two new homes, 4,000 square feet of commercial space, thirty-two off-street parking places, and a children's play area. Working with the City of Boston's Department of Neighborhood Development, the excavation has taken place for fifteen units and seven townhouses and were framed in March 2004. This effort will require a tremendous amount of resources – from donations of money and materials to thousands of volunteer hours and pro bono professional services. Sponsors have stepped up to the challenge to help fundraise this $4 million dollar project. This project will have an enormous impact on the community.

# Blight flight

## Habitat brings housing and commerce to long-vacant lot

By Thomas Grillo, Globe Correspondent, 10/18/2003

Decades after rioters inflamed by Martin Luther King's assassination torched a block along Blue Hill Avenue in Roxbury, Habitat for Humanity is rebuilding the homes and shops, hoping to spur a transformation of the neighborhood's vacant lots and boarded-up buildings.

"You can set your watch by this development," said Bruce A. Percelay, Habitat for Humanity Greater Boston Inc.'s president. "When we're done, you'll hear the whir of power tools on both sides of Blue Hill Avenue."

The Arrowhead development -- it's named for the shape of the land -- will when it's completed in spring 2005 feature 22 brick town house condominiums, a clock tower, a park, and street-level stores. Proponents say the $2.8 million project will boost a blighted section of Boston that has not experienced the kind of renaissance nearby Grove Hall has enjoyed.

Habitat for Humanity International, a nonprofit developer based in Americus, Ga., was

founded by Millard and Linda Fuller in 1976 to help alleviate the shortage of affordable housing. Habitat relies solely on volunteer labor -- former President Jimmy Carter was its most famous volunteer -- and cash donations. Habitat has built more than 100,000 homes, 55 in Boston.

The Blue Hill Avenue project, though, is one of Habitat's largest urban projects. A lot is riding on the effort, the group says. If it succeeds, it will send a message to private sector builders that a high-crime neighborhood can support new homes and businesses. If it doesn't succeed, residents are apt to be disappointed by one more broken promise.

The neighborhood has a tumultuous history. In the 1960s, about 90,000 Jewish families left sections of Roxbury, Mattapan, and Dorchester for the suburbs, part of the era's "white flight." During summer 1967 and a year later, after King's assassination, riots erupted and businesses burned. The city seized the burned-out, tax-delinquent buildings between Creston and Intervale Streets in 1974 and razed them. Since then, the lot has been vacant.

After several failed attempts to interest developers, Boston's Department of Neighborhood Development last year chose Habitat to purchase the site, for $150,000. Work begins next month.

David Lopes, a longtime resident and chairman of the Blue Hill Avenue Initiative Task Force, a group organized by Mayor Thomas M. Menino to encourage development of Blue Hill Avenue from Dudley Street to Franklin Park, said Habitat's design creates an opportunity to demonstrate to other developers what is possible.

"Some of the housing built by Habitat would not be allowed on my street, but because of community input they agreed to recreate what that block looked like in the 1940s," Lopes said. "We think this project will be the impetus for other quality developments." Though Boston in is the midst of a record-breaking housing boom, sections of Roxbury remain blighted. A trip down Blue Hill Avenue from Dudley to Mattapan Square takes pedestrians past 96 city-owned vacant lots and dozens that are privately held. "Blue Hill Avenue did not get that way overnight, and it won't change overnight," Lopes said. "It's a long process to redevelop an area that has been so devastated. But this is a marathon, and we're here for the long haul."

John Judge, Habitat's executive director, said the condominiums will be sold at cost to low-income residents. A buyer must contribute 300 hours to help build the house. The two-, three-, and four-bedroom units will be priced from $92,000 to $115,000 and be sold with 25-year, no-interest mortgages.



40 ADAMS STREET
MILTON, MA 02186
TEL: 617.296.0058
FAX: 617.296.0729
www.rebuildingtogetherboston.org

Honorable George A. O'Toole, Jr.
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

April 18, 2005

Re: Lanco Scaffolding

Dear Mr. O'Toole:

Rebuilding Together Boston (RTB) is a non-profit organization working in partnership with the community, volunteers, and skilled labor to stabilize and revitalize homes in our city. Our initiative brings homeowners and non-profit organizations in need together with volunteers from all walks of life to prevent homelessness and improve the quality of the lives of our recipients.

Rebuilding Together Boston has hired Lanco Scaffolding to erect scaffolding on several or our job sites over the past three years. Lanco's workmen are highly trained and skilled and have properly installed the needed scaffolding at all of our sites. We are pleased with their promptness and dedication to our program and their safety record.

We will continue to hire Lanco Scaffolding on future projects and look forward to maintaining our excellent work relationship with them.

If you have any questions or concerns, please contact me at any time.

Sincerely,

Martine L. Taylor
Executive Director

*The nation's largest volunteer organization preserving and revitalizing low-income houses and communities*

# EXHIBIT  N

**REDACTED**

----- Original Message -----
**From:** Reeder, David
**To:** Mary Gildea
**Sent:** Thursday, June 30, 2005 9:20 AM
**Subject:** RE: Balance due on account for Lanco, 1-320965-00

Mary: We received your payment of $17,918 on 6/29 for the 014 policy audit. All policy period audits have now been paid to date, subject to any future revisions.

In addition, your current 015 policy is now paid to date through installment #3 due 6/28. Your account has a zero balance at this time, with 6 more monthly installments of $13,666 scheduled to bill on the 015 policy, subject to any changes that might be made per endorsement at a future date.

Dave Reeder

----- Original Message -----
**From:** Reeder, David
**To:** marygildea@comcast.net
**Sent:** Tuesday, June 14, 2005 1:49 PM
**Subject:** Balance due on account for Lanco, 1-320965-00

Mary: As per our discussion, the most recent audit revisions for the 010, 011 and 012 policies left a balance due of $44,364. We received your payment of $44,364 on 5/16. All audits for the 010, 011, 012 and 013 policy periods are paid to date, subject to any further revisions that might be done at a future time.

The current balance due on account is $36,107. This includes the recently completed 014 policy audit of $17,918 due 6/1, an endorsement on the 015 policy of $4523 due 6/1, and the next regular monthly installment on the 015 of $13,666 due 6/28.

Dave Reeder, Accountant
IMS Financial Operations
(Phone) 800-653-7893
(Fax) 603-334-8161

7/7/2005

# EXHIBIT  O

Carpenters Benefit Funds

350 Fordham Road
Wilmington, MA 01887
www.carpentersfund.org
Phone 978-694-1000
Fax 978-657-9973

Thomas J. Harrington
*Chairman*

Harry R. Dow
*Executive Director*

April 19, 2005

The Honorable George A. O'Toole, Jr.
United States District Court for the District of MA
John Joseph Moakley U.S. Courthouse
One Courthouse Way
Boston, MA 02210

SUBJECT:  Carlos Gomez, Lanco Scaffolding

Dear Judge O'Toole:

I am writing this letter on behalf of Carlos Gomez of Lanco Scaffolding.  In May 2004 Carlos voluntarily acknowledged Lanco's fringe benefit liability and entered into a Settlement Agreement to pay the fringe benefit liability with interest over time.

Additionally, Lanco Scaffolding is current with all known fringe benefit obligations to the Carpenters Benefit Funds through March 31, 2005.

I hope the above information will be taken into consideration in this case. If you have any questions, please call me at 978-752-1132.

Sincerely,

Harry R. Dow
Executive Director

HD:MD

By fax:  617-776-9260

C:  Carlos Gomez



Carpenters Benefit Funds
## Central Collection Agency

350 Fordham Road
Wilmington, MA 01887
www.carpentersfund.org
Phone 978-694-1000
Toll-free 1-800-344-1315
Fax 978-657-8619

Harry R. Dow
*Executive Director*

May 11, 2004

## SETTLEMENT AGREEMENT

THE MASSACHUSETTS CARPENTERS CENTRAL COLLECTION AGENCY (MCCCA) and **Lanco Scaffolding, Inc.** enter into the present Settlement Agreement with respect to **Lanco Scaffolding, Inc.'s** delinquency to the Massachusetts Carpenters Central Collection Agency in accordance with the following terms and conditions:

1. **Lanco Scaffolding, Inc.** agrees that it owes to the MCCCA the principal amount of $145,183.03, which includes monies owed for delinquent fringe benefit contributions covering the period January 2002 through October 2003, found through a payroll audit or hours reported.

2. **Lanco Scaffolding, Inc.** agrees that it shall make the payment of the above referenced principal amount on account, together with interest, as follows:

   a. Upon receipt of this agreement, **Lanco Scaffolding, Inc.** shall pay $50,000.00 to the MCCCA.

   b. On or before June 1, 2004, **Lanco Scaffolding, Inc.** shall pay $10,000.00 to the MCCCA.

   c. On or before July 1, 2004, **Lanco Scaffolding, Inc.** shall pay $10,000.00 to the MCCCA.

   d. On or before August 1, 2004, **Lanco Scaffolding, Inc.** shall pay $10,000.00 to the MCCCA.

   e. On or before September 1, 2004, **Lanco Scaffolding, Inc.** shall pay $10,000.00 to the MCCCA.

   f. On or before October 1, 2004, **Lanco Scaffolding, Inc.** shall pay $10,000.00 to the MCCCA.

   g. On or before November 1, 2004, **Lanco Scaffolding, Inc.** shall pay $10,000.00 to the MCCCA.

h. On or before <u>December 1, 2004, Lanco Scaffolding, Inc.</u> shall pay <u>$10,000.00</u> to the MCCCA.

i. On or before <u>January 1, 2005, Lanco Scaffolding, Inc.</u> shall pay <u>$10,000.00</u> to the MCCCA.

j. On or before <u>February 1, 2005, Lanco Scaffolding, Inc.</u> shall pay <u>$10,000.00</u> to the MCCCA.

Final payment in the amount of $<u>5,183.03</u> shall be due on or before <u>March 1, 2005</u>.

3. All parties understand that this Agreement has interest calculated at <u>10.0%</u> for its term. It is also understood, however, that the MCCCA changes its interest rate semi-annually on <u>January 1</u> and <u>July 1</u>. The parties agree that the payment amounts due on <u>July 1, 2004 through, March 2005, or thereafter,</u> may be higher or lower depending on the MCCCA's interest rates set on <u>July 1, 2004</u> and <u>January 1, 2005.</u>

4. At all times, <u>Lanco Scaffolding, Inc.</u> agrees that it shall remain current with respect to any new obligations to the MCCCA for hours worked by its carpenter employees since <u>April, 2004,</u> and that current payments shall be made in a timely manner in accordance with the applicable collective bargaining agreement(s) to which <u>Lanco Scaffolding, Inc.</u> is bound.

5. The failure of <u>Lanco Scaffolding, Inc.</u> to make any of the payments set forth in paragraphs 2 and 4 on the dates set forth shall constitute a material breach of this Agreement, and as a consequence of the breach, <u>Lanco Scaffolding, Inc.</u> shall be obligated to pay the remaining balance due under this Settlement Agreement upon demand by the MCCCA.

6. In the event that <u>Lanco Scaffolding, Inc.</u> breaches this Agreement by not making its payments in a timely manner and fails to make full payment of the remaining balance upon demand by the MCCCA, <u>Lanco Scaffolding, Inc.</u> shall be liable to the MCCCA either under this Settlement Agreement or the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. 1001 et seq, or both for the remaining balance, interest, liquidated damages, and attorney's fees and costs incurred in having to collect the remaining balance.

7. In the event that <u>Lanco Scaffolding, Inc.</u> breaches this Agreement and the MCCCA files suit against <u>Lanco Scaffolding, Inc., Lanco Scaffolding, Inc.</u> waives any and all defenses and shall stipulate to judgment in the amount of the remaining balance, plus 20% liquidated damages, statutory pre-judgment interest at the rate of 12%, court costs of $150, and attorney's fees in the amount of $700.

8. In the event that <u>Lanco Scaffolding, Inc.</u> refuses to execute a stipulation for the entry of judgment as set forth above within 14 days of a demand in writing made upon <u>Lanco Scaffolding, Inc.</u> or an attorney who has appeared in the lawsuit, <u>Lanco Scaffolding, Inc.</u> shall be liable to the MCCCA for and consents to the entry of judgment

against it for an additional 20% of the principal amount due in liquidated damages in addition to the amounts set forth above or any other remedies provided by law.

9. The parties to this Settlement Agreement agree that the United States District Court for the District of Massachusetts is the proper venue for and shall have jurisdiction over any action brought for the breach of this Settlement Agreement.

10. **Carlos Gomez** agrees to personally guarantee **Lanco Scaffolding, Inc.'s** obligations covered by this Settlement Agreement and consents to the entry of a judgment imposing on him/her joint and several liability with **Lanco Scaffolding, Inc.** in any lawsuit that the MCCCA may file under ERISA or this Agreement concerning the Company's obligations covered by this Agreement.

Massachusetts Carpenters
Central Collection Agency

by: _____
      Harry R. Dow, Executive Director

_____
Carlos Gomez, Personally

Lanco Scaffolding, Inc.

by _____
Carlos Gomez, President

On this _11th_ day of _May_, 20_04_
Before me, the undersigned notary public, personally appeared
_Harry R. Dow_
proved to me through satisfactory evidence of identification, which were
_personal knowledge_
to be the person whose name is signed on the preceding or attached document in my presence.

_Karen Marie Vaughan_
Notary Public
My Commission Expires: _Jan 4, 2008_

On this _19th_ day of _May_, 20_04_,
Before me, the undersigned notary public, personally appeared
_CARLOS GOMEZ_
proved to me through satisfactory evidence of identification, which were
_CUSTOMER KNOWN_,
to be the person whose name is signed on the preceding or attached document in my presence.

_Barbara A. Green_
Notary Public
My Commission Expires: _2-17-10_

# EXHIBIT  P



Carpenters Benefit Funds
## Central Collection Agency

350 Fordham Road
Wilmington, MA 01887
www.carpentersfund.org
Phone 978-694-1000
Toll-free 1-800-344-1515
Fax 978-657-8619

Harry R. Dow
*Executive Director*

June 10, 2005

**Re: Lanco Scaffolding Inc.**

To Whom This May Concern:

Lanco Scaffolding Inc., of Somerville MA, entered into a Settlement Agreement with the Carpenters Central Collection Agency to make payments toward fringe benefits owed for work performed from January 2002 through October 2003.

Lanco Scaffolding Inc. paid the full amount due on the Settlement Agreement and is current with fringe benefits paid through April 2005 **with no known delinquencies at this time**.

Please feel free to contact this Agency if you have any questions or require further information regarding this matter.

Sincerely,

Diana Dadoly
Office Manager

DD.pd

# EXHIBIT  Q



EAST CAMBRIDGE
SAVINGS BANK

TREASURER CHECK

109280

Date April 08, 2004

Pay to the
Order of    *******INTERNAL REVENUE SERVICE********    Amount $ *****900,000.00

Nine Hundred Thousand and 00/100*******    DOLLARS

Memo_____

Two signatures required over $50,000

REDACTED

CUSTOMER COPY

TREASURER CHECK

| Check No. | Date | Check Amount |
|---|---|---|
| 109280 | 04-08-2004 | *****900,000.00 |

Pay To The Order Of
*******INTERNAL REVENUE SERVICE********
Memo
Account Number

Transaction Description

NON-NEGOTIABLE



05/03/04          2838                    50,000.00


05/03/04          2837                    200,000.00



CARLOS GOMEZ
39 EARLE STREET
SOMERVILLE, MA 42443

NUMBER
283

EAST CAMBRIDGE SAVINGS BANK
CAMBRIDGE, MA 02141-1263

63-704/2110

DATE 7-15-04

AMOUNT /0g,0

PAY ONE Hundred Thousand 00/100

TO THE
ORDER
OF    UNITED STATES TREASURY

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  2003 form 4868

REDACTED

100,000.00

2836

04/26/04

$100,000.00

▼ DETACH HERE ▼

# EXHIBIT  R

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX

WOBURN DISTRICT COURT
Docket No. 9953CR001086

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS<br><br>v.<br><br>MARY GOMEZ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF JAMES M. DIGIULIO, ESQ.

I, James M. DiGiulio, Esq., hereby depose and state under oath:

1.      I am an attorney admitted to practice law in the Commonwealth of Massachusetts.

I represented Defendant Mary Gomez in the above-captioned litigation and at the hearing on

March 22, 2000 that ultimately resulted in the matter being continued without a finding

("CWOF"). I make this declaration on personal knowledge, except where otherwise indicated.

Where my declaration is not made on personal knowledge, I make it on information and belief.

2.      I make this declaration in support of Ms. Gomez's Motion to Vacate Admission to

Sufficient Facts and for a New Trial.

3.      According to a police report dated May 13, 1999, Rosalia De Guzman (the

"Complainant") alleged that she was assaulted by Ms. Gomez. A true and accurate copy of the

May 13, 1999 police report is attached hereto as Exhibit A.

1

4.      According to the police report, at the time of the incident the Complainant was working in Ms. Gomez's home, where she performed duties including house-cleaning, babysitting and cooking.

5.      In the police report the Complainant alleged that on May 11, 1999, Ms. Gomez, among other things, yelled obscenities at her, grabbed her by the arm, and pushed her up against the door frame. The Complainant further alleged that on May 13, 1999, Ms. Gomez, among other things, told the Complainant she no longer needed her, grabbed her by the shirt, pushed her up against the wall, and grabbed her cheeks and chest. The Complainant also asserted that Ms. Gomez attempted to kiss her.

6.      The Complainant went to the police and made this report on the same day she was fired by Ms. Gomez for odd and erratic behavior.

7.      On May 14, 1999, the Woburn District Court issued a criminal complaint charging Ms. Gomez with one count of Indecent Assault and Battery and one count of Assault and Battery in connection with incidents alleged to have occurred on May 13, 1999. A true and accurate copy of the complaint is attached hereto as Exhibit B. No charges arose from the allegations regarding May 11, 1999.

8.      I was retained by Ms. Gomez to represent her in connection with these charges.

9.      Ms. Gomez vigorously maintained her innocence and fully intended to take the matter to trial.

10.     During the course of preparation for trial, I found troubling inconsistencies in the Complainant's accounts of the nature of the alleged altercation with Ms. Gomez. For example, the police report stated that the Complainant alleged that Ms. Gomez "grabbed [the Complainant] by the cheeks and tried to pull her mouth toward [Ms. Gomez's] mouth in an

2

1469752

attempt to kiss her." On the other hand, the Commonwealth's Bill of Particulars stated that Ms.

Gomez "sucked on [the Complainant's] lip" and "bit her arm." A true and accurate copy of the

Bill of Particulars is attached hereto as Exhibit C. The police report says nothing about a bite on

the arm. In addition, the Commonwealth's Motion in Limine Regarding Fresh Complaints told a

different story: that Ms. Gomez had bitten the Complainant both on the lip and on the left wrist.

A true and accurate copy of the Motion in Limine Regarding Fresh Complaints is attached hereto

as Exhibit D.

11.    I communicated these inconsistencies in the Complainant's statements to both the

police and to the district attorney's office. The police detectives who had arrested Ms. Gomez

indicated at the time that they arrested Ms. Gomez that they doubted the veracity of the

Complainant's allegations.

12.    Although I communicated my concerns to the Woburn Assistant District Attorney

who prosecuted the case, the Commonwealth chose to proceed with the case.

13.    On March 22, 2000, Ms. Gomez appeared in court ready to proceed to trial.

14.    On March 22, 2000, the day of trial, the Commonwealth filed a Motion in Limine

to Admit Olivia Gomez's Out-of-Court Statements Into Evidence As "Spontaneous Utterances."

A true and accurate copy of the Motion in Limine to Admit Olivia Gomez's Out-of-Court

Statements Into Evidence As "Spontaneous Utterances" is attached hereto as Exhibit E. Olivia

Gomez is Ms. Gomez's daughter. She was only 2 years old at the time of the alleged incident,

and was only 3 years old as of March 22, 2000. The court denied the motion, which sought to

allow the Complainant to testify about statements allegedly made by Olivia. However, the

Commonwealth indicated that if the Complainant would not be permitted to testify about the

child's alleged statements, the Commonwealth intended to call the child herself to testify. This

3

came as a complete surprise to myself and to Ms. Gomez, as Olivia's name was not on the witness list. This was also surprising given the child's young age at both the time of the alleged incident and as of March 22, 2000. I lodged my objection to the Commonwealth calling the child to testify on the grounds that Olivia was not old enough to be a competent witness. The judge indicated that the court would take up the issue at a later time, during trial.

15.    Ms. Gomez was shocked and distraught when she was told that the Commonwealth could call Olivia as a witness. I believe that Ms. Gomez understood that while the court had not yet decided the issue with finality, there was a strong possibility that Olivia would be required to testify. Ms. Gomez was anguished and visibly upset over this possibility.

16.    Ms. Gomez's decision about whether to proceed to trial was made over a very short time on the morning of March 22, 2000. The time from when the case was first called, when several motions in limine were heard and decided, to the time of her plea was no more than a couple of hours. It is my recollection that this case was Ms. Gomez's first experience with criminal court proceedings, and that she was very intimidated by the process.

17.    Although Ms. Gomez maintained her innocence, she decided that she did not want to go to trial on the charges, particularly in light of the possibility that the Commonwealth would call her young child to testify. Ms. Gomez made the decision to proceed with a CWOF in spite of the fact that I believed she had a strong defense and that she would have prevailed at trial. I advised Ms. Gomez of the rights that she would be waiving should she proceed with the CWOF disposition. However, I believe that, given her lack of experience in such matters, she was not very savvy to the implications of a plea disposition.

18.    I had serious concerns about Ms. Gomez entering a plea of guilty because she so vehemently maintained her innocence, and because I believed the Complainant's story to be

4

1469752

incredible. As an Officer of the Court and her attorney, I could not allow Ms. Gomez to admit to a crime she maintained she did not commit. In addition, I was concerned that a guilty plea could have a *res judicata* effect in any subsequent civil case. I made these concerns known to the judge during a lobby conference, and for these reasons the judge and Ms. Gomez agreed that Ms. Gomez would be permitted to make what was essentially an <u>Alford</u> plea pursuant to the Supreme Court's decision in <u>North Carolina v. Alford</u>, 400 U.S. 25 (1970). By making an <u>Alford</u> plea in the context of a CWOF, Ms. Gomez was not required to admit the facts that comprised the crime charged, but rather would admit that the facts alleged were sufficient to establish guilt.

19.    On behalf of Ms. Gomez, I submitted to the court a Tender of Plea or Admission and Waiver of Rights form dated March 22, 2000. A true and accurate copy of the Tender of Plea or Admission and Waiver of Rights form is attached hereto as Exhibit F. Ms. Gomez deliberately checked neither "Plea of Guilty" nor "Admission of Facts Sufficient for a Finding of Guilty" on this form.

20.    The court then conducted an oral colloquy with Ms. Gomez and granted a CWOF in this case. A true and accurate copy of the transcript from the March 22, 2000 plea hearing is attached hereto as Exhibit G.

21.    The Tender of Plea or Admission and Waiver of Rights form reflects that the court sentenced Ms. Gomez to 18 months of unsupervised probation, and required that she submit to a clinical evaluation and comply with any recommendations thereof. A court-ordered clinical evaluation concluded that Ms. Gomez required neither counseling nor any other treatment. Ms. Gomez subsequently successfully completed her probation, and the case stands dismissed.

1469752

22.    The day after the criminal proceeding concluded, Ms. Gomez received notice in the form of a letter from the Complainant's attorney that the Complainant intended to bring civil charges against her. The Complainant thereafter brought a civil suit in Superior Court, De Guzman v. Gildea Gomez (Civ. No. 0014CV0031). The case was subsequently transferred to Chelsea District Court.

23.    During her civil deposition, the Complainant made a number of unfounded and bizarre allegations about Ms. Gomez and her husband, including the claim that they were having people follow her. She produced no evidence that this had ever happened.

24.    Additional inconsistencies in the Complainant's claims were not revealed until the civil case. In a statement to the court on the day of Ms. Gomez's plea, the Complainant had alleged that she was "traumatized" by the alleged incident, and as a result she was "seek[ing] therapy once a week and tak[ing] sleeping pills." The Complainant later reasserted this new allegation in her civil suit, where she brought a claim for mental anguish resulting in depression and anxiety. Indeed, during her deposition in the civil suit the Complainant testified that she suffered from psychological conditions as a result of the alleged assault by Ms. Gomez. She also made similar statements during the civil trial. However, medical records later produced during the civil case proved that the Complainant had suffered from psychological conditions well before the alleged assaults by Ms. Gomez. For example, medical records showed that the Complainant had been treated on prior occasions for depression and anxiety, for which she was prescribed Paxil. One evaluation even noted questionable suicidal actions. These medical records had not been produced to me at the time of Ms. Gomez's plea in March of 2000.

25.    The civil trial also revealed other inconsistencies in the Complainant's story. The Complainant had claimed that she had received medical treatment at a clinic on the day she was

6

allegedly assaulted by Ms. Gomez. However, records obtained from the clinic showed that her

earliest visit was on May 17, several days after the alleged assault occurred, and that she

revisited the clinic on May 19 at the behest of her attorney to be examined and evaluated. I was

not aware of these discrepancies at the time of Ms. Gomez's plea. In addition, it was revealed

that the Complainant had reported to a Division of Employment and Training (DET) case worker

that the alleged incident with Ms. Gomez had occurred on May 16, not May 11 or 13, as she had

reported to the police. This inconsistency was brought to the attention of the North Reading

Police Prosecutor prior to the criminal trial. However, pursuant to M.G.L. c. 151A, § 46, the

DET document showing this inconsistency was inadmissible at Ms. Gomez's criminal trial.

26.    At the conclusion of the bench trial in the civil matter, the court found in favor of

Ms. Gomez, concluding that "[t]here was no assault and battery by the Defendant [Ms. Gomez]

at any time alleged by the [Complainant]." A true and accurate copy of the Memorandum

Decision dated October 22, 2003 in De Guzman v. Gildea Gomez (Civ. No. 0014CV0031) is

attached hereto as Exhibit H. In his decision, Judge Gailey stated that there were "myriad

inconsistencies" in the Complainant's accounts, and declared the Complainant to be "utterly and

unequivocally incredible as a witness." In addition, "[o]n the evidence presented at trial it is

more likely than not that the [Complainant's] accounts of the events of May 11 and 13, 1999 are

all totally fabricated and bear no relation whatsoever to the truth." Id.

27.    Based upon the foregoing paragraphs, I believe that the charges against Ms.

Gomez in the criminal case were entirely fabricated by the Complainant.

SWORN UNDER THE PAINS AND PENALTIES OF PERJURY, THIS 9 th DAY OF

March, 2005.

James M. DiGiulio, Esq.

7

Exhibit A

△ 99  1086

```
                    POLICE OFFICER'S FORMAL REPORT      05/13/99 21:36
                    NORTH READING POLICE DEPT                  PAGE:  1
Case#:   55744     ******** PRELIM  DO NOT GIVE OUT ********   TTYVAC04-32

  rpt date: 05/13/99 19:21              reported: THURSDAY   05/13/99 15:41
      ucr: 300  ARREST/WARRANT MANAGEMENT SYS*
      ibr: 1:11D
  location: 14 DARRELL DR
     follow up by: Detective Bureau        case status:  CLEARED/CLOSED NORMAL
        officer:  25 DET MURPHY             rpt status: Preliminary
                                         review officer:
  comp/vict notify: No                sup review officer:
  cir/involve type:
```
---------------------------------------------------------------------------
complaint: SEXUAL ASSAULT ON CLEANING WOMAN
---------------------------------------------------------------------------
```
reporting officer:   3 LT HAYES              assignment: B      car: DESK
  second officer:                           sup/back-up:
```
---------------------------------------------------------------------------

```
                           *** NAMES ***
   type    mast#  name/add                    phone      dob        ss#
  ======= ====== =========================  ========= ========= ===========
DEFENDANT 023479 GOMEZ,MARY E                          02/03/57 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
                 14 DARRELL DR   NORTH READING MA 01864

          obtn: TN0E005574401
    VICTIM 030125 DEGUZMAN, ROSALIA                     09/16/50
                 10 FORSYTH ST   CHELSEA
```
---------------------------------------------------------------------------

```
                         *** NARRATIVE ***
        ON THE ABOVE DATE AND TIME I, DETECTIVE MICHAEL P. MURPHY,
WAS INFORMED BY LT. HAYES OF AN ALLEGED INDECENT ASSAULT/ BATTERY
THAT OCCURED AT #14 DARRELL DR. NORTH READING MA..
        INFORMATION WAS RECIEVED FROM EAST BOSTON SGT. GAUGAN. HE
REPORTED TO LT. HAYES THAT ROSALIA DEGUZMAN WAS AT THE EAST
BOSTON POLICE STATION AND THAT SHE ALLEGED THAT SHE WAS ASSAULTED
BY MARY GOMEZ D.O.B 02/03/57.
        MYSELF AND OFC. BRENNAN WENT TO THE EAST BOSTON POLICE
STATION AND WERE MET BY THE DUTY LIEUTENANT. WE WERE THEN
INTRODUCED TO ROSALIA  DEGUZMAN D.O.B 09/16/50. ROSALIA WAS
WEARING A PINK SHIRT THAT APPEARED TO BE TORN HER HAIR AND FACE
LOOKED TO BE DISHEVELED.
        BOSTON POLICE OFFICER JOSE MOLINA ASSISTED ME IN TRANSLATING
THE INTERVIEW WITH ROSALIA. THE INTERVIEW TOOK PLACE AT APPROX.
5:20 PM ON MAY 13,1999. ROSALIA EXPLAINED THAT SHE WORKS FOR
MARY GOMEZ AT #14 DARRELL DR. NORTH READING MA.. HER DUTIES
INCLUDE HOUSE CLEANING , BABYSITTING AND COOKING MEALS. ROSALIA
STATED THAT SHE HAS WORKED ON AND OFF FOR MARY GOMEZ FOR THE PAST
THREE YEARS.
        ROSALIA STATED THAT ON MAY 11, 1999, SHE WENT TO WORK AT #14
DARRELL DR.. SHE STATED THAT SHE ARRIVED AT APPROX. 9:30 AM AND
THAT SHE MADE MARY'S CHILDREN BREAKFAST. ROSALIA STATED THAT MARY
HAD BEEN ACTING STRANGE THE LAST FEW WEEKS AND THAT SHE BECAME
```

```
                    POLICE OFFICER'S FORMAL REPORT     05/13/99 21:36
                    NORTH_READING POLICE DEPT                 PAGE:  2
   Case#:   55744   ******** PRELIM  DO NOT GIVE OUT ********  TTYVAC04-32
-------------------------------------------------------------------------
```

### *** NARRATIVE ***

VERY DEMANDING. ROSALIA STATED THAT SHE TRIED TO DO HER WORK AS
SHE HAS IN THE PAST BUT THAT MARY WAS MAKING AN ISSUE ABOUT ALL
OF HER WORK. ROSALIA STATED THAT AT APPROX. 12:30 , MARY BEGAN TO
YELL OBSCENTITIES AT HER AND TOLD HER TO DO WHAT SHE SAY'S.
ROSALIA TOLD MARY THAT SHE WILL LEAVE IF SHE DOESN'T LIKE THE WAY
SHE DOES THINGS . ROSALIA STATED THAT MARY WENT UP TO THE SECOND
FLOOR AND RETURNED APPROX. FIVE MINUTES LATER. ROSALIA STATED
THAT MARY CAME UP TO HER AND GRABBED HER BY THE ARM AND PUSHED
HER UP AGAINST THE DOOR FRAME. ROSALIA STATED THAT SHE WAS
PLEADING WITH MARY TO LET HER GO. MARY TOLD ROSALIA " IF YOU OPEN
YOUR MOUTH , I'LL KILL YOU". ROSALIA STATED THAT AT THAT POINT
MARY LET HER GO AND SHE LEFT THE HOME.
     ROSALIA RETURNED TO WORK ON WEDNESDAY 05/12/99 AND REPORTED
THAT THE DAY WENT BY WITHOUT INCIDENT.
     ROSALIA REPORTED THAT ON THURSDAY MAY 13, 1999 SHE RETURNED
TO WORK AT #14 DARRELL DR. N. READING MA.. ROSALIA ARRIVED AT
APPROX. 9:30 AM AND MADE THE CHILDREN BREAKFAST. AT APPROX. 11:00
AM, MARY TOLD HER CHILDREN TO GO OUT AND GET IN HER VAN. ROSALIA
STATED THAT MARY HAD PLANNED TO WORK AT HER SOMERVILLE OFFICE.
SOMETIME AFTER THAT MARY TOLD THE CHILDREN THAT SHE HAD CHANGED
HER MIND AND TOLD THEM TO PLAY OUTSIDE.  ROSALIA STATED THAT MARY
BEGAN TO "DEGRADE" HER BY TELLING HER TO SCRUB THE FLOORS WITH A
BRILLO PAD . MARY TOLD ROSALIA TO GET A PAIL OF WATER AND SCRUB
THE DOOR FRAMES . ROSALIA STATED THAT MARY TOLD HER THAT SHE
NEEDED SOMEONE WHO SPOKE ENGLISH . ROSALIA ASKED MARY WHY SHE HAS
KEPT HER WORKING FOR SO LONG AND MARY TOLD HER "I DON'T NEED YOU"
ROSALIA STATED THAT MARY THEN GRABBED HER BY THE SHIRT , CAUSING
THE SHIRT TO TEAR, AND PUSHED HER UP AGAINST THE WALL. MARY
GRABBED ROSALIA BY THE CHEEKS AND TRIED TO PULL HER MOUTH TOWARD
MARY'S MOUTH IN AN ATTEMPT TO KISS HER. MARY THEN GRABBED
ROSALIA'S LEFT BREAST AND SQUEZZED IT. MARY LAUGHED AT ROSALIA
AND CONTINUED UNTIL THE CHILDREN ENTERED THE KITCHEN AREA.
ROSALIA STATED THAT SHE LEFT THE HOME AND WENT TO THE EAST BOSTON
POLICE STATION. ROSALIA STATED THAT SHE FELT MORE COMFORTABLE
THERE BECAUSE MARY TOLD HER THAT SHE HAD "FRIENDS" ON THE NORTH
READING POLICE DEPT..
     I REQUESTED THAT DET. LlOYD WYZARD PHOTOE SEVERAL BRUISES ON
ROSALIA'S ARM. THE BRUISES WERE TO HER LEFT ARM AND APPEARED TO
BE RECENT. THE BRUISES HAD A GRAYISH PURPLE COLOR . I ALSO
REQUESTED THAT A FEMALE OFFICER PHOTOE THE TORN SHIRT THAT
ROSALIA WAS WERAING . ALL PHOTOES WERE INITIALED BY DET. WYZARD
AND TURNED OVER TO ME.
     AT APPROX. 19:36 HRS. MYSELF , DET. ROMEO AND OFC. BRENNAN
RESPONDED TO #14 DARRELL DR. AND ADVISED MARY GOMEZ THAT SHE
WAS BEING PLACED UNDER ARREST FOR : CH 265-S13H (INDECENT A&B)
MAY 13,1999 INCIDENT, AND CH 265-S13A (ASSAULT AND BATTERY),
MAY 11, 1999 INCIDENT. MARY WAS ALSO HAD AN OUTSTANDING WARRANT
OUT OF SOMERVILLE DISTRICT COURT.
     MARY WAS TRANSPORTED BACK TO THE NORTH READING POLICE
STATION AND INTRODUCED TO LT. HAYES AND ADVISED OF ALL OF HER
RIGHTS PERTAINING TO HER ARREST.

```
                    POLICE OFFICER'S FORMAL REPORT          05/13/99 21:36
                    NORTH_READING POLICE DEPT                      PAGE:  3
Case#:    55744     ******** PRELIM  DO NOT GIVE OUT ********    TTYVAC04-32
------------------------------------------------------------------------------
```

*** NARRATIVE ***
BAIL WAS SET AT $500.00.

RESPECTFULLY SUBMITTED,

DETECTIVE MICHAEL P. MURPHY

```
=============================================================================
chief [ ]   capt/oic [ ]   cid [ ]   traffic [ ]   fire [ ]   other [ ]
=============================================================================
```
I recommend this case be declared:
  Unfounded( )  Not Cleared( )   Court Action(✓)  Cleared by Arrest( )
Case Declared:
      Active( )      Complete( )        Unfounded( )  Domestic Violence( )

_Michael P. Murphy_
Reporting Off's Sig. Date/Time          _____
            5/13/99                     OIC Signature        Date/Time

Nov 18 2004 4:20PM    Law Office of James M. Di    781-224-1995    p.5

| CRIMINAL COMPLAINT | DOCKET NUMBER 9953CR001086 | Page 1 of | Trial Court Of Massachusetts District Court Department |
|---|---|---|---|

| DEFENDANT NAME GOMEZ, MARY E. | | | COURT NAME & ADDRESS Woburn District Court 30 Pleasant Street Woburn, MA 01801-4125 |
|---|---|---|---|
| DEFENDANT DOB 02/03/1957 | DATE COMPLAINT ISSUED 05/14/1999 | DATE OF OFFENSE 05/13/1999 | NO. OF COUNTS 2 |
| OFFENSE LOCATION N READING | POLICE DEPARTMENT OF OFFENSE NORTH READING PD | | |

**ARREST**

| | POLICE INCIDENT NUMBER | NEXT EVENT ARRAIGNMENT | NEXT EVENT DATE & TIME 5/14/1999 10:00 AM |
|---|---|---|---|

The undersigned complainant, on behalf of the Commonwealth, on oath complains that on the date(s) indicated below the defendant committed the offense(s) listed below and on any attached pages.

# DEFENDANT COPY

| COUNT | CODE | OFFENSE DESCRIPTION |
|---|---|---|
| 1 | 265/13H | INDECENT A&B ON PERSON 14 OR OVER c265 §13H |

on 05/13/1999 did commit an indecent assault and battery on a person who had attained age 14, without the consent of such person, in violation of G.L. c.265, §13H. (PENALTY: state prison not more than 5 years; or jail or house of correction not more than 2½ years; upon conviction, must register as a sex offender pursuant to G.L. c. 6, §§178C-178H; must submit a DNA sample within 90 days of conviction pursuant to G.L. c.22E, §3.)

| 2 | 265/13A/B | A&B c265 §13A |

on 05/13/1999 did assault and beat ROSALIA DEGUZMAN, in violation of G.L. c.265, §13A. (PENALTY: house of correction not more than 2½ years; or not more than $500.)

| SIGNATURE OF COMPLAINANT X | SWORN TO BEFORE CLERK-MAGISTRATE/ASST.CLERK/DEP.ASST.CLERK X | | DATE |
|---|---|---|---|
| NAME OF COMPLAINANT ROMEO, THOMAS | CLERK-MAGISTRATE/ASST.CLERK X | | DATE |

Date/Time Printed: 05/14/1999 09:36 AM

Form No.

**COMMONWEALTH OF MASSACHUSETTS**

**MIDDLESEX, SS.**                                    **WOBURN DISTRICT COURT**
                                                     **Docket # 9953 CR 001086**

**COMMONWEALTH**

**v.**

**MARY GOMEZ**

---

**COMMONWEALTH'S BILL OF PARTICULARS**

---

The following constitutes a bill of particulars, providing the defendant and the Court reasonable notice of the crime charged, including time, place, manner, or means. Mass. R. Crim. P., 13(b)(1); Commonwealth v. King, 387 Mass. 464, 441, N.E.2d 248 (1982). The purpose of this document is to fully inform the defendant, by giving them reasonable knowledge of the nature and character of the crime charged, and adding substance to the factual information supplied by the complaint, thereby enabling them to prepare an adequate defense. Commonwealth v. Daughtry, 417 Mass. 136, 142 (1994); Rogan v. Commonwealth, 415 Mass. 376, 378 (1993); Commonwealth v. Amirault, 404 Mass. 221, 233 (1989); Commonwealth v. Cantres, 405 Mass. 238, 242 (1989); Commonwealth v. Conceicao, 10 Mass. App. Ct. 899 (1980); Commonwealth v. Whitehead, 379 Mass. 640 (1980).

Additionally, this bill of particulars is not intended to be, nor can it reasonably be taken as, a complete statement of all the Commonwealth's evidence. Commonwealth v. Kirpatrick, 26 Mass. App. Ct. 595, 598 (1988). See Commonwealth v. Hare, 361 Mass. 263, 270 (1972).

The effect of this bill of particulars when filed with the Court, is to bind and restrict the Commonwealth as to the scope of the complaint and to the proof to be offered in support of it. Rogan v. Commonwealth, 415 Mass. 376, 378 (1993); Commonwealth v. Hare, 361 Mass. 263, 267-268 (1972), quoting Commonwealth v. Ianello, 344 Mass. 723, 726 (1962). Yet, if at

trial, there exists a material variance between the evidence and the bill of particulars, the Judge may order the bill of particulars amended or may grant such other relief as justice requires. The amendment may be done during the trial, after the evidence is completed, or after the final argument, provided there is no charge in the substantive offenses that have been charged, and the defendant is not prejudiced. M.R. Crim. P. 13(b)(2); Commonwealth v. Tavares, 385 Mass. 140 (1985); Commonwealth v. Iacovelli, 9 Mass. App. Ct. 694 (1980).

The following is the particulars in the case

**DATE** : May 13, 1999.

**TIMES**   At about 12:00 pm

**PLACES**:  In the kitchen at 14 Darrell Drive, N. Reading, MA

**MANNER AND MEANS**:  The defendant did push the victim against the wall, grabbed her by the hair and her shirt, pressed her against the wall with her knee, sucked on her lip, bit her arm and grabbed her left breast and squeezed it.

For the Commonwealth,
MARTHA COAKLEY
DISTRICT ATTORNEY

by:

Mary Polly Phillips
Assistant District Attorney
397 Main Street
Woburn, MA 01801
(781) 933-9586

Date: 8/31/99

Exhibit D

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.                                WOBURN DISTRICT COURT
                                             DOCKET NO. 99-1086

COMMONWEALTH

V.

MARY GOMEZ

---

COMMONWEALTH'S MOTION *IN LIMINE* AND MEMORANDUM
IN SUPPORT THEREOF REGARDING FRESH COMPLAINTS
MADE BY ROSALIE DEGUZMAN

---

Now comes the Commonwealth and requests this Court to allow Officer Molina,

Detective Murphy and Sergeant Gaugan to testify as a fresh complaint witnesses in the

above-captioned matter. Rosalie DeGuzman made complaints to these witnesses concerning

the alleged sexual assault by the defendant.  As grounds therefore, the Commonwealth states

that such testimony is admissible to corroborate Rosalie DeGuzman's testimony and refers to

the cases cited in the memorandum of law below.

The Commonwealth further requests that this Court instruct the jury prior to the fresh

complaint testimony of these witnesses and again during the final charge, that such testimony

may be considered only to corroborate Rosalie DeGuzman's in-court testimony and not as

substantive evidence of what occurred.

## MEMORANDUM OF LAW

## FACTS

The defendant is charged with indecent assault & battery and assualt & battery on

Rosalie DeGuzman.

On May 13, 1999, the date of the incident, Ms. DeGuzman arrived at the defendant's home for work, as a nanny/housekeeper. Some point after noon the defendant came down from the second floor in an upset manner. A dispute ensued regarding cleaning the kitchen and payment for services. The defendant was upset and wanted someone in her home who spoke English. The defendant asked Ms. DeGuzman to leave. Ms. DeGuzman complied and responded that she did not want the defendant to call her back. At this point, Ms. DeGuzman turned towards the closet to retrieve her jacket and leave. The defendant pushed her against the wall and stated, "when I talk to you, you listen". The defendant then grabbed the victim's cheek, grabbed her hair and pulled her head back. It was at this time that the defendant made a sucking/biting action to Ms. DeGuzman's upper lip. Ms. DeGuzman pleaded to be released from the defendant's hold, and which time the defendant grabbed the victim's breast and squeezed it. The defendant's children entered the kitchen area, trembling and crying. The defendant bit the victim on her left wrist and released her. After a brief exchange of words, the victim left the premises and reported the incident to the East Boston Police Department and then to the North Reading Police Department.

## ARGUMENT

Under the fresh complaint doctrine, a sexual crime complaint made by a victim within a reasonable period of time after the alleged incident is admissible as corroboration of the victim's testimony. Commonwealth v. Crowe, 21 Mass. App. Ct. 456, 480 (1986); Commonwealth v. Peters, 429 Mass. 22 (1999). The rationale underlying this rule of evidence is that a jury might consider the absence of fresh complaint as inconsistent with an accusation of sexual assault. See Commonwealth v. Bailey, 370 Mass. 388, 391-97 (1976); Commonwealth v. Licata, 412 Mass. 654 (1992).

On direct examination, a complainant may testify only about the fact that he/she made a fresh complaint and to whom the complaint was made. Peters, 429 Mass. at 28. The fresh complaint witness then must be produced to testify and be available for cross-examination. Id. The fresh complaint witness may testify about the fact of the complaint as well as the details of the complaint. Commonwealth v. LaValley, 410 Mass. 641, 643 & n.4 (1991). Fresh complaint evidence, including the details, is admissible so the jury can draw their own conclusions based on the statement. Peters, 429 Mass. at 27. The victim's statement is admissible even if it was partially elicited by questions from fresh complainants. Commonwealth v. Brenner, 18 Mass. App. Ct. 930 (1984). Additionally, the Supreme Judicial Court has recognized the evidence of fresh complaint may consist of a series of complaints. See Commonwealth v. Izzo, 359 Mass. 39, 44 (1971); Commonwealth v. Ellis, 319 Mass. 627 (1946).

There is no fixed time in law within which a victim of a sexual assault must "make her first complaint for that complaint to be admissible in evidence as a fresh complaint." Commonwealth v. Amirault, 404 Mass. 221, 228 (1989); see Commonwealth v. Adams, 23 Mass. App. Ct. 534 (1987); Commonwealth v. Bedard, 6 Mass. App. Ct. 959 (1978); Commonwealth v. Bailey, supra. In determining the "freshness" of a report, the judge must consider, in addition to the length of the delay, "whether the victim's actions were reasonable in the particular circumstances of the case." Commonwealth v. Gardner, 30 Mass. App. Ct. 515, 524 (1991). Even though the freshness of a complaint of rape is not measured solely by the clock or calendar, Commonwealth v. Dion, 30 Mass. App. Ct. 406, 413 (1991), it is discordant linguistically to attach the adjective "fresh" to a complaint made some time after the event. See Commonwealth v. Hyatt, 31 Mass. App. Ct. 488, 490 (1991). For the

3

communication by the victim to qualify as a fresh complaint, it need only be "reasonably prompt in light of the circumstances." Commonwealth v. King, 387 Mass. 473 (1982).

Lapse of time is not the sole test of admissibility of this corroborative testimony. Other factors, specifically in cases of child sexual assault victims, have been taken into consideration. These include: intimidation; comprehension of what happened; express threats; continued presence of the assailant; relationship between the assailant and the victim; and matters personal to the victim such as embarrassment, fear, shame and guilt. See Hyatt, 31 Mass. App. Ct. at 491. As the reasons for the delay are subject to explanation, the length of the delay goes to the weight of the evidence and is for the determination of the fact finder. Commonwealth v. Rollo, 203 Mass. 354, 355 (1909).

<div align="center">CONCLUSION</div>

Here the victim's reports of the assault were reasonably prompt. The Commonwealth would request that this Court allow the testimony of the fresh complaint witnesses.

Respectfully Submitted
For the Commonwealth,

MARTHA COAKLEY
DISTRICT ATTORNEY

by: _Donna Ashton (copy)_

Donna M. Ashton
Assistant District Attorney
Middlesex District Attorney Office
Woburn Division
397 Main Street
Woburn, MA 01801
(781) 933-9586

Dated:  May 22, 2000

<div align="center">4</div>

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS

**WOBURN DISTRICT COURT
DOCKET # 9953 CR 1086**

**COMMONWEALTH'S MOTION IN LIMINE TO ADMIT OLIVIA
GOMEZ'S OUT-OF-COURT STATEMENTS INTO EVIDENCE
AS "SPONTANEOUS UTTERANCES"**

The Commonwealth moves in limine to allow the introduction of Olivia Gomez's statements to Rosalie DeGuzman into evidence as spontaneous utterances.

In support, the Commonwealth states that the statements were made under the influence of an exciting event before the declarant had time to fabricate the statements and they explained the exciting event. <u>Commonwealth v. Crawford</u>, 417 Mass. 358 (1994); <u>Commonwealth v. Napolitano</u>, 42 Mass. App. Ct. 549 (1997).

The Commonwealth's Memorandum of Law In Support of Its Motion In Limine is attached hereto.,

Respectfully Submitted,
FOR THE COMMONWEALTH

Donna M. Ashton
Assistant District Attorney

1

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS
                                         **WOBURN DISTRICT COURT**
                                         **DOCKET # 9953 CR 1086**


**COMMONWEALTH**

**V.**

**MARY GOMEZ**

---

### COMMONWEALTH'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION IN LIMINE TO ADMIT OLIVIA GOMEZ'S OUT-OF-COURT STATEMENTS INTO EVIDENCE AS "SPONTANEOUS UTTERANCES"

---

### INTRODUCTION

The Commonwealth moves to allow the introduction into evidence of out-of-court statements made by Olivia Gomez to the alleged victim, Rosalie DeGuzman. Specifically, the Commonwealth moves to allow introduction of the following statements made by Miss Olivia Gomez:

> 1. On May 13, 1999, at approximately 11:00 a.m., Olivia Gomez entered the defendant's home, specifically the kitchen area, whereupon she viewed the defendant pinning Ms. DeGuzman against the wall.

> 2. Ms. DeGuzman is expected to testify that on May 13, 1999, upon viewing the defendant and Ms. DeGuzman, the declarant Miss Olivia Gomez was crying and trembling.

> 3. Further, Miss Olivia Gomez stated "Don't touch Nana, Mommy. Don't touch Nana". Contemporaneoulsy, while making this statement, the declarant, Miss Olivia Gomez, kicked her mother, the defendant and then bit the defendant on her thigh.

2

Miss Olivia Gomez's statements to the above witnesses are admissible as "spontaneous utterances."   Commonwealth v. Crawford, 417 Mass. 358 (1994); Commonwealth v. Napolitano, 42 Mass. App. Ct. 549 (1997).

## LEGAL ARGUMENT

**I.**    **THE ALLEGED STATEMENT OF MISS OLIVIA GOMEZ TO MS. DEGUZMAN IS ADMISSIBLE AS A SPONTANEOUS UTTERANCE**

The declarant's aforementioned statements are admissible evidence under the spontaneous utterance exception to the hearsay exclusionary rule.  A statement falls within the spontaneous utterance exception "if it is made under the influence of an exciting event and before the declarant has had time to contrive or fabricate the remark. [I]t must also tend to qualify, characterize, and explain the underlying event."  Commonwealth v. Zagranski, 408 Mass. 278, 284 (1990) (citations omitted).  The spontaneous utterance exception to the hearsay exclusionary rule is a deeply rooted hearsay exception with "'particularized guarantees of trustworthiness.'"  Commonwealth v. Napolitano, 42 Mass. App. Ct. 549, 554 (1997) (citations omitted); see also  Commonwealth v. Crawford, 417 Mass. 358, 362 (1994); Commonwealth v. McLaughlin, 364 Mass. 211, 222 (1973); Commonwealth v. Alvarado, 36 Mass. App. Ct. 604, 607 (1994).

**A.**    The Statements Were Made Under The Influence Of An Exciting Event And At A Time When Olivia Gomez, A Child, Would Be Expected To be Truthful

The statement must be made under the influence of an exciting event in order for it to be admissible as a spontaneous utterance. Zagranski, 408 Mass. 278.  The focus is on the exciting nature of the event because that, along with the short lapse in passage of time after the event, provides indicia of trustworthiness of the statement.  See Commonwealth v. Crawford, 417 Mass. 358, 362 (1994); Commonwealth v. McLaughlin, 364 Mass. 211, 222 (1973); Commonwealth v. Napolitano, 42 Mass. App. Ct. 549, 554 (1997) Commonwealth v. Alvarado, 36 Mass. App. Ct. 604, 607 (1994).  "'[T]he utterance may be taken as particularly

3

trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to those facts just observed by him; and may therefore be received as testimony to those facts.'" McLaughlin, 364 Mass. at 222 (quoting Wigmore on Evidence).

In Commonwealth v. Alvarado, 36 Mass. App. Ct. 604 (1994), the Appeals Court upheld the introduction of hearsay statements in the prosecution of a domestic violence case in Lawrence District Court. In Alvarado, the defendant was charged with biting the victim. Id. at 605. Two police officers testified at trial that the victim "'appeared to be very upset. Her entire face was wet with tears,' and 'she was hysterical, crying; very, very emotional, upset, . . . and very nervous.'" Id. at 604-605. The Court deemed this to be ample indicia that the victim was excited when the statements were made. Id.

In many cases involving the admissibility of spontaneous utterances, the courts look at the declarant's demeanor when the statement is made. For example, in Commonwealth v. Brown, 413 Mass. 693 (1992), the SJC found that a doctor's description of a three and one-half year old victim/declarant as "'terrified, tremulous, and scared,'" although medicated with morphine, was sufficient indicia that the statements were made under the influence of an exciting event. Id. at 695. Also, in Commonwealth v. Napolitano, 42 Mass. App. Ct. 549 (1997), the Appeals Court upheld the defendant's convictions for assault and battery by means of a dangerous weapon and assault and battery on his girlfriend where the witnesses described scrapes, bruises, and some blood on the victim and variously described the victim's demeanor as visibly shaken, crying, extremely agitated, and hysterical. Id. at 550-551.

Furthermore, although the "exciting event" in the instant case was an event involving violence perpetrated on the declarant, the precipitating event need not be such an event. In Zagranski, the SJC upheld the introduction of statements made by the defendant's wife as he was being placed under arrest in their home for a murder committed three days prior to the arrest.[1] Zagranski, 408 Mass. at 285.

---

[1] In Zagranski, the SJC allowed the arresting officer to testify that the defendant's wife

4

In the instant case, there is sufficient indicia that the statements sought to be admitted into evidence were made under the influence of an exciting event. Ms. DeGuzman observed Miss Olivia Gomez to be crying and trembling immediatley prior to the statement being made.

### 1.    The Declarant Need Not Be A Victim Of A Crime

The "exciting event" need not be an event in which the declarant was the victim of a crime, but rather, the declarant may simply be a witness to a crime or other exciting event. Zagranski, 408 Mass. at 285; Commonwealth v. McLaughlin, 364 Mass. 211 (1973); Commonwealth v. Texeira, 29 Mass. App. Ct. 200, 205 (1990). In Zagranski, the SJC upheld the introduction of statements made by the defendant's wife as he was being placed under arrest in their home for a murder committed three days prior to the arrest.[2] Zagranski, 408 Mass. at 285.

### 2.    The Statement Itself Is Sufficient Proof Of The Exciting Event

The statement itself sought to be admitted as a spontaneous utterance is sufficient proof of the exciting or precipitating event. Alvarado, 36 Mass. App. Ct. at 606; see also Napolitano, 42 Mass. App. Ct. at 554 ("It is also manifest that the exciting event which led to [the victim's] emotional agitation and subsequent statements was the physical attack she reported, not (as the defendant posits) an argument between her and the defendant about a ring and a chain."). To be sure, "'the statement itself is taken as sufficient proof of the exciting event.'" Alvarado, 36 Mass. App. Ct. at 606 (citation omitted).

Notwithstanding this rule, in the instant case, as in Alvarado, there is evidence of the excitement of the event independent of the statement. This evidence includes, *inter alia*, the fact that the declarant followed this statement

said, "Murder? Where is the body? Show me the body. Where is the body if there's a murder?" 408 Mass. at 285.

[2]    In Zagranski, the SJC allowed the arresting officer to testify that the defendant's wife said, "Murder? Where is the body? Show me the body. Where is the body if there's a murder?" 408 Mass. at 285.

5

with actions tending to show the intent of the statement. Specifically, the physical actions that were undertaken by the declarant to provoke the defendant to release the vicitm from the defendant's grasp.

### 3. The Declarant May Be Angry When The Statements Are Made

The fact that the declarant may have been angry at the time of making the statement does not render the statement inadmissible as a spontaneous utterance. See Commonwealth v. Tiexeira, 29 Mass. App. Ct. 200, 205 (1990) (upholding admissibility of a statement where the declarant "was mad" at the time the statement was made).

### B. The Statement Was Made Before The Declarant Had Time To Fabricate The Remark Because Precise Contemporaneousness Is Not Required

The statement sought to be admitted into evidence must have been made before the declarant had time to fabricate the remark. Zagranski, 408 Mass. at 285. "'[A] statement is admissible if its utterance was spontaneous to a degree which reasonably negated premeditation or possible fabrication.'" Commonwealth v. Crawford, 417 Mass. 358, 362 (1994) (citation omitted). However, "the statements 'need not be strictly contemporaneous with the exciting cause.'" Id.; Napolitano, 42 Mass. App. Ct. at 553; see also Handbook of Massachusetts Evidence, P. Liacos , § 8.16 (6th ed. 1994) ("Statements need not be strictly contemporaneous with the exciting cause to be admissible, provided that the underlying event has not lost its sway and been dissipated.").

In Crawford, the declarant was a four year old witness to her father's shooting of her mother. Id. at 360. Approximately two to four hours after the shooting, the defendant brought the declarant to a friend's home. Id. at 361. The declarant remained at that location for approximately thirty minutes without telling anyone what she witnessed. Id. The declarant's grandmother arrived at the friend's home after approximately thirty minutes passed (approximately 2 1/2 to 4 hours

6

after the shooting) and the declarant immediately stated, "'Daddy shot Mummy.'" Id. The grandmother then drove to the scene of the murder with the declarant. Id. A short time after arriving, the declarant told a neighbor and a police officer that, "'Daddy . . . my Daddy killed my Mummy.'" Id. The SJC allowed the grandmother, neighbor, and police officer to testify as to the declarant's statements. Id. at 363. Importantly, the SJC allowed the testimony of the neighbor and the police officer because the statements "were products of the continuing stress of her mother's homicide." Id.

To be sure, "[p]recise contemporaneousness is not required so long as it appears that, notwithstanding the passage of some time, the statements, were made under the stress of the exciting event." Brown, 413 Mass. at 696. In Brown, five hours passed between the statement by the declarant and the exciting event.[3] Id. at 695.

In the instant case, the statement made by Ms. Olivia Gomez to Ms. DeGuzman was contemporaneuos with the actions that the defendant is presently being charged with in the instant complaints.

### C.    The Statement Qualifies, Characterizes, And Explains The Underlying Event

The statement must qualify, characterize, and explain the underlying event. Zagranski, 408 Mass. at 284. Although, "[t]his requirement is seldom litigated," Handbook Of Massachusetts Evidence at § 8.16, it has been met in the instant case. As in Napolitano, 42 Mass. App. Ct. at 553, wherein the victim identified the defendant and described the manner in which the defendant tried to kill her, the instant victim's statement to Ms. DeGuzman directly explained what was happening and who was the perpetrator of the crime.

### D.    The Declarant Of The Statement Need Not Be Unavailable To Testify At Trial

---

[3]    The Brown court looked approvingly to cases in other jurisdictions that allowed statements made up to eleven hours after the exciting event. Brown, 413 Mass. at 696.

"The deeply rooted hearsay exception for excited utterances is deemed so specially reliable that the usual requirement of proving the declarant unavailable is dispensed with." Napolitano, 42 Mass. App. Ct. at 557. Thus, the admissibility of a spontaneous utterance does not depend on the unavailability of the declarant. McLaughlin, 364 Mass. at 224; Commonwealth v. Rockett, 41 Mass. App. Ct. 5, 6 (1996) ("the prosecution is not required 'to produce the declarant at trial or to demonstrate unavailability.'") (quoting Crawford, infra); see also Crawford, 417 Mass. at 362 (four year old declarant ruled competent witness after voir dire of declarant; thus, declarant was available and SJC upheld admissibility of declarant's statements through the testimony of three witnesses).

## II.   THE INTRODUCTION OF THE STATEMENT INTO EVIDENCE DOES NOT VIOLATE THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

The defendant's Sixth Amendment rights under the Confrontation Clause will not be violated if this court allows admission of the victim's spontaneous utterances. Crawford, 417 Mass. at 358.

The SJC in Crawford held:

It is clear that the defendant's rights under the Sixth Amendment were not violated by the admission of the [four year old declarant's] statements.
The United States Supreme Court held that the admission of hearsay evidence under the spontaneous utterance exception to the hearsay rule did not violate the confrontation clause of the Sixth Amendment, despite the failure of the prosecution to produce the declarant at trial or to demonstrate [the declarant's] unavailability. The [U.S. Supreme] Court's decision rested in part on its perception that such evidence generally was trustworthy and that its exclusion would not promote the "integrity of the factfinding process."

Crawford, 417 Mass. at 364 (quoting White v. Illinois, 112 S.Ct. 736 (1992)); see also McLaughlin, 364 at 219-220 (the defendant's right of cross-examination is not violated whenever hearsay is admitted against him and he is not able to cross-examine the person to whom the hearsay statement is attributed.");

Napolitano, 42 Mass. App. Ct. at 557 (Sixth Amendment not violated by introduction of spontaneous utterance despite the Commonwealth's failure to show that the declarant was unavailable); Alvarado, 36 Mass. App. Ct. at 606-607 (("'[W]here proffered hearsay has sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule, the Confrontation Clause is satisfied.'") (quoting White v. Illinois)).

### III.   THE INTRODUCTION OF THE STATEMENT INTO EVIDENCE DOES NOT VIOLATE ARTICLE 12 OF THE MASSACHUSETTS DECLARATION OF RIGHTS

Finally, the defendant's confrontation rights under article 12 of the Massachusetts Declaration of Rights will not be violated if this court allows admission of the victim's spontaneous utterances. The Appeals Court in Napolitano expressly rejected such an argument given the inherent reliability and trustworthiness of spontaneous utterances. Napolitano, 42 Mass. App. Ct. at 554. In fact, the Appeals Court also rejected the defendant's argument under Commonwealth v. Amirault, 424 Mass. 591 (1997), that his confrontation rights require a face-to-face confrontation by the declarant:

> The defendant baldly asserts [] that his confrontation right could only be constitutionally satisfied by 'having the jury observe [the victim's] demeanor as she testified against him, that is, as she made the accusatory statements.' We reject this dubious proposition as unsupported by any case authority or reasoned argument. More fatally, it is contradicted by the many decisions that have allowed trustworthy incriminating hearsay to be admitted despite the fact that the jury in such situations never observe the demeanor of the declarant making the inculpatory statement.

Napolitano, 42 Mass. App. Ct. at 555 (emphasis in the original) (citations omitted).

Furthermore, the Supreme Judicial Court stated:

> Article 12, like the Sixth Amendment, only grants the right to a defendant in a criminal proceeding to confront the witness offering the declaration. Thus even in a criminal trial, where the right of confrontation is at its zenith, there are numerous rules allowing the introductory of hearsay evidence.

9

<u>Mendonza v. Commonwealth</u>, 423 Mass. 771, 785 (1996) (emphasis added).

## CONCLUSION

Based upon all of the above, the Commonwealth's Motion In Limine To Admit Miss Olivia Gomez's Out-Of-Court Statements Into Evidence As "Spontaneous Utterances" should be allowed and the statement made by the declarant to Ms. DeGuzman should be admitted.

Respectfully Submitted,
For the Commonwealth

MARTHA COAKLEY
DISTRICT ATTORNEY


DONNA M. ASHTON
Assistant District Attorney
Middlesex District Attorney's Office
Woburn Division
397 Main Street
Woburn, Massachusetts 01801
(781) 933-9586

Dated: May 22, 2000

10

Exhibit F

| TENDER OF PLEA OR ADMISSION WAIVER OF RIGHTS | DOCKET NO. 9953CR001086 | CR/R 2 | Trial Court of Massachusetts District Court Department |
|---|---|---|---|

| INSTRUCTIONS: This form must be typed or printed clearly, completed prior to the Pretrial Hearing, signed by both counsel and submitted to the court by the defendant at or before the Pretrial Hearing. | NAME OF DEFENDANT Mary Gamez | COURT DIVISION Woburn District Court 30 Pleasant Street Woburn, MA 01801 |
|---|---|---|

## SECTION I                                        TENDER OF PLEA

Defendant in this case hereby tenders the following:    **PLEA OF GUILTY    ADMISSION TO FACTS SUFFICIENT FOR A FINDING OF GUILTY** conditioned on the dispositional terms indicated below. Include all proposed terms (guilty finding, finding of sufficient facts, continued without finding, dismissal, fine, costs, probation period and supervision terms, restitution amount including the identification of the recipient of restitution, and any sentence of incarceration, split sentence or suspended sentence, etc.). Number each count and specify terms for each count separately.

| COUNT NO. | DEFENDANT'S DISPOSITIONAL TERMS (Check "Yes" if Prosecution agrees – Check "No" if Prosecution disagrees) | | PROSECUTOR'S RECOMMENDATION (Required if Prosecutor disagrees with terms) |
|---|---|---|---|
| 1 | Assault + battery Dismissed | YES ___ NO | G. 18 months prob. Ct clinic eval + follow Stay Away from V |
| 2 | Indecent Assault & battery CWOF 1 yr. probation court clinic evaluation To be dismissed at end of 1 yr | YES ___ NO | G. Concurrent #1 |
| | | YES ___ NO | |
| | | YES ___ NO | |
| | | YES ___ NO | |

A TRUE COPY ATTEST

*Kathleen M. McKeon*

ASST/CLERK-MAGISTRATE

WE HAVE CONSULTED WITH THE PROBATION DEPARTMENT REGARDING ANY PROBATION TERMS SET FORTH ABOVE.

| SIGNATURE OF DEFENSE COUNSEL X | DATE 3-22-00 | SIGNATURE OF PROSECUTING OFFICER X | DATE 3/22/00 |
|---|---|---|---|

## SECTION II                PLEA OR ADMISSION ACCEPTED BY THE COURT

The Court    **ACCEPTS** the tendered Plea or Admission on defendant's terms set forth in Section I, and will impose sentence in accordance with said terms, subject to submission of defendant's written WAIVER (see Section IV on reverse of this form), completion of the required oral COLLOQUY, a determination that there is a FACTUAL BASIS for the Plea or Admission, and notice of ALIEN RIGHTS.

## SECTION III                PLEA OR ADMISSION REJECTED BY THE COURT

| The Court  X **REJECTS** the defendant's dispositional terms set forth above and, in accordance with Mass. R. Crim. P. 12(c)(6), has set forth to the defendant the dispositional terms it would find acceptable, to wit: (Reject) CWOF Both counts 18 mos probation. Clinic eval. & Comply with any Recommendation | **DEFENDANT'S DECISION IF COURT REJECTS TENDERED PLEA OR ADMISSION:** Defendant **WITHDRAWS** the tendered Plea or Admission; the parties must complete and file a Pretrial Conference Report, a Pretrial Hearing must be conducted and a trial date scheduled, if necessary. X Defendant **ACCEPTS** terms set forth by the Court, a Plea or Admission will be accepted by the court and said dispositional terms imposed, subject to submission of defendant's written WAIVER (see Section IV on reverse of this form), completion of the required oral COLLOQUY, a determination that there is a FACTUAL BASIS for the Plea or Admission, and notice of ALIEN RIGHTS. |
|---|---|

| SIGNATURE OF JUDGE ACCEPTING OR REJECTING PLEA OR ADMISSION X | DATE 3/22/00 | SIGNATURE OF DEFENSE COUNSEL (if rejection decision made) | DATE 3-22-00 |
|---|---|---|---|

DC-CR 22 (8/96)

## SECTION IV    DEFENDANT'S WAIVER OF RIGHTS (G.L. c. 263, § 6) & ALIEN RIGHTS NOTICE (G.L. c. 278, § 29D)

I, the undersigned defendant, understand and acknowledge that I am voluntarily giving up the right to be tried by a jury or a judge without a jury on these charges.

I have discussed my constitutional and other rights with my attorney. I understand that the jury would consist of six jurors chosen at random from the community, and that I could participate in selecting those jurors, who would determine unanimously whether I was guilty or not guilty. I understand that by entering my plea of guilty or admission, I will also be giving up my right to confront, cross-examine, and compel the attendance of witnesses; to present evidence in my defense; to remain silent and refuse to testify or provide evidence against myself by asserting my privilege against self-incrimination, all with the assistance of my defense attorney; and to be presumed innocent until proven guilty by the prosecution beyond a reasonable doubt.

I am aware of the nature and elements of the charge or charges to which I am entering my guilty plea or admission. I am also aware of the nature and range of the possible sentence or sentences.

My guilty plea or admission is not the result of force or threats. It is not the result of assurances or promises, other than any agreed-upon recommendation by the prosecution, as set forth in Section I of this form. I have decided to plead guilty, or admit to sufficient facts, voluntarily and freely.

I am not now under the influence of any drug, medication, liquor or other substance that would impair my ability to fully understand the constitutional and statutory rights that I am waiving when I plead guilty, or admit to sufficient facts to support a finding of guilty.

I understand that if I am not a citizen of the United States, conviction of this offense may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization, pursuant to the laws of the United States.

| SIGNATURE OF DEFENDANT | DATE | |
|---|---|---|
| X | 3-22-00 | |

## SECTION V    DEFENSE COUNSEL'S CERTIFICATE (G.L. c. 218, § 26A)

As required by G.L. c. 218, § 26A, I certify that as legal counsel to the defendant in this case, I have explained to the defendant the above-stated provisions of law regarding the defendant's waiver of jury trial and other rights so as to enable the defendant to tender his or her plea of guilty or admission knowingly, intelligently and voluntarily.

| SIGNATURE OF DEFENSE COUNSEL | B.B.O. NO. | DATE | |
|---|---|---|---|
| X | | 3-22-00 | |

## SECTION VI    JUDGE'S CERTIFICATION

I, the undersigned Justice of the District Court, addressed the defendant directly in open court. I made appropriate inquiry into the education and background of the defendant and am satisfied that he or she fully understands all of his or her rights as set forth in Section IV of this form, and that he or she is not under the influence of any drug, medication, liquor or other substance that would impair his or her ability to fully understand those rights. I find, after an oral colloquy with the defendant, that the defendant has knowingly, intelligently and voluntarily waived all of his or her rights as explained during these proceedings and as set forth in this form.

After a hearing, I have found a factual basis for the charge(s) to which the defendant is pleading guilty or admitting and I have found that the facts as related by the prosecution and admitted by the defendant would support a conviction on the charges to which the plea or admission is made.

I further certify that the defendant was informed and advised that if he or she is not a citizen of the United States, a conviction of the offense with which he or she was charged may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization, pursuant to the laws of the United States.

| SIGNATURE OF JUDGE | DATE | |
|---|---|---|
| X | 3/22/00 | |

## CondenseIt™

THE COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                    WOBURN DISTRICT COURT
                                 Docket No. 9953CR001086

* * * * * * * * * * * * * * * * * * * * *

COMMONWEALTH OF        *
MASSACHUSETTS          *
                       *
                       *
                       *        HEARING
     vs.               *
                       *
                       *
MARY GOMEZ             *
* * * * * * * * * * * * * * * * * * * * *

          DATE:     March 22, 2000

          BEFORE:   Judge McGinnis

          LOCATION: Woburn District Court

---

Page 3

1              P R O C E E D I N G S
2          THE CLERK:  You may be seated.  The
3    Commonwealth vs. Mary Gomez.  Would you
4    stand, please?  Step forward, please.
5          THE COURT:  Ms. Gomez, please raise
6    your right had.  Have you been sworn?
7          MS. GOMEZ:  No.
8
9                  (Whereupon, Ms. Gomez was
10                 duly sworn.)
11
12         THE COURT:  Ma'am, I'm going to ask
13   you a series of questions.  If at any time,
14   you don't understand me, please tell me that,
15   and I'll go ahead and rephrase to make sure
16   that you do understand each question put to
17   you.
18         And I'd begin by noting that you have
19   filed, through your attorney, a document
20   entitled "Tender or Plea or Admission, Waiver
21   of Rights Form."  It's that green piece of
22   paper.  Do you see that Ma'am?
23         MS. GOMEZ:  Yes, I do.
24         THE COURT:  Okay.  And it appears

---

Page 2

APPEARANCES:

James M. DiGiulio, Esquire
333 North Avenue
Wakefield, MA  01880
781/246-5100
Representing the Defendant:


Donna Ashton, Esquire
Assistant District Attorney
Representing The Commonwealth.

---

Page 4

1    that you've signed that document.  Is that
2    your signature?
3          MS. GOMEZ:  I did sign it.
4          THE COURT:  And before you signed it,
5    did you read the document and go over it with
6    your lawyer?
7          MS. GOMEZ:  I did.
8          THE COURT:  And you understand the
9    terms of that document, do you?
10         MS. GOMEZ:  I understand.
11         THE COURT:  So you understand that
12   you do have the right to a trial; is that
13   correct?
14         MS. GOMEZ:  I understand that.
15         THE COURT:  And you do understand
16   that, if you took the case to trial, you
17   wouldn't have to prove that you were innocent
18   of these charges; rather, The Commonwealth
19   would have the burden of proving that you
20   were guilty of them.  Do you understand that?
21         MS. GOMEZ:  I understand that.
22         THE COURT:  And you understand that
23   you have the right at a trial to confront and
24   cross-examine witnesses who might be called

---

WORD INDEX

Condenselt ™

Page 5

1  to testify against you. You yourself would
2  not have to testify, nor would you otherwise
3  have to incriminate yourself. Do you
4  understand that?
5      MS. GOMEZ: I do.
6      THE COURT: Now, could you again, for
7  the record, please state your full name?
8      MS. GOMEZ: Mary Gomez.
9      THE COURT: How old are you, Ma'am?
10     MS. GOMEZ: Thirty-two.
11     THE COURT: And how far did you go
12  with your formal studies?
13     MS. GOMEZ: I graduated college.
14     THE COURT: Have you ever been
15  treated for an emotional or mental illness?
16     MS. GOMEZ: No.
17     THE COURT: Are you today under the
18  influence of any alcohol, any prescription
19  medications, drugs of any kind?
20     MS. GOMEZ: No.
21     THE COURT: And do you understand, if
22  you did wish to take the matters to trial,
23  you could choose between two different kinds
24  of trial. One would be a trial before a

Page 6

1  judge sitting with the jury; the other would
2  be a trial before a judge sitting without a
3  jury. Do you understand that?
4      MS. GOMEZ: I understand that.
5      THE COURT: And if you chose to have
6  a trial before a judge sitting with a jury, a
7  pool of people would be randomly drawn from
8  this general community, and from that pool,
9  six people would be chosen to sit on your
10  jury. You could play an active role,
11  certainly, through your attorney in selecting
12  those six jurors.
13     Those six jurors would be the judges
14  of fact. They would listen to the testimony.
15  They would weigh all of the evidence. And at
16  the close of the trial and their
17  deliberations, all six of those jurors would
18  have to be unanimous in agreeing that The
19  Commonwealth had proven a case against you
20  beyond any reasonable doubt before the jury
21  could find you guilty. Do you understand
22  that?
23     MS. GOMEZ: I understand.
24     THE COURT: And the judge who would

Page

1  preside at that trial would listen to
2  argument relative to issues of law which
3  might arise during the course of the trial.
4  The judge would also be responsible for
5  instructing the jury on the law applicable to
6  the facts of the case before the jury began
7  its deliberations.
8      And lastly, were the jury to find you
9  guilty, the judge would be responsible for
10  imposing a sentence or some other
11  disposition. Do you understand that?
12     MS. GOMEZ: I do.
13     THE COURT: And instead of a jury
14  trial, so-called, you could, if you wish,
15  take the matter to a judge sitting as I am at
16  the moment without a jury. And in that form
17  of a trial, it's up to the judge, not a jury,
18  to listen to the testimony, weigh the
19  evidence and, ultimately, decide by that same
20  reasonable doubt standard whether or not The
21  Commonwealth has proven a case against you
22  before the judge can or could find you
23  guilty. Do you understand that?
24     MS. GOMEZ: I do.

Page 8

1      THE COURT: And were the judge to so
2  find, then that judge would have
3  responsibility for imposing a sentence or
4  some other disposition. Do you understand
5  that?
6      MS. GOMEZ: I do.
7      THE COURT: Now, you've gone over
8  this matter with your attorney, and your
9  attorney has explained to you the elements of
10  the offenses with which you're charged, and
11  has explained, likewise, the maximum penalty
12  which could be brought to bear were you to be
13  found guilty; is that correct?
14     MS. GOMEZ: Yes, he has.
15     THE COURT: And you're satisfied with
16  the time and attention devoted to this matter
17  by your attorney?
18     MS. GOMEZ: I am.
19     THE COURT: Do you understand that
20  I'm not required by law to accept the offer
21  you're making or to impose the disposition
22  you suggest? If, however, I feel that more
23  severe sanction or disposition is
24  appropriate, and you disagree with me, you

HENNESSEY CORP., dba ROBERT H. LANGE CO

Condenselt™

ave every right to withdraw this offer to
dmit, and take the case then to trial? Do
ou understand that?

MS. GOMEZ: I do.

THE COURT: Has anyone promised you
nything or threatened you in any way
oncerning your giving up your right to a
ial?

MS. GOMEZ: They have not.

THE COURT: Do you understand that if
ou are not a citizen of the United States, a
onviction in this matter or a finding that
ere were facts sufficient to warrant a
nding of guilt entered, you could be
eported from this country, denied admission
this country, and/or denied naturalization
a citizen of the United States? Do you
nderstand that, Ma'am?

MS. GOMEZ: I understand.

THE COURT: All right. Listen
arefully, if you would, please, as I ask The
ommonwealth to state for the record the
cts which the prosecution is prepared to
ove.

MS. ASHTON: Thank you, Your Honor.
r the record, Donna Ashton representing The
ommonwealth.

We have a report of Officer
ichael -- Detective -- excuse me, Michael
urphy, who is in the Courtroom this morning.

He states that on May 13, 1999, he
sponded to the East Boston police station
a result of a Sergeant Goggin's -- who is
o in the Courtroom -- request. There was
individual there, a Ms. Rosalie DeGuzman
onetic), who is the victim in this matter
d present in the Courtroom, as well, at
t station, and she alleged that she was
aulted by a Mary Gomez, the defendant
fore you.

Detective Murphy went to the Boston
lice statement (sic) and met with the
tim, Rosalie DeGuzman (phonetic). She was
aring a pink shirt that appeared to be
n. Her hair and face looked to be
heveled.

She explains that she works for Mary
mez at 14 Darrow Road in North Reading.

1  Her duties include housekeeping, babysitting,
2  and cooking meals, and that she has worked on
3  and off for Mary Gomez for the past three
4  years.
5       She related that on the date of the
6  offense, May 13th, she returned to work at 14
7  Darrow Road in North Reading. She arrived at
8  approximately 9:30 in the morning, and made
9  the children breakfast.
10      At approximately eleven, Mary told
11  her children to go out and get in her van.
12  Rosalie stated that Mary had planned to work
13  in her Somerville office. Sometime after
14  that, Mary told the children that she had
15  changed her mind, and told them to play
16  outside.
17      She stated that Mary began to degrade
18  her by telling her to scrub the floors with a
19  Brillo pad; that she indicated that she
20  should get a pail of water and scrub the door
21  frames. She stated that Mary told her that
22  she needed someone who spoke English.
23      Rosalie, the victim, asked Mary why
24  she has kept her working for so long, and

1  Mary said, 'I don't need you.'
2       At this point, Rosalie stated that
3  Mary grabbed her by the shirt, causing her
4  shirt to tear, and pushed her up against the
5  wall. Mary, the defendant before you,
6  grabbed Rosalie by the cheeks and tried to
7  pull her mouth towards Mary's mouth in an
8  attempt to kiss her. Mary then grabbed
9  Rosalie's left breast and squeezed it. She
10 laughed until the children entered the
11 kitchen area.
12      She stated that she felt more
13 comfortable at the East Boston police because
14 Mary told her that she had friends at the
15 North Reading police department.
16      Photographs were taken by a female
17 officer, and later that evening, the North
18 Reading police went to the home of the
19 defendant and placed her under arrest.
20      Those are, in essence, the facts of
21 The Commonwealth's case.
22      THE COURT: All right, thank you.
23 Now, you've heard those facts which were read
24 into the record; is that correct, Ma'am?

WORD INDEX

Condensceclt™

**Page 13**

1  MS. GOMEZ: I've heard them.
2  THE COURT: All right. Now, do you
3  acknowledge that The Commonwealth has in its
4  possession facts sufficient to prove your
5  guilt?
6  MS. GOMEZ: I can't acknowledge that
7  they would prove my guilt.
8  THE COURT: Would you like to speak
9  to your attorney?
10  MR. DiGIULIO: Yes.
11  THE COURT: All right, take a moment.
12  MS. GOMEZ: I can acknowledge that if
13  they did prove my guilt ---
14  THE COURT: Well, you may wish to
15  speak to your lawyer for just a moment.
16  (Pause.)
17  MS. GOMEZ: I understand that if they
18  were to prove those facts, and find me
19  guilty, there would be (unintelligible).
20  THE COURT: Well, you understand that
21  the testimony in this case would see your
22  testifying, and would also see witnesses
23  testify for The Commonwealth. It's been
24  reported that you would testify. You're

**Page**

1  THE COURT: Now, again, my question
2  to you is, do you acknowledge that the
3  evidence which The Commonwealth is prepar-
4  to prove, that the facts which were just
5  recited, are sufficient to establish your
6  guilt? And again, you may want to talk to
7  your lawyer before you answer that.
8  (Pause.)
9  MS. GOMEZ: Those facts, if believed
10  by a jury, could establish my guilt.
11  THE COURT: Can I see counsel? Are
12  you content with that?
13  MS. ASHTON: No, Your Honor. I think
14  that she needs to say that there is
15  sufficient ---
16  THE COURT: But either she's going to
17  admit or she's going to admit that the
18  evidence is sufficient to establish guilt.
19  You can't have it both ways.
20  MR. DiGIULIO: Well, I think she's
21  admitting that ---
22  THE COURT: No, she's not. She's
23  pulling her punches, which is her right.
24  We'll try the case.

**Page 14**

1  obviously not required to testify and, in
2  fact, you have a right to remain silent and
3  not testify.
4  But the -- And the Court is fully
5  prepared to proceed to trial, and the trial
6  is your absolute right.
7  But if what you are acknowledging is
8  that The Commonwealth does have in its
9  possession facts which are sufficient,
10  evidence which is sufficient to establish
11  your guilt, then we'll proceed in some other
12  fashion. If -- And The Commonwealth
13  certainly has represented that its case is
14  strong, and your defense, as I understand it,
15  is that the incident in question never took
16  place; is that correct?
17  MS. GOMEZ: That's correct.
18  THE COURT: And you understand that
19  it would be, if you did choose to testify, a
20  question of your credibility versus the
21  credibility of the other witnesses, plus any
22  other evidence which might be introduced. Do
23  you understand that?
24  MS. GOMEZ: I understand.

**Page**

1  MR. DiGIULIO: Well, I thought that
2  we discussed that she didn't have to admit.
3  THE COURT: No, she doesn't, but she
4  has to acknowledge that -- or admit, if you
5  will, that The Commonwealth has in its
6  possession facts sufficient to prove her
7  guilt, to establish her guilt. She's not
8  admitting to it, but she's acknowledging that
9  there -- that it has evidence which is
10  sufficient, in and of itself -- in and of
11  itself -- to establish guilt.
12  MR. DiGIULIO: If the question is
13  posed to her that way, I think that she'll
14  say an affirmative. I just need another five
15  seconds with her.
16  (Pause.)
17  MS. GOMEZ: Those facts are
18  sufficient to establish guilt.
19  THE COURT: And is that a statement
20  or belief which you make knowingly, freely,
21  and voluntarily?
22  MS. GOMEZ: Yes.
23  THE COURT: And again, no one has
24  threatened you or promised you anything in

Condenselt™

WORD INDEX

Page 17

exchange for your acknowledgment; is that
correct?

MS. GOMEZ: That's correct.

THE COURT: Well, given what I find
to be a knowing freely and voluntary waiver,
and the tenuousness of defense's proffer that
this is a sufficient waiver, and that there
are facts sufficient to warrant the finding,
and we have benefit of a probation report and
a tender which appears to be somewhat
disparate, the defense, for the record, on
Count Number 1 seeks dismissal -- Is it Count
Number 1, or --

You cite the assault and battery,
which is technically, I think, Count Number
2.

MR. DiGIULIO: I'm sorry, Your Honor.

THE COURT: Is it the assault and
battery which you seek dismissal on, or is it
the ---

MR. DiGIULIO: The assault and
battery, Your Honor. It's the lesser
included offense.

THE COURT: And so, The Commonwealth

Page 18

is moving for guilty on both counts, 18
months probation, straight probation. The
Defense moves for a dismissal of the assault
and battery, and on the remaining count, a
continuance without a finding for a period of
one year.

Now, on the question of the
dismissal, why on that ---

MR. DiGIULIO: Your Honor, because
it's my understanding that's a lesser
included offense of Count 1 as I understand
it now, and it's only one charge there, and
there isn't two events. There's one event
that's being alleged.

MS. ASHTON: Your Honor, I think The
Commonwealth has provided for the record
sufficient facts on both separate counts,
that she was pushed up against the wall, that
there was a biting action on her mouth. The
grabbing of the breast is just one ---

MR. DiGIULIO: That was not alleged
in the facts, Your Honor.

MS. ASHTON: Your Honor, she pushed
her up against the wall. She grabbed her by

Page 19

1  the check, which is enough for an assault and
2  battery; tried to pull her mouth towards Mary
3  in an attempt to kiss her.
4      THE COURT: Okay. Okay. We've
5  conferenced the case, and I seem to remember
6  the allegation of a kick -- of a push. Was
7  there some other -- was there a wrist?
8      MS. ASHTON: There was a biting on
9  the wrist, Your Honor.
10     THE COURT: The wrist, that's what I
11  was thinking of.
12     MS. ASHTON: There was also a pushing
13  with the knee against the thigh.
14     THE COURT: All right. So those were
15  part of the allegation. I don't know that
16  I'd be inclined to dismiss that count,
17  Counsel.
18     MR. DiGIULIO: Your Honor, the police
19  report did not state those facts, as I
20  indicated.
21     THE COURT: This is on the tender,
22  again, and it's not a motion to dismiss. I
23  understand what's motivating your request.
24     But as a tender -- and typically, on

Page 20

1  the day of trial, the defendant, of course,
2  has no right to a defense cap plea. And I'm
3  entertaining this as a defense cap plea, in
4  deference to the facts and circumstances
5  surrounding the case. However, I would not
6  be inclined, through this vehicle, to dismiss
7  that count.
8      Now, you otherwise -- Well, The
9  Commonwealth is moving for guilty, and I'm
10  happy to hear you on where you lie, disparate
11  or otherwise, that is, the continuance
12  without a finding versus the guilty 18
13  months, if you wish to be heard further.
14     MS. ASHTON: Your Honor, I would like
15  to bring to the Court's attention that the
16  victim is in the Courtroom, and she does wish
17  to address the Court.
18     But first, the rationale for The
19  Commonwealth's recommendation is, obviously,
20  the facts of this case, the charges that are
21  presented before you.
22     It is a serious allegation, and it's
23  a serious charge with which this defendant is
24  being faced, and we do think that the guilty

21

1    finding, absent her record, that the facts
2    are enough to have this Court enter a guilty
3    finding for this case, Your Honor, due to the
4    facts that I've already recited and that
5    we've belabored all morning.
6         But I do also wish to bring to the
7    Court's attention that the victim does have a
8    statement, and I believe she just wants me to
9    read it to the Court.
10        THE COURT:  Okay.  Why don't we read
11   it into the record then.
12        MS. ASHTON:  Your Honor, it has been
13   written in Spanish, and it was translated by
14   the Court Interpreter.  It states -- It's
15   actually dated September 23, 1999.
16        "Your Honor, I ask only for justice.
17   What this woman, Maria Gomez did to me was
18   very painful, humiliating and degrading.  My
19   life has changed incredibly.  I was a happy
20   woman, sure of myself.  Now, I'm traumatized,
21   nervous, humiliated and insecure.  I had to
22   sell part of my jewelry so that I could buy
23   food and pay some of my bills.  I asked for
24   help from the government so that I could

ROBERT H. LANGE CO., INC.

22

1   survive" -- and in parentheses, she writes --

2   "food stamps) and was turned down.  I owe

3   five months' rent.  I lost my job.  My credit

4   is ruined, and I seek therapy once a week and

5   take sleeping pills.  I am also afraid of

6   people.  I want to be the same as before,

7   happy and confident.  For me, it's hard to

8   think that everything this woman did to me

9   may not be believed.  After all, she's a

10  woman of business and wealth, and I have to

11  work for a weekly salary in order to survive.

12  You will not believe all that I have suffered

13  as a result of this trauma caused by her.

14  This was not the only occasion where Mary

15  Gomez has assaulted me.  It occurred various

16  times with sexual overtones.  Sincerely,

17  Rosalie DeGuzman (phonetic)."

18        THE COURT:  All right, thank you.

19  The defense suggests a disposition which

20  would feature a continuance without a

21  finding.  Do you wish to be heard further,

22  counsel, on that?

23        MR. DiGIULIO:  Your Honor, just on a

24  couple of points briefly.  Your Honor, we are

ROBERT H. LANGE CO., INC.

23

1    asking that the case be continued without a

2    finding for a period of one year.  You know,

3    I am aware of what we had discussed in the

4    lobby.

5             Your Honor, Ms. Gomez does not have

6    any prior conviction record.  When I had

7    looked at it at the beginning of the outset

8    of this case, it was my understanding that

9    there may have been a larceny by check.  She

10   had closed out an account before the check

11   had cleared.  She knew nothing about it.  It

12   was probably eight years old.  It came to

13   light when this incident occurred.  That

14   was -- There was no criminal intent, and

15   there was no conviction.

16             She has no record, Your Honor.  Based

17   upon that, and based upon what you have heard

18   about what the defense has for evidence, Your

19   Honor, we think that this is a fair

20   resolution.  We also think that one year is

21   sufficient time for a probationary period

22   with the order that you believe that the

23   Court would impose regarding the court clinic

24   evaluation.  Eighteen months is -- with no

ROBERT H. LANGE CO., INC.

24

1    record, Your Honor, is a long period of time.

2         I would also -- You know that Mrs.

3    Gomez is a married -- is married.  She's the

4    mother of three.  She's lived in North

5    Reading for quite some time.  She's a

6    business woman, very well respected in the

7    community, Your Honor.

8         I would also ask that the defendant

9    be given an opportunity, again, as we had

10   discussed in the lobby, to state her primary

11   motivation for this disposition on the

12   record.

13        THE COURT:  Well, certainly, Ma'am,

14   in the course of the colloquy, I indicated to

15   you, you have the right to a trial.  That

16   right remains inviolate, and we'll have the

17   jury here within 30 minutes, if you'd like to

18   reconsider and take the case to trial.

19        If you'd like to share with the Court

20   your motivation, mindful of the fact that you

21   have conceded that The Commonwealth does have

22   in its possession evidence sufficient to

23   prove your guilt.  But if you'd like to

24   explain further your motivation, by all

ROBERT H. LANGE CO., INC.

25

1    means, do so.

2          MS. GOMEZ:  Yes.  That's basically

3    it, the uncertainty of a verdict a jury may

4    or may not render, and I've (unintelligible.)

5          And I don't know that I have the

6    stomach for a trial.

7          THE COURT:  But you do acknowledge

8    that you have the right -- the Court ---

9          MS. GOMEZ:  I understand that ---

10         THE COURT:  --- has placed at your

11   disposal a jury trial, and you have, again,

12   given that right up, knowingly, freely, and

13   voluntarily?

14        MS. GOMEZ:  Yes.

15        THE COURT:  Is that correct, Ma'am?

16        MS. GOMEZ:  I understand that.

17        THE COURT:  My inclination would be,

18   again, to not dismiss the count which was

19   described, but rather, to continue both

20   counts for a period of 18 months without a

21   finding.  There would be the routine referral

22   to the Court's clinic for an evaluation

23   relative to any emotional needs that Ms.

24   Gomez might present with.  If the clinic felt

ROBERT H. LANGE CO., INC.

26

1    that there was a need for any further

2    counseling, or any counseling or programming,

3    the Court would make that recommendation.

4        If Ms. Gomez felt that that was

5    inappropriate, she, of course, could

6    challenge that.  I'd be happy if the parties

7    wish to retain jurisdiction for that purpose.

8        If the Court clinic felt that there

9    was no need, given the emotional state with

10   which Ms. Gomez presented, for any follow-up

11   care or counseling, then the probation which

12   would be ordered would be without

13   supervision.  It would be administrative

14   probation.

15       In the event that there were to be

16   some counseling, then there would be a degree

17   of supervision necessary only to ensure that

18   there was compliance with the programming.

19       The continuance without a finding,

20   typically, with the understanding that its

21   terms would be honored by the probationer,

22   and with the understanding, of course, that

23   there would be no violation of state, local,

24   or federal law during the course of the

ROBERT H. LANGE CO., INC.

TRANSCRIPT

27

1      probation, would see Ms. Gomez eligible to

2      move for a dismissal at the end of the 18-

3      month term.

4             In the event that those matters were

5      then disposed of in that fashion, there would

6      be no record of conviction.

7             On the other hand, of course, if

8      there were a violation of law that would

9      trigger a probation violation, or if there

10     were some other violation of probation found

11     during the 18-month term, then a probation

12     revocation hearing would -- well, of course,

13     one would be convened.  And if after that

14     hearing, there were a finding of violation,

15     then the Court would have the discretion of

16     entering a guilty finding at that time, and

17     all of the Court's dispositional options at

18     that time would again be before it.

19            So having said that, that is the

20     disposition which I propose.  If you wish you

21     accept it, you may; if you wish to reject it,

22     you may do that, and we'll begin the jury

23     trial.

24            MS. GOMEZ:  I accept.

                   ROBERT H. LANGE CO., INC.

28

1    THE COURT: Let me write that up.

2    MR. DiGIULIO: The defendant is

3    requesting that you retain jurisdiction, if

4    you would.

5    THE COURT: I'm happy to do that.

6    And that's relative to the appropriateness of

7    the clinic evaluation.

8    MR. DiGIULIO: Yes. Thank you.

9    THE COURT: All right. If you would

10   ask counsel to sign in the lower right. I've

11   couched this as a rejection insofar as I'm

12   not dismissing per your request. So if you

13   acknowledge that, then you can sign that.

14   And we'll forego the victim rights.

15   THE CLERK: Ms. Gomez, on Docket

16   Number 1086 of 1999, the Court, on Count 1,

17   indecent assault and battery on a person of

18   14 or over, the Court finds sufficient facts

19   to find you guilty, declines an interim

20   finding of guilty, continues the matter for

21   18 months, until September 20, 2001.

22   The Court also orders that you

23   undergo a Court clinic evaluation, and any

24   follow-up counseling or other treatment as

ROBERT H. LANGE CO., INC.

Condenseit™

Page 29

1   required by the Court clinic. If the Court
2   clinic finds that there is no requirement of
3   counseling or follow-up treatment, then your
4   probation will be come administrative only.
5       Judge McGinnis will also maintain
6   jurisdiction relating to any issues of the
7   Court clinic evaluation.
8       On Count 2, assault and battery, the
9   Court appearance finds sufficient facts of
10  guilty, finds an interim finding of guilty
11  and continues the matter without a finding
12  for 18 months, until September 20, 2001,
13  under the same terms and conditions, and
14  concurrent with Count 1.
15      The Court waives any victim/witness
16  assessment fee, but does assess you a $50 per
17  month probation supervision fee, which again,
18  will be waived in the event that the Court
19  clinic finds that you not need any follow-up
20  treatment.
21      MS. GOMEZ: Thank you, Your Honor.
22      THE COURT: You're welcome. Counsel,
23  we had also -- I'm sorry, we had indicated no
24  avoidable contact.

Page 30

1       MS. ASHTON: Correct.
2       THE COURT: So I'm going to add that
3   to the probation contract, no avoidable --
4       MR. DiGIULIO: Yes, that would be
5   fine. There is currently relationships with
6   family members that are employed by her, Your
7   Honor, but --
8       THE COURT: No, that's fine. It's
9   just personal interaction, if it can be
10  avoided.
11      THE CLERK: No avoidable contact,
12  Judge?
13      THE COURT: I'm sorry?
14      THE CLERK: No avoidable contact?
15      THE COURT: No avoidable -- Okay.
16  Thank you very much.
17      THE CLERK: Court will be in recess.
18
19          (Whereupon, the proceedings
20          were concluded.)
21
22
23
24

Page 31

CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS

I, Patricia A. Nelligan, a Notary

Public, in and for the Commonwealth of Massachusetts,

do hereby certify that the foregoing transcript

represents a complete, true and accurate copy of tape

recordings furnished to me in the above-entitled

matter, to the best of my knowledge, skill and

ability.

_____
PATRICIA A. NELLIGAN
Notary Public

My Commission Expires:
April 26, 2002

Page 29 - Page 31

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.
                                    CHELSEA DISTRICT COURT
                                    Civil Action No. 0014CV0031

ROSALIA DE GUZMAN,    Plaintiff    )
                                   )
            VS.                    )    MEMORANDUM DECISION
                                   )
MARY E. GILDEA GOMEZ,              )
                      Defendant    )

    This is an action for personal injuries arising from alleged assaults and batteries purportedly committed by Defendant Mary E. Gildea Gomez against Plaintiff Rosalia De Guzman on or about May 11 and May 13, 1999.

    Based on the credible and relevant evidence in the record, and reasonable inferences drawn therefrom, I find that:

    Without going into detail as to the myriad inconsistencies in Plaintiff's accounts of the alleged incidents, the Plaintiff's record of physical and psychological treatment before and after the alleged incidents, and the Plaintiff's false and inconsistent testimony as to her medical conditions and treatments, I find that Plaintiff is utterly and unequivocally incredible as a witness. On the evidence presented at trial it is more likely than not that the Plaintiff's accounts of the events of May 11 and 13, 1999 are all totally fabricated and bear no relation whatsoever to the truth.

    There was no assault and battery by the Defendant at any time alleged by the Plaintiff.

    Accordingly, judgment should enter for the Defendant.

                              _____
                              Timothy H. Gailey,
                              Presiding Justice

Dated: October 22, 2003

## CERTIFICATE OF SERVICE

I, Alison V. Douglass, hereby certify that on March 15, 2005, I caused a true copy of (1) Defendant's Motion to Vacate Admission to Sufficient Facts and for a New Trial; (2) Memorandum of Law in Support of Motion to Vacate Admission to Sufficient Facts and for a New Trial; and (3) Declaration of James M. DiGiulio, Esq., to be served by first class mail on the Middlesex County District Attorney's office.

Dated:  March 15, 2005

Alison V. Douglass

# EXHIBIT  S

*Law Offices of James M. DiGiulio, P.C.*
*Lakeside Office Park*
*599 North Avenue*
*Suite 7, Floor 2*
*Wakefield, MA 01880*

*Tel.*    *(781) 246-5100*                                    *Fax*    *(781) 246-1986*

May 4, 2005

Honorable George A. O'Toole, Jr.
United States District Court,
District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2300
Boston, MA 02110

RE:    *U.S. v. Carlos Gomez, Mary Gildea, and Lanco Scaffolding, Inc.*
       *Docket No. 05-CR-10022-GAO*

Dear Sir or Madam:

        I am an attorney admitted to practice law in the
Commonwealth of Massachusetts.  I represented Mary Gildea
Gomez in a criminal proceeding, Commonwealth v. Mary Gomez,
No. 9953CR001086 (Woburn District Court), in which Ms.
Gomez accepted a continuance without a finding ("CWOF")
rather than endure an emotionally charged criminal trial in
which the Commonwealth had stated that they would call her
very young daughter as a witness.  In a subsequent civil
suit regarding the same underlying facts and using a
preponderance standard, the court entered judgment for Ms.
Gomez, concluding that the allegations against her were
"totally fabricated and [bore] no relation whatsoever to
the truth."  De Guzman v. Gildea Gomez, No. 0014CV0031
(Chelsea District Court).  A true and accurate copy of the
Memorandum Decision dated October 22, 2003 is attached
hereto as Exhibit 1.  For these reasons, to the extent that
Ms. Gomez's plea in this prior matter will be considered by
the court in determining her sentence in the above-
captioned case, I respectfully request that the court
refrain from treating Ms. Gomez's criminal plea as a prior
sentence under § 4A1.1(d) of the Federal Sentencing

Guidelines, as she was actually innocent of the charges against her.

In <u>Commonwealth v. Mary Gomez</u>, Ms. Gomez was charged with one count of assault and batter and one count of indecent assault and battery, based on the now totally discredited allegations of her former housekeeper and child caretaker, Rosalia De Guzman (the "Complainant"), that Ms. Gomez grabbed her shirt, pushed her up against a wall and grabbed her cheeks and chest during a dispute over housekeeping in May 1999. The Complainant apparently filed a police report on the same day that she was fired by Ms. Gomez for odd and erratic behavior, just hours after she left Ms. Gomez's home. During the course of preparing for trial, I found troubling inconsistencies in the Complainant's accounts of the nature of the alleged altercation with Ms. Gomez. When I communicated this information to the police detectives who had arrested Ms. Gomez, they indicated that they also had doubts about the veracity of the Complainant's allegations. I also communicated this information to Donna Ashton, the Woburn Assistant District Attorney who prosecuted the case. However, the Commonwealth chose to proceed with the case.

On March 22, 2000, Ms. Gomez appeared in court ready to proceed to trial and defend her innocence against these unwarranted accusations. On the day of trial, the Commonwealth revealed for the first time that it planned to call Ms. Gomez's young daughter as a witness. This came as a complete shock to Ms. Gomez, as her daughter's name was not on the witness list, and because of the child's tender age. I informed the court that I objected to the Commonwealth calling Ms. Gomez's young daughter as a witness. However, the court indicated that it would address the issue of the child's competency when she was called to testify.

While Ms. Gomez maintained her innocence, she decided she did not want to go to trial on the charges, particularly in light of the Commonwealth's intent to call her young daughter as a witness. Ms. Gomez was anguished over the Commonwealth's decision to call her daughter to testify, and she made the decision to proceed with a CWOF despite the fact that I believed she had a strong defense and that she would have prevailed at trial.

Because I felt duty-bound not to allow my client to admit guilt for a crime she did not actually commit, and

because I was concerned that a guilty plea could have a *res judicata* effect on any subsequent civil case, the court agreed to allow Ms. Gomez to enter an Alford-type plea pursuant to the Supreme Court's decision in North Carolina v. Alford, 400 U.S. 25 (1970). Ms. Gomez was not required to admit to any of the alleged facts supporting the charges. Instead, she merely acknowledged that the facts alleged, if believed by a jury, would be sufficient to support a guilty verdict. Ms. Gomez steadfastly maintained her actual innocence throughout the plea colloquy. On Ms. Gomez's behalf, I submitted to the court a Tender of Plea or Admission and Waiver of Rights form dated March 22, 2000. Ms. Gomez checked neither "Plea of Guilty" nor "Admission of Facts Sufficient for a Finding of Guilty" on this form. The court then conducted an oral colloquy with Ms. Gomez and granted a CWOF in the case, noting that she was not admitting to any wrongdoing.

The Tender of Plea or Admission and Waiver of Rights form reflects that the court sentenced Ms. Gomez to 18 months of unsupervised probation, and required that she submit to a clinical evaluation and comply with any recommendations thereof. A court-ordered clinical evaluation concluded that Ms. Gomez required neither counseling nor any other treatment. Ms. Gomez subsequently successfully completed her probation.

A day or two after the criminal proceeding concluded, the Complainant brought a civil suit against Ms. Gomez in Massachusetts Superior Court, De Guzman v. Gildea Gomez, which was ultimately transferred to Chelsea District Court. I represented Ms. Gomez in the civil suit as well. During the deposition of the Complainant, she made a number of unfounded and bizarre allegations about Ms. Gomez and her husband, including the claim that they were having people follow her, threaten her, and bribe her not to proceed with the case.

For example, the Complainant claimed that she drove back and forth to Kittery, Maine three separate days each weekend for six weeks, where an unseen man would approach her from behind and give her directions to go to various locations to receive bribe money. She claimed she did this for six straight weeks despite never being paid any money.

She never produced any credible evidence that any of these things ever happened, and the counts relating to

these alleged threats were dismissed upon summary judgment.
There were also a number of material inconsistencies in the
Complainant's claims, particularly regarding her physical
injuries and the psychological conditions she suffered
from, which she maintained were the result of the alleged
assault by Ms. Gomez.  At the conclusion of the bench trial
in the civil matter, the court found in favor of Ms. Gomez,
concluding that "[t]here was no assault and battery by the
Defendant [Ms. Gomez] at any time alleged by the
[Complainant]."  Exhibit 1.  In his decision, Judge Gailey
stated that there were "myriad inconsistencies" in the
Complainant's accounts, and declared the Complainant to be
"utterly and unequivocally incredible as a witness."  Id.

     In sum, the criminal case against Ms. Gomez was based
upon the word of an unstable woman with a well-documented
history of psychological problems, clearly motivated by
economic gain, whose testimony was resoundingly rejected as
false by Judge Gailey, applying a lower standard of proof
than beyond a reasonable doubt.  The charges against Ms.
Gomez in the criminal case were entirely fabricated by the
Complainant.  During the plea hearing on March 22, 2000,
Ms. Gomez struggled, and for understandable reasons, with
even admitting that the government had sufficient facts.
Given the Commonwealth's intent to call her very young
child as a witness, it is clear that Ms. Gomez's plea was
tendered under duress.

     I have been advised by Ms. Gomez's attorneys that her
plea may be considered by this court in determining her
sentence in the above-captioned case, which would increase
her Criminal History Category from I to II.  Given the fact
that Ms. Gomez's innocence was made absolutely clear in the
civil suit, which was based upon the same facts as the
criminal proceeding, and the fact that Ms. Gomez entered
into the criminal plea only because of the threat that her
young child would be forced to testify in court, I
respectfully ask the court not to increase Ms. Gomez's
Criminal History Category on the basis of this plea.

                              Yours very truly,


                              James M. DiGiulio

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                              CHELSEA DISTRICT COURT
                                      Civil Action No. 0014CV0031


ROSALIA DE GUZMAN,     Plaintiff    )
                                    )
            VS.                     )    MEMORANDUM DECISION
                                    )
MARY E. GILDEA GOMEZ,               )
                    Defendant       )

     This is an action for personal injuries arising from alleged assaults and
batteries purportedly committed by Defendant Mary E. Gildea Gomez against
Plaintiff Rosalia De Guzman on or about May 11 and May 13, 1999.
     Based on the credible and relevant evidence in the record, and reasonable
inferences drawn therefrom, I find that:
     Without going into detail as to the myriad inconsistencies in Plaintiff's
accounts of the alleged incidents, the Plaintiff's record of physical and
psychological treatment before and after the alleged incidents, and the
Plaintiff's false and inconsistent testimony as to her medical conditions and
treatments, I find that Plaintiff is utterly and unequivocally incredible as a
witness. On the evidence presented at trial it is more likely than not that the
Plaintiff's accounts of the events of May 11 and 13, 1999 are all totally
fabricated and bear no relation whatsoever to the truth.
     There was no assault and battery by the Defendant at any time alleged by
the Plaintiff.
     Accordingly, judgment should enter for the Defendant.


                              _____
                              Timothy H. Gailey,
                              Presiding Justice

Dated: October 22, 2003

# EXHIBIT  T

# LAW OFFICES OF
# BARRY P. WILSON

BARRY P. WILSON
EDWARD N. HARRINGTON

MAILING ADDRESS:
240 COMMERCIAL STREET
SUITE 5A
BOSTON, MASSACHUSETTS 02109
617 248-8979
FAX 617 523-8700

May 2, 2005

Honorable George A. O'Toole, Jr.
United States District Court (Massachusetts)
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

Dear Judge O'Toole:

I am an attorney admitted to practice law in the
Commonwealth of Massachusetts. I had the pleasure of
representing Carlos Gomez in another legal matter in 1993-
1994. I have reviewed a document captioned "Prior Record",
which was produced by the United States Probation Office to
his current attorneys, Cooley Manion Jones LLP. My prior
representation of him relates to the assault charges on
that document dated 7/2/90 and 11/26/90.

Mr. Gomez retained me after he had been convicted of
two counts of assault in Commonwealth v. Carlos Gomez,
Middlesex Superior Court, Indictment Nos. 90-3414-14 and
sentenced to 7-10 years at MCI Cedar Junction, 3 years to
be served, the balance suspended. Fortunately, I was able
to vindicate him of this conviction by prevailing on a
Motion for New Trial before the trial court (Judge Bohn).
The Motion was granted because of the discovery of new
evidence which led Judge Bohn to conclude that the
testimony of the prosecution's key witness "was *false and
misleading* in a material respect" (italic added).
Throughout the ordeal, Mr. Gomez strenuously maintained his
innocence – the new evidence was consistent with his
version of the relevant events and totally inconsistent
with the key witness's. The Middlesex County District
Attorney's office then nolle prossed the matter, thereby
mercifully ending this terrible chapter of Mr. Gomez's
life.

Page 2


Unfortunately, Mr. Gomez was forced to serve almost **13** months in jail before the Motion for New Trial was allowed. Thus, though justice was ultimately served, he must have endured untold anguish during those 13 months.  I respectfully ask this Court to consider this, which is effectively a debt that Mr. Gomez "pre-paid" to society, in determining a sentence in the current matter.

Very truly yours,

Barry P. Wilson