UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) CRIMINAL NO. 5-10022 GAO |
| CARLOS GOMEZ and | ) |
| MARY GILDEA, | ) |
| | ) |
| defendants. | ) |

UNITED STATES' SENTENCING MEMORANDUM

In their memorandum to this Court and its manifold attachments, Defendants contend that their criminal conduct, which included defrauding the IRS, workers compensation insurers, and ERISA-protected health care and retirement plans, is somehow outside the heartland of the applicable sentencing guidelines, and that they should receive concomitantly reduced sentences. While they make a number of claims, the major themes of their submission are: first, that their offenses were the result of mere record-keeping lapses; second, that in pocketing roughly four and half million dollars through their fraud, they didn't really cause much "loss" to their victims; and third, that their jobs are too important for them go to prison. From these premises, defendants suggest that their criminal conduct lies outside the heartland of the applicable sentencing guidelines, warranting a downward departure (or deviation under Booker) so as to eliminate all term of imprisonment. As discussed below, defendants' claims do not hold water.

1. Defendants' Frauds Reflect Planned, Sustained and Deliberate Conduct.

Defendant suggest that they have committed mere record-keeping offenses, and moreover, that their lapse in record-keeping was simply a by-product of their altruistic desire to avoid disclosing that most of the employees of their company were illegal immigrants. See, e.g.,

Defendants' Sentencing Memorandum ("Def. Mem.") at 8 ("Mr. Gomez was faced with a dilemma . . . he chose to help his workers and their families."). Indeed, defendants go so far as to assert that "[t]his is one of those rare cases where the offenses were committed in the service of a greater good, to provide decent wages to men willing to put in hard and dangerous work to support their families." Defendant's Sentencing Memorandum at 10.

Defendants' self-serving description of their offense conduct does more than gloss over the fact that they pocketed millions of dollars from their crimes, it also mis-represents what they actually did. They portray their offenses as simple omissions – an ongoing failure to report all the workers on their payroll. Indeed, their sentencing memorandum suggests that these mere omissions were simply perpetuated by the press of circumstances and were somehow difficult to correct. See, .e.g., Defendants' Sentencing Mem. at 11 ("If she suddenly reported all the workers actually on the payroll, it would expose those employees who were without green cards . . ..").

In actuality, defendants' fraud was executed with a variety of different falsehoods, neatly tailored to maximize the defendants' criminal advantage. Thus, while tax authorities were given one set of (false) payroll figures, workers compensation insurers were given another (reflecting lower payroll figures than the already false figures that had been provided to the tax authorities). The ERISA-protected pension and health funds, in turn, were given still other, utterly fraudulent, reports. By this ruse, workers compensation insurers were provided wholly fictitious numbers, together with fabricated "copies" of tax returns that showed significantly lower payroll numbers than the genuine (albeit also false) tax returns that were filed with tax authorities. In reporting workers' hours to the union retirement and health funds, the defendants did not just omit certain

2

employees, they carefully under-reported the hours worked by others, showing just enough hours per week to qualify the workers for their benefits, while avoiding paying their fair share of the costs of those benefits. Such under-reporting of hours was in no way a product of any perceived need to shield illegal aliens from detection; it was theft, pure and simple.

As for the defendants' protestations that it was somehow difficult to correct their falsehoods once they began, the actual history of their offenses reflects precisely the opposite. Only by dint of assiduous effort were they able to perpetuate their scheme, which involved telling different lies to different victims, and creating forged documents to support each separate version.

The defendants have submitted to this Court a substantial compendium of testimonials by individuals who speak to their character for generosity. But defendants' actions speak even louder to their character for dishonesty and greed. Maintaining fraudulent deceptions of the scale and complexity at issue in this case does not happen by accident. The defendants had to be, and were, punctilious in their record keeping, carefully labeling and filing the various false and forged documents that they supplied to the various auditors and officials with whom they dealt. See PSR §40. When it came to the welfare funds, defendants did not simply neglect to report their workers to the ERISA plans, they carefully "gamed" the system to enable those workers whose names were disclosed to obtain benefits, while paying only a fraction of the contributions they actually owed.

Most telling, however, is the defendants' response to the uncovering of their fraud. Even after an auditor from Liberty Mutual uncovered discrepancies that pointed to undisclosed payroll, the defendants persisted in their lies and dissembling. First they lied about the role of

the undisclosed worker whom the auditor had noted as suffering an on-the-job injury. See PSR ¶¶21-22. Then they lied about the location of their payroll records, deflecting attention toward their tax preparer. PSR ¶¶23-25 & 30. When that ruse fell through, they denied the existence of the ledgers showing their cash payments to workers. PSR 32-34. And finally, when confronted with the discovery of their fraud, on October 31, 2003, Gildea "came clean" and provided a "full" spreadsheet purporting to reflect Lanco's entire under-the-table payroll. PSR ¶¶38. As it turned out, however, even this last disclosure was a lie. Defendants had doctored the records that were turned over, omitting approximately 8 or 9 employees, whose existence was ultimately discovered only in a review of documents seized by search warrant. See PSR ¶¶ 39.

There was, in short, nothing casual, coincidental, unavoidable or negligent about the fraud in this case. Nor was there anything aberrant or out of character. Defendants set out to defraud, they concocted a multitude of forged and fabricated documents to support their fraudulent representations, and they persisted in their deceptions even as the truth came out.

  2. <u>Defendants Gained Millions, and their Victims Suffered Corresponding Losses.</u>

The defendants' crimes consisted of fraudulently avoiding some $4.7 million dollars in business expenses of the kind that legitimate businesses face as a part of their ordinary operations. The stipulated loss figure upon which the guideline calculation rests accounts <u>only</u> for the defendants' most direct profit from their fraud, the payments that they evaded through their false representations.

The parties' agreed-upon calculation of loss tends to <u>under</u>-count the harm caused by their offenses. As the PSR noted, loss calculation does not account for any of the losses to Massachusetts' unemployment insurance fund or the Masschusetts Department of Revenue due

4

to the concealment of Lanco's true payroll. PSR ¶45. Moreover, the loss calculation does not include any of the losses suffered by federal and state <u>income</u> tax authorities due to the concealment of millions of dollars in Lanco's payroll. Undoubtedly, the workers whom the defendants paid under-the-table did not declare their incomes or pay any taxes to federal or state authorities, but while the defendants may have profited indirectly (through the willingness of illegal immigrants to be paid less due to the fact that they have no tax obligations), no attempt has been made to factor this income tax evasion into the loss calculation. Nor does the loss calculation take into account the gains that the defendants garnered by paying sub-union wages to their workers, while simultaneously holding themselves out as a union shop and, on that basis, garnering contracts for "prevailing wage" projects funded by state or federal government entities.

While the United States acknowledges that Defendants' crimes arose from their operation of a legitimate business enterprise, this neither justifies nor mitigates their criminal conduct. There is nothing unusual, let alone extraordinary, about the circumstance that the crimes at issue here – insurance fraud, ERISA fraud and tax fraud – arose from the operations of a legitimate business. On the contrary this is precisely the setting in which such crimes occur. Nor is it unusual that the victims of such frauds were institutions, rather than individuals.

Defendants' suggest that the organizations that were the victims of their frauds did not suffer losses. But they conveniently elide the nature of the payments that were evaded. The fact is that the defendants put millions of dollars in their own pockets by evading their fair share of the costs of providing for the welfare of their workers, such as employment taxes for cover

Social Security and Medicare, workers compensation insurance, health care and pensions. These are expenses that all businesses in their industry are required to bear.

ERISA contributions, like workers compensation insurance premiums and even tax obligations, reflect long-term, group obligations. In submitting their "expert" analysis of the losses in this case, defendants make much of a wholly unremarkable fact: that the impact of fraud and free-riding is muted, in the short-term, by the effect of pooling large numbers of workers and employers who contribute to those systems. What defendant ignore, however, is that over the not-very-long run the costs of such fraud are borne by everyone else in their industry, or (for taxes) our society. Everyone else pays a greater share to make up for the fees evaded by the free-riders.

Defendants do not suggest that the employment tax fraud in this case was in anyway mitigated by the fact that the general fund of the Social Security program is currently in surplus. Such a claim would be laughable. But it is no more absurd than defendants' suggestion that their other frauds were somehow mitigated by the fact that the Insurance Companies and employee welfare plans suffered no immediate "loss," because there were no catastrophic injuries in their company during the years at issue.

Throughout their memorandum, the defendants offer a topsy-turvy view of modern economic life. Thus, they describe as an "anomaly" (Defendants' Sentencing Memorandum at 11) the notion that wages paid to workers would reflect the costs of insuring against on-the-job injury (as required by law) as well as the costs associated with ERISA-based funds for healthcare and retirement, and the costs of the social security and employment taxes. But these are costs that <u>everyone</u> in our society shares, they are the price of admission for participating in the

economic life of our nation. In defendants' view, it seems, the putative norm is to illegally hire undocumented immigrants and pay them under the table, thus sharing in the prosperity of our modern American economy while, at the same time, reaping the competitive advantage of bearing lower operating costs than those of competitors who obey the law.

Defendants wax grandiloquent about the ties of kinship and solidarity that supposedly underlay their practice of hiring illegal aliens and paying them under the table. As a matter of law, however, what they are describing is <u>criminal</u> conduct. It is a felony to encourage or induce an alien to come to, enter, or reside in the United States in violation of law. 8 U.S.C. §1324(a)(1)(A)(iv). It is a misdemeanor to engage in a pattern of knowingly hiring illegal aliens. 8 U.S.C. §§ 1324a, 1324a(f). Without gainsaying the sincerity of the defendants' desire to provide jobs to relatives and fellow immigrants, it is impossible to miss the fact that – in so doing – they were also able to avoid millions of dollars in ordinary employment costs by avoiding the expenses of associated with paying for the accident insurance, healthcare, retirement and social security costs that our society requires employers to provide to workers.

      a.    <u>Insurance Premium Fraud Loss</u>

In particular, Defendants contend that, because they had a good accident record during the period of their fraud scheme, the nearly $2 million in insurance premiums they evaded should not be treated as "losses" for purposes of weighing the seriousness of their offenses. Def. Mem. at 17-20. Defendants presuppose that they merely caused insurance companies to forgo "an additional $1,983,935 in profits off Lanco." Def. Mem. at 20. In so arguing, they ignore the fact that, in the field of mandatory workers compensation insurance, insurers' profits are

prescribed by a statutory rate-setting system, in which rates are readjusted on an annual basis to reflect the claims/loss actual experience in each industry.

By focusing on the putative lack of any "out-of-pocket" loss, defendants ignore that, in critical respects, Workers Compensation Insurance operates as system of taxation and as a public welfare system. The insurance companies did not choose to do business with Lanco, they were <u>required</u> to provide coverage to Lanco when Lanco was assigned to them through the "pool" operated by the state-chartered Workers Compensation Rating and Inspection Bureau ("WCRIB"). Nor did the insurance companies negotiate the premiums charged to Lanco, those rates were set – based on annually updated actuarial analyses of each job classification – by the WCRIB and ultimately the Insurance Commissioner. And unlike liability insurance, where fraud by an insured may void the insurer's liability, the insurance companies were responsible for insuring all workers employed by Lanco, whether disclosed or not.[1] See <u>United States v. Pimental</u>, 380 F.3d 575, 584-85 (1st Cir. 2004). Notwithstanding the defendants' attempt to characterize the insurance companies' losses as mere "expectancy" damages, the simple fact is that the defendants were fraudulently evading insurance premiums imposed – and quantified – by Massachusetts law. See <u>Pimental</u>, 380 F.3d at 585 (Jury could conclude that defendant "was attempting to dishonestly minimize the insurance premiums to the company that he should have been paying <u>under Massachusetts law</u>.") (emphasis added).

---

[1] This principle is vividly illustrated in this very case. In dealing with their insurers, defendants' carefully orchestrated a charade to create the appearance that Lanco was a small company, primarily involved in leasing equipment to construction sites, with few employees. The first hint that something was wrong with the picture came when an insurance auditor noted that an-undisclosed Lanco employee named Johnny Ortiz had applied for compensation for an on-the-job injury.

In the regulatory statutory framework that governs workers compensation insurance, the costs of Lanco's fraud were ultimately borne by its competitors in the scaffolding industry in Massachusett. A key component in setting the rates for insurance in any particular job classification, such as scaffolding workers, is the ratio of the costs of accidents among all scaffolding workers in Massachusetts to the wages paid to all scaffolding workers in Massachusetts. Fraudulently understating the amount of payroll paid to scaffolding workers skews the statistics upon which the insurance rates are based. If a significant number of work hours are hidden while the rate of accidents remains constant, the data reflect an artificially higher rate of accidents per work hour, thereby inflating the insurance rates for all who employ scaffolding workers.

In this context, it makes no more sense to argue that, because an employer had a good safety record, there was no "loss" to its workers compensation insurer than it would for a tax payer to argue that, because he did not collect social security benefits or other government payments in any particular year, there is no "loss" from a tax evasion. In the area of workers compensation insurance a good safety record – determined actuarially – yields a lower rate under the formulas used to calculate premiums. This component of the rate determination is known as the experience "modification." For each of the policy years at issue in this case, Lanco's insurance premium calculation reflected an experience modification indicative of its safety record relative to others in the scaffolding industry. Undermining Defendant's protestations that Lanco has an "extraordinary safety history," (Def. Mem. at 18), the records show that two policy years (March 1996-March 1997) and (March 1997-March 1998) reflect surcharges, based on <u>below</u>-average accident history. During the later years that are at issue in this case, (from March

1998 forward), Lanco was given credits for an above average safety history. An above-average safety record does indeed merit a reduction in a company's insurance premiums; it does not provide a license to defraud the insurer.

In an industry such as construction scaffolding serious on-the-job accidents occur intermittently, but they can often result in catastrophic injuries (falls from elevation commonly result in paralysis or death). It is unsurprising, then, that a particular employer in the industry may have an excellent safety record for many years in a row. But the point of the mandatory workers compensation system is to be sure that there will be coverage for the injured worker when serious accidents occur and to be sure that the cost of providing such coverage is borne proportionally by all participants in the particular industry. It is, of course, fortunate that Lanco has had a good safety record in recent years, but that fact has little bearing on the measurement of the loss. Indeed, the nature of defendants' crime would be no different if – in one of the years in question – there had been a serious injury -- that's what insurance is for.

Defendants cite Judge Gertner's sentencing decision in United States v. Pimental, 367 F.Supp.2d 143, 155 (D. Mass. 2005), to support their contention that there was no "loss" to the insurers in this case. There are two responses. First, in the United States' view, the analysis in Pimental is flawed. Second, this case is factually distinct; the critical facts in Pimental case – upon which the court relied in finding "no loss" – are not present here.

It is the United States' view the analysis in the Pimental re-sentencing (United States v. Pimental, 367 F.Supp.2d 143, 155 (D. Mass. 2005)) was flawed because it failed to take into consideration the fact that, in mandatory workers compensation insurance situations, neither the fact of coverage, the scope and extent of coverage, nor premiums that may be charged are

subject to negotiation.  Instead, the opinion seems to be premised on the notion that the insurance contract at issue was a simple private bargain.  The decision by the First Circuit in <u>Pimental</u>, which reversed the district court's earlier entry of a judgment of acquittal, makes clear that this regulatory framework informs the entire fraud scheme:

> Here, there was more than sufficient evidence for the jury to conclude that Pimental lied about the nature of his company's work in order to pay cheaper premiums on his workers' compensation insurance. The jury easily could have concluded that Pimental was attempting to dishonestly minimize the insurance premiums to the company that he should have been paying under Massachusetts law.

<u>United States v. Pimental</u>, 380 F.3d 575, 585 (1st Cir. 2004).

Apart from any analytical flaws in the <u>Pimental</u> re-sentencing memorandum, there is a critical <u>factual</u> distinction between this case and <u>Pimental</u>, which defendants neglect to mention.  The key finding of fact upon which Judge Gertner's sentencing decision in <u>Pimental</u> rested was the court's conclusion that "it is reasonable to believe that Pimental paid <u>higher</u> premiums than he should have, had he properly characterized his tasks."  <u>Pimental</u>, 367 F.Supp.2d at 155 (emphasis added).  In light of this finding of fact – that the defendants' misrepresentations did not actually result in any evasion of premiums – there would indeed be no loss, or "intended loss" as the court used the term in <u>Pimental</u>.  In <u>Pimental</u> the court was dealing with a case that was equivalent to a tax case in which a false entry on a tax return had no impact on the ultimate calculation of tax.  In the case at bar, by contrast, there is no such difficulty in calculating the precise amount of the premiums evaded.  Indeed, the parties have agreed on this figure, which is slightly below $2,000,000, for the insurance fraud alone.  That is a far cry from the figure in <u>Pimental</u>, which was zero.

Defendants also cite Judge Young's decision in United States v. Tobin, 28 F. Supp. 2d 674 (D. Mass. 1998), which does not support their position. In Tobin, Judge Young addressed only the question of restitution, under 18 U.S.C. §3663. The Tobin decision explicitly did not address the question of calculating loss under the Sentencing Guidelines. See Tobin, 28 F.Supp.2d at 676 (citing United States v. Messner, 107 F.3d 1448, 1455 (10th Cir.1997), which contrasts the calculation of restitution with the determination of loss under the Sentencing Guidelines, which permit the use of "actual or intended loss"). Noting that the question was "a close one," the court in Tobin ruled that an insurer's right to collect insurance premiums was a mere expectancy, and not the kind of property right that would merit restitution under Section 3663. Tobin, 28 F.Supp.2d at 677. In reaching that conclusion, the Tobin decision failed to note the critical distinction between ordinary liability insurance, which is sold in a voluntary market, and workers compensation insurance. The key assumption upon which the Tobin decision depends is that, "Under both federal law and Massachusetts law, the conventional remedy of an insurer for fraudulent misrepresentations by an insured is recission of the contract." 28 F.Supp.2d at 677 n.3. But in the context of workers compensation insurance this assumption is simply incorrect. Under the policy imperatives that govern the workers compensation system, an injured worker may not be denied coverage, even if his/her employer lied to the insurance carrier. See Pimental, 380 F.3d at 584-85. Recission is not an option.

    b.    ERISA Fraud Loss

The audacity of defendants' suggestion that their crimes consisted of mere omissions of record keeping comes into sharp relief when one examines their contentions about the loss from the ERISA fraud. They argue, of course, that the losses to the ERISA benefit plans are somehow

overstated in the guideline calculation. This argument is premised on the notion that they should be held responsible only for the loss attributable to under-reporting the wages of workers whom they <u>did</u> disclose to the ERISA plans. <u>See</u> Def. Mem. at 20-21. In other words, they ask the Court to <u>ignore</u> the entirety of the loss attributable to their concealment of certain employees altogether, and to consider only the losses attributable to their under-reporting of the work hours of those few employees whom they did disclose.

It is hardly surprising that the ERISA plans and unions are taking the position that they bear no responsibility for non-members who were never disclosed to them and for whom the plans have received no contributions. <u>See</u> Def. Mem. at 20-21. But this does nothing to alter the fact that the funds, as a whole, were directly harmed in precisely the amounts calculated. Nor does it alter the fact that defendants carefully manipulated their reporting of employees' work hours by reporting the bare minimum required to obtain health and pension benefits – thus reaping the benefits of the ERISA programs while maximizing the economic harm to them.

3.  <u>Defendants' Job Responsibilities and Good Works Do Not Take This Case Out of the Heartland</u>

Those who suffer most from criminal conduct are usually – first – the victims and – second – innocent persons who are close to the criminals. This latter harm is commonly a result of, or compounded by, the imposition of punishment. As unfortunate as this may be, it is hardly extraordinary.

From a legal/doctrinal perspective, harm to business interests represents the better "bet" in a defendant's plea for lenity at sentencing. The law of departures based upon economic harm to third-parties, epitomized in this circuit by <u>United States v. Olbres</u>, 99 F.3d 28, 26 (1st Cir. 1996), appears more hospitable to defendants than the law of departures based upon harm to

13

family members and young children.  Where family circumstances are involved, the First Circuit has ruled that "[a] downward departure for extraordinary family circumstances may be appropriate where the care provided by the defendant is 'irreplaceable or otherwise extraordinary.'"  United States v. Roselli, 366 F.3d 58, 68 (1st Cir. 2004) (quoting United States v. Pereira, 272 F.3d 76, 82 (1st Cir. 2001)).

At best, this state of the law appears to reflect the crude mathematics of common-law rule making.  There are tens of thousands of federal criminal defendants with young children, and so the law's recognition of what factors make a case "extraordinary" is highly nuanced.  By contrast, there are far fewer cases that have addressed the question of what makes a business-owner so "extraordinary" as to warrant a downward departure.  A somewhat cynical perspective might suggest that the mathematical effect is cruder: because there are so many criminal defendants with young children, carving out a broad exception to the guidelines for them would eviscerate the criminal justice system's program of deterring and punishing crime.  By contrast, the occasional departure for business owners is allowed because it is less likely to wreck havoc on the system, or – at any rate – will be less visible.  Still more cynical would be the suggestion that departures based on business responsibilities reflect a sub rosa resurrection of the very inequities that gave birth to the Sentencing Guidelines in the first instance, the reluctance of judges to impose significant terms of imprisonment on those who commit economic crimes.  Cf. United States v. Thurston, 358 F.3d 51, 80 (1st Cir. 2004) ("One of the goals of the entire guidelines regime was to minimize discrepancies in the treatment of 'white collar' and 'blue collar' crimes.").  Indeed, the line is perilously thin between the permissible departure sanctioned under Olbres (in effect, "the defendant's job is too important to send him/her to

prison") and the wholly impermissible notion that a defendant's wealth and status insulate him/her from responsibility for his/her crimes."

The United States suggests that, whatever may be the state of the law with respect to departures, there is ample room in the post-Booker sentencing regime to re-focus the discussion. To put it bluntly, the weighing of values implicit in the current state of "departure" law is indefensible. While there are exceptions, contemporary notions of moral responsibility reflect the primacy of the obligation to care for and raise one's children. It is difficult to imagine that many individuals in our society would choose, if told they could not do both, to stay with their job rather than to provide and care for their young children. It makes no sense, therefore, to say that having young children does not get you a "get-out-of-jail-free" card, but that having important job responsibilities does. The unextraordinary reality is that criminal defendants are human beings with a wide range of duties, obligations and responsibilities and that incarceration disrupts their performance of those duties.

Leaving aside such broad philosophical considerations, the factual premises of defendant's submission are dubious on their face. The description of Mary Gildea's role as an office-manager includes nothing to suggest that her duties could not be performed by someone hired for that purpose; she appears to perform the kind of general office duties common to medium-sized businesses. See Def. Mem. at 15. Indeed, the administration of Lanco's business office will be considerably simplified if, going forward, the company obeys the law. Preparing multiple sets of "books" and forging facially believable tax records is laborious and time-consuming work. It is much faster and easier to make one set of truthful entries into an automated accounting program with automatic check writing functions (or even to use an outside

payroll service), than to calculate by hand a company's cash payroll and then to accumulate sufficient currency to make the payments each week. While Carlos Gomez's duties are more difficult to evaluate, it must be noted that, in recent years, Mr. Gomez has <u>not</u> been the primary estimator or on-site foreman for Lanco's construction work, Kendall Moran has handled those functions.

While there is plenty of reason to believe that Lanco could not survive without <u>someone</u> doing the jobs that the defendants do, the evidence is thin indeed to suggest that Lanco could not get by with anyone other than the defendants doing those jobs.

As for Defendants' child-rearing obligations, there is nothing to suggest that this case approaches the threshold for a finding of "extraordinary" circumstances. Moreover, the United States' agreement to accede to a request for some kind of staggering in the defendants' prison terms seems adequate to address the point.

Finally, defendants' submissions are replete with testimonials to their generosity to employees, family members and to their children's private school. Such good works are indeed commendable, but they are hardly "extraordinary." It cannot seriously be suggested that the defendants gave away the $4,770,099 they pocketed by their offenses, let alone any portion of the otherwise legitimate profits they garnered by virtue of their competitive advantage in being able to underbid those who feel constrained to follow this country's labor laws. Generosity such as defendants' is properly to be rewarded – as the various testimonials reflect that it has been – by the gratitude of its beneficiaries, not by exempting the givers from the consequences of their crimes. See generally <u>Thurston</u>, 358 F.3d at 80 ("Those who donate large sums because they can should not gain an advantage over those who do not make such donations because they

cannot."). Given that their crime consisted of obtaining millions of dollars by fraud, defendants' focus on their generosity amounts to little more than a plea for mercy because they made good use of their ill-gotten gains.

## CONCLUSION

The sentencing guidelines in this case point to very substantial sentences. Defendants have done much to emphasize the human costs associated with such sentences. They have not, however, pointed to anything that would make their cases "extraordinary." To put it another way, the guidelines are high because the crimes at issue here were committed deliberately, were motivated by greed, were serious, and were extremely lucrative. The guidelines point to terms of incarceration that fulfill the directive of Section 3553 to impose sentences that are sufficient, but not greater than necessary, to reflect the seriousness of the offenses, to impose just punishment and to deter such conduct by others.

                            Respectfully submitted,

                            MICHAEL J. SULLIVAN
                            United States Attorney

dated: August 26, 2005

                     By: */s/Paul G. Levenson*
                          PAUL G. LEVENSON
                          Assistant U.S. Attorney
                          John Joseph Moakley United States Courthouse
                          1 Courthouse Way, Suite 9200
                          Boston, MA 02210
                          (617) 748-3147